## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ENDOCRINE SOCIETY,<br>2055 L Street NW, Suite 600<br>Washington, DC 20036,<br><br>    *Plaintiff,*<br><br> v.<br><br>FEDERAL TRADE COMMISSION,<br>600 Pennsylvania Avenue, NW<br>Washington, DC 20580;<br><br>ANDREW N. FERGUSON, in his official<br>capacity as CHAIRMAN OF THE FEDERAL<br>TRADE COMMISSION,<br>600 Pennsylvania Avenue, NW<br>Washington, DC 20580;<br><br>MARK R. MEADOR, in his official capacity<br>as COMMISSIONER OF THE FEDERAL<br>TRADE COMMISSION,<br>600 Pennsylvania Avenue, NW<br>Washington, DC 20580; and<br><br>JOHN DOES 1–3, in their official capacities as<br>COMMISSIONERS OF THE FEDERAL TRADE<br>COMMISSION,<br>600 Pennsylvania Avenue, NW<br>Washington, DC 20580,<br><br>    *Defendants.* | Case No. 1:26-cv-00512<br><br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF**<br><br><br>**(RULE 57 SPEEDY HEARING<br>REQUEST)** |

Plaintiff the Endocrine Society brings this complaint for declaratory and injunctive relief against Defendants Federal Trade Commission, Andrew N. Ferguson, in his official capacity as Chairman of the Federal Trade Commission, Mark R. Meador, in his official capacity as Commissioner of the Federal Trade Commission, and John Does 1–3, in their official capacities as Commissioners of the Federal Trade Commission (collectively, "FTC" or "Defendants"). In support thereof, the Endocrine Society states as follows:

## SUMMARY OF THE CASE

1.      This case presents a question of profound constitutional and public significance: whether a nonprofit organization of scientific and medical professionals can speak freely and openly about a developing area of medical science.  The answer to that question should be obvious.  The First Amendment safeguards that constitutional right, and it prohibits the government from using its investigative and enforcement powers to silence speech, settle scientific debates, or demand adherence to its preferred views.  Allowing the FTC to breach this constitutional guarantee and censor views with which it disagrees would have grave consequences for both scientific inquiry and public health.  This Court should enjoin the FTC from doing so.

2.      The Endocrine Society is a 110-year-old charitable, non-profit organization dedicated to advancing research and education in the highly specialized area of hormone science.  Historically, its willingness to share its findings and expertise on issues related to endocrinology has helped ensure that the nation's leading public health officials are able to make policy decisions that protect and promote public health.  The Endocrine Society plays a critical role in the public health arena, but it is a small organization.  Although its 18,000 members make it the world's largest organization devoted to the study of endocrinology, it has only 70 employees.  As a result, its members devote countless volunteer hours to the Endocrine Society's activities such as peer review of articles for its multiple academic journals, and planning and presenting educational sessions addressing a broad range of hormone-related conditions.  These include conditions that impact millions, such as diabetes, obesity, and hormone-related cancers as well as conditions affecting a small percentage of the population, like gender dysphoria.

3.      For the last century, the Endocrine Society has advanced scientific breakthroughs and improved human health through the study of endocrinology.  The organization's journals have

2

been the fora for foundational advances in the understanding of endocrine science and clinical endocrinology.  The Endocrine Society also organizes and hosts educational programs devoted to endocrinology, publishes free clinical practice guidelines related to endocrine disorders, and supports clinicians, researchers, scientists, and students of endocrinology in every stage of their professional lives.

4.    Despite its dedicated focus on science and clinical endocrinology, the Endocrine Society is among those organizations that have been described by some members of the Trump Administration as "demonic forces" "committing war on kids" in the United States.[1]  The organization has been asked by the office of a Cabinet Secretary to retract or alter clinical practice guidelines, it has had pages of government-sanctioned reports devoted to disparaging its processes and analysis, and it has been identified by name in proposed rules, statements, and a workshop led by a federal agency as promoting harmful medicine that lacks scientific integrity.

5.    These relentless attacks have now escalated.  The Endocrine Society is the subject of a retaliatory, unjustifiably broad, and surprisingly aggressive investigation by the Federal Trade Commission—an agency without jurisdiction to regulate the noncommercial speech of nonprofit medical organizations.  The aim of the FTC's campaign is apparent through its actions and statements: to silence the Endocrine Society, deprive it of members, and drain it financially.

6.    This Administration has trained its sights on the Endocrine Society because it views the organization as guilty of promoting "gender ideology," a pejorative term the Administration uses to describe the view that certain medical treatments can be appropriate, safe, and effective in treating gender dysphoria and gender incongruence.  These medical treatments, which—along with

---

[1] Joe Kinsey, *White House MAHA Official Destroys Youth Transgender Treatments as Nike Continues to Dodge Study Questions*, OutKick (Apr. 25, 2025), https://www.outkick.com/analysis/white-house-maha-official-rips-youth-transgender-treatments-nike-continues-dodge-study-questions [https://perma.cc/7CJM-Q7PX].

positive mental health care and support—seek to align an individual's outward presentation of sex with their gender identity, are known as gender affirming care. The Administration has made it a priority to stamp out "gender ideology" in every way possible, even enshrining that objective in the Federal Register. The Administration's attacks on the Endocrine Society are part of this campaign and are particularly focused on the Endocrine Society's clinical practice guidelines for gender dysphoria and gender incongruence, which were published in 2017.[2]

7.    The Endocrine Society is not a political, ideological, or commercial organization. It does not treat patients or market, advertise, or sell any medical products or treatments. It has no financial or ideological interest in any particular treatment being determined to be appropriate for any given patient with gender dysphoria. And its public statements about gender affirming care are based on scientific evidence and reflect medical opinion. The Endocrine Society's clinical practice guidelines for gender dysphoria follow the same levels of process and rigor required of all of its guidelines, such as those related to pituitary incidentaloma,[3] hyperprolactinemia,[4] and osteoporosis.[5] And the approach taken in all of the Endocrine Society's guidelines reflects a guiding principle underpinning all of health care: namely, allowing qualified medical providers to

[2] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869 (Sept. 13, 2017), https://academic.oup.com/jcem/article/102/11/3869/4157558 [https://perma.cc/9CSM-2KXC].

[3] Pamela U. Freda et al., *Pituitary Incidentaloma: An Endocrine Society Clinical Practice Guideline*, 96 J. Clin. Endocrinol. & Metab. 894 (2011), https://www.endocrine.org/clinical-practice-guidelines/pituitary-incidentaloma [https://perma.cc/P8VH-4NPY].

[4] Shlomo Melmed et al., *Diagnosis and Treatment of Hyperprolactinemia: An Endocrine Society Clinical Practice Guideline*, 96 J. Clin. Endocrinol. & Metab. 273 (Feb. 2011), https://www.endocrine.org/clinical-practice-guidelines/hyperprolactinemia [https://perma.cc/VJT9-ANUM].

[5] Richard Eastell et al., *Pharmacological Management of Osteoporosis in Postmenopausal Women: An Endocrine Society Clinical Practice Guideline*, 104 J. Clin. Endocrinol. & Metab. 1595 (Mar. 2019), https://www.endocrine.org/clinical-practice-guidelines/osteoporosis-in-postmenopausal-women [https://perma.cc/G8X9-5MUN].

support patients and their families in making informed decisions that are supported by science and align with their medical needs, health goals, and personal values.

8. Nonetheless, the Administration's attacks on "gender ideology" have placed the Endocrine Society repeatedly in its crosshairs. The Administration has produced a study that refers to the Endocrine Society and its clinical practice guidelines on gender dysphoria almost 100 times, criticizes those guidelines and those professional medical societies who endorse them as "not trustworthy," and disparages the role that nonprofit medical organizations like the Endocrine Society play in influencing the "healthcare landscape."[6] Executive orders refer to the science underlying the Endocrine Society's publications as "[j]unk [s]cience" that "lacks scientific integrity" and characterize the scientific and medical consensus that the Endocrine Society supports as "anti-American, subversive, harmful, and false."

9. Now, the FTC has moved to advance this aspect of the Administration's agenda. It is doing so by exercising its investigatory powers to police and punish the Endocrine Society's speech that the Administration disfavors—even though that speech has no relationship to the agency's mandate, even though that speech reflects pure scientific opinion and not "ideology," and even though the Endocrine Society falls far outside the ambit of the FTC's regulatory authority.

10. On January 20, 2026, the FTC issued a Civil Investigative Demand ("CID") to the Endocrine Society. The CID focuses on noncommercial speech on a topic of public concern expressing a viewpoint that the Administration overtly disapproves. In doing so, it seeks to punish the Endocrine Society for speaking, to deter it from doing so again, and to force the Endocrine Society to conform to the Trump Administration's preferred view.

---

[6] U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* 217, (Nov. 19, 2025), https://opa.hhs.gov/sites/default/files/2025-11/gender-dysphoria-report.pdf [https://perma.cc/UCW2-R8MC].

11.     Defendants are free to disagree with the Endocrine Society's statements.  But they cannot misuse agency authority to punish or censor the Endocrine Society based on its viewpoint or to drain the Endocrine Society of its members, associates, and resources.  Nor can they launch punitive investigations in an attempt to cut off scientific inquiry and debate.  The First Amendment of the Constitution prohibits this unlawful conduct.

12.     This matter lies at the core of the First Amendment.  It concerns the open exchange of scientific knowledge and expertise on a matter of profound public concern—it is therefore the form of expression that the Constitution most strongly protects.   Permitting retaliation or censorship in these circumstances would endanger the ability of organizations to share information and opinion on any issue, be that vaccine safety and efficacy, environmental health risks, emerging infectious diseases, or gender dysphoria.   The resulting silence would not only undermine constitutional freedoms, but would deprive public health officials, medical professionals, and the public of information to help inform decisions, ultimately harming the public's health and welfare.

13.     This Court should immediately enjoin Defendants from burdening the Endocrine Society's constitutional rights.

## **PARTIES**

14.     Plaintiff the Endocrine Society is a 501(c)(3) charitable, non-profit organization dedicated to accelerating scientific breakthroughs in the field of endocrinology and improving human health.  The Endocrine Society's principal place of business is in Washington, D.C.

15.     Defendant Andrew N. Ferguson is the Chairman of the FTC and one of the five Commissioners in charge of the agency.  His business address is in Washington, D.C.  Chairman Ferguson is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein.  He is being sued in his official capacity.

16.     Defendant Mark R. Meador is a Commissioner of the FTC.  His business address is in Washington, D.C.  Commissioner Meador is responsible for overseeing the FTC's activities, including investigations such as the one complained of herein.  He is being sued in his official capacity.

17.     Defendant John Doe 1 is the third Commissioner of the FTC and is the individual serving out the unexpired term of Melissa Ann Holyoak.  On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein.  They are being sued in their official capacity

18.     Defendant John Doe 2 is the fourth Commissioner of the FTC and is the individual serving out the unexpired term of Rebecca Kelly Slaughter (who President Trump fired on March 18, 2025).  On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein.  They are being sued in their official capacity.

19.     Defendant John Doe 3 is the fifth Commissioner of the FTC and is the individual serving out the unexpired term of Alvaro Bedoya (who President Trump fired on March 18, 2025, and who resigned his position on June 9, 2025).  On information and belief, their business address is in Washington, D.C., and they are also responsible for overseeing the FTC's activities, including investigations such as the one complained of herein.  They are being sued in their official capacity.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  The Endocrine Society's claims arise under the First Amendment to the U.S. Constitution.

21.     This Court has authority to grant Plaintiff declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the All Writs Act, 28 U.S.C. § 1651, Federal Rules of Civil Procedure 57 and 65, and the Court's inherent equitable powers.

22.     Subject matter jurisdiction exists under Article III because Plaintiff has suffered and will continue to suffer injury in fact.  There is a sufficient causal connection between Plaintiff's injuries and Defendants' pursuit of this investigation, and a favorable decision by this Court granting Plaintiff relief will redress those injuries.

23.     This dispute is ripe because Plaintiff's rights have already been violated, and Plaintiff will suffer further imminent invasions of those rights in the absence of relief from this Court.  The CID and the associated investigation have already chilled Plaintiff's speech and caused it associational, financial, and other harms.

24.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because the FTC has its principal place of business and the individual Defendants perform their official duties in the District of Columbia.  Venue is also proper because a substantial part of the events giving rise to Plaintiff's claims occurred in the District: The FTC served its CID in the District; the Endocrine Society's compliance or noncompliance therewith will occur in the District; and the substantial chill to and other acts of retaliation against Plaintiff has been—and continues to be— suffered, in substantial part, in the District.  Venue is further proper because the Endocrine Society's principal place of business is in the District.

## **GENERAL ALLEGATIONS**

### I.      **FACTUAL BACKGROUND**

#### A.      **The Endocrine Society is a charitable nonprofit medical organization.**

25.     The Endocrine Society was founded in 1916.  With more than 18,000 members across the world, it is the largest and most active organization in the world devoted to the study of

hormones and clinical practice across the entire spectrum of endocrine treatment, including diabetes, obesity, fertility, bone health, and hormone-related cancers. Its original articles of incorporation describe its purpose as promoting "scientific research," "diffus[ing] information" by "lecture," and publishing on "scientific subjects." That remains true today. Its current articles of incorporation describe it as "organized and operated exclusively for educational and scientific purposes."

26. The Endocrine Society's revenue and expenses are derived from and directed towards activities in furtherance of its charitable mission. The majority of the individuals who work with the Endocrine Society are member volunteers, not paid employees, and a significant portion of the Endocrine Society's income comes from grants and donations. The Endocrine Society's other revenue comes predominantly from sales of its peer-reviewed journals, membership dues, and attendance fees for its educational programs. Most of the Endocrine Society's expenses are devoted to organizing and hosting educational programs and publishing peer-reviewed scientific journals.

27. The Endocrine Society is classified by the Internal Revenue Service as a 501(c)(3) organization. That designation is reserved for entities that are organized and operated exclusively for charitable, religious, educational, or scientific purposes. As a consequence of that classification, the Endocrine Society's earnings may not improperly benefit its founders, board members, or officers. The Endocrine Society is also forbidden from supporting or opposing political candidates, and lobbying cannot comprise a substantial part of its activities. The Endocrine Society complies with these requirements, and it has maintained its 501(c)(3) classification for over 70 years.

28. The Endocrine Society engages in noncommercial speech on a variety of scientific

and medical topics germane to its expertise and charitable purpose.  Among the many ways the Endocrine Society engages with the scientific and medical communities, it publishes peer-reviewed journals, clinical practice guidelines, scientific statements, and position statements.  The Endocrine Society also engages in advocacy related to its charitable purpose of advancing knowledge of endocrinology and human health worldwide.  To that end, the Endocrine Society provides information to legislatures and regulators and participates in litigation as a nonparty amicus, providing information relevant to its expertise to aid courts in deciding issues relevant to endocrinology.

**B.     Gender affirming care is a topic of ongoing public, scientific, and medical debate.**

29.     Gender dysphoria is a disorder in which an individual suffers physical and emotional distress related to an incongruence between their gender identity and the sex in which they would outwardly present absent medical intervention.  Gender dysphoria is not new.  Throughout recorded history, there has been recognition that some individuals experience confusion and anguish resulting from rigid, forced conformity to sexual dimorphism—namely, classification of individuals as one of two discrete sexes.  Gender dysphoria can be treated through a variety of medical interventions, including counseling, hormonal treatment, and surgical intervention, where clinically appropriate.

30.     Over the last few decades, there has been an expansion in the understanding of gender identity along with the implications for the care of transgender and gender diverse individuals.  In parallel with the greater societal awareness of transgender individuals, evidence-based practices in caring for pediatric and adult transgender patients have been developed in response to scientific research.

31.     For years, the medical consensus, based on extensive medical research and clinical experience, has been that treatment for gender dysphoria and gender incongruence should be based on individualized assessments by qualified professionals in consultation with the patient and—for patients under 18—their parents or legal guardian, should sometimes include some manner of gender affirming care.  Gender affirming care refers to any one, or a combination, of social, psychological, behavioral, and medical interventions designed to support and affirm an individual's gender identity.  Gender affirming care can include, when clinically indicated, hormonal treatment or surgery for those who are old enough to and provide informed consent, which is also required from parents of patients under age 18.  There is a consensus in the scientific community that access to such treatments can have a positive impact on the mental health of individuals with gender dysphoria.

32.     Despite increased awareness, many barriers to improving the health and well-being of transgender youth and adults remain.  A 2016 survey of endocrinologists, the physicians most likely to care for these patients, found that over 80% have never received training on care of transgender patients. Medical treatment for gender dysphoria/gender incongruence is also often considered elective by insurance companies, which fail to provide coverage for physician prescribed treatment.  The lack of adequate funding, training, and resources can have an adverse impact on patient outcomes, and transgender individuals who have been denied care show an increased likelihood of adverse psychological outcomes, such as engaging in self-harm.

**C.     The Endocrine Society has engaged in protected, non-commercial speech concerning gender affirming care.**

33.     As one of the world's oldest and foremost authorities on endocrine disorders and hormonal treatments of other disorders, the Endocrine Society has frequently engaged in speech concerning gender dysphoria and gender affirming care.  That speech constitutes statements of

medical and scientific opinion and analyses on existing research in the treatment of individuals with gender dysphoria. The Endocrine Society has never engaged in the advertising, marketing, commercial promotion, or sale of any gender affirming treatment or medications. Simply put, its activities are noncommercial in nature and purpose.

34.    The Endocrine Society publishes medical, evidence-based clinical practice guidance for its members and other providers on a wide range of clinical endocrine issues, including the treatment of individuals with gender dysphoria/incongruence. These clinical practice guidelines are developed using a robust and rigorous process that adheres to the highest standards of trustworthiness and transparency as defined by the National Academy of Medicine. All guidelines are made available free of charge.

35.    The Endocrine Society's guidelines are developed by panels of individuals chosen for their clinical or other relevant expertise. The panels employ a rigorous methodology to craft guidelines using the Grading of Recommendations, Assessment, Development, and Evaluation ("GRADE") system, and the draft guidelines undergo a rigorous review and approval period before publication. The guidelines are not developed in a vacuum. Guidelines take an average of 2-3 years to develop through a multi-step drafting, comment, review, and approval process. This includes a member comment period and expert review period, and all comments are addressed by the guideline development panel prior to publication. There is ample opportunity for feedback and debate through these yearslong development process. The GRADE framework aims for maximum transparency, and it provides a systematic approach for making clinical recommendations. The Endocrine Society also requires that guideline panelists adhere to the organization's conflict of interest policy to ensure transparency, objectivity, and trustworthiness.

36.    Published guidelines provide recommendations for care that reflect the strength of

each recommendation along with summaries of evidence, an explanation of the criteria employed, and justification for the recommendation. This ensures that the Endocrine Society's process allows those relying on its recommendations to understand and assess the evidence and criteria, including values and preferences for consideration by a patient and their family, used in making these judgments.

37.     The Endocrine Society first published medical guidelines related to gender affirming care in 2009, and it has since engaged in a process of revising and updating the guidelines based on updates in medicine and science. In 2017, following a rigorous review and approval period, the Endocrine Society published its most recent version of its Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons Guideline (the "Guidelines") to provide medical guidance for providers that treat youth patients with gender dysphoria.[7]

38.     The Endocrine Society's Guidelines followed the same levels of process and rigor required of all its medical guidelines. The medical and scientific experts serving on the guideline writing panel used the GRADE system to draft recommendations that were subject to review, including by Endocrine Society Members and cosponsoring organizations. The published Guidelines cite more than 260 research studies, which represent the best available data found during a thorough review of the research at the time. The Guidelines reflect the strength of each recommendation, the quality of the supporting evidence, and criteria—including values and preferences for consideration by a patient and their family—used by the guideline writing panel in reaching its conclusions.

39.     The Guidelines recognize that "[g]ender affirmation is a multidisciplinary treatment in which endocrinologists play an important role."[8] They emphasize the importance of

---

[7] Hembree, *supra* note 2.
[8] *Id.* at 3869.

shared decision-making, including a robust diagnostic assessment by a highly qualified mental health professional working with a pediatric endocrinologist or experienced clinician and suggest proceeding as conservatively as possible, in consultation with and consent from the patient and family and to give youth with gender dysphoria and their parents time to consider their options. Before the onset of puberty, the Guidelines provide for mental health care and support but recommend against puberty blocking and gender affirming hormone treatment.  Where gender dysphoria continues into adolescence (after the onset of puberty), the Guidelines provide for consideration of puberty blockers and gender affirming hormone therapy in addition to mental health care and support.

40.    For either of these treatments, the Guidelines emphasize the need for determination by a qualified mental health professional that certain diagnostic and treatment criteria are met, including a demonstrated, long-lasting, and intense pattern of gender dysphoria that has worsened with the onset of puberty.  The Guidelines state that the patient and their family must be requesting the treatment, and the patient and their family must be informed of the effects and possible side effects of treatment, as well as options to preserve fertility.  Finally, the Guidelines say that the patient must be deemed capable of providing informed consent and the patient's parents or legal guardians also must consent to the treatment and be involved in supporting the patient throughout the treatment process.  The reality of treatment for gender dysphoric adolescents matches the conservative approach suggested by the Guidelines.  Around 85% of adolescents diagnosed with gender dysphoria are prescribed no gender-affirming medication at all.

41.    While designed to be used as a resource, the Guidelines are not intended to dictate the treatment of a particular patient, which is made clear in the Guidelines themselves, which say:

The guidelines should not be considered inclusive of all proper approaches or methods, or exclusive of others.  The guidelines cannot guarantee any specific

14

outcome, nor do they establish a standard of care. The guidelines are not intended to dictate the treatment of a particular patient. Treatment decisions must be made based on the independent judgement of healthcare providers and each patient's individual circumstances.[9]

42. In 2020, the Endocrine Society also published a position statement, entitled *Transgender Health* (the "Position Statement").[10] This publication explains the Endocrine Society's high-level policy positions on the provision of gender affirming care, patient and other considerations, and important areas for future development in this space.

43. The Position Statement underscores important considerations related to gender affirming care including the lack of insurance coverage for appropriate medical and psychological treatment for transgender individuals; the considerable research on and development of evidence-based standards of gender affirming care; and the growing understanding of the positive impact that increased access to such treatments can have on the mental health of transgender individuals. The Position Statement also describes the risks associated with the current care landscape, including lack of specific training for medical providers, which can put transgender individuals at risk of maltreatment, harassment, and violence.

44. In addition to the Guidelines and the Position Statement, the Endocrine Society has also made other public statements concerning the treatment of gender dysphoria and gender affirming care. Most prominently, the Endocrine Society engages in advocacy on a wide variety of issues related to the practice of endocrinology, and as a part of that advocacy, it has submitted comments in response to proposed agency rules and filed amicus briefs in several matters, generally advocating for the availability of gender affirming care and preservation of independent

---

[9] *Id.* at 3895.
[10] Endocrine Society, *Transgender Health Position Statement* (Dec. 2020), https://www.endocrine.org/-/media/endocrine/files/advocacy/position-statement/position_statement_transgender_health_pes.pdf [https://perma.cc/8PMD-2U9P].

doctor and patient decision-making regarding the best course of treatment for individual patients.

45.     In summary, the "ideology" that the Endocrine Society espouses in relation to gender affirming care reflects the same guiding principles that underpin health care generally; namely, an evidence-based approach that allows qualified medical providers to support patients and their families in making informed decisions that are supported by science and align with their medical needs, health goals, and personal values.  In all cases, the Endocrine Society emphasizes that treatment decisions be made based on individual patients and circumstances and that treatments be appropriately monitored.

**D.      The Trump Administration has made opposition to gender affirming care a core component of its policy platform.**

46.     The Trump Administration has expressly opposed the Endocrine Society's position and viewpoint on transgender individuals, gender dysphoria, and gender affirming care.  President Trump and other high-ranking officials in his Administration have clearly communicated that it is the policy of the federal government that (1) gender affirming care is not supported by evidence or science, (2) transgender people should not be recognized or addressed based on their gender identity, and (3) gender affirming care should not be available in any case, especially to minors. The Administration has repeatedly expressed its overt antagonism towards individuals or entities whose behavior or speech are contrary to any of these positions.

47.     The Administration has framed this as a war on both practice and ideology.  In addition to cutting off access to gender affirming care, the Administration has repeatedly stated that its goal is to stop the "advancement" and "promot[ion]" of "gender ideology."[11]  According to the Administration—and as enshrined in the Federal Register—"gender ideology" is "anti-

---

[11] *Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14190, 90 Fed. Reg. 8853 (Feb. 3, 2025); *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).

American, subversive, harmful, and false."[12]  In line with that belief, the Administration has sought

to cut off access to gender affirming care and speech that "advances" or "promotes" it.

48.    The President's attack on people who are transgender and on gender affirming care

began even before inauguration.  After the 2024 election, the President-Elect promised to "on Day

1, . . . sign an executive order instructing every federal agency to cease the promotion of sex or

gender transition at any age."[13]

49.    Immediately upon taking office, the President made good on that promise.  On

January 20, 2025, he signed Executive Order 14168, which again staked out ideological ground in

the debate over gender affirming care.  The Executive Order said first that the Administration was

rejecting the "false claim[s]" of "gender ideology."[14]  Soon after, Executive Order 14187 named

the World Professional Association for Transgender Health (WPATH)—an advocate for access to

gender affirming care—as a proponent of "[j]unk [s]cience" that "lacks scientific integrity."[15]  To

operationalize that ideological position, the Executive Order directed federal agencies to "ensure

grant funds do not promote gender ideology."[16]

50.    That Executive Order was soon followed by others with similar language and

functions.  On February 3, 2025, the President signed Executive Order 14190, which required that

executive departments "eliminat[e] Federal funding" for organizations "advanc[ing]" the "anti-

American, subversive, harmful, and false ideology" that a person could be "born in the wrong

body."[17]  Executive Order 14246 targeted a law firm in part because of its support for causes that

---

[12] 90 Fed. Reg. at 8853.
[13] *Trump's Day One Plans Target Transgender Health Care, Transgender Athletes*, NPR (Nov. 15, 2024), https://www.npr.org/transcripts/nx-s1-5181967.
[14] 90 Fed. Reg. at 8615.
[15] *Protecting Children From Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025).
[16] 90 Fed. Reg. at 8616.
[17] 90 Fed. Reg. at 8853-8855.

"refus[ed] to accept the biological reality of sex."[18]  Other Executive Orders also directly targeted individuals who are transgender.  Executive Order 14183 expelled all transgender servicepeople from the military and enshrined in the Federal Register that they are not "honorable, truthful, and disciplined" and that they lack "the humility and selflessness required of a service member."[19] Executive Order 14148 rescinded previous executive orders prohibiting discrimination against and guaranteeing equal rights to transgender individuals.[20]

51.    On May 1, 2025, the Department of Health and Human Services (HHS) issued a Report to the President reaffirming and summarizing the Administration's positions on gender dysphoria and gender affirming care.  The Report stated the Administration's belief that medical standards that allow for gender affirming care "were not drafted based on scientific evidence" but were instead "junk-science."[21]  It went on to report that the Centers for Medicare & Medicaid Services had issued a memorandum "alert[ing] providers" to the "lack of medical evidence" supporting gender affirming care.[22]  The Report noted that similar memoranda were published by the Substance Abuse and Mental Health Services Administration, the Health Resources and Services Administration, and the Office of the Assistant Secretary for Health.[23]

---

[18] *Addressing Risks from Jenner & Block*, Exec. Order No. 14246, 90 Fed. Reg. 13997 (Mar. 28, 2025).
[19] *Prioritizing Military Excellence and Readiness*, Exec. Order No. 14183, 90 Fed. Reg. 8757 (Feb. 3, 2025).
[20] *See Initial Rescissions of Harmful Executive Orders and Actions*, Exec. Order No. 14148, 90 Fed. Reg. 8237 (Jan. 28, 2025) (rescinding Executive Orders Nos. 13988, 14020, 14021, 14075).
[21] The White House, *Report to the President on Protecting Children from Surgical and Chemical Mutilation Executive Summary* (Apr. 28, 2025), https://www.whitehouse.gov/fact-sheets/2025/04/report-to-the-president-on-protecting-children-from-surgical-and-chemical-mutilation-executive-summary/ [https://perma.cc/Z7NY-6V9P].
[22] *Id.*
[23] *Id.*

E.    **Other federal agencies have followed the President's directive to take all actions necessary to cut off access to, and speech about, gender affirming care**

52.    As directed by the President and as required by executive order, other agencies have taken up the cause of stamping out the promotion and advancement of gender affirming care and "gender ideology."  As one official in the Department of Health and Human Services put it, the Administration's target is the "demonic forces" that are "committing war on kids" by advocating for the availability of gender affirming care.[24]

53.    The Department of Justice publicized its actions in accordance with the President's directions in an April 22, 2025 memorandum from the Attorney General.  The memorandum was explicit that the Department's goal was to "hold accountable" those who advance the "ideological agenda" that "teaches children to deny biological reality," namely "gender ideology."  The memorandum characterized gender affirming care as illegal "genital mutilation" and directed "all U.S. Attorneys" to prosecute any clinician who had provided such care "to the fullest extent possible."  The memorandum also criticized WPATH's gender affirming care guidelines as "fundamentally flawed and unreliable," "promot[ing]" a "radical ideology," and "not science." Finally, the memorandum explicitly authorized investigations based on speech: it said that the Department of Justice would "investigate and hold accountable" those who it determined had tried to "mislead the public" by speaking favorably about gender affirming care.[25]

54.    A follow-up memorandum by Assistant Attorney General stated that the Department of Justice's Civil Division would "use all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities"

---

[24] Kinsey, *supra* note 1.
[25] *Preventing the Mutilation of American Children*, Memorandum from the Attorney General to Select Component Heads (Apr. 22, 2025),  https://www.justice.gov/ag/media/1402396/dl [https://perma.cc/54NN-ARKU].

who had played any role in providing gender affirming care.[26]

55.    HHS has also played a prominent role in the Administration's ideological battle against gender affirming care.  On March 5, 2025, the Centers for Medicare & Medicaid Services (CMS) issued a Quality and Safety Special Alert Memo entitled "Protecting Children from Chemical and Surgical Mutilation," which told providers that gender affirming care was a dangerous form of "chemical and surgical mutilation" and declared that there was a "lack of medical evidence" supporting it.  The CMS memorandum referred to gender affirming care as "interventions that cause sterilization," "mutilation practices," and "harmful, unscientific medical interventions."[27]

56.    On November 19, 2025, HHS issued a press release characterizing proponents of gender affirming care as "peddl[ing] . . . lie[s]."[28]  The same day, HHS released its own report on gender affirming care.  The HHS report directed its focus in large part on the Endocrine Society's Guidelines—referencing the organization and its Guidelines almost 100 times—and labeled the Guidelines as "not trustworthy."[29]  The report named the Guidelines as among "[t]he most influential sources of clinical guidance for treating pediatric [gender dysphoria] in the U.S." and noted that all three were of "very low quality."[30]  The report also lamented the "significant influence" that nonprofit medical organizations like the Endocrine Society have on the "healthcare

---

[26] *Civil Division Enforcement Priorities*, Memorandum from Brett A. Shumate, Assistant Attorney General, DOJ, Civil Division (June 11, 2025), https://www.justice.gov/civil/media/1404046/dl?inline [https://perma.cc/PLV9-5PQH].

[27] CMS, HHS, *Protecting Children from Chemical and Surgical Mutilation*, QSSAM-25-02-Hospitals (Mar. 5, 2025), https://www.cms.gov/files/document/qssam-25-02-hospitals.pdf [https://perma.cc/G47S-RZ34].

[28] HHS, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures* (Nov. 19, 2025), https://www.hhs.gov/press-room/hhs-releases-peer-reviewed-report-discrediting-pediatric-sex-rejecting-procedures.html [https://perma.cc/VD9Q-FHF2].

[29] *Treatment for Pediatric Gender Dysphoria*, *supra* note 6, at 150.

[30] *Id.* at 146.

landscape."[31]

57.     On December 18, 2025, a follow-up letter by the Secretary of HHS again cited the Endocrine Society Guidelines as "very low quality."[32]  That same day, the Secretary held a press conference in which he announced that "current evidence does not support claims that" gender affirming care constituted "safe and effective . . . treatments for pediatric gender dysphoria."[33]

58.     A few weeks later, on December 31, 2025, HHS sent a letter to the Endocrine Society.  The letter reiterated the Administration's position that gender affirming care for minors is "not supported by evidence" and it said that "[i]t is this administration's priority to end all" gender affirming care for minors.  The letter then directly purported to require the Endocrine Society to cease its speech that contradicted the government's viewpoint.  After noting that the Endocrine Society published clinical guidance for treating pediatric gender dysphoria," it demanded that the Endocrine Society "immediately . . . revise [its] medical guidelines and guidance that advise medical professionals to provide these procedures to minors."

**F.      The FTC has expressly committed to advancing the President's agenda of cutting access to and speech about gender affirming care**

59.     The Federal Trade Commission has played a central role in the Administration's attack on gender affirming care.  Defendant Andrew Ferguson, the Chairman of the FTC, has made it his mission to "transform the F.T.C., . . . into an enforcer of President Trump's social and

---

[31] *Id.* at 217.

[32]  HHS, Declaration of Robert F. Kennedy Jr., Sec'y of HHS re Safety, Effectiveness, and Professional Standards of Care for Sex-Rejecting Procedures on Children and Adolescents (Dec. 18, 2025), https://www.hhs.gov/sites/default/files/declaration-pediatric-sex-rejecting-procedures.pdf.

[33] C-SPAN, *Health and Human Services Secretary Kennedy News Conference on Child Health Care Policy* (Dec. 18, 2025), https://www.c-span.org/program/news-conference/heath-and-human-services-secretary-kennedy-news-conference-on-child-health-care-policy/670663.

political agendas."[34]  Before the Chairman was appointed, he promised in a memorandum in support of his appointment that he would make it a priority to "[a]dvance the President's agenda," including "[f]ight[ing] back against the trans agenda" by "[i]nvestigat[ing] the doctors, therapists, hospitals, and others who deceptively pushed" gender affirming care.[35]  The Chairman has publicly waged that ideological battle the on several fronts.  For example, soon after being appointed, the Chairman wrote a letter to FTC staff, stating that no political appointee could attend events sponsored by the American Bar Association, in part because of its support for "transgender ideology."[36]

60.     On July 9, 2025, the FTC held a workshop entitled "The Dangers of 'Gender-Affirming Care' for Minors," moderated in part by Chairman Ferguson and by an attorney-advisor in his office.[37]  When the workshop was announced, a group of FTC employees released an anonymous letter, questioning the FTC's decision to host a workshop on a politically charged topic clearly outside its regulatory jurisdiction, and on a topic on which it clearly "ha[d] already taken a position opposing gender-affirming care for minors."[38]  When the workshop was held, it amounted to a several-hour assault on gender affirming care.[39]  The Endocrine Society was repeatedly

[34] Cecilia Kang & David McCabe, *The FTC Chairman Who Tilted the Agency to Trump*, N.Y. Times (Dec. 8, 2025), https://www.nytimes.com/2025/12/08/technology/ftc-andrew-ferguson-regulator.html.
[35] *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News, https://punchbowl.news/wp-content/uploads/FTC-Commissioner-Andrew-N-Ferguson-Overview.pdf [https://perma.cc/HNG3-GRUR].
[36] Andrew N. Ferguson, Chairman, FTC, Letter from Chairman Ferguson to Staff(Feb. 14, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/aba-letter_ferguson.pdf [https://perma.cc/ZBP9-TQ3M].
[37] FTC, *The Dangers of "Gender-Affirming Care" for Minors: Transcript of Workshop* (July 9, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-The-Dangers-of-Gender-Affirming-Care-for-Minors-Transcript.pdf [https://perma.cc/74E4-Y229].
[38] FTC Employees, *Statement of Concern Dated July 2, 2025 from FTC Employees on the FTC's July 9 Workshop on Gender-Affirming Care* (July 2, 2025), https://fingfx.thomsonreuters.com/gfx/legaldocs/akvexqzyopr/FTC%20staff%20statement.pdf [https://perma.cc/W92B-929B].
[39] *The Dangers of "Gender-Affirming Care" for Minors*, *supra* note 37.

22

mentioned and attacked during the workshop, as were its guidelines.  During the workshop, one

panelist described the problem posed by nonprofit "medical associations" that have "published

endorsements or kind of de facto endorsements" of gender affirming care.  That panelist asserted

that the FTC should "act[] against them, by seeking injunctions" and that "just the act of

conducting thorough investigations" and "making that public" could be instrumental in "exposing

the medical associations to the public" such that they could "start losing members" and "other

revenue streams."[40]  That panelist has since been hired as a lawyer by the FTC to "spearhead"

investigations on gender affirming care.[41]  A few weeks after the workshop, the FTC issued a

notice that it was seeking public comments informing it about "organization[s] that recommend[]

gender-affirming care" or "made public representations about" gender affirming care.[42]  That

comment period closed on September 26, 2025.

### G. Retaliatory investigations have been central to the Administration's war on "gender ideology"

61.    As the Administration has leveraged its power in various ways to cut off both access

to and speech about gender affirming care, retaliatory investigations have been central to its

strategy.

62.    In a Department of Justice press release from July 9, 2025, the government

"announced that it ha[d] sent more than 20 subpoenas to doctors and clinics" that had provided

gender affirming care.[43]  Courts have repeatedly granted relief to the recipients of those subpoenas,

---

[40] *Id.* at 81-82.

[41] Mary Margaret Olohan, *Trump Admin Hires Glenna Goldis, Lawyer Fired by Letitia James*, Daily Wire (Feb. 5, 2026), https://www.dailywire.com/news/trump-admin-hires-glenna-goldis-lawyer-fired-by-letitia-james [https://perma.cc/A4EG-Q6K4].

[42] FTC, *Request for Public Comment Regarding "Gender-Affirming Care" for Minors* (July 9, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/GAC-RFI-FINAL.pdf [https://perma.cc/89FE-ALUN].

[43] Press Release, DOJ, Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children (July 9, 2025), https://www.justice

concluding that they were pretextual and improperly motivated.

63.    On September 3, 2025, a court concluded, based on the "threadbare support" for a subpoena served on Seattle Children's Hospital, that it was issued for an "improper purpose"—namely, "an effort to end gender-related care for minors," which the Department of Justice did "not contend . . . is a federal healthcare offense." *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *12 (W.D. Wash. Sept. 3, 2025).

64.    On October 27, 2025, a court held that quashing a subpoena served on a telehealth provider of gender affirming care required no "speculation about hidden motives" given that the Administration had stated its "explicit agenda" to "'downsize or eliminate' all gender-affirming care." The court said that "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating." *QueerDoc, PLLC v. DOJ*, --- F. Supp. 3d ---, 2025 WL 3013568, at *5 (W.D. Wash. Oct. 27, 2025).

65.    On January 5, 2026, a court held that a "pretextual" subpoena "paint[ed] a compelling picture" that the government's stated motivation for its investigation was "a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations.'" *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026).

66.    On January 21, 2026, a court held that that because the government had "fail[ed] to place before the court any information, record, or evidence supporting or pertaining to investigation" that would justify its subpoena, it was "not issued for a legitimate governmental purpose." The court reasoned that the government had failed to "plausibly explain[] the purported

.gov/opa/pr/department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical [https://perma.cc/WP4V-28J5].

connection" between the documents it sought and any violation of law, which revealed that the investigation was "a pretext to fulfill the Executive's well-publicized policy objective to terminate and block gender affirming healthcare." *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *7-8 (D. Md. Jan. 21, 2026).

### H. The FTC has used retaliatory investigations to further the Administration's political and ideological agenda

67.     The FTC has similarly used retaliatory investigations to further the Administration's agenda by punishing entities espousing views or engaging in speech that the Administration disagrees with.

68.     In *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025), this Court concluded that the FTC had retaliated against an entity's "quintessential First Amendment activity" by issuing an "expansive CID" that "had its intended effect" of "deter[ing]" the entity from engaging in further, related speech. *Id.* at 112.  The D.C. Circuit subsequently agreed that there was "support for finding a likelihood of retaliation" in the record supporting a preliminary injunction. *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *6 (D.C. Cir. Oct. 23, 2025). The FTC has issued several CIDs similar to the one enjoined in the *Media Matters* case on other media organizations that have engaged in similar speech and premised on similar theories.  Two of those CIDs are now subject to petitions to quash, arguing that they constitute First Amendment retaliation.[44]  Both of the recipients of those CIDs have also now filed suit in this Court, seeking

---

[44] Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to NewsGuard Techs., Inc.*, FTC File No. 251-0061 (Jan. 16, 2026), https://www.ftc.gov/system/files/ftc_gov/pdf/NewsGuard-PTQ.pdf [https://perma.cc/R3BU-E5TN]; Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to The Global Disinformation Index*, FTC File No. 251-0061 (Sept. 17, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/2510061GlobalDisinformationIndexPTQ.pdf [https://perma.cc/33MX-23XB].

to enjoin the CIDs and investigations because they violate the First Amendment.[45]

69.    More recently, the FTC has turned the focus of its retaliatory investigations to proponents of gender affirming care.  Publicly available documents show that just before the FTC served the CID at issue here on the Endocrine Society, it served nearly identical CIDs on the American Academy of Pediatrics ("AAP") and WPATH.  The HHS report that repeatedly characterized the Endocrine Society's Guidelines as "junk science" listed publications by those two organizations as the other guidelines that are the "most influential sources of clinical guidance for treating pediatric [gender dysphoria] in the U.S."[46]  Both AAP and WPATH have since filed petitions to quash their respective CIDs, claiming that the CIDs constitute unconstitutional retaliation under the First Amendment.[47]

## II.    PROCEDURAL BACKGROUND

### A.    The FTC served a sweepingly broad CID on the Endocrine Society that is overtly focused on its First Amendment protected speech and has no plausible relationship to any legitimate FTC investigation

70.    On January 20, 2026, the Endocrine Society was served with a CID issued by the FTC.  *See* Exhibit 1.  The CID says that the "purpose" of the Commission's investigation "is to determine whether [the Endocrine Society] or any other Person, . . . have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment."  *Id.* at 1.  The CID

---

[45] *See* Complaint, *Disinformation Index, Inc. v. FTC*, No. 25-04137 (D.D.C. Nov. 25, 2025), Dkt. No. 1; Complaint, *NewsGuard Techs. v. FTC*, No. 26-00353 (D.D.C. Feb. 6, 2026), Dkt. No. 1.
[46] *Treatment for Pediatric Gender Dysphoria*, *supra* note 6, at 146.
[47] Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to World Professional Ass'n for Transgender Health*, FTC File No. P264800 (Feb. 9, 2026), https://www.ftc.gov/system/files/ftc_gov/pdf/WPATH-PTQ.pdf [https://perma.cc/DW8F-2EZC]; Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Am. Acad. of Pediatrics*, FTC File No. P264800 (Feb. 9, 2026), https://www.ftc.gov/system/files/ftc_gov/pdf/AAP-PTQ.pdf [https://perma.cc/8XS7-YVV7].

notes that "according to the [the Endocrine Society]," such treatments "purport[]" to treat minors with gender dysphoria. *Id.*

71.     The FTC has no power to regulate the Endocrine Society.  The FTC's enforcement authority extends to "person[s], partnership[s], or corporation[s]."  15 U.S.C. § 45(m)(1)(A).  A "corporation" includes "any company . . . which is organized to carry on business for its own profit or that of its members."  15 U.S.C. § 44.  The FTC has never claimed, and no court has ever held, that the FTC can regulate nonprofit charitable corporations like the Endocrine Society.  Although the FTC Act authorizes the FTC to issue CIDs to nonprofit entities, it can only do so in pursuit of a legitimate investigation into a possible violation of the FTC Act by a regulable entity.  15 U.S.C. § 57b-1(a)(6), (c)(1).  The sections of the FTC Act invoked by the CID as the basis for an FTC investigation concern false advertising and deceptive trade practices.  Although the Endocrine Society sometimes publishes paid advertisements, no such advertising or commercial activity by the Endocrine Society is in any way implicated by the CID.  Instead, the CID is focused entirely on the Endocrine Society's noncommercial protected speech concerning gender affirming care.

72.     The CID makes dozens of sweeping requests for documents, information, and communications from every employee, officer, and "affiliate[]" of the Endocrine Society.  CID at 8.  Its terms would require disclosure of vast quantities of information and communications regarding the Endocrine Society's members, donors, and other organizations it has partnered with.  The requests often require production of documents from over a decade.  Even the CID's definitions are astonishingly broad.  For example:

      (a)     The CID states that every time it requests a "document" related to a topic, it means any "drafts or prior versions;" "notations on the copy;" "copies of all hyperlinked materials;" all forms of electronic messaging, such as texts or instant

messages; and any "information" "on all devices (including employee-owned devices) used for Organization-related activity." *Id.*

(b)     The CID states that every time it says "Organization," "You," and "Your," that also includes "other persons working for or on behalf of" an extensive list of entities or individuals with potential ties to the Endocrine Society. *Id.*

(c)     The CID states that every time it requests information about a "communication," it means "the transmittal of information by any means" without limitation by medium. *Id.*

73.     The CID has three express focuses.  For each focus, the CID demands every conceivable piece of information that the Endocrine Society has.

74.     First, the CID focuses on what it terms "covered statements."  Covered statements include any statements "express or implied" that any medical intervention that purports to treat gender dysphoric minors is safe, effective, or supported by evidence-based science.  For covered statements, the CID demands (1) a description of every covered statement, (2) the name of the person responsible for developing, reviewing, or substantiating the covered statement, (3) every communication with any entity, internal or external, related to the covered statement, and (4) any communication with any entity, internal or external, that references the covered statement.  *Id.* at 6.

75.     The CID does not purport to or attempt to limit or relate any part of its request for information about covered statements with reference to advertising, commerce, or any economic activity.

76.     The CID's other two focuses are the Endocrine Society's 2017 Guidelines and 2020 Position Statement.  Neither the Guidelines nor the Position Statement advertised any product or

services or otherwise proposed any economic transactions.  For both the Guidelines and the Position Statement, the CID requests (1) all communications of any type with any entity internal or external related to the Guidelines or the Position Statement, and (2) the name of every individual or entity that participated in developing or issuing the Guidelines or Position Statement.  *Id.* at 6– 7.

77.    The CID particularly targets information about individuals and entities the Endocrine Society has associated with in connection to its speech about gender affirming care, including the identity of donors.  The CID also requests communications concerning gender affirming care with government entities like legislators and regulators.  And it asks for communications with other nonprofit organizations that the Endocrine Society has joined with in advancing clinical practice for the treatment of gender dysphoria—in other words, organizations that share its "gender ideology." *Id.* at 7.

### B.    The Endocrine Society attempted in good faith to negotiate compliance with the CID

78.    Because the Endocrine Society is outside the FTC's regulatory jurisdiction and no statements of advertising or promotion were in any way implicated by the CID, the Endocrine Society believed that the CID was (1) entirely *ultra vires* and outside the FTC's jurisdiction and (2) a violation of its First and Fourth Amendment rights.  Despite this, the Endocrine Society met and conferred with the FTC in an effort to narrow the scope of the FTC's requests and explore the possibility of partial compliance with the CID, including agreeing to produce documents that would confirm to the FTC that the Endocrine Society was outside of its jurisdiction.

79.    The meet and confer process with the FTC was marked by irregularity at every turn. At the first conference, on January 30, 2026, two attorney-advisors from the office of the Chairman of the FTC attended.  One was one of the moderators of the FTC's workshop on gender affirming

care, during which a participant (who is now an FTC attorney) said that the FTC should "act[]
against" nonprofit "medical associations" that had "published endorsements" of gender affirming
care by "conducting . . . investigations" that could cause the organizations to "start losing
members" and "other revenue streams."[48]   At the January 30 meet and confer, the Endocrine
Society asked the FTC what potential false advertising it was investigating such that its
investigation required document production and answers to interrogatories from the Endocrine
Society.  Although the FTC did not answer directly, it responded in part with a hypothetical—
saying that if a nonprofit organization were to state in documents disseminated to clinicians that a
treatment was safe and effective, the organization's statement could itself be false advertising.  As
the Endocrine Society noted in its petition to quash the CID, this assertion—which would sweep
in countless statements by hundreds of nonprofit organizations in thousands of clinical practice
guidelines as potentially "advertising"—would constitute an unprecedented construction of the
FTC Act.  At the meet and confer, the FTC also demanded that the Endocrine Society waive any
right to petition to quash the CID as part of an initial production agreement.  That demand would
have required the Endocrine Society to give up objections to the FTC's production requests before
the parties had even discussed or settled what the production requests required.  In addition, the
FTC accelerated its production date and demanded that the first round of a rolling production
schedule—which was to require a massive production of every document or communication the
Endocrine Society had access to that made reference to gender affirming care—be completed a
month before the return date listed on the CID.  Finally, the FTC declined the Endocrine Society's
request for a two-week extension of the deadline for a petition to quash the CID, stating that
granting any extension would be a significant concession and would require the Endocrine Society

---

[48] *The Dangers of "Gender-Affirming Care" for Minors*, *supra* note 37, at 81-82.

to agree to production.

80. Publicly available information on the FTC's website shows that the FTC grants extensions of the petition to quash deadline in the majority of cases, sometimes extending the deadline repeatedly over the course of several months. For example, the petition to quash in the *Media Matters* case was filed after the FTC granted one extension, then offered another one unsolicited.[49]

81. During a subsequent meet and confer with Commission staff, the Endocrine Society continued its good faith efforts to compromise with the FTC and proposed terms—largely in line with what the FTC had requested for two priority requests—for beginning compliance with the CID, while again requesting a brief extension of the deadline to file a petition to quash to allow for further negotiation over the CID's terms. The FTC rejected the Endocrine Society's proposal. Instead, it demanded that the Endocrine Society propose specific and binding search terms that would determine its production obligation under one of the CID's most expansive requests within the next two days. In addition, when the Endocrine Society reiterated that it had First Amendment concerns with the CID generally, the FTC expressed frustration with the Endocrine Society's objection and insisted that the Endocrine Society had somehow waived any such First Amendment claim by failing to discuss it with the FTC earlier. As publicly available documents show, when another similar party attempted to discuss First Amendment concerns with a similar CID with the FTC during an early meet and confer, the FTC stated that such conversation would not be "constructive."[50] Yet, and despite the fact that the Endocrine Society had flagged First

---

[49] Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to Media Matters for Am.*, FTC File No. 251-0061 (June 18, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/2510064mediamattersptqredactedpublic.pdf [https://perma.cc/QYH4-8LDQ].
[50] *Am. Acad. of Pediatrics*, *supra* note 47.

Amendment concerns far earlier in the meet and confer process, the FTC stated that it no longer had enough time to consider the Endocrine Society's First Amendment objection, while at the same time refusing to grant any extension to the petition to quash deadline that would have allowed the Commission more time to discuss and address those constitutional infirmities.

82.     In a follow-up letter sent to the Endocrine Society the next day, at 9:53 pm on a Friday evening, the FTC accused the Endocrine Society of bad faith and expanded its claim of waiver, asserting for the first time that the Endocrine Society had waived *every* objection to the CID.

83.     The FTC's retaliatory, hardline position left the Endocrine Society with no choice. Given that the FTC had refused its compromises, offered only impossible terms, and refused multiple requests to extend the deadline for its petition to quash the CID, the Endocrine Society filed a petition to quash the CID on February 10, 2026.  Although that petition is still pending, the FTC's most recent communication with the Endocrine Society maintains that the Endocrine Society has "waived" every objection to the CID.

## C.    The FTC's investigation is irreparably harming the Endocrine Society by chilling its speech and hampering its charitable mission

84.     Because of the FTC's investigation and CID, the Endocrine Society is currently and will continue to be irreparably harmed absent court intervention.  Even absent enforcement, the CID has chilled and will continue to chill the Endocrine Society's speech and association.  The CID acts as a threat of retaliatory government action and makes the Endocrine Society's communications subject to the possibility of future disclosure.

85.     The CID demonstrates the Administration's and the FTC's willingness to impose extraordinary costs and burdens on individuals and entities like the Endocrine Society that the Administration perceives as advancing "gender ideology."  If the CID were enforced, it would be

devastating to the Endocrine Society.  Compliance would require the Endocrine Society to divert between a half and a third of its employees towards compliance and to spend hundreds of thousands of dollars of its limited budget on document preservation, collection, and production.  By substantially increasing the risk that any communication or association with the Endocrine Society—especially regarding gender affirming care—could expose others to similarly retaliatory action, the CID has sharply chilled the Endocrine Society's speech and association.

86.    The most significant casualty of the Adminsitration's retaliatory campaign against "gender ideology" and its perceived proponents is a planned update to the Endocrine Society's 2017 Guidelines.  The Endocrine Society routinely updates all its clinical practice guidelines based on developing research and clinical advancements.  Every update goes through the same rigorous, transparent, and public-facing GRADE system as every other Endocrine Society guideline.  The updates therefore take years of drafting, review, and approval processes to complete.  In 2022, the Endocrine Society's Board voted to begin a routine update in 2023 of its clinical practice guidelines for the treatment of gender dysphoria and gender incongruence.  The process began and was expected to result in an updated guideline in approximately 2026.  However, in 2025, advancement of the guideline's drafting and review process stopped, as researchers and methodologists informed the Endocrine Society that they could no longer be associated with work on gender affirming care, out of fear for their personal safety, future funding, and of government retaliation.

87.    The Endocrine Society's inability to complete an update to its guidelines harms the very interests the Administration purports to be trying to protect.  As with any guideline update, this one would consider any new research into areas relevant to the guideline's purpose, for example the effects of puberty delaying medication and hormone therapy as well as any other

research questions identified by the guideline writing panel.  But because of the Administration's aggression towards speech about gender affirming care, scientists, clinicians, and researchers are unable or unwilling to expose themselves to the personal attacks and potential reputational and financial ruin the Administration has vowed to inflict on anyone associated with gender-affirming care.

88.     The FTC investigation and the Administration's attacks on proponents of gender affirming care have pervasively chilled the Endocrine Society's other speech about gender affirming care.  The organization's magazine, social media, and newsletter no longer cover the issue because the Endocrine Society fears that any coverage will trigger additional adverse government action.  For the same reasons, the Endocrine Society is not responding to media requests on gender affirming care and is far less willing to respond to government-issued proposed rules or declarations, thus chilling its ability to petition or seek redress from its government on this issue of public concern.  The Endocrine Society routinely engages with members of Congress to provide information about issues of endocrine health.  But the Endocrine Society will no longer plan educational briefings for Congress on issues related to gender dysphoria.  The Endocrine Society submitted comments to two proposed HHS rules on February 17, 2025.  On information and belief, the content of the Endocrine Society's comment was altered by the organization's fear of additional government retaliation.

89.     The FTC's campaign against the Endocrine Society has also stymied the organization's ability to associate with other professional medical organizations.  Organizations like the Endocrine Society often join together to respond to proposed regulations, participate as amici in litigation, and make joint statements.  The Endocrine Society's associational activities related to gender affirming care have almost entirely stopped.  The organization's Government

and Public Affairs Department has even paused certain activities related to work on other issues, such as engagement in some coalitions, partially as a result of ongoing investigations conducted by the FTC and other government actors.  The Endocrine Society had considered responding to a proposed rule by CMS related to gender affirming care in a joint statement with other medical organizations.  That effort was abandoned as a result of feared government retaliation and the potential requirement of disclosures of communications with other individuals and organizations.

90.     Finally, the FTC's investigation and CID have inflicted serious burdens on the Endocrine Society's employees and membership.  After receiving the CID, the Endocrine Society informed members and employees that they should preserve documents so the Endocrine Society could comply with its potential production obligations.  Some recipients of the notice replied that, as a result of the FTC's investigation, the institutions they were associated with would likely no longer allow them to work with the Endocrine Society on topics related to gender affirming care, out of fear that those institutions could themselves be placed under the Administration's scrutiny. In addition, members expressed concern about the litigation hold out of apparent fear of personal consequences from the Administration if it learned that they had worked with or had any communication with the Endocrine Society related to gender affirming care.

## CAUSES OF ACTION

### COUNT I
### Retaliation in Violation of the First Amendment

91.     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

92.     Defendants violated, and continue to violate, the Endocrine Society's First Amendment rights through their investigation and service of an overbroad and unduly burdensome CID on Plaintiffs without cause and in excess of their legal authority.  "[T]he First Amendment

prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). That is what the FTC is doing here.

93.     To prevail on a First Amendment retaliation claim, Plaintiff must show "(1) [it] engaged in conduct protected under the First Amendment; (2) the [Defendants] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiff's] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). All three elements are established based on this Complaint's allegations.

94.     The Endocrine Society is engaging in protected speech. The First Amendment protects scientific speech like any other, and the speech targeted by the CID is noncommercial speech on a highly disputed matter of public concern. Defendants' retaliation is especially egregious here because Plaintiff's contributions are critical to public discourse in this area. As Defendants themselves acknowledge, Plaintiff's publications are among the most cited and relied on in the treatment of gender dysphoria; Plaintiff also publishes the preeminent journals that concern hormonal treatments and endocrinology.

95.     Establishing that a person of "ordinary firmness" would be deterred from speaking is "not a high" bar to clear. *Jenner & Block LLP v. DOJ*, 784 F. Supp. 3d 76, 95 & 95 n.7 (D.D.C. 2025). The CID—and the unusually aggressive way the FTC has sought to enforce it—would deter an ordinary person from taking actions that would expose them to future investigations or retaliation.

96.     Defendants' investigation is expressly focused on Plaintiff's protected speech. It is also part of a well-documented pattern by this Administration and by Defendants of utilizing pretextual investigations to retaliate against proponents of gender affirming care and against

entities engaging in speech that the Administration disfavors.  The Administration has stated outright that it considers the Endocrine Society to be among the most significant proponents of "gender ideology" and that its speech is therefore among the most dangerous and necessary to stamp out.  The Administration already sent Plaintiff a letter demanding it alter its speech to align with the Administration's viewpoint—an unambiguous First Amendment violation.  When Plaintiff did not do so, Defendants sought to achieve the same goal through this retaliatory investigation.

## COUNT II
### Viewpoint-Based Discrimination

97.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

98.    In addition to retaliating against Plaintiff's past speech, the FTC's investigation is a clear attempt to prevent Plaintiff from engaging in further speech in favor of gender affirming care.  The Administration has made it clear that its goal is not only to stop the practice of such care, but also to stamp out the "gender ideology" that supports gender affirming care and recognizes the existence of transgender people.  To further these ideological ends, the Administration has targeted the organizations that represent established medical and scientific research supporting gender affirming care.

99.    The government "cannot . . . use the power of the State" to "suppress disfavored expression."  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024).  "Any system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 516 (D.C. Cir. 2010) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)) (alternations in original).  "[I]nformal sanctions" that "deliberately set about to achieve the suppression" of disfavored speech are no less repugnant than

direct prohibitions. *Playboy Enters., Inc. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (quoting *Bantam Books*, 372 U.S. at 67). "This danger [of viewpoint censorship] is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763 (1988).

100.    To prevail on a viewpoint-based censorship claim, Plaintiff must show (1) a "threat of invoking legal sanctions" or other system of "prior restraints," (2) which is intended "to achieve the suppression" of disfavored speech. *Vullo*, 602 U.S. at 180, 202. Plaintiff can establish both elements.

101.    Defendants' CID is a legal action that carries a threat of possible enforcement in federal court. Defendants have also implied that an enforcement action beyond the CID is possible as a result of their investigation.

102.    Defendants have made express their intention to force the Endocrine Society to alter its speech and to cease expressing a viewpoint that they disfavor. Defendants held a workshop focused on the "harms" of Plaintiff's "ideology." A participant in that workshop—who is now an FTC employee hired to lead investigations into gender affirming care—urged Defendants to use investigations to force organizations like the Endocrine Society to stop espousing "gender ideology." Following that playbook, Defendants have opened an investigation and issued a CID designed to silence Plaintiff's speech on the topic of gender affirming care. In addition, any enforcement action against Plaintiff under the FTC Act for its statements about gender affirming care would constitute even more direct viewpoint-based coercive action.

### COUNT III
### Violation of First Amendment Right to Freedom of Association

103.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

104.    "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others . . . [t]he risk of a chilling effect on association is enough." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021).  Requiring an organization to disclose all parties with whom it communicated in the process of engaging in government-disapproved speech places a singular burden on associational rights.  *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958).  Accordingly, "before requiring that organizations reveal sensitive information about their members and supporters," the government must satisfy "exacting scrutiny." *Bonta*, 594 U.S. at 609).  When "exacting scrutiny applies, the challenged requirement must be narrowly tailored to the interest it promotes, even if it is not the least restrictive means of achieving that end." *Id*. at 609–10.

105.    The CID implicates Plaintiff's associational rights by requiring disclosure of nearly every person it communicated with in any way regarding gender affirming care.  The CID would require Plaintiff to produce donor information and attendance sheets for informal sessions if any discussion of gender affirming care occurred there.  Even absent enforcement, the looming threat of enforcement of these terms of the CID has substantially burdened Plaintiff's associational rights, prevented it from joining coalitions, and made it impossible to work with its members on speech that is primary to its charitable goal.

106.    Because of these burdens, the investigation can escape injunction only if it is narrowly tailored to a compelling government interest.  It is not.  The FTC lacks enforcement jurisdiction over Plaintiff and its purported investigation has no relationship to any plausible violation of the FTC Act.

## COUNT IV
### Violation of First Amendment Press Freedom

107.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

108.    "The First Amendment guarantees a free press primarily because of the important role it can play as a vital source of public information." *Zerilli v. Smith*, 656 F.2d 705, 710 (D.C. Cir. 1981) (internal quotations omitted).  "Efforts [must] be taken to minimize impingement upon the reporter's ability to gather news." *Id.* at 712.  That interest is not "confined" to protecting "newspapers and periodicals;" it "necessarily embraces" "every sort of publication which affords a vehicle of information and opinion." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 390 n.6 (2010) (quoting *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938)).  In particular, "[a]cademicians engaged in pre-publication research [are] accorded protection commensurate to that which the law provides for journalists." *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998); *see also Bd. of Trs. of Leland Stanford Jr. Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991) ("[T]he First Amendment protects scientific expression and debate just as it protects political and artistic expression.").  Government action that burdens the ability to engage in journalism in a targeted way must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012) (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987)).

109.    Defendants' investigation burdens Plaintiff's scientific and medical journalism. The CID would require Plaintiff to disclose all manner of information concerning its communications with other individuals and entities while engaging in scientific and medical journalism on a topic of profound public concern.  Even absent enforcement, the threat of that disclosure has made it impossible for Plaintiff to engage in further journalistic activities.

Communications on sensitive topics, especially medical ones, and especially where the topic is as politicized as gender affirming care, require confidentiality.  The CID makes it impossible for Plaintiff to promise any parties it communicates with that their communications will not be made public or at least exposed to unfriendly government scrutiny.  Furthermore, an enforcement action against Plaintiff based on its statements about gender affirming care would be tantamount to the government punishing the Endocrine Society for truthful reporting, in violation of the First Amendment's right to freedom of the press.

110.    Because the FTC's investigation, including its sweeping CID, burdens the press rights Plaintiff enjoys, it must be narrowly tailored to a compelling government interest.  For the reasons alleged above, it is not.

## COUNT V
### Violation of First Amendment Right to Petition the Government

111.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

112.    "[P]roviding information, commenting on proposed legislation, and other lobbying activities implicate . . . [the] petition rights."  *United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) (citing *Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir. 1967) ("[E]very person or group engaged . . . in trying to persuade Congressional action is exercising the First Amendment right of petition.) (alteration in original).  Participating in litigation, including as an amicus, also implicates the right to petition guaranteed by the First Amendment.  *Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401 (4th Cir. 2001); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 155 (D.D.C. May 27, 2025) ("Filing and pursuing lawsuits are forms of protected petitioning.").  In total, the Petition Clause guarantees that no one can be deprived of "effective way[s] to affect government policy."  *Autor v. Pritzker*, 740 F.3d 176, 183

(D.C. Cir. 2014). Because of its potential to chill petitioning activity, government disclosure requirements that implicate the Petition Clause must satisfy "exacting scrutiny," meaning the burden is to show that they have "a 'substantial relationship' to a 'sufficiently important governmental interest.'" *Calzone v. Summers*, 942 F.3d 415, 422 (8th Cir. 2019) (quoting *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 874, 874–75 (8th Cir. 2012) (en banc), and citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)).

113. The CID violates the right to petition by threatening to require disclosure of the Endocrine Society's communications with government entities. The communications implicated by this request will concern sensitive and politically charged topics. Even absent enforcement, the threat of disclosure makes it impossible for Plaintiff to safeguard its internal communications regarding interactions with government entities or to promise any government entity with which it interacts that its communications will not be made public. That makes it impossible for Plaintiff to freely communicate with government actors concerning issues and advocacy that are central to its charitable mission.

114. The CID similarly demands information about any amicus briefs Plaintiff has filed in cases concerning gender affirming care. This potential disclosure requirement chills the Endocrine Society's willingness to participate as an amicus or coordinate amicus briefs in coalitions, as it has in the past.

115. Because the investigation burdens Plaintiff's right to petition, it can only be sustained if it is substantially related to an important government interest. As explained *supra*, it is not.

## COUNT VI
### Violation of First Amendment and Fourth Amendment through an
### *Ultra Vires*, Overbroad, and Unduly Burdensome Investigation

116.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

117.    The Fourth Amendment requires an agency's use of compulsory process be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See v. City of Seattle*, 387 U.S. 541, 544 (1967).  "Where the materials sought to be seized [by a CID] may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'" *Reporters Comm. for Freedom of Press v. AT&T Co.*, 593 F.2d 1030, 1055–56 (D.C. Cir. 1978) (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978)).  In addition, a CID that requests information relevant to a journalist's investigation or sources must exhibit "special sensitivity . . . in view of the vital function the press serves in a self-governing society."  *SEC v. McGoff*, 647 F.2d 185, 191 (D.C. Cir. 1981).

118.    As alleged above, the CID burdens Plaintiff's First Amendments rights to speech, association, press, and petition.  Furthermore, the CID requires expansive disclosure of communications relevant to Plaintiff's scientific and medical journalism.

119.    The CID does not adhere to the Fourth Amendment's requirements with scrupulous exactitude.  It includes nearly limitless requests for documents and information that span over a decade but have no plausible relationship to the FTC's jurisdiction or any investigation into a violation of the FTC Act.  Accordingly, it is *ultra vires*, overbroad, overly intrusive, and unduly burdensome.

## PRAYER FOR RELIEF

WHEREFORE, the Endocrine Society respectfully requests that this Court provide the following relief:

a) Declare that Defendants' investigation constitutes a retaliatory action in violation of Plaintiff's rights under the First Amendment of the U.S. Constitution.

b) Declare that Defendants' CID violates Plaintiff's First Amendment rights by censoring Plaintiff's speech based on its viewpoint.

c) Declare that Defendants' CID violates Plaintiff's First Amendment right to freedom of association.

d) Declare that Defendants' CID violates the rights accorded to Plaintiff by the First Amendment's promise of freedom of the press.

e) Declare that Defendants' CID violates Plaintiff's First Amendment right to petition the government.

f) Preliminarily and permanently enjoin Defendants, their officers, agents, servants, and employees from taking any further or continuing action against Plaintiff in relation to (1) its publication of the Guidelines, (2) its publication of the Position Statement, or (3) its noncommercial statements concerning the safety or efficacy of gender affirming care.

g) Grant such other and further relief as this Court deems just and proper.

Dated:  February 17, 2026

Respectfully submitted,

/s/ Raymond P. Tolentino
Raymond P. Tolentino (DC Bar No. 1028781)
Heather Sawyer (DC Bar No. 497688)
(*Pro Hac Vice* forthcoming)
Dev P. Ranjan (D.C. Bar No. 90019329)
(*Pro Hac Vice* forthcoming)
COOLEY LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC  20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
rtolentino@cooley.com
hsawyer@cooley.com
dranjan@cooley.com

*Counsel for Plaintiff the Endocrine Society*