**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE ENDOCRINE SOCIETY,

*Plaintiff*,

v.

FEDERAL TRADE COMMISSION, *et al.*,

*Defendants*.

Case No. 1:26-cv-00512-JEB

**ORAL ARGUMENT REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I. FACTUAL BACKGROUND .......................................................................... 2

    A. The Endocrine Society is a charitable nonprofit organization solely focused on advancing the field of endocrinology through scientific research and advocacy. ........................................................................ 2

    B. The Endocrine Society has engaged in noncommercial speech about gender affirming care. ................................................................................ 4

    C. The Trump Administration has made opposition to gender affirming care a core component of its policy platform. .................................................. 6

    D. The FTC has seized on the President's directives to punish speech the President disfavors. ................................................................................. 8

    E. The FTC served a sweepingly broad CID on the Endocrine Society. ................. 10

    F. The Administration's campaign of retaliation is chilling the Endocrine Society's speech. ....................................................................................... 12

    G. The FTC is pursuing punitive investigations against other nonprofit organizations that speak about gender affirming care. ......................................... 14

II. PROCEDURAL HISTORY .......................................................................... 15

LEGAL STANDARD ......................................................................................... 17

ARGUMENT ..................................................................................................... 17

I. THE ENDOCRINE SOCIETY IS LIKELY TO SUCCEED ON THE MERITS. .......... 19

    A. The Endocrine Society is likely to establish that the FTC violated the First Amendment by retaliating against its constitutionally protected speech on a matter of public concern .................................................................................... 19

        1. The Endocrine Society engaged in protected speech on a matter of public concern. ................................................................................. 19

        2. The FTC's actions would deter a person of ordinary firmness from speaking again. ......................................................................... 22

        3. The FTC's actions are causally linked to the Endocrine Society's protected activities. ........................................................................ 23

            a. The CID explicitly targets protected speech. ............................... 23

            b. The FTC has announced that it disapproves of and seeks to retaliate against the Endocrine Society's speech. ....................... 27

# TABLE OF CONTENTS
(continued)

Page

   c. The FTC's investigation fits into a pattern of retaliatory action. ............................................................................ 30

 B. The Endocrine Society is likely to establish that the FTC's investigation burdens its First Amendment rights and fails heightened scrutiny. ..................... 32

  1. The FTC's investigation operates as a viewpoint-discriminatory prior restraint. ......................................................... 32

  2. The FTC's investigation burdens the Endocrine Society's First Amendment rights to associate, be part of the press, and petition. ........... 34

  3. The FTC's investigation does not withstand any level of scrutiny. ......... 38

 C. The FTC's investigation violates the Fourth Amendment. .................................. 39

II. THE ENDOCRINE SOCIETY WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ENJOIN THE FTC. .................................................................... 40

III. THE REMAINING EQUITABLE FACTORS FAVOR GRANTING PRELIMINARY RELIEF. ............................................................................................ 41

CONCLUSION .......................................................................................................................... 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ............................................................................................19

*In re 2025 Subpoena to Children's Nat'l Hosp.,*
    2026 WL 160792 (D. Md. Jan. 21, 2026) ...........................................18, 26, 31, 39

*In re Admin. Subpoena No. 25-1431-019,*
    800 F. Supp. 3d 229 (D. Mass. 2025) ...........................................................18, 30

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.,*
    __ F. Supp. 3d __, 2026 WL 80796 (D.D.C. Jan. 11, 2026) ...................................31

*Am. Oversight v. Hegseth,*
    788 F. Supp. 3d 14 (D.D.C. 2025) .......................................................................17

*Am. Sch. of Magnetic Healing v. McAnnulty,*
    187 U.S. 94 (1902) .............................................................................................21

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) ......................................................................................35, 38

*Aref v. Lynch,*
    833 F.3d 242 (D.C. Cir. 2016) ............................................................................19

*Ark. Writers' Project, Inc. v. Ragland,*
    481 U.S. 221 (1987) ...........................................................................................36

*Autor v. Pritzker,*
    740 F.3d 176 (D.C. Cir. 2014) ............................................................................37

*Balt. Scrap Corp. v. David J. Joseph Co.,*
    237 F.3d 394 (4th Cir. 2001) .............................................................................37

*\*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ........................................................................................32-34

*Boardley v. U.S. Dept. of Interior,*
    615 F.3d 508 (D.D.C. 2010) ...............................................................................32

*Cal. Dental Ass'n v. FTC,*
    526 U.S. 756 (1999) ......................................................................................25-26

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

*Calzone v. Summers,*
    942 F.3d 415 (8th Cir. Nov. 1, 2019)...................................................................... 37-38

*Cent. Hudson Gas & Elec. Co. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980)..................................................................................................20

*Citizens United v. FEC,*
    558 U.S. 310 (2010)..................................................................................................36

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 530 (1980)..................................................................................................19

*Cusumano v. Microsoft Corp.,*
    162 F.3d 708 (1st Cir. 1998)...............................................................................36, 41

*Darviris v. Petros,*
    812 N.E.2d 1188 (Mass. 2004) .................................................................................25

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030,*
    2026 WL 33398 (D. Colo. Jan. 5, 2026)........................................................... 18, 30-31

*Eastman Chem. Co. v. Plastipure, Inc.,*
    775 F.3d 230 (5th Cir. 2014) ....................................................................................20

*FEC v. Machinists Non-Partisan Pol. League,*
    655 F.2d 380 (D.C. Cir. 1981)..................................................................................38

*Fed. Educ. Ass'n v. Trump,*
    795 F. Supp. 3d 74 (D.D.C. 2025).............................................................................41

*FTC v. Agora Financial, LLC,*
    447 F. Supp. 3d 350 (D. Md. 2020)...........................................................................25

*Jenner & Block LLP v. U.S. Dep't of Just.,*
    784 F. Supp. 3d 76 (D.D.C. 2025).............................................................................22

*John Doe No. 1 v. Reed,*
    561 U.S. 186 (2010)..................................................................................................37

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016).................................................................................40, 42

*Lovell v. City of Griffin,*
    303 U.S. 444 (1938)..................................................................................................36

iv

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*McMillan v. Togus Reg'l Off., Dep't of Veterans Affs.*,
   294 F. Supp. 2d 305 (E.D.N.Y. 2003) ..................................................................20

*Media Matters for Am. v. Bailey*,
   2024 WL 3924573 (D.D.C. Aug. 23, 2024) ...................................................22, 35

*\*Media Matters for Am. v. FTC*,
   2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ............................................... *passim*

*\*Media Matters for Am. v. FTC*,
   805 F. Supp. 3d 105 (D.D.C. 2025) ............................................................ *passim*

*\*Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025) .................................................................. *passim*

*Media Matters for Am. v. Paxton*,
   732 F. Supp. 3d 1 (D.D.C. 2024) .......................................................................22

*Minn. Citizens Concerned for Life, Inc. v. Swanson*,
   692 F.3d 864 (8th Cir. 2012) ............................................................................37

*NAACP v. Button*,
   371 U.S. 415 (1963)..........................................................................................37

*\*Nat'l Rifle Ass'n of Am. v. Vullo*,
   602 U.S. 175 (2024).................................................................................. 1, 33-34

*Nieves v. Bartlett*,
   587 U.S. 391 (2019)..........................................................................................23

*Playboy Enters., Inc. v. Meese*,
   639 F. Supp. 581 (D.D.C. 1986) ......................................................................32

*QueerDoc, PLLC v. U.S. Dep't of Just.*,
   __ F. Supp. 3d __, 2025 WL 3013568 (W.D. Wash. Oct. 27, 2025).........18, 27, 30

*Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*,
   593 F.2d 1030 (D.C. Cir. 1978)..................................................................36, 39

*In re Sealed Case*,
   77 F.4th 815 (D.C. Cir. 2023)....................................................................32, 38

*SEC v. McGoff*,
   647 F.2d 185 (D.C. Cir. 1981).........................................................................39

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*See v. City of Seattle,*
    387 U.S. 541 (1967)..........................................................................................39

*In re Subpoena Duces Tecum No. 25-1431-016,*
    2025 WL 3562151 (W.D. Wash. Sept. 3, 2025).............................................18, 30

*In re Subpoena No. 25-1431-014,*
    __ F. Supp. 3d __, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025)...............18, 27, 30

*Talbott v. United States,*
    2025 WL 3533344 (D.C. Cir. Dec. 9, 2025).....................................................20

*Tao v. Freeh,*
    27 F.3d 635 (D.C. Cir. 1994).........................................................................22

*Time Warner Cable, Inc. v. Hudson,*
    667 F.3d 630 (5th Cir. 2012).........................................................................36

*Torrey v. Infectious Diseases Soc'y of Am.,*
    86 F.4th 701 (5th Cir. 2023).........................................................................21

*U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.,*
    507 F. Supp. 2d 45 (D.D.C. 2007)..............................................................36, 38

*Underwager v. Salter,*
    22 F.3d 730 (7th Cir. 1994)..........................................................................21

*United States v. Alvarez,*
    567 U.S. 709 (2012).....................................................................................21

*United States v. Peck,*
    154 F. Supp. 603 (D.D.C 1957).....................................................................36

*United States v. Ring,*
    706 F.3d 460 (D.C. Cir. 2013)......................................................................37

*United States v. Stanchich,*
    550 F.2d 1294 (2d Cir. 1977)....................................................................27, 30

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943).....................................................................................19

*Wash. Legal Found. v. Friedman,*
    13 F. Supp. 2d 51 (D.D.C. 1998)...................................................................42

## TABLE OF AUTHORITIES
(continued)

Page(s)

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) ...............................................................22

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
784 F. Supp. 127 (D.D.C. May 27, 2025)................................................37

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................................................................................17

*Zurcher v. Stanford Daily*,
436 U.S. 547 (1978)................................................................................39

**Statutes**

15 U.S.C.
§ 44..........................................................................................15, 25
§ 45(m)(1)(A)..........................................................................15, 25
§ 57b-1(a)(6) ..................................................................................26
§ 57b-1(c)(1) ..................................................................................26

**Other Authorities**

*Clinical Practice Guidelines*, Endocrine Society ...........................................3

*Defending Women from Gender Ideology Extremism and Restoring Biological
Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615
(Jan. 20, 2025)....................................................................................... 6-7

*Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14190, 90
Fed. Reg. 8853 (Feb. 3, 2025) ......................................................... 6-7, 28

*FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News ...................9, 28

FTC, *Request for Public Comment Regarding "Gender-Affirming Care" for
Minors* ...............................................................................10, 29, 34

FTC, *Transcript of Workshop: The Dangers of "Gender-Affirming Care" for
Minors* (July 9, 2025)...................................................... 9-10, 29, 34

Jody Godoy, *US FTC Workshop Criticizing Medical Care for Transgender Youth
Draws Staff Opposition*, Reuters (July 2, 2025) .................................28, 33

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-
Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102
J. Clinical Endocrinology & Metabolism 3869 (Nov. 1, 2017)......................5, 11, 13

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

HHS, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures* (Nov. 19, 2025)................................................................8

*In re Am. Med. Ass'n*,
94 F.T.C. 701, 1979 WL 199033 (Oct. 12, 1979).................................................26

Joe Kinsey, *White House MAHA Official Destroys Youth Transgender Treatments as Nike Continues to Dodge Study Questions*, OutKick (Apr. 25, 2025) .................................7

Letter from Andrew N. Ferguson, Chairman of the FTC to Staff (Feb. 14, 2025)........................9

Mary Margaret Olohan, *Trump Admin Hires Glenna Goldis, Lawyer Fired by Letitia James*, Daily Wire (Feb. 5, 2026)................................................10, 30

*Matter of Coll. Football Ass'n*,
117 F.T.C. 971 (1994)............................................................26

*Position Statement on Transgender Health*, Endocrine Society & Pediatric Endocrine Society (Dec. 2020) ............................................5-6, 11

*Preventing the Mutilation of American Children*, Memorandum from the Attorney General to Select Component Heads (Apr. 22, 2025) ............................7, 28

*Protecting Children from Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025) ............................................6-7

Jon Schweppe (@JonSchweppe), X (Nov. 19, 2025, at 13:18 ET)................................9

Joe Simonson (@SaysSimonson), X (Feb. 10, 2026, at 13:48 ET)................................9

*Statement of Concern Dated July 2, 2025 from FTC Employees on the FTC's July 9 Workshop on Gender-Affirming Care* (July 2, 2025)................................29

*Staying in Our Lane: Resisting the Temptation of Using Consumer Protection Law to Solve Other Problems*, Prepared Remarks of Andrew N. Ferguson, Commissioner of the FTC, at the 2024 International Consumer Protection and Enforcement Network (ICPEN) Fall Conference, Washington, D.C. (Sept. 27, 2024)................................................................25

*Trade Regulation Rule on Unfair or Deceptive Fees,* 90 Fed. Reg. 2066-01 (Jan. 10, 2025)................................................................26

U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* (Nov. 19, 2025)................................8, 28, 31

## <u>TABLE OF AUTHORITIES</u>
(continued)

**Page(s)**

*Trump's Day One Plans Target Transgender Health Care, Transgender Athletes*,
NPR (Nov. 15, 2024) ................................................................................................7

The White House, *Report to the President on Protecting Children from Surgical
and Chemical Mutilation Executive Summary* (Apr. 28, 2025)................................8

## INTRODUCTION

"Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). Defying that bedrock constitutional rule, the Trump Administration seeks to end scientific discourse and debate on a topic of profound public concern: gender affirming care. Taking up that cause, the Federal Trade Commission (FTC) has delivered on its Chairman's promise to "fight back against the trans agenda" by serving on the Endocrine Society—a nonprofit organization dedicated to research and education—a Civil Investigative Demand (CID) requesting essentially every document and communication in its possession with any reference to gender affirming care. That CID is already visiting significant harms on the Endocrine Society, chilling its ability to speak on high-profile public-policy questions implicating its scientific expertise.

The FTC's investigation is not a one-off attack. For the last thirteen months, officials in the Trump administration have relentlessly targeted those who support or provide gender affirming care and what the Administration calls the "gender ideology" informing this care. According to the Administration, that ideology is "anti-American, subversive, harmful, and false," and based on "false claim[s]" that "lack[] scientific integrity." The Administration has announced that "no sane person could endorse" gender affirming care, because it is "chemical and surgical mutilation" based on "junk science" that is "not trustworthy" and "very low quality." It has made it clear that "[i]t is the policy of the United States" that there are only "two sexes" and that they are "not changeable and are grounded in fundamental and incontrovertible reality." Federal officials have called organizations that support gender affirming care "demonic forces" that are "committing war on kids" by "pedd[ling] . . . lie[s]."

This investigation is the Administration's latest push to extinguish the "ideology" of gender

affirming care.  But while the FTC can disagree with, criticize, and disfavor the Endocrine Society's speech on a topic of public concern, it cannot use its powers of investigation or enforcement to punish the Endocrine Society or suppress its views.  Yet by every objective indication, that is what the CID does: it demands a staggering amount of information about the Endocrine Society's noncommercial speech on scientific issues of profound relevance to public health and welfare.  The CID does not seek information about any commercial speech of any for-profit entity within the FTC's jurisdiction.  That omission confirms that—as the FTC's Chairman previewed with his promise to target the "trans agenda"—the FTC is attacking the Endocrine Society and its peers because it disfavors their speech.  The First and Fourth Amendments prohibit this retaliatory, unlawful CID.  And unless this Court grants immediate relief, the Endocrine Society will face irreparable harm from the government's campaign of intimidation.  As many other courts have done in similar cases, the Court should enter a preliminary injunction and block the FTC's unconstitutional attempt to suppress the Endocrine Society's speech.

## BACKGROUND

### I.    FACTUAL BACKGROUND

#### A.    The Endocrine Society is a charitable nonprofit organization solely focused on advancing the field of endocrinology through scientific research and advocacy.

The Endocrine Society is a charitable, nonprofit organization.  Compl. ¶¶ 25-27.  Since its founding in 1916, it has dedicated itself to accelerating scientific breakthroughs and improving human health in the field of endocrinology.  *Id*. ¶ 25.  With more than 18,000 members across the world, the Endocrine Society is the largest and most active organization devoted to the study of hormones and clinical practice across the entire spectrum of endocrinology.  *Id.*  The Endocrine Society was organized for the purpose of promoting "scientific research," "diffus[ing]

information" by "lecture," and publishing on "scientific subjects." Ex. 1.[1]  Those remain its objectives today, and it is still "organized and operated exclusively for educational and scientific purposes." Ex. 2.  It has been recognized by the Internal Revenue Service as a 501(c)(3) organization for over 80 years.  *See* Declaration of Mila N. Becker (Becker Decl.) ¶ 4.

The Endocrine Society engages in noncommercial speech on a diverse array of scientific and medical topics that align with its expertise and charitable purpose.  Compl. ¶ 27.  The Endocrine Society publishes top-ranked peer-reviewed journals, clinical practice guidelines, and scientific statements that have contributed to foundational advancements in the field of endocrinology.  *Id.* ¶ 28.  It also engages in limited advocacy related to its charitable purpose of advancing knowledge of endocrinology and human health worldwide.  *Id.*  That includes the publication of position statements on issues related to endocrinology.  *Id.*  The Endocrine Society also provides information to—and conducts informational sessions for—legislators and regulators and sometimes participates in litigation as an *amicus*, lending its expertise to aid courts in deciding issues relevant to endocrinology.  *Id.*

The Endocrine Society's publications also advance clinical practice in endocrinology.  The Endocrine Society publishes medical, evidence-based clinical practice guidance for its members and other providers on a wide range of clinical endocrine issues.  Compl. ¶ 34.  For instance, it has published guidelines regarding the treatment of pituitary incidentaloma, hyperprolactinemia, and osteoporosis.  *See Clinical Practice Guidelines*, Endocrine Society, https://perma.cc/PET5-PJCD. The Endocrine Society's guidelines are developed by panels of individuals chosen for their clinical or other relevant expertise.  Compl. ¶ 35.  The panels employ a rigorous methodology to craft

---

[1] All references to "Ex. _" refer to the Exhibits attached to the Declaration of Raymond P. Tolentino, filed concurrently herewith.

guidelines, and the draft guidelines undergo a thorough review and approval period before publication. *Id.* Guidelines take years to develop; that timeframe includes a member comment period, an expert review period, and a period for the guideline development panel to address comments before publication. *Id*. The Endocrine Society also requires that guideline panelists adhere to the organization's conflict of interest policy to ensure transparency, objectivity, and trustworthiness. *Id.*

The Endocrine Society's revenue and expenses are derived from and directed towards activities in furtherance of its charitable mission. Compl. ¶ 26. It has approximately 70 employees and depends heavily on the work of its volunteer members. *Id.* ¶ 2. Its primary sources of revenue are sales of its peer-reviewed journals, membership dues, attendance fees for its educational programs, grants, and donations. *Id.* ¶ 26. And its expenses are primarily devoted to organizing and hosting educational programs and publishing peer-reviewed scientific journals. *Id.*

**B.    The Endocrine Society has engaged in noncommercial speech about gender affirming care.**

Gender dysphoria is a disorder in which an individual suffers physical and emotional distress related to an incongruence between their gender identity and the sex in which they would physically present absent medical intervention. Compl. ¶ 29. For years, the medical consensus has been that, in some cases, gender dysphoria is appropriately treated with some manner of gender affirming care, potentially including counseling, hormonal treatment, or surgical intervention. *Id*. ¶¶ 30-31. The medical consensus is that access to gender affirming care can have a positive impact on the mental health of individuals with gender dysphoria. *Id.* ¶ 31.

As one of the world's oldest and foremost authorities on endocrine disorders and hormonal treatments of other disorders, the Endocrine Society has frequently engaged in speech concerning gender dysphoria and gender affirming care. Compl. ¶ 33. Its speech has included statements of

medical and scientific opinion and analyses of existing research on the treatment of individuals with gender dysphoria. *Id.* The Endocrine Society has never engaged in the advertising, marketing, commercial promotion, or sale of any gender affirming treatment or medications. *Id.* Rather, it has participated in the advancement of knowledge regarding the treatment of gender dysphoria, just like it has done in countless other areas of endocrine science. *Id.* ¶¶ 33-34.

The Endocrine Society published its first guidelines for the treatment of gender dysphoria in 2009. Compl. ¶¶ 37-38. It routinely updates its guidelines, and in 2017, the Endocrine Society published its most recent version of its guidelines, *Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons* (2017 Guidelines). Ex. 3, Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism 3869-3903 (Nov. 1, 2017). The 2017 Guidelines cite more than 260 research studies, representing the best available data found during a thorough review of the research at the time. Compl. ¶ 38. The 2017 Guidelines reflect the strength of each recommendation, the quality of the supporting evidence, and criteria used by the guideline writing panel in reaching its conclusions, including values and preferences for consideration by a patient and their family. *Id.* The 2017 Guidelines recommend proceeding with treatments of gender dysphoria as conservatively as possible. *Id.* ¶ 39. They recommend against puberty blocking and gender affirming hormone treatment before puberty and contemplate those treatments only if a demonstrated, long-lasting, and intense pattern of gender dysphoria worsens with the onset of puberty. *Id.* ¶¶ 39-40.

In addition to its guidelines, the Endocrine Society publishes policy statements and public statements based on medical evidence. Compl. ¶¶ 7, 10, 33, 42, 44. For example, the Endocrine Society published a "Position Statement" in December 2020 on transgender health. *See* Ex. 4,

*Position Statement on Transgender Health*, Endocrine Society & Pediatric Endocrine Society (Dec. 2020); *see also* Compl. ¶¶ 42-43.  Citing reputable medical guidance and peer-reviewed journals, the Position Statement explained the history of gender affirming care, explained various considerations related to gender affirming care, such as insurance coverage and other barriers to receiving treatment, and articulated the Endocrine Society's positions on gender affirming care related to policy decisions, medical intervention, and research funding.  *Id*.  The Endocrine Society has put out similar public statements and fact sheets in response to various news events and to further public awareness about gender affirming care and has submitted comments to various government entities, including in response to proposed agency rules and legislative initiatives.  *Id*. ¶ 44.

### C.    The Trump Administration has made opposition to gender affirming care a core component of its policy platform.

The Trump Administration has taken a markedly antagonistic position towards gender affirming care.  It has stated that its goal is to stop the "advancement" and "promot[ion]" of "gender ideology."  Ex. 5, *Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14190, 90 Fed. Reg. 8853 (Feb. 3, 2025); Ex. 6, *Protecting Children from Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025).  According to the Administration, this "ideology" is typified by "the false claim that males can identify as and thus become women and vice versa."  Ex. 7, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025).  In the Administration's view, the ultimate expression of "gender ideology" is support for "gender affirming care," which "attempt[s] to transform an individual's physical appearance to align with an identity that differs from his or her sex" as assigned at birth.  Ex. 6.  This "ideology" contradicts

the "policy of the United States" which is that there are only "two sexes" and they are "not changeable and are grounded in fundamental and incontrovertible reality." Ex. 7.

According to the Administration—and as enshrined in the Federal Register—"gender ideology" is "anti-American, subversive, harmful, and false." Ex. 5. In line with that belief, the Administration has sought to cut off access to gender affirming care and speech that "advances" or "promotes" it. This objective was identified before the President took office, when he promised to "on Day 1, . . . sign an executive order instructing every federal agency to cease the promotion of sex or gender transition at any age." Ex. 8, *Trump's Day One Plans Target Transgender Health Care, Transgender Athletes*, NPR (Nov. 15, 2024). It has since continued to animate the Administration's actions, for instance in executive orders stating that the Administration is rejecting the "false claim[s]" of "gender ideology," naming perceived proponents of "gender ideology" as "lack[ing] scientific integrity," and directing federal agencies to "ensure grant funds do not promote" and "eliminat[e] Federal funding for" "gender ideology." Exs. 5-7.

The rest of the executive branch has followed the President's directions to extinguish this "ideology," even characterizing its proponents as "demonic forces." Ex. 9, Joe Kinsey, *White House MAHA Official Destroys Youth Transgender Treatments as Nike Continues to Dodge Study Questions*, OutKick (Apr. 25, 2025). The Attorney General has directed the Department of Justice (DOJ) to "hold accountable" those who advance the "ideological agenda" of gender affirming care, describing this care as illegal "genital mutilation" and promising that DOJ will "investigate and hold accountable" those who it determines to have "mislead the public" by promoting it. Ex. 10, *Preventing the Mutilation of American Children*, Memorandum from the Attorney General to Select Component Heads (Apr. 22, 2025). The Centers for Medicare & Medicaid Services (CMS) issued a memorandum "alert[ing] providers" to the "lack of medical evidence" supporting gender

affirming care and noted that similar memoranda were published by the Substance Abuse and Mental Health Services Administration, the Health Resources and Services Administration, and the Office of the Assistant Secretary for Health. Ex. 11, The White House, *Report to the President on Protecting Children from Surgical and Chemical Mutilation Executive Summary* (Apr. 28, 2025).

The Administration's ideological battle with "gender ideology" has often focused directly on the Endocrine Society and its Guidelines, which are among "[t]he most influential sources of clinical guidance for treating pediatric [gender dysphoria] in the U.S." Ex. 12, U.S. Dep't of Health & Hum. Servs. (HHS), *Treatment for Pediatric Gender Dysphoria: Review of Evidence and Best Practices* 146 (Nov. 19, 2025). Despite the Guidelines' scientific rigor, HHS has charged that the Guidelines are also "not trustworthy," "very low quality," and "peddl[ing] . . . lie[s]." *Id.* at 146, 150; Ex. 13, HHS, *HHS Releases Peer-Reviewed Report Discrediting Pediatric Sex-Rejecting Procedures* (Nov. 19, 2025).

HHS conveyed the same criticisms in a follow-up letter sent to the Endocrine Society. Ex. 14. The letter reiterated that the "administration's priority [was] to end all" gender affirming care for minors because such care is "not supported by evidence." *Id*. at 1. The letter then stated that the Endocrine Society should "immediately . . . revise [its] medical guidelines and guidance that advise medical professionals to provide these procedures to minors." *Id.* at 2.

### D. The FTC has seized on the President's directives to punish speech the President disfavors.

The FTC has emerged as a willing participant in the Administration's assault on "gender ideology": For the last year, its actions have reflected the Administration's position that proponents of gender affirming care should be investigated and punished. Compl. ¶ 59. Before his appointment as Chairman of the FTC, then-Commissioner Andrew Ferguson pledged to use his

role to "[a]dvance the President's agenda."  Ex. 15 at 1, *FTC Commissioner Andrew N. Ferguson for FTC Chairman*, Punchbowl News.  That included "[f]ight[ing] back against the trans agenda" by "[i]nvestigat[ing] the doctors, therapists, hospitals, and others who deceptively pushed" gender affirming care.  *Id.*  Immediately after taking office, he took a concrete but symbolic step in that battle, announcing a policy that all political appointees are prohibited from attending events sponsored by the American Bar Association, in part because of its support for "transgender ideology."  Ex. 16 at 2, Letter from Andrew N. Ferguson, Chairman of the FTC to Staff (Feb. 14, 2025).  The Chairman's staff has been equally vocal in its outward support for the Administration's hostility to gender affirming care.  For example, an FTC senior policy advisor posted on social media that organizations that supported gender affirming care "peddled . . . lie[s]," "betrayed their oath[s]," and engaged in "malpractice."  Ex. 17, Jon Schweppe (@JonSchweppe), X (Nov. 19, 2025, at 13:18 ET).  And just two weeks ago, the Director of the FTC Office of Public Affairs posted on social media that only "partisan morons" could "believe investigating whether children had their breasts and genitalia improperly removed is 'an attack on transgender rights.'"  Ex. 18, Joe Simonson (@SaysSimonson), X (Feb. 10, 2026, at 13:48 ET).

The FTC has also attempted to integrate the battle against "gender ideology" into its enforcement agenda.  On July 9, 2025, the FTC held a workshop entitled "The Dangers of 'Gender-Affirming Care' for Minors."  Ex. 19, FTC, *Transcript of Workshop: The Dangers of "Gender-Affirming Care" for Minors* (July 9, 2025).  The Endocrine Society was brought up several times during the workshop—the facts and opinions in its Guidelines were declared to be "untrue," though the organization itself was acknowledged to be "otherwise legitimate."  *Id.* at 33, 70.  In addition to the "dangers" of gender affirming care, the workshop also focused on "how harmful gender ideology is," with a particular focus on speech about the topic.  *Id.* at 75.  For example, panelists

discussed the dangers of using "the language of gender affirming care," including phrases like "sex assigned at birth," "gender identity," "cisgender," and "preferred pronouns." *Id.* at 13-14, 75-76. One panelist addressed how to deal with nonprofit "medical associations" that had "published endorsements or kind of de facto endorsements" of gender affirming care. *Id.* at 81. Her answer was to "act[] against" them "by seeking injunctions," and she said that "just the act of conducting thorough investigations" and "making that public" could be instrumental in "exposing the medical associations to the public" such that they could "start losing members" and "other revenue streams." *Id.* at 81-82. This panelist has since been hired by the FTC to "spearhead" investigations into gender affirming care. Ex. 20, Mary Margaret Olohan, *Trump Admin Hires Glenna Goldis, Lawyer Fired by Letitia James*, Daily Wire (Feb. 5, 2026). A few weeks after the workshop, the FTC issued a notice that it was seeking public comments informing it about "organization[s] that recommend[] gender-affirming care" or "made public representations about" gender affirming care. Ex. 21, FTC, *Request for Public Comment Regarding "Gender-Affirming Care" for Minors*.

### E.    The FTC served a sweepingly broad CID on the Endocrine Society.

On January 20, 2026, the Endocrine Society was served with a CID. Ex. 22. The CID says that the "purpose" of the Commission's investigation "is to determine whether [the Endocrine Society] or any other Person, . . . have made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment." *Id.* at 1. The CID notes that "according to the [the Endocrine Society]," such treatments "purport[]" to treat minors with gender dysphoria. *Id.*

The CID has three focuses. For each, the CID demands essentially every piece of information that the Endocrine Society has, including documents, information, and communications from every employee, officer, and "affiliate[]" of the Endocrine Society. Ex. 22 at 8. First, the CID focuses on what it terms "covered statements." Covered statements include

any statements, whether "express or implied," that any medical care for minor patients with gender dysphoria is safe, effective, or supported by evidence-based science. *Id.* For covered statements, the CID demands (1) a description of every covered statement, (2) the name of the person responsible for developing, reviewing, or substantiating the covered statement, (3) every communication with any entity, internal or external, related to the covered statement, and (4) any communication with any entity, internal or external, that references the covered statement. *Id.* at 6. The CID's other two focuses are the Endocrine Society's 2017 Guidelines and 2020 Position Statement. For both the Guidelines and the Position Statement, the CID requests (1) all communications of any type with any entity internal or external related to the Guidelines or the Position Statement, and (2) the name of every individual or entity that participated in developing or issuing the Guidelines or Position Statement. *Id.* at 6-7.

The CID also directly targets the Endocrine Society's associations and public advocacy. For example, it requests any "information" related to gender affirming care for minors "provided to any legislature or regulator" and asks for a description of every "lawsuit" in which the Endocrine Society participated as an "amicus." Ex. 22 at 6-7. And it asks for "documents required to be signed"—namely, attendance sheets—from any "formal or informal session or conference You hosted or organized related in any way to" gender affirming care. *Id.* at 7.

The CID's requests often require production of documents going back more than a decade. Ex. 22 at 6-7. The CID's definitions are also broad. For example: The CID states that every time it requests a "document" related to a topic, it means any "drafts or prior versions"; "notations on the copy"; "copies of all hyperlinked materials"; all forms of electronic messaging, such as texts or instant messages; and any "information" "on all devices (including employee-owned devices) used for Organization-related activity" that relates to the topic. *Id.* at 8. In addition, the CID states

that every time it says "Organization," "You," and "Your," that also includes "other persons working for or on behalf of" an extensive list of entities or individuals with potential ties to the Endocrine Society. *Id.* In combination, the extended timeframe the CID targets, its expansive document requests, and its broad definitions make compliance practically impossible.

### F. The Administration's campaign of retaliation is chilling the Endocrine Society's speech.

Enforcement of the CID would be devastating to the Endocrine Society. Compliance would require the Endocrine Society to divert between a half and a third of its employees towards compliance, and it would likely cost well over $500,000 of the organization's limited budget to satisfy the CID's document preservation, collection, and production requirements. Becker Decl. ¶¶ 19-22. But financial harm is not the only significant harm at play here. The CID has already sharply chilled the Endocrine Society's speech and association by substantially increasing the risk that any communication or association with the Endocrine Society—especially regarding gender affirming care—could expose others to similarly retaliatory action. *Id.* ¶¶ 24, 30-36.

For the Endocrine Society, the most significant casualty of the Administration's retaliatory campaign against "gender ideology" and its perceived proponents is a planned update to the 2017 Guidelines. Becker Decl. ¶¶ 24-25. The Endocrine Society routinely updates all its clinical practice guidelines based on developing research and clinical advancements. *Id.* ¶ 13. In 2022, the Endocrine Society's Board voted to begin a routine update in 2023 of its clinical practice guidelines for the treatment of gender dysphoria and gender incongruence. *Id.* ¶ 24. The process began and was expected to result in an updated guideline in approximately 2026. *Id.* But in 2025, advancement of the guideline's drafting and review process was delayed, as researchers and methodologists informed the Endocrine Society that they could no longer be associated with work on gender affirming care, out of fear for their personal safety, future funding, and of government

retaliation. *Id.*

The Endocrine Society's inability to complete an update to its guidelines harms the very interests the Administration purports to protect. Becker Decl. ¶ 25. As with any guideline update, this one would consider any new research into areas relevant to the guideline's purpose, for example the effects of puberty delaying medication and hormone therapy as well as any other research questions identified by the guideline writing panel. *Id.* But because of the Administration's retaliation against speech about gender affirming care, scientists, clinicians, and researchers are unable or unwilling to expose themselves to harms the Administration demonstrated that it will inflict on anyone associated with gender affirming care. *Id.* ¶ 24.

The Administration's broadsides against "gender ideology" have also chilled the Endocrine Society's other speech about gender affirming care. The organization's magazine, social media, and newsletter no longer cover the issue because the Endocrine Society fears that any coverage will trigger additional adverse government action. Becker Decl. ¶ 29. For the same reasons, the Endocrine Society has stopped responding to most media requests on gender affirming care and has curtailed its communications with government actors on the subject. *Id.* For example, the Endocrine Society routinely engages with members of Congress to provide information about issues of endocrine health, including on treatment of gender dysphoria. *Id.* ¶ 30. But the Endocrine Society has stopped planning educational briefings for Congress on issues related to gender dysphoria. *Id.* In addition, the content of comments Endocrine Society submitted to two proposed HHS rules on February 17, 2026, was adjusted to address the Administration's attacks on the Endocrine Society's Guidelines and blunt further retaliation against it. *Id.*

The Endocrine Society's associational activities related to gender affirming care have also almost entirely stopped. Becker Decl. ¶ 31. The organization's Government and Public Affairs

Department has paused many activities, such as engagement in some coalitions, partially as a result of ongoing investigations conducted by the FTC and other government actors. *Id.* For example, the Endocrine Society had considered joining a statement with other medical organizations about proposed agency rules to restrict access to gender affirming care. *Id.* That effort was abandoned as a result of feared government retaliation and the potential requirement of disclosures of communications with other individuals and organizations. *Id.*

Finally, the FTC's investigation and CID have inflicted serious burdens on the Endocrine Society's employees and members. Becker Decl. ¶ 33. After receiving the CID, the Endocrine Society informed certain members and employees that they should preserve documents so the Endocrine Society could comply with its potential production obligations. *Id.* Some recipients of the notice replied that, as a result of the FTC's investigation, the institutions they were associated with would likely no longer allow them to work with the Endocrine Society on topics related to gender affirming care out of fear that those institutions could themselves be placed under the Administration's scrutiny. *Id.* In addition, members expressed concern about the litigation hold out of apparent fear of personal consequences from the Administration if it learned that they had worked with or had any communication with the Endocrine Society related to gender affirming care. *Id.*

### G.    The FTC is pursuing punitive investigations against other nonprofit organizations that speak about gender affirming care.

As publicly available documents show, the FTC issued CIDs against at least two other nonprofit organizations that have engaged in speech about gender affirming care on the same day that it issued its CID against the Endocrine Society. Petition to Quash Civil Investigative Demand, *In re Civil Investigative Demand to World Professional Ass'n for Transgender Health*, FTC File No. P264800 (Feb. 9, 2026), https://perma.cc/DW8F-2EZC; Petition to Quash Civil Investigative

Demand, *In re Civil Investigative Demand to Am. Acad. of Pediatrics*, FTC File No. P264800 (Feb. 9, 2026), https://perma.cc/8XS7-YVV7. Both the American Academy of Pediatrics (AAP) and the World Professional Association for Transgender Health (WPATH) received CIDs. Both AAP and WPATH are organizations that, like the Endocrine Society, have published statements and clinical guidelines supporting gender affirming care as an option that should be available for patients when clinically indicated. Compl. ¶ 69. And those two organization's guidelines were cited by HHS—along with the Endocrine Society's—as the most influential on clinicians treating gender dysphoria. *Id.* The CIDs issued to those organizations are strikingly similar to those issued to the Endocrine Society, and they demand all documents relating to their guidelines and public statements about gender affirming care. *Id*.

## II.   PROCEDURAL HISTORY

After receiving the CID, the Endocrine Society sought to meet and confer to narrow the CID's broad scope. Compl. ¶ 78. The Endocrine Society explained that, because it was a 501(c)(3) nonprofit organization that does not engage in commercial speech, it was outside of the FTC's regulatory jurisdiction. *Id.* ¶ 79; *see* 15 U.S.C. §§ 44, 45(m)(1)(A). It requested that the FTC explain how the intrusive demands on the Endocrine Society could further any legitimate enforcement objective. *Id.*

The FTC declined to constructively engage with the Endocrine Society on its concerns surrounding the CID. Compl. ¶ 79. It repeatedly demanded the Endocrine Society waive every objection to the CID in order to set a production schedule. *Id.* ¶¶ 79, 81-82. When the Endocrine Society made clear that it would not waive its right to object to the CID, including on constitutional grounds, the FTC asserted that the Endocrine Society had somehow inadvertently waived all of its objections, *id.* ¶ 82, notwithstanding that the Endocrine Society consistently maintained that it had

serious objections to the scope and nature of the CID in every meet and confer session, *id.* ¶¶ 79, 81.

The FTC's few concessions narrowing or clarifying the CID were not enough to address the Endocrine Society's serious concerns. When the Endocrine Society pointed out that certain broad document requests with no temporal boundaries were unworkable for a 110-year-old organization, the FTC still demanded twelve years of records, dating back to 2014. Ex. 23 at 5. The FTC allowed the Endocrine Society to provide a list of any publicly available documents it provided to legislatures or regulators instead of the documents themselves, but it still required the Endocrine Society to produce copies of every non-public document it had provided to those government entities. *Id.* at 14. The FTC clarified that its inclusion in the definition of the "Organization" of its "members" did not require the Endocrine Society to answer or produce documents on behalf of its over 18,000 members but failed to address the vague and broad inclusion of "affiliates" of the organization in that definition. *Id.* The FTC also identified two priority requests and sought to accelerate production to February 20, 2026, nearly a month before the date of production in the CID. *Id.* at 5. Even though the Endocrine Society agreed to produce documents on one of those requests on the FTC's accelerated timeline, the FTC would not accept the Endocrine Society's proposal to narrow the scope with regard to the FTC's second priority request. *Id.* at 7-8, 15. Instead, the FTC said that to obtain an extension of the deadline for its petition to quash—which otherwise would need to be filed three business days later—the Endocrine Society would be required to propose binding search terms for that request for the FTC's review and approval within less than two days, an impossible task under the circumstances. *Id.* at 15.

Because informal discussions were not yielding progress, the Endocrine Society moved to quash or limit the subpoena before the FTC on February 10, 2026. *In re Civil Investigative Demand to the Endocrine Society*, FTC File No. P264800 (Feb. 10, 2026), https://perma.cc/QXS2-8FLC. But in light of the FTC's erroneous waiver assertions and the ongoing harm to the Endocrine Society and its members, the Endocrine Society filed this action one week later. The Endocrine Society is not alone in seeking this Court's review of the FTC's efforts to investigate nonprofit medical organizations for their guidance on gender affirming care. Both AAP and WPATH have also filed actions to enjoin the FTC's investigation on constitutional grounds. *Am. Acad. of Pediatrics v. FTC*, No. 26-cv-508-CRC (D.D.C. Feb. 17, 2026); *World Pro. Ass'n for Transgender Health v. FTC*, No. 26-cv-532-JEB (D.D.C. Feb. 18, 2026).

## LEGAL STANDARD

A plaintiff seeking preliminary relief must show: (1) likelihood of success on the merits; (2) likelihood of "suffer[ing] irreparable harm in the absence of preliminary relief;" (3) that "the balance of equities tips in [their] favor;" and (4) that "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge" when "the Government is the opposing party." *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 30 (D.D.C. 2025) (Boasberg, C.J.).

## ARGUMENT

This case fits a disturbing pattern. Again and again in the past year, the federal government has sought to unleash its vast investigatory powers against entities who do not share the current Administration's policy views. Those actions run headlong into the First Amendment, which forbids the government from targeting or limiting speech on matters of public concern. And they equally transgress the Fourth Amendment, which prohibits overbroad investigations that interfere

17

with free speech.  Applying those constitutional provisions, courts—including the D.C. Circuit—have repeatedly rejected the Administration's retaliatory and viewpoint-discriminatory investigations.  Those examples include cases, like this one, where plaintiffs sought (and achieved) preliminary relief against investigations initiated by the FTC.  *See Media Matters for Am. v. FTC*, 2025 WL 2988966, at *11 (D.C. Cir. Oct. 23, 2025) (declining to stay injunction against FTC investigation); *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 138 (D.D.C. 2025) (enjoining FTC investigation).  And they also include cases, like this one, where plaintiffs challenged the federal government's attempts to target what it has termed "gender ideology" through baseless investigations.  *QueerDoc, PLLC v. U.S. Dep't of Just.*, __ F. Supp. 3d __, 2025 WL 3013568, at *5 (W.D. Wash. Oct. 27, 2025) (quashing subpoena); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025) (same); *In re Subpoena No. 25-1431-014*, __ F. Supp. 3d __, 2025 WL 3252648, at *34 (E.D. Pa. Nov. 21, 2025) (same); *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *13 (W.D. Wash. Sept. 3, 2025) (same); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *10-11 (D. Colo. Jan. 5, 2026) (same); *In re 2025 Subpoena to Children's Nat'l Hosp.*, 2026 WL 160792, at *7-9 (D. Md. Jan. 21, 2026) (same).

This Court should reach the same result.  As explained below, the FTC's investigation seeks to punish and silence the Endocrine Society for its protected speech, and thus violates the First Amendment's prohibitions on retaliation and viewpoint discrimination.  The FTC's improper investigation also burdens the Endocrine Society's rights to associate, to participate in the press, and to petition the government, and it fails to satisfy any level of scrutiny.  The Endocrine Society is being irreparably harmed by the FTC's actions targeting its speech and advocacy about gender

18

affirming care.  And the public interest overwhelmingly favors enjoining the FTC from moving forward with its unconstitutional inquiry.  A preliminary injunction is warranted.

## I.    THE ENDOCRINE SOCIETY IS LIKELY TO SUCCEED ON THE MERITS.

The Endocrine Society is likely to succeed on the merits of its claims that the FTC's investigation violates its First and Fourth Amendment rights.

### A.    The Endocrine Society is likely to establish that the FTC violated the First Amendment by retaliating against its constitutionally protected speech on a matter of public concern.

To prevail on its retaliation claim, the Endocrine Society must show:"(1) [it] engaged in conduct protected under the First Amendment; (2) [the FTC] took some retaliatory action sufficient to deter a person of ordinary firmness in [P]laintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  Each element is satisfied here.

### 1.    The Endocrine Society engaged in protected speech on a matter of public concern.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Thus, the category of speech most entitled to First Amendment protection is speech on "matters of public concern." *Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 534 (1980); *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 584 (2023) ("By allowing all views to flourish, the framers understood, we may test and improve our own thinking both as individuals and as a Nation.").

The Endocrine Society, as a publisher of scientific and medical research and articles, *see* Compl. ¶¶ 25, 32-35, is plainly "engaged in conduct protected under the First Amendment" on matters of public concern, *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584 (D.C. Cir. 2025).

It is beyond dispute that "public debate on matters of public concern" includes "scientific matters." *McMillan v. Togus Reg'l Off., Dep't of Veterans Affs.*, 294 F. Supp. 2d 305, 316 (E.D.N.Y. 2003); *Eastman Chem. Co. v. Plastipure, Inc.*, 775 F.3d 230, 235 (5th Cir. 2014) (holding that the First Amendment protects "scientific debates unfolding within the scientific community"). And the question of whether gender affirming care should be available to patients of all ages is a topic of robust and ongoing public, scientific, and medical debate. Compl. ¶¶ 29-32; *see Talbott v. United States*, 2025 WL 3533344, at *9 (D.C. Cir. Dec. 9, 2025) (stating that there is a "fraught medical divide" on "treatment efficacy" regarding gender dysphoria). Thus, the Endocrine Society's work to advance the understanding and treatment of gender dysphoria—through its medical guidelines, its messaging to members and the public, and its advocacy—is core First Amendment activity.

Critically for this case, the Endocrine Society's statement of opinion on a matter of medical debate has no commercial character. True, when "statements are made only in the context of commercial transactions," the "government may ban forms of communication more likely to deceive the public than to inform it." *Cent. Hudson Gas & Elec. Co. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 n.5, 563 (1980) (internal quotation marks omitted). But "direct comments on public issues" made outside the commercial context fall outside of that authority. *Id.* at 562 n.5. The Endocrine Society's work falls into the latter category: It does not attempt to profit from its research or medical opinions, advertise or market any treatments or medications, or provide any medical care or services itself. Becker Decl. ¶¶ 6-9, 11. It is a 501(c)(3) nonprofit organization whose revenues and expenditures are subject to public scrutiny. *Id.* ¶¶ 4, 9-10. The Endocrine Society cannot—and does not—seek profit for itself or its members, and it has no financial interests that are implicated by its clinical recommendations or policy positions. *Id.* ¶ 11. Instead, the organization is focused on public advocacy to advance the field of endocrinology and improve

human health.  *Id.* ¶¶ 7-9.  The Endocrine Society's speech therefore lacks any of the characteristics of the commercial speech that the First Amendment allows the government greater latitude to regulate under false-advertising statutes like the FTC Act.

And when it comes to noncommercial scientific speech on matters of public concern, an unbroken line of authority prohibits the government from seeking to dictate the truth or falsity of an idea.  The Supreme Court and the courts of appeals have long rejected attempts by the government to police debates about which "schools of medicine" are "devoid of merit."  *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 106 (1902).  That is because, as Judge Easterbrook put the point for the Seventh Circuit, "Scientific controversies must be settled by the methods of science rather than by the methods of litigation[:] More papers, more discussion, better data, and more satisfactory models—not larger awards of damages—mark the path toward superior understanding of the world around us."  *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) (citation omitted).  Or, as the Fifth Circuit explained, "publishing a medical opinion—even a hotly debated one—in a peer-reviewed journal cannot give rise to a misrepresentation claim."  *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704-05 (5th Cir. 2023); *see United States v. Alvarez*, 567 U.S. 709, 723 (2012) ("[A] ban on speech, absent any evidence that the speech was used to gain a material advantage, . . . would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition"); *id.* at 733 (Breyer, J., concurring in the judgment) (same); *id.* at 751-52 (Alito, J., dissenting) (same).  The government cannot, consistent with the Constitution, contend that noncommercial medical opinions violate false-advertising laws.

**2.    The FTC's actions would deter a person of ordinary firmness from speaking again.**

The FTC's investigation of the Endocrine Society—and this CID in particular—will "deter" the Endocrine Society "from speaking again." *Media Matters*, 805 F. Supp. 3d at 129; *see supra* at 11. This standard is "not a high" bar to clear. *See Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 95 n.7 (D.D.C. 2025). Whenever those "who exercise free speech find themselves facing more burdensome . . . requirements than those . . . who remain silent, they are unlikely to speak freely on matters of public concern." *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994). Thus, courts have repeatedly held that retaliatory investigations "unquestionably chill[] . . . exercise of . . . First Amendment rights," even when they do not ultimately lead to enforcement actions. *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000); *see Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 27-28 (D.D.C. 2024). The CID is also accompanied by the threat of an action to enforce compliance in federal court and the even more coercive threat of an enforcement action under the FTC Act. Compl. ¶¶ 84-85; *see Media Matters*, 805 F. Supp. 3d at 131.

The deterrent effect of the CID is particularly acute because of the sensitive information the FTC seeks: Private communications between researchers concerning one of the most politically charged topics on which the Administration has taken an outspoken and absolutist view. Compl. ¶¶ 72-77. The CID directly seeks information about "editorial process" that led to the Endocrine Society's publication on such a politically charged—and Administration-disapproved—topic. *Id.*; *see Paxton*, 732 F. Supp. 3d at 28; *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *11 (D.D.C. Aug. 23, 2024). In addition, the Endocrine Society's "actual response" demonstrates the CID's chilling effect. *See supra* at 12-14. The FTC's investigation has already deterred the Endocrine Society from engaging in protected speech, associating in furtherance of its speech, publishing medical journalism, and engaging in protected petitioning. *Id.* It also has chilled the

Endocrine Society's internal communications about gender affirming care, further obstructing its ability to fulfill its charitable purposes.  Becker Decl. ¶¶ 27-28.

> 3.    **The FTC's actions are causally linked to the Endocrine Society's protected activities.**

Finally, the FTC commenced this investigation and issued this CID because of the Endocrine Society's constitutionally protected speech.  The standard is but-for causation: The question is whether "the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).  And in *Media Matters*, the D.C. Circuit identified various features of an FTC CID that, in combination, suggested that "protected speech likely caused issuance of the Demand."  2025 WL 2988966, at *6.  Each feature is present here.  *First*, the CID itself confirms that the FTC seeks to investigate protected speech on a matter of public concern, in a manner that is strongly suggestive of an intent to retaliate.  *Second*, the FTC (and the Administration of which it is a part) has publicly stated that it seeks to punish the Endocrine Society's speech on these topics.  And *third*, the investigation falls in line with an unmistakable pattern of retaliatory investigations by the FTC and the Administration.

> a.    **The CID explicitly targets protected speech.**

The "broad scope of the demand—including its effort to probe into" protected speech—is "evidence of pretext."  *Media Matters*, 2025 WL 2988966, at *7.  The CID focuses overtly on the Endocrine Society's speech conveying a viewpoint with which the FTC disagrees.  *See supra* at 10-12.  It requests voluminous records relating to that speech.  And it does not explain how any of those requests are related to any action or entity that the FTC can regulate.  The CID's retaliatory purpose is thus apparent on its face.

The CID focuses on three topics.  *See* Compl. ¶ 73.  The first topic is "any representation, whether express or implied," that treatments for gender dysphoria "are safe," "are proven

effective," "improve mental health," "reduce the incidence of suicide," "are fully or partly reversible," or "have few side effects." Ex. 22 at 8. The second and third topics relate to the Endocrine Society's 2017 Guidelines and its 2020 Position Statement. *Id.* at 8-9. For each topic, the CID demands: (1) a description of every statement; (2) the name of the person responsible for developing, reviewing, or substantiating the statement; (3) every communication with any entity, internal or external, related to the statement; and (4) any communication with any entity, internal or external, that references the statement. *Id.* at 5-7. For the reasons already explained, that speech is protected by the First Amendment because it expresses opinions on a matter of intense public concern. Also as already explained, the speech lacks any commercial character. Thus, the text of the CID itself demonstrates that it aims to retaliate.

As the D.C. Circuit and the district court concluded in *Media Matters*, the disconnect between the speech the CID targets and the FTC's purported enforcement action is further evidence of pretext. In other words, "the sweeping scope of the FTC's CID" does not "square with the proffered reason." *Media Matters*, 805 F. Supp. 3d at 137. The FTC asserts that it is investigating "representations" and "practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment." Ex. 22 at 1. But the CID's document requests do not focus on marketing or advertising. Instead, the CID asks for vast quantities of documents and information through unreasonably broad definitions and demands, all focused on the Endocrine Society's noncommercial speech about gender affirming care. To give just a few examples, the CID targets the Endocrine Society's "legal advocacy" to "legislature[s]" and "regulator[s]," and "lawsuits" in which it appeared as an "amicus." *Id.* at 5-7. It requests information like attendance sheets from "formal or informal session[s]" that relate in any way to gender affirming care. *Id.* at 7. These are

24

categories of speech that receive the highest First Amendment protections, and they have no discernible relationship to any plausible theory of false-advertising liability.

Indeed, courts considering similar questions have often held that false-advertising liability does not extend to noncommercial speech on scientific matters. For example, in *FTC v. Agora Financial, LLC*, 447 F. Supp. 3d 350 (D. Md. 2020), the FTC sued the sellers of a book containing recommendations on managing Type 2 diabetes. *Id.* at 355-56. Although the FTC sought to regulate ads for the book, it acknowledged that it lacked authority to regulate the book's content. *See id.* at 364 (stating that book's content "lies outside of the FTC's jurisdiction"); *see also Darviris v. Petros*, 812 N.E.2d 1188, 1193 (Mass. 2004) (similar under state false-advertising law). As the Chairman aptly put it, the FTC's "authority does not allow [it] to ban products"—or, even more obviously, speech—"just because someone might use [it] for false advertising." Ex. 24, *Staying in Our Lane: Resisting the Temptation of Using Consumer Protection Law to Solve Other Problems*, Prepared Remarks of Andrew N. Ferguson, Commissioner of the FTC, at the 2024 International Consumer Protection and Enforcement Network (ICPEN) Fall Conference, Washington, D.C., at 2 (Sept. 27, 2024). And under that principle, seeking to investigate the Endocrine Society's non-advertising statements is simply outside of the FTC's lane.

Retaliatory purpose is also apparent because the CID is not "made in accordance with applicable law." *Media Matters*, 2025 WL 2988966, at \*7. The FTC has no power to enforce the FTC Act against the Endocrine Society because the FTC lacks the authority to sue an entity unless it was "organized to carry on business for its own profit or that of its members." 15 U.S.C. §§ 44, 45(m)(1)(A); *see Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 765 (1999). The Endocrine Society is a 501(c)(3) nonprofit that expends its resources on education and the publication of medical journals. *See supra* at 2-4. Thus, the analysis the FTC employs in determining whether a

corporation is a nonprofit outside the Commission's jurisdiction defeats any assertion of enforcement authority over the Endocrine Society.  The FTC considers as relevant an entity's "tax-exempt status" and classification as a 501(c)(3) entity.  *In re Am. Med. Ass'n*, 94 F.T.C. 701, 1979 WL 199033, at *221 (Oct. 12, 1979); *see Trade Regulation Rule on Unfair or Deceptive Fees,* 90 Fed. Reg. 2066-01, 2164 n.687 (Jan. 10, 2025) (citing *In re Am. Med. Ass'n*, 94 F.T.C. at 990).  It also considers whether there is "an adequate nexus" between the organization's "activities and its alleged public purpose" and whether its funds are "use[d] for 'recognized public purposes.'" *Matter of Coll. Football Ass'n*, 117 F.T.C. 971, 993 (1994); *see Unfair or Deceptive Fees*, 90 Fed. Reg. at 2164 n.686 (citing *Coll. Football Ass'n*, 117 F.T.C. at 993)*.*  The Endocrine Society's activities do not "plainly fall within the object of enhancing its members' 'profit.'" *Cal. Dental Ass'n*, 526 U.S. at 767.  From 1916 to the present day, the Endocrine Society has been "organized to" promote "scientific research," "diffus[ing] information" by "lecture," and publishing on "scientific subjects."  Exs. 1-2.  Accordingly, it has been recognized as a 501(c)(3) nonprofit corporation for over 80 years.  *See supra* at 3.

Although the FTC can issue CIDs to entities *outside* of its statutory jurisdiction, those CIDs must be issued in connection with a legitimate investigation into a potential violation of the FTC Act by an entity *within* its jurisdiction.  15 U.S.C. § 57b-1(a)(6), (c)(1).  But the FTC has never identified such an entity in connection with this CID.  And the CID's questions and document request are plainly irrelevant to any inquiry into any advertising or other commercial activity by some unknown third party.  Rather the CID focuses on the formulation and communication of the Endocrine Society's medical views.  To be sure, Chairman Ferguson has threatened to go after "doctors, therapists, hospitals, and others" who support gender affirming care.  But the FTC "regulates commerce, not patient care." *Children's Nat'l Hosp.*, 2026 WL 160792, at *8; *see In*

*re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *17 ("Congress never authorized a roving mandate to regulate and alter state-licensed medical care."). Thus, it is hard to see what lawful investigation would be furthered by the CID issued against the Endocrine Society. At a minimum, this CID is so disconnected from anything genuinely within the FTC's wheelhouse that the only plausible inference is that the FTC issued it to retaliate.

In sum, courts are "not required to exhibit a naiveté from which ordinary citizens are free." *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.). "No legitimate investigation would demand thousands of . . . records from an entity that cannot, by definition, commit the violations being investigated." *QueerDoc*, 2025 WL 3013568, at *6. Nothing in the CID suggests that a legitimate investigation is ongoing or even possible within the FTC's designated authority; instead, every feature of the CID suggests that the FTC is seeking to target a nonprofit's noncommercial speech on a matter of public concern.

**b.    The FTC has announced that it disapproves of and seeks to retaliate against the Endocrine Society's speech.**

The case for retaliation gets only stronger when the CID is considered in its broader context, including the Administration's and the FTC's "expression of hostility to the protected speech." *Media Matters*, 2025 WL 2988966, at *8. One reason to conclude that the FTC is retaliating against the Endocrine Society for its protected activity is that the FTC has said, over and over, that it intends to do so. Thus, there is no need to look for "hidden motives": "the Administration's explicit agenda"—which the FTC and its Chairman have pledged to advance—confirms that it seeks to retaliate. *QueerDoc*, 2025 WL 3013568, at *5.

Since the President took office in 2025, this Administration has repeatedly and vehemently attacked gender affirming care and all entities that provide and advocate for that care. *See* Compl. ¶¶ 46-60. It has described statements supporting gender affirming care—or what it calls "gender

ideology" more broadly—as "anti-American, subversive, harmful, and false."  Ex. 5.  HHS has issued a report stating that medical recommendations concerning gender affirming care are "not trustworthy."  Ex. 12 at 150.  The Justice Department has issued a memorandum characterizing gender affirming care as illegal "genital mutilation"; declaring that it will "hold accountable" those who advance the "ideological agenda" that "teaches children to deny biological reality," namely "gender ideology"; and directing federal prosecutors to prosecute any clinician who provides gender affirming care "to the fullest extent possible."  Ex. 10 at 1, 3-4.

The FTC has been an eager participant in this Administration-wide campaign.  Chairman Ferguson has stated that his goal is to "[f]ight back against the trans agenda" by "[i]nvestigat[ing] the doctors, therapists, hospitals, and others who deceptively pushed" gender affirming care.  Ex. 15; *see* Ex. 25, Jody Godoy, *US FTC Workshop Criticizing Medical Care for Transgender Youth Draws Staff Opposition*, Reuters (July 2, 2025) (other FTC officials publicly stating that "[n]o sane person could endorse" gender affirming care).  In *Media Matters*, the D.C. Circuit concluded that Chairman Ferguson's public statements "of his intent to target . . . actors in language that focuses on their viewpoints and the content of their speech" supported a finding of retaliation.  2025 WL 2988966, at *8.  That same evidence exists here.

This effort to wield state power to combat "gender ideology" has frequently centered on the Endocrine Society.  In particular, the Administration has targeted the Endocrine Society's 2017 Guidelines, which are among "[t]he most influential sources of clinical guidance for treating pediatric [gender dysphoria] in the U.S."  Ex. 12 at 146.  Most prominently, a report by HHS cites the Endocrine Society and its Guidelines nearly 100 times, concluding that they are "very low quality" and "not trustworthy."  *Id.* at 146, 150.  The Administration has also previously tried to coerce the Endocrine Society into retracting its Guidelines.  Ex. 14 at 2.  Relying on its own report,

HHS has demanded that the Endocrine Society "immediately . . . revise [its] medical guidelines and guidance that advise medical professionals to provide" gender affirming care to minors. *Id.* The FTC seeks to accomplish the same goal through this punitive investigation.

The FTC itself has also directly taken aim at the Endocrine Society and its speech. On July 9, 2025, it held a workshop entitled "The Dangers of Gender-Affirming Care for Minors," led in part by Chairman Ferguson, Commissioner Meador, and other FTC officials. As a group of employees noted in a concerned letter, the name of the workshop indicated the FTC "ha[d] already taken a position opposing gender-affirming care for minors." Ex. 26, *Statement of Concern Dated July 2, 2025 from FTC Employees on the FTC's July 9 Workshop on Gender-Affirming Care* (July 2, 2025). During the workshop, the Endocrine Society and its 2017 Guidelines were mentioned several times, and panelists and moderators attacked gender affirming care and speech related to it throughout. A panelist at the workshop also specifically endorsed the sort of retaliatory investigation the FTC has now commenced against the Endocrine Society. In response to a question from Commissioner Meador about what "remedies or solutions" the FTC should seek in enforcement actions related to gender affirming care, she recommended that the FTC should "act[] against" "associations" that have "published endorsements or kind of de facto endorsements" of gender affirming care by "conducting thorough investigations in the course of pursuing a prosecution and making that public" such that those associations would "start losing members," "lose other revenue streams," and "los[e] traction on Capitol Hill." Ex. 19 at 80-82. A few weeks after the workshop, the FTC began executing that strategy: It issued a notice that it was seeking public comments informing it about "entities" that "made public representations about" gender affirming care. Ex. 21 at 4. Meanwhile, the panelist who suggested this (unconstitutional and retaliatory) playbook has since been hired by the FTC to lead investigations related to gender

29

affirming care.  Ex. 20.  Just as in *Media Matters*, therefore, "individuals who had publicly criticized" the Endocrine Society's work—including two moderators at the FTC's panel—"were involved with Chairman Ferguson or the Commission at the time the Demand issued."  2025 WL 2988966, at *8.

Here, again, the Court need not adopt any "naiveté."  *Stanchich*, 550 F.2d at 1300.  "No clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very [speech] it claims to be merely investigating."  *QueerDoc*, 2025 WL 3013568, at *5.  The Court should take the Administration and FTC at their word: The FTC is investigating the Endocrine Society and organizations like it to punish and silence their speech.

### c.    The FTC's investigation fits into a pattern of retaliatory action.

Finally, as in *Media Matters*, this CID is part of a "pattern of litigation and information demands" that uses compulsory process as punitive measures to retaliate.  *Media Matters*, 2025 WL 2988966, at *6.  Several courts have already concluded that the Administration is employing bad faith, "suspicionless investigations" to punish proponents of gender affirming care.  *See*, *e.g.*, *QueerDoc*, 2025 WL 3013568, at *5 (quashing subpoena because "[n]o clearer evidence of improper purpose could exist than the Government's own repeated declarations that it seeks to end the very practice it claims to be merely investigating"); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 239 (quashing subpoena because it was "issued for an improper purpose, motivated only by bad faith" and the administration's "disapproval of the transgender community and its aim to end [gender affirming care]"); *In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *28 (quashing subpoena because it offered "no basis" for the information it demanded); *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *12 (quashing subpoena because it was issued for the "improper purpose" of "end[ing] gender-related care for minors"); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *7 (quashing subpoena because

DOJ's justification was "a smokescreen for its true objective of pressuring pediatric hospitals into ending gender-affirming care through commencing vague, suspicionless 'investigations'"); *Children's Nat'l Hosp.*, 2026 WL 160792, at *7-8 (quashing subpoena because it "lack[ed] a proper investigative purpose" or even a "bare foundation" for the documents requested).

Courts have similarly concluded that the FTC is using punitive investigations to retaliate against speech that the Administration disfavors. In *Media Matters*, this Court recently held that an FTC investigation was retaliation against an entity that had engaged in protected speech that the administration disfavored. 805 F. Supp. 3d at 129. Upholding the district court's decision to enjoin the FTC's action, the D.C. Circuit agreed that the plaintiff was likely to succeed in showing that the FTC's actions were retaliatory. *Media Matters*, 2025 WL 2988966, at *6.

In this case, the FTC focuses its retaliatory investigations on proponents of gender affirming care. Publicly available documents show that just before the FTC served the CID at issue here on the Endocrine Society, it served nearly identical CIDs on the AAP and WPATH. The throughline between the three organizations is apparent. The HHS report that repeatedly characterized the Endocrine Society's Guidelines as "not trustworthy" also listed their publications as the other guidelines that are the "most influential sources of clinical guidance for treating pediatric [gender dysphoria] in the U.S." Ex. 12 at 146. And the CIDs were issued soon after HHS's attempt to strip funding from AAP was enjoined by this court, as likely First Amendment retaliation. *Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, __ F. Supp. 3d __, 2026 WL 80796, at *16 (D.D.C. Jan. 11, 2026). Both AAP and WPATH have since filed petitions to quash or limit their respective CIDs, claiming—as the Endocrine Society did—that the CIDs constitute unconstitutional retaliation under the First Amendment. AAP's Petition to Quash Civil Investigative Demand, *supra* at 15; WPATH's Petition to Quash Civil Investigative Demand,

*supra* at 14.  And both have now filed suit in this Court, seeking to enjoin those CIDs on the same grounds.  *Am. Acad. of Pediatrics v. FTC*, No. 26-cv-508-CRC (D.D.C. Feb. 17, 2026); *World Pro. Ass'n for Transgender Health v. FTC*, No. 26-cv-532-JEB (D.D.C. Feb. 18, 2026).  Thus, both "the timing" and the "circumstances" under which this CID was issued further suggest that it is motivated by retaliatory animus.  *Media Matters*, 805 F. Supp. 3d at 135.

**B.    The Endocrine Society is likely to establish that the FTC's investigation burdens its First Amendment rights and fails heightened scrutiny.**

Even if the FTC's investigation were not forbidden retaliation against the Endocrine Society's protected speech, it would still violate the First Amendment.  The FTC's investigation operates as a viewpoint-discriminatory prior restraint on the Endocrine Society's future speech. And it additionally burdens the Endocrine Society's rights to associate, to serve as part of the press, and to petition.  Thus, the FTC's actions are subject to heightened scrutiny.  Because the FTC cannot come close to carrying that burden, its investigation violates the First Amendment.

**1.    The FTC's investigation operates as a viewpoint-discriminatory prior restraint.**

Just as the government cannot retaliate against a speaker for its past speech, it equally cannot take steps to inhibit a speaker's future speech.  Courts have made clear that "[a]ny system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." *Boardley v. U.S. Dept. of Interior*, 615 F.3d 508, 516 (D.D.C. 2010) (alteration in original) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).  "[I]nformal sanctions" that "deliberately set about to achieve the suppression" of disfavored speech are no less repugnant than direct prohibitions.  *Playboy Enters., Inc. v. Meese*, 639 F. Supp. 581, 585 (D.D.C. 1986) (citing *Bantam Books*, 372 U.S. at 67).  Any prior restraint or viewpoint-based restriction is reviewed under strict scrutiny.  *In re Sealed Case*, 77 F.4th 815, 829 (D.C. Cir. 2023).

As the Supreme Court's decision in *Bantam Books* illustrates, the FTC's investigation is an unconstitutional attempt to indirectly silence future speech. In *Bantam Books*, Rhode Island created a commission that "notif[ied]" a "distributor" of books on "official Commission stationery" that "books or magazines" be "distributed" "had been reviewed by the Commission" and "had been declared . . . to be objectionable." 372 U.S. at 61. A group of publishers argued that the Commission's activities "amount[ed] to a scheme of governmental censorship" that "abridge[d] First Amendment liberties." *Id.* at 64. The Supreme Court agreed, stating that although no books had been "seized or banned," and no one had been "prosecuted for their possession or sale," the Commission had "deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." *Id.* at 67. In short, *Bantam Books* held that "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors," even when that coercion is "indirect[]." *Vullo*, 602 U.S. at 180, 190.

Here, as in *Bantam Books*, the FTC's "acts and practices directly and designedly" seek to stop the Endocrine Society from engaging in further speech about gender affirming care. 372 U.S. at 68. The Administration has made it abundantly clear that it finds the Endocrine Society's speech "objectionable," "anti-American," and "false"; has sent a letter to the Endocrine Society demanding that it revise or alter its Guidelines; and has held an FTC workshop entirely focused on asserting the "dangers" of the very treatments that the Guidelines describe as "safe" and "effective" when clinically appropriate and monitored by qualified medical professionals. *See supra* at 6-10. As one FTC official put it, the Administration's position is that "[n]o sane person could endorse" gender affirming care. Ex. 25.

In keeping with that disapproval, the FTC served the Endocrine Society with a remarkably broad CID—covering the Endocrine Society's past speech *and future speech* for as long as the FTC's "investigation" continues—focused expressly on the precise viewpoint that the Administration has repeatedly broadcast that it finds objectionable.  Just as in *Bantam Books*, the obvious effect of that decision is to effectuate "informal censorship," 372 U.S. at 67, by making clear the consequences of future speech supporting gender affirming care.  In effect, the FTC has told the Endocrine Society that every time it speaks favorably again about this topic of public concern, it will be forced to hand over to the government every document, communication, email, and text message that is in any way relevant to what it says, at its own cost.  It has also repeatedly suggested that the Endocrine Society could be subject to liability under the FTC Act just for using certain words or expressing certain concepts that the government disapproves.  Ex. 19 at 13 (panelist stating that "the vocabulary of gender affirming care" is "designed to . . . mislead consumers" and so "all of these terms are Section 5 violations"); Ex. 21 at 4 (seeking information on "entities . . . that have . . . otherwise made public representations about" gender affirming care).  The First Amendment prohibits "thinly veiled threats to institute . . . proceedings" when they aim "to achieve the suppression of disfavored speech."  *Vullo*, 602 U.S. at 189.  This attempt to "do indirectly what [the FTC] is barred from doing directly" triggers heightened scrutiny.  *Id*. at 190.

## 2.    The FTC's investigation burdens the Endocrine Society's First Amendment rights to associate, be part of the press, and petition.

The FTC's investigation is also subject to heightened scrutiny because it burdens the Endocrine Society's First Amendment rights in other ways.  As the D.C. Circuit has repeatedly recognized, even absent enforcement, a CID can inflict "present, concrete, and objective harms" that "will persist without the Commission also taking enforcement action."  *Media Matters*, 2025 WL 2988966, at *3; *see Paxton*, 138 F.4th at 588 (Henderson, J., concurring in the judgment)

(agreeing that associational injury from CID is "ongoing—not contingent or attenuated—and not self-inflicted").  The Endocrine Society is suffering "harms (not merely 'chilling effects')" even absent the CID's enforcement.  *Paxton*, 138 F.4th at 579.  The CID has "impacted [its] editorial process," "harm[ed] . . . [its] freedom of association," and restricted its ability to interact with the government.  *Bailey*, 2024 WL 3924573, at *11; *Media Matters*, 2025 WL 2988966, at *4. Accordingly, the CID burdens the Endocrine Society's rights to association, press, and petition. Each burden independently requires the CID to withstand heightened scrutiny.

*First*, a CID that burdens associational rights is subject to heightened scrutiny.  "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others . . . . the risk of a chilling effect on association is enough."  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021).  "Broad and sweeping state inquiries" into an organization's "beliefs and associations" "discourage citizens from exercising rights protected by the Constitution."  *Id.*  Accordingly, courts have concluded that an organization's associational rights are impaired when an investigation prevents the investigated party from associating with others.  *See Paxton*, 138 F.4th at 586 (Henderson, J., concurring in the judgment).  When a threat of "compelled disclosure" burdens an organization's associational rights, it is "reviewed under exacting scrutiny."  *Bonta*, 594 U.S. at 608.

The CID imposes those burdens.  Researchers and methodologists who previously worked with the Endocrine Society have said that they can no longer be associated with its work on gender affirming care.  Becker Decl. ¶ 24.  In addition, after being served with the CID, the Endocrine Society was required to inform members who were subject to a litigation hold.  *Id*. ¶ 33.  Members replied that they would no longer be able to associate with the Endocrine Society because their institutions would not permit exposure to similar government scrutiny.  *Id.*  The organization has

paused engagement in some coalitions. *Id.* ¶ 31. And it has adjusted the content of comments to proposed rules and amicus briefs in litigation. *Id.* ¶ 32.

*Second*, a CID that burdens journalistic rights is subject to heightened scrutiny. "[T]he First Amendment protects information-gathering activities from official harassment." *Paxton*, 138 F.4th at 580 (internal quotation marks and alterations omitted). Protections for journalists are not "confined" to protecting "newspapers and periodicals;" they "necessarily embrace[] every sort of publication which affords a vehicle of information and opinion." *Citizens United v. FEC*, 558 U.S. 310, 390 n.6 (2010) (Scalia, J., concurring) (quoting *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938)). In particular, "[a]cademicians engaged in pre-publication research [are] accorded protection commensurate to that which the law provides for journalists." *Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998). "[O]fficial harassment of the press places a *special* burden on information-gathering." *Paxton*, 138 F.4th at 580. For that reason, when a CID "abridge[s] the right to gather information that is guaranteed by the First Amendment," "protections" are "appropriate." *Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1053 n.75 (D.C. Cir. 1978). Government action that burdens journalism in a targeted way must be "necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end." *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 641 (5th Cir. 2012) (citing *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231 (1987)); *see also U.S. Commodity Futures Trading Comm'n v. McGraw-Hill Cos.*, 507 F. Supp. 2d 45, 50-51 (D.D.C. 2007) (stating that the "reporter's privilege" that applies to subpoenas can be overcome with a "compelling interest").

The CID burdens these rights as well. As in many cases, the freedoms of association and of the press are linked, because "[t]o inhibit the freedom of . . . association of newspapermen is to infringe upon the freedom of the press." *United States v. Peck*, 154 F. Supp. 603, 605 (D.D.C

1957).  Because of the harms to its ability to associate, the Endocrine Society has also been unable to advance its research and publishing endeavors.  Becker Decl. ¶¶ 24-26, 29-34.  Most critically, the Administration's attacks have stalled its work on a critical contribution it would otherwise have made to public health and scientific journalism: an update to its Guidelines.  *Id.* ¶¶ 24-25.  And its broader ability to collaborate with scientists and researchers to advance the understanding of gender dysphoria and its treatments also has been significantly diminished.  *Id.* ¶¶ 33-34.

*Third*, a CID that burdens the right to petition the government is subject to heightened scrutiny.  "[P]roviding information, commenting on proposed legislation, and other lobbying activities implicate . . . [the] petition rights."  *United States v. Ring*, 706 F.3d 460, 468 (D.C. Cir. 2013); *see id.* ("[E]very person or group engaged . . . in trying to persuade Congressional action is exercising the First Amendment right of petition.").  Participating in litigation, including as an *amicus*, also implicates the right to petition guaranteed by the First Amendment.  *Balt. Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401 (4th Cir. 2001); *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 127, 155-56 (D.D.C. May 27, 2025) ("Filing and pursuing lawsuits are forms of protected petitioning"); *see also NAACP v. Button*, 371 U.S. 415, 429 & 440 n.19 (1963) (stating that "litigation" is "a form of political expression," including when "mostly in the form of amicus curiae briefs").  In total, the Petition Clause guarantees that no one can be deprived of "effective way[s] to affect government policy."  *Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014).  Because of its potential to chill petitioning activity, government disclosure requirements that implicate the Petition Clause must satisfy "exacting scrutiny."  *Calzone v. Summers*, 942 F.3d 415, 422 (8th Cir. Nov. 1, 2019) (citing *Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 874-75 (8th Cir. 2012) (en banc), and *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010)).

The FTC's investigation has burdened this right as well. As noted above, the Endocrine Society has paused engagement in coalitions in areas regarding gender affirming care. Becker Decl. ¶ 31. The investigation has also hampered the Endocrine Society's ability to submit comments to proposed rules and amicus briefs in litigation. *Id*. ¶ 36. At times, the Endocrine Society has adjusted the content of its submissions to address the Administration's attacks on its Guidelines and help avoid further retaliation. *Id*. ¶ 26. It has also similarly altered its engagement with Congress, including self-censoring the information or educational resources that it provides to members of Congress concerning gender dysphoria or gender affirming care to minimize the potential for retaliatory governmental actions. *Id.* ¶ 30.

### 3. The FTC's investigation does not withstand any level of scrutiny.

Because of these overlapping burdens, the FTC's investigation is subject to heightened scrutiny. *See In re Sealed Case*, 77 F.4th at 829-30 (both prior restraints and content-based restrictions warrant strict scrutiny); *Bonta*, 594 U.S. at 609-10 (burden on association must be narrowly tailored); *McGraw-Hill*, 507 F. Supp. 2d at 51 (burden on press must serve compelling interest); *Calzone*, 942 F.3d at 422 (burden on petitioning must have "substantial relationship to a sufficiently important governmental interest"). On any of these formulations, the CID cannot survive.

To start, because the FTC's investigation is so far outside the realm of its authority or jurisdiction, *see supra* at 25-27, "no compelling interest for the subpoenaed information can possibly exist," *FEC v. Machinists Non-Partisan Pol. League*, 655 F.2d 380, 389 (D.C. Cir. 1981). The FTC has never explained how it has authority to investigate the Endocrine Society, a 501(c)(3) nonprofit organized to promote research and education, and therefore plainly outside the reach of the FTC Act. *See supra* at 25-27.

In addition, even if the FTC generally had the authority for its investigation, the CID's "sweeping scope" does not "square with"—and therefore is not tailored to—"the proffered reason." *Media Matters*, 805 F. Supp. 3d at 137. The CID's expansive requests have no nexus to speech that could potentially be construed as "advertising"—or even to determining whether such speech has any commercial character. Instead, nearly every request targets information about the Endocrine Society's noncommercial speech over the course of over a decade on a matter of public concern, and its associations with others in furtherance of that speech. *See supra* at 10-12. The subpoena is thus "the classic impermissible fishing expedition" rather than a targeted demand. *Children's Nat'l Hosp.*, 2026 WL 160792, at *9.

## C.    The FTC's investigation violates the Fourth Amendment.

For all the same reasons given above, the FTC's investigation also violates the Fourth Amendment. The Fourth Amendment requires an agency's use of compulsory process to be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *See v. City of Seattle*, 387 U.S. 541, 544 (1967). Where "the materials sought to be seized" by a CID "may be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Am. Tel. & Tel.*, 593 F.2d at 1055-56 (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978)). In addition, a CID that requests information relevant to a journalist's investigation or sources must exhibit "special sensitivity . . . in view of the vital function the press serves in a self-governing society." *SEC v. McGoff*, 647 F.2d 185, 191 (D.C. Cir. 1981).

As explained, the CID burdens the Endocrine Society's First Amendment rights many times over. And, far from adhering to the Fourth Amendment with "scrupulous exactitude," the CID is overbroad, unduly burdensome, and entirely outside the FTC's authority. *See supra* at 23-27, 38-39. It requests vast quantities of information—which would divert a substantial proportion

of the Endocrine Society's employees and cost hundreds of thousands of dollars—to produce documents with no commercial nexus. *See supra* at 12, 23-27. For example, it requests all copies of all communications the Endocrine Society has had with "legislature[s]" and "regulator[s]," information about its participation as an amicus in litigation, and "recordings," "transcripts," and attendance sheets from any "formal or informal sessions" concerning gender affirming care. Ex. 22 at 5-8. The FTC's investigation thus violates the Fourth Amendment for all the same reasons that it violates the First Amendment.

## II.    THE ENDOCRINE SOCIETY WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT ENJOIN THE FTC.

If the Court agrees that the Endocrine Society is likely to succeed on the merits of its constitutional arguments, the requirement that it "demonstrate an irreparable injury . . . . is easily met." *Media Matters*, 805 F. Supp. 3d at 138. Whenever an entity is "suffering from a campaign of retaliation against [it] in response to [its] exercise of [its] First Amendment rights," it suffers "an irreparable injury." *Paxton*, 138 F.4th at 585. And the "loss of First Amendment freedoms," even for "minimal periods of time, unquestionably constitutes irreparable injury." *Id.* As explained above, the FTC's investigation seeks to retaliate against the Endocrine Society and is chilling the Endocrine Society's speech, association, journalism, and petitioning. *See supra* at 19-39. Because the Endocrine Society has shown that its First Amendment interests are both being "threatened" and "in fact being impaired," it has established irreparable injury. *Paxton*, 138 F.4th at 585.

Moreover, the real-world harm to the Endocrine Society is independently sufficient to show that the Endocrine Society is being irreparably injured. "An organization is harmed if the actions taken by the defendant have perceptibly impaired the organization's programs." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quotation marks and alterations omitted).

Since the government's campaign of retaliation began, the Endocrine Society's work on gender affirming care has stalled; its ability to collaborate with scientists and researchers has been damaged and, in some cases, lost; and members have reported that their institutions might insist that they disassociate from the Endocrine Society. Becker Decl. ¶¶ 33-34. Its members and employees have stopped or slowed communicating even internally about gender affirming care for fear of future government retaliation, should their communications be disclosed. *Id.* ¶ 30. It has also ceased certain advocacy and education efforts relevant to gender affirming care. *Id.* ¶ 31. These injuries go to the core of the Endocrine Society's functioning as a charitable medical organization seeking to advance endocrinology and public health. Because the CID "creates serious difficulties for [the Endocrine Society] to accomplish [its] mission," it is irreparably harmed. *Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 98 (D.D.C. 2025).

## III. THE REMAINING EQUITABLE FACTORS FAVOR GRANTING PRELIMINARY RELIEF.

The remaining equitable factors—the balance of equities and public interest—"merge if the government is the opposing party." *See Paxton*, 138 F.4th at 585. "'When a private party seeks injunctive relief against the government,'" the Court "must 'weigh[] the benefits to the private party from obtaining an injunction against the harms to the government and the public from being enjoined.'" *Id.* These factors overwhelmingly favor relief.

To start, "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional" government action. *Paxton*, 138 F.4th at 585. That interest is at its apex here, where the CID requests information concerning "pre-publication research" by "[a]cademicians" that is protected by the "the reporter's privilege." *Cusumano*, 162 F.3d at 714. Because the public has an interest in "supporting the full exchange of views in

scientific . . . discussions," *Wash. Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 57 (D.D.C. 1998), the balance of the equities lopsidedly tilts in the Endocrine Society's favor.

By contrast, there is little weighing on the other side.  The FTC failed to provide a plausible justification for its investigatory demands of a nonprofit entity that is not subject to the FTC Act, and has never explained how the requests in the CID in particular have any legal basis.  The FTC therefore suffers no legitimate harm from a preliminary injunction.  *See Newby*, 838 F.3d at 12 (holding there is "substantial public interest" in ensuring that the government "abide[s]" by the law).  And even if its investigation were within its authorities, the FTC's "interest in enforcing consumer protection laws" would not overcome the public's interest in the free flow of information concerning medical science.  *Media Matters*, 2025 WL 2988966, at *10.

*        *        *

As in other recent and ongoing cases, the FTC seeks to wield its vast powers to investigate an entity for engaging in speech on matters of intense public debate and for expressing views that contradict the Administration's stated ideological agenda.  *See, e.g.*, *Media Matters*, 2025 WL 2988966; *Media Matters*, 805 F. Supp. 3d 105; *Am. Acad. of Pediatrics*, No. 26-cv-508-CRC (D.D.C.); *World Pro. Ass'n for Transgender Health*, No. 26-cv-532-JEB (D.D.C.).  A constellation of objective factors confirms that the Endocrine Society's First Amendment-protected right to speak, associate, petition, and publish caused the FTC's investigation.  In such circumstances, the law is clear: The investigation is retaliatory and unconstitutional under the First and Fourth Amendments, and it must be stopped.  And every day the FTC's investigation continues, the Endocrine Society faces irreparable harm to its mission to educate the public on sensitive scientific issues.  Preliminary relief is urgently needed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Endocrine Society requests that the Court grant injunctive relief that (1) prohibits Defendants from implementing or enforcing the Civil Investigative Demand served by the Federal Trade Commission to the Endocrine Society dated January 15, 2026; and (2) prohibits Defendants from issuing any further demands on or further investigating the Endocrine Society in violation of its First or Fourth Amendment rights, including in connection with its Guidelines, Position Statement, or noncommercial speech regarding gender affirming care.


Dated:  February 24, 2026               Respectfully submitted,

                                                    */s/ Raymond P. Tolentino*
                                                    Raymond P. Tolentino (D.C. Bar No. 1028781)
Heather Sawyer (D.C. Bar No. 497688)
(*Pro Hac Vice*)
Joshua Revesz (D.C. Bar No. 1616617)
Dev P. Ranjan (D.C. Bar No. 90019329)
(*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC  20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
rtolentino@cooley.com
hsawyer@cooley.com
jrevesz@cooley.com
dranjan@cooley.com

*Counsel for Plaintiff the Endocrine Society*