IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE ENDOCRINE SOCIETY,<br><br>*Plaintiff*,<br><br>v.<br><br>FEDERAL TRADE COMMISSION, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-00512-JEB |

**DECLARATION OF MILA N. BECKER IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELMINARY INJUNCTION**

I, Mila N. Becker, hereby declare as follows:

1.  I am over the age of eighteen and fully competent to make this declaration. I am the Chief Policy Officer ("CPO") at the Endocrine Society. If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2.  I joined the Endocrine Society in June 2013 as the Senior Director of Advocacy & Policy and became the organization's CPO in 2015. In my role, I oversee the Endocrine Society's Government and Public Affairs Department, which manages the Society's public policy agenda and advocacy efforts. I develop strategies to create and improve policies that affect access to and quality of care, and I engage in advocacy related to diabetes, obesity, funding for medical research, and endocrine-disrupting chemicals. I also serve as liaison to the Endocrine Society's Clinical Affairs, Research Affairs, and Advocacy & Public Outreach Core Committees. These committees play an integral role in implementing the Society's mission, sharing the latest clinical and research information, and making policy recommendations. Over the past twelve years, I have had the opportunity to work closely with our staff, our members, our partner organizations, government officials, and others in the medical society, scientific organization, and policy communities. As a

1

result, I have developed a broad and deep knowledge of the Endocrine Society's operations and of the clinicians, scientists, and groups with which we collaborate.

3. I have reviewed the publicly available versions of the Endocrine Society's Form 990 for fiscal years 2020 – 2023 submitted to the IRS and available on its public website and, in consultation with our Finance Department, I am generally familiar with the organization's financial operations and tax compliance status.

Background

4. Founded in 1916, the Endocrine Society is a 501(c)(3) charitable, non-profit organization dedicated to accelerating scientific breakthroughs and improving patient health and wellbeing. The organization qualifies as a publicly supported organization and has been recognized by the Internal Revenue Service as tax-exempt under § 501(c)(3) for at least 84 years.

5. The Endocrine Society has more than 18,000 members, including scientists, physicians, educators, and nurses, in 122 countries. It is the largest and most active organization devoted to the study of hormones and clinical practice in endocrinology and proudly counts ten of the world's most distinguished scientists who have received the honor of the Nobel Prize in Physiology or Medicine or Chemistry among its members, including four of its past presidents.

Charitable Purpose

6. The Endocrine Society's mission is to advance excellence in endocrinology and promote endocrinology's role in scientific discovery, medical practice, and human health. To accomplish this, the Endocrine Society publishes multiple peer-reviewed journals and publications, hosts forums for the exchange of clinical and scientific knowledge in the field, and supports its over 18,000 members through every stage of their careers.

7. The Endocrine Society has a top-ranked peer-reviewed journal publishing program that addresses dozens of endocrine issues. The Endocrine Society also publishes policy statements,

scientific statements, and clinical practice guidelines. In addition, the Endocrine Society hosts meetings and conferences to provide opportunities to share the latest information and updates in endocrinology and to facilitate professional development and networking for members and all professionals involved in the specialized field of hormone research and clinical endocrinology.

8. The Endocrine Society also offers educational and training opportunities that cover all areas of endocrinology. The Endocrine Society's Center for Learning provides a wealth of activities that afford our members opportunities to pursue and maintain specialty certifications with regulatory or certifying bodies. The Endocrine Society's Special Interest Groups and online platforms allow our members to share information with their peers, learn best practices, and find research collaborations. The Endocrine Society also works with its members to develop policy positions and educate policy makers about them.

9. The Endocrine Society's revenue comes predominantly from program service activities directly related to its exempt educational and scientific purposes. These include journal sales, educational meeting and registration fees, membership dues, author publication charges, and other related services. In 2024, these activities generated approximately 86% of total revenue. Donations and private grants also make up a portion of the Endocrine Society's income. In summary, funding from member services and educational programs together with broad-based contributions constitute most of the Endocrine Society's funding. This information is available from public-facing IRS Form 990s, which also reflect that the Endocrine Society devotes the bulk of its expenses to program services that directly advance its exempt educational and scientific purposes, like organizing and hosting educational programs and publishing journals. The Endocrine Society's latest Form 990 reflecting information from 2024, which has been submitted but not yet posted publicly by the IRS, continues to reflect our charitable purpose. The majority

of the individuals who work with the Endocrine Society are member volunteers, not paid employees. In fact, the organization relies on more than 2,700 member volunteers compared to approximately 70 employees, demonstrating its community-driven charitable operations.

10. The organization's financial statements are audited by an independent accountant, and executive compensation is determined through an independent process involving review and approval by independent persons and use of comparability data. These controls ensure funds are devoted to charitable purposes and protected from misuse.

11. The Endocrine Society does not sell medical products, treat patients, or provide medical care. It has no financial interest in the suggestions or recommendations contained in its guidelines or other position statements regarding endocrine care. Its activities do not provide substantial economic benefits to its members and are designed to further the organization's noncommercial, charitable mission and purpose.

Guideline Development

12. While the Endocrine Society directs its members to potential endocrine-related research opportunities, the Endocrine Society does not itself conduct clinical research. In other words, the Endocrine Society's work related to clinical practice guidelines involves working with our members who are experts in the field to analyze the publicly available evidence. The Endocrine Society determines the topics for guidelines, selects an expert writing committee, and provides the infrastructure for the development and publication by using a robust and rigorous process that adheres to the highest standards of trustworthiness and transparency as defined by the Institute of Medicine. The Endocrine Society also follows the Grading of Recommendations, Assessment, Development and Evaluation (GRADE) methodology to develop its recommendations. GRADE is a transparent framework for summarizing evidence and provides a

systematic approach for making clinical practice recommendations. Additionally, Endocrine Society guidelines are not developed in a vacuum. Guidelines generally take several years to develop through a multi-step drafting, comment, review, and approval process. There is ample opportunity for feedback and debate through this years-long development process. Indeed, the free and robust exchange of information and ideas, and the ability to collaborate and consult across experts and organizations are critical to the Endocrine Society's guideline development process. Consequently, the Endocrine Society's guidelines represent a high-quality resource to be used for patient care based on medical evidence, author expertise, and rigorous scientific review.

13. The Endocrine Society routinely updates its clinical practice guidelines based on developing research and clinical advancements. Typically, guideline updates consider any new research into areas relevant to the guideline's purpose as well as any other research identified by the guideline writing panel.

14. The Endocrine Society's guidelines are available as a resource to medical providers and the broader public. It makes its guidelines available free of charge, regardless of membership in the organization, and the Endocrine Society has no financial interest that is implicated by suggestions or recommendations in its guidelines.

15. The Endocrine Society's guidelines do not dictate the treatment of a particular patient or any specific course of treatment more generally. Instead, the guidelines can help medical providers support patients and families in making informed health care choices that align with a patient's individual health circumstances as well as their (and, for patients under age 18, their parents') values and preferences. This is made clear in the guidelines themselves. For example, and as set forth in its 2017 publication entitled *Endocrine Treatment of Gender-Dysphoric/Gender-*

*Incongruent Persons: An Endocrine Society Clinical Practice Guideline* (the "2017 Guidelines")*,* which is available to the public free of charge on the Endocrine Society's website:

> The guidelines should not be considered inclusive of all proper approaches or methods, or exclusive of others. The guidelines cannot guarantee any specific outcome, nor do they establish a standard of care. The guidelines are not intended to dictate the treatment of a particular patient. Treatment decisions must be made based on the independent judgement of healthcare providers and each patient's individual circumstances.

16. In 2009, using the process described above, the Endocrine Society published its first guidelines for the treatment of gender dysphoria. These guidelines subsequently underwent routine updates, and the 2017 Guidelines are the most recent version of these guidelines.

17. In addition to the guidelines, the Endocrine Society has also published position and public statements on gender affirming care grounded in scientific evidence. For example, in December 2020, the Endocrine Society published a "Position Statement" on transgender health. Citing reputable medical guidance and peer reviewed journals, the Position Statement explained the history of gender affirming care, explained various considerations related to gender affirming care, such as insurance coverage and other barriers to receiving treatment. This statement also summarized the Endocrine Society's positions on gender affirming care related to policy decisions, medical intervention, and research funding. The Endocrine Society has also released similar public statements and fact sheets in response to various news events and to further public awareness about gender affirming care and has submitted comments to various government entities, including in response to proposed agency rules, requests for information, and legislative initiatives. The Endocrine Society's statements reflect its view, shared by several major medical organizations, that access to gender affirming care can have a positive impact on the mental health of individuals with gender dysphoria. As with development of its guidelines, the Endocrine Society's

6

development of these materials demands an environment that allows for the free and robust exchange of ideas and information and the ability to collaborate and consult with other experts and organizations.

Burden of the Civil Investigative Demand

18. I have reviewed the Civil Investigative Demand (CID) issued to the Endocrine Society by the Federal Trade Commission. There are multiple requests that implicate many different elements of the Endocrine Society's work.

19. Based on my experience, responding to the requests as drafted would require us to undertake a substantial and burdensome process of identifying and speaking with a number of individuals across our organization who may have been involved with our work in these areas, including at least the Clinical Practice Guideline team, the Publications Department, the Communications and Media Relations teams, the Executive Office, the Meetings and Education Department, the Membership Department, and the IT team as well as the Government & Public Affairs team. Compliance would likely require diverting significant time from at least 30 of the organization's approximately 70 employees. In addition to Endocrine Society staff, responding to the requests as drafted could also require us to interrupt the work of several Endocrine Society members, including the expert writing panel of the guidelines, the authors of our position statement and policy documents, the Board of Directors, and other member experts in transgender medicine who have participated in the Endocrine Society's work. Then, we might need to seek potentially responsive documents from those individuals. As a nonprofit, the Endocrine Society's technology infrastructure is not designed to optimize compliance with complex, litigation-driven processes such as the CID. The Endocrine Society uses a Microsoft 365-based office system that makes it

time-consuming to search for or easily sort documents. The process is especially burdensome when large quantities of documents are required to be filtered based on complex criteria.

20. Given the breadth of the requests, Endocrine Society would need to collect Electronically Stored Information ("ESI") from some or all of the individuals who would need to be involved in any response to the CID, and we would likely need to retain a third-party vendor to collect and process those documents. Any collected documents would also need to be reviewed by attorneys for responsiveness and privilege. Moreover, my team would need to closely review the responsiveness and privilege determinations, because many of our documents may be highly technical (including use of acronyms and medical information) or require familiarity or expertise to properly categorize. Further, many of our documents may involve third parties with their own privacy interests, or sensitive patient or health data. Screening for this information would require a substantial commitment of time and resources from Endocrine Society.

21. I understand that discovery costs of this type can often run into at least the hundreds of thousands of dollars, which has significant budget implications for a 501(c)(3) organization like our medical society. Approximately ten years ago, the Endocrine Society was involved in discovery related to a different matter. Even as a non-party to the suit, at that time, our costs were close to $100,000 plus significant staff time. Consequently, based on the breadth of the CID in this case, we estimate that our costs could be well over $500,000 plus weeks of IT and other relevant staff time. For a nonprofit medical society like ours, this cost and staff burden is not easily absorbed and would have significant effect on our budget. Our Finance Department is already considering the budget impact of compliance with the CID and identifying what programs, products, and services will be affected, moved, delayed, or stopped. Our IT Department also must

consider what the budgetary impact of compliance will be on technology infrastructure plans as well as its staff capacity and what additional help would be needed.

22. The work I have described would be required to respond to the CID as drafted would divert our staff from the vital, urgent work Endocrine Society does to advance endocrine practice for patients and endocrine research. It would compromise our ability to deliver on other critical programs and services of the Society and hinder our ability to execute core functions to advance the mission of the Society. For example, responding to this CID will take away staff time from working on issues like reducing the cost of insulin and obesity medications, research on diabetes prevention, and funding for biomedical research. It will also take away preparation for the Endocrine Society's annual meeting and development of educational products and programs such as other guidelines. In addition, the CID requests would create new burdens on not only Society member leaders but could also impact rank-and-file members who volunteered to lend their expertise. Our members, like other physicians and researchers across the country, are busy with patient and administrative activities. Assisting us in responding to these broad requests would reduce their time for caring for patients and for research.

Chilling Effect

23. The CID, as well as other retaliatory actions by the federal government against the Endocrine Society based on its views regarding the treatment of gender dysphoria, have also created an environment that obstructs the organization's ability to publish research, freely communicate, associate with others, and educate and advocate with the government.

24. One of the most concrete effects of the Administration's retaliation against speech concerning gender affirming care is that the Endocrine Society has had to delay a planned update to the 2017 Guidelines. In 2022, the Endocrine Society's Board voted to begin a routine update in 2023 of its clinical practice guidelines for the treatment of gender dysphoria and gender

incongruence. The process was expected to result in an updated guideline in approximately 2026. However, in 2025, researchers and methodologists informed the Endocrine Society that they could no longer be associated with work on gender affirming care because they feared for their personal safety, future funding, and of government retaliation.

25. The Endocrine Society's inability to update the 2017 Guidelines harms patients and other interests the Administration claims it is trying to protect. As with any guideline update, the planned update to the 2017 Guidelines would consider any new research into areas relevant to the guideline's purpose. For example, this might include the effects of puberty delaying medication and hormone therapy as well as any other research questions identified by the guideline writing panel.

26. On February 17, 2026, the Endocrine Society submitted comments to proposed rules for the Centers for Medicare and Medicaid Services (CMS) that would restrict access to gender affirming care. The proposed rules were unusual and reflected a retaliatory tone by specifically calling out the Endocrine Society and the Administration's distrust of our guidelines rather than emphasizing affirmative evidence for its proposal. Consequently, we took considerable care to respond to the government's attacks on the Endocrine Society's Guidelines and otherwise adjusted the contents of our comments based on fear of additional government retaliation. We also did not promote our response in public statements, which has been the usual process.

27. In addition to being one element in that larger pattern of retaliatory action, I believe the CID—which expressly focuses on the Endocrine Society's protected expression concerning a hotly debated topic—would be independently sufficient to cause the chilling effect that the Endocrine Society currently suffers under. As drafted, the CID requests production of internal communications with our members and partners, internal chats, notes, drafts, social media posts,

and private emails.  Our staff and members use these tools to communicate with each other and engage in robust, frank, and healthy discussion of the Society's work product.

28. From my discussions with Endocrine Society leadership, staff, and members, I am aware that our staff and members are communicating less, and less freely, because of the CID. Already, our staff are more cautious about sending written communications.  In addition to disrupting communications between staff, the CID has already created an environment in which departments and teams affected are pausing some new activities or reducing current activities out of concern that if required to comply with the CID they will be unable to perform other duties and responsibilities of their jobs.

29. Our organization's public messaging and publishing concerning its work on gender affirming care has also been severely chilled.  Our peer-reviewed journals do not invite papers or opinions on the topic, as they otherwise would; we limit our posting about gender-affirming care on our website; and we take extra precautions with our Special Interest Group on Transgender Health webinars including restricting topics, not broadly promoting sessions outside the group, moderating Q&A, and restricting its session at the annual meeting to a room instead of in an open area on the exhibit floor.  The Endocrine Society's magazine, social media, and newsletter no longer cover the issue because the Endocrine Society fears that any coverage will trigger additional adverse government action.  The Endocrine Society has also stopped responding to most media requests on gender affirming care.

30. We have also significantly reduced our communications with government officials and limited our efforts to influence government policy on the topic.  For example, the Endocrine Society will no longer plan educational briefings for Congress on issues related to gender dysphoria, even though the organization historically has routinely engaged with members of

Congress to provide information about issues of endocrine health. In addition, we declined the invitation to participate in a review of the HHS report on gender-affirming care because it was apparent that the report would attack gender-affirming care and organizations supporting it, rather than neutrally review the existing science on the topic.

31. The Endocrine Society's Government and Public Affairs Department has paused activities related to work on other issues, such as engagement in some coalitions, partially as a result of ongoing investigations conducted by the FTC and other government actors. We considered joining a statement with other medical organizations about proposed agency rules curtailing gender affirming care but ultimately decided against doing so because of a fear of government retaliation and the potential requirement of disclosures of communications with other individuals and organizations.

32. Government threats of investigation and legal actions—as manifest in the CID—are also chilling the Endocrine Society's ability to find individuals willing to work on issues related to the endocrine treatment of gender dysphoria, including the Endocrine Society's guidelines for care. Several individuals who previously have worked on this topic have informed the Society that they can no longer do so for several reasons: (1) fear for their personal security and safety in light of increased harassment and threats of violence, and potential scrutiny from the Administration; (2) the risk and—in some instances—threat of being fired from current jobs or losing future employment opportunities; (3) the risk of being denied future research funding opportunities because of their work on this issue; and (4) for those who are not U.S. citizens, fear that working on this issue will put their immigration status at risk.

33. One immediate effect of the CID was that it harmed the Endocrine Society's association with recipients of the resulting litigation hold. After receiving the CID, the Endocrine

Society informed members and employees that they were subject to a litigation hold and should preserve documents to ensure that the Endocrine Society would be able to comply with its potential production obligations. In response to receiving this litigation hold for a government investigation, some members informed us that they would no longer be able to associate with the Endocrine Society or participate in its publishing. Members expressed fear of retaliation, including that their institutions would not want to be exposed to any resulting government scrutiny and the potential adverse consequences for them personally if the Administration learned they had worked with or had any communication with the Endocrine Society related to gender affirming care. In addition, a potential candidate for an Endocrine Society leadership position informed us that they were told by their institution that they would lose their job if they took the leadership position and the Endocrine Society published new guidelines on gender dysphoria.

34. This chilling effect will only increase if the Endocrine Society is forced to comply with the CID. Based on what has already happened and my experience working at the Society and in this field, I am concerned that our staff and members will avoid communicating with each other on current Endocrine Society projects and programs, even those that are not related to gender affirming care; that our members increasingly will step back from volunteering to work on future clinical practice guidelines, educational sessions and materials; that our members will stop participating in Endocrine Society leadership, committees and work groups; and that new members will fear joining. While Endocrine Society members are committed to ensuring access to care for individuals with gender dysphoria, we are hearing that our members do not feel comfortable using our platforms to discuss this issue.

35. The chilling effect has also impacted our members and will continue to do so. Those who treat people with gender dysphoria or who are transgender are working in often hostile

environments in which their clinics are subject to threats and in some cases actual violence. For example, a bomb threat was made against Boston Children's Hospital for providing gender affirming care and an intentionally set fire severely damaged an Atlanta clinic specializing in this care. These threats and acts of violence have forced the Endocrine Society to secure additional security personnel for several recent meetings. Out of fear for their personal safety and in an effort to avoid threats, harassment, and other retaliatory acts, some members have requested that we remove their contact information from our online directory. While this helps keep their name out of public attention, it also makes it harder for patients to find a physician with this and other endocrine expertise. If these members learn that their communications with their professional society are now subject to government investigation, I am concerned that it will cause some to walk away from the Society just when they need it the most and when their contributions will be helpful to others.

36. This CID has also created a notable strain on our activities to help educate policy makers and the courts about transgender medicine so that they have medical evidence and scientific information to inform their decisions. As a result of this CID, whenever the Endocrine Society prepares to submit a new amicus filing, send a letter to the government, meet with a legislator or government official, or issue a new policy statement, we must consider whether this will result in future adverse attention from the government, including investigations or possible enforcement action. This has hampered our ability to submit comments to proposed rules and amicus briefs in litigation. This is truly chilling to the Endocrine Society's ability to participate in the policy, legislative, and regulatory process and share our views as well as clinical and scientific information with policy makers.

37. In spite of the substantial costs, burdens, and chilling effect of the FTC's CID, the Endocrine Society remains steadfast in its commitment to ensuring that public health policy and debate is driven by medical evidence and allows qualified medical providers to support patients and their parents in making informed decisions that align with their medical needs, health goals, and personal values.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. *See* 28 U.S.C. § 1746.

Executed on this 24th day of February, 2026, at Punta Cana, Dominican Republic

*Mila N. Becker*
Mila N. Becker