# EXHIBIT 24

**UNITED STATES OF AMERICA**
**Federal Trade Commission**
WASHINGTON, D.C. 20580

Office of Commissioner
Andrew N. Ferguson

**Staying in Our Lane:**
**Resisting the Temptation of Using Consumer Protection Law to Solve Other Problems**

**Prepared Remarks of Commissioner Andrew N. Ferguson[*]**
**U.S. Federal Trade Commission**

**2024 International Consumer Protection and Enforcement Network (ICPEN)**
**Fall Conference**

**Washington, D.C.**
**September 27, 2024**

Good afternoon. It's a pleasure speak with so many consumer protection officials from across the country and around the world. Today, I want to discuss an issue that has become acute at the FTC but that I think is relevant to many of your organizations as well: the temptation to use the broad scope of consumer protection laws to venture beyond our role as consumer protection enforcers and attempt to solve larger social, economic, or political issues facing our respective nations.

One of the greatest strengths of consumer protection law is its adaptability. It's impossible to enumerate all the ways a business might shortchange consumers, so this flexibility is a powerful tool for regulators, allowing us to tackle new forms of misconduct as they emerge. It is also a powerful deterrent to businesses who might otherwise be tempted to gain an illegitimate advantage by wronging their customers.

But this flexibility carries with it the temptation to treat consumer-protection law as a panacea for social ills. We must be mindful not to stretch the scope of consumer-protection laws beyond their rightful purpose. We must stay in our lane. Everyone is a consumer. But not every issue is a consumer-protection issue. Consumer protection should focus on safeguarding individuals in their capacity as consumers—not in every aspect of their lives. I think that means that our concern should be limited to deception and unfairness in the commercial context only. Allow me to share a few examples of recent and hypothetical FTC enforcement actions so you can understand my view.

Earlier this year, the Commission settled a case with NGL Labs,[1] a company that runs an anonymous internet messaging service marketed to teenagers and children under 13.[2] NGL sent

---

[*] The views expressed in these remarks are my own and do not necessarily reflect the views of the Federal Trade Commission or any other Commissioner.

[1] Compl., *FTC v. NGL Labs, LLC*, 2:24-cv-5753 (C.D. Cal. July 9, 2024) (hereinafter "NGL Labs Compl."); Stipulated Order for Permanent Inj., Monetary J., Civil Penalty J., and Other Relief, *FTC v. NGL Labs, LLC*, 2:24-cv-5753 (C.D. Cal. July 9, 2024).

[2] NGL Labs Compl., *supra* note 1, at ¶¶ 11–20, 47–52.

fake and distressing anonymous messages to minors to sell those minors a paid membership that would supposedly allow them to see who was behind those very same messages.[3] That kind of conduct preys on and manipulates vulnerable teenage consumers—it is reprehensible, and it is unfair under the FTC's consumer protection law. I voted in favor of the enforcement action, but warned in a concurrence that the Commission should not use its consumer protection authority to declare the offering of any and all anonymous messaging to teenagers an inherently unfair practice.[4] Online anonymity for teenagers, I argued, can have real benefits—for example, encouraging at-risk teens to seek help and protecting teens from cancel culture's ruin.[5] But there is another reason why the Commission should not declare an entire category of product or service unlawful because we think it is more harmful than useful: it is outside of our remit as consumer protection enforcers. Rather than being about the impropriety of a particular commercial transaction—deception or other unfairness in the sale and discharge of the service—it would be the Commission making value judgments about the desirability or undesirability of a mode of communication altogether.

To appreciate the distinction I am making, fast forward about two months. The Commission just this week settled a case against Rytr for offering a generative AI service capable of generating consumer reviews based on a user prompt.[6] The Commission took the view that such a service is nothing but a means and instrumentality for generating fake reviews to be used to deceive consumers in violation of the FTC Act.[7] I disagreed.[8] A review generator has obvious, and lawful utility for consumers who want help drafting a real consumer review. I don't know about you, but I can see why someone would want to use an AI service to help them generate a first draft of a review. My staff's first drafts are incredibly useful to me, even if I discard every word they've written—if only to get past a dreadful case of writer's block staring at a blank page. Our authority does not allow us to ban products just because someone might use them for false advertising.[9] But I do not think I could have further faulted the complaint as venturing outside of our consumer protection jurisdiction, since false advertising is exactly the kind of conduct that hurts people in their capacity as consumers.

Staying true to our enforcement directive is especially important when it comes to new, potentially revolutionary technology. We must resist the impulse to stretch our consumer protection authority to regulate AI, for example. Avoiding mission creep requires discernment. Deepfakes, for example, can cause real harm to individuals, but not necessarily in their capacity as consumers. If a deepfake is used falsely to claim that someone has endorsed a product, or if a company uses AI to generate a video that misrepresents the functionality of its product, then the FTC should

---

[3] *Id.* at ¶¶ 23, 26–27.

[4] Concurring Statement of Comm'r Andrew N. Ferguson, Joined by Comm'r Melissa Holyoak, *In the Matter of NGL Labs, LLC, et al.*, FTC Matter No. 2223144, at 1, 3 (July 9, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ngl-ferguson-concurrence-final-version.pdf.

[5] *Id.* at 3–4.

[6] Compl. ¶¶ 6–7, *In re Rytr LLC* (Sept. 25, 2024) (hereinafter "Rytr Compl."), https://www.ftc.gov/system/files/ftc_gov/pdf/2323052rytrcomplaint.pdf; Decision and Order, *In re Rytr LLC* (Sept. 25, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ 2323052rytracco.pdf.

[7] Rytr Compl., *supra* note 6, at ¶¶ 15–18.

[8] Dissenting Statement of Comm'r Andrew N. Ferguson, Joined by Comm'r Melissa Holyoak, *In the Matter of Rytr LLC*, FTC Matter No. 2323052 (Sept. 25, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-rytr-statement.pdf.

[9] *Id.* at 5–6.

pursue those cases. But defamatory deepfakes, for example, have nothing to do with consumer protection in and of themselves, and are more properly the domain of other areas of law or of legislative action by the people's representatives. Similarly, the question of how to compensate intellectual property owners whose work is used to train AI models is generally a matter of intellectual property law, not consumer protection.

The Commission recently released a monumental report on social media[10]—a project begun during the Trump Administration nearly four years ago. In my concurrence,[11] I took issue with the report's view that the law should prohibit targeted advertising in part on the basis of the emotional response it may generate in the viewer.[12] To be sure, the law must confront the mass *gathering* and *sharing* of private data.[13] But I do not believe the government should get into the business of policing the emotional harms that come from *seeing* an advertisement. American law has long avoided imposing liability purely because an emotional injury for an obvious reason: almost any act can trigger emotional trauma in somebody.[14] Society would come to a standstill if we tried to hold people liable every time they caused a negative emotional reaction in someone else.

Pertinent to today's discussion, if the Commission tried to hold businesses liable for people's emotional reactions to their advertisements, it would be exceeding its consumer protection authority. Our interest in advertising should be in its commercial content, not its other expressive content. An ad affects us in our capacities as consumers insofar as it communicates something about the price or quality of a good or service. Consumer protection law has nothing to say about our aesthetic or emotional reactions. The FTC has no more legitimate interest in protecting people from emotionally traumatizing ads than it has in protecting them from emotionally traumatizing movies or books.

Consumer protection enforcers should take these legal distinctions seriously. In the United States, courts have become intensely skeptical of bureaucratic agencies exceeding their statutory authority. If we continue to stretch the bounds of our consumer protection authority to usurp the general legislative power, we might wake up one day to a judicial decision that severely curtails our authority even on legitimate consumer protection issues. Even if we can get away with using consumer protection authority to address general issues of political and social significance, such conduct can do considerable harm and we should strive to avoid it.

Most importantly, abuse of consumer protection authority undermines the rule of law. The rule of law requires that businesses and individuals have certainty as to their rights and responsibilities. It is one thing to have to contend with a law that requires you to treat consumers honestly and fairly—essentially a beefed-up public law of contracts and commercial torts. But when such a law is used to punish any conduct that a government bureaucrat finds undesirable after the fact, regardless of subject matter, then that legal maxim which forms the cornerstone of the rule of law, that everything that the law does not prohibit is allowed, no longer holds. This lack

---

[10] FTC, A Look Behind the Screens: Examining the Data Practices of Social Media and Video Streaming Services, An FTC Staff Report (Sept. 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/Social-Media-6b-Report-9-11-2024.pdf.
[11] Concurring and Dissenting Statement of Comm'r Andrew N. Ferguson Regarding the Social Media and Video Streaming Services Report, FTC Matter No. P205402 (Sept. 19, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-statement-social-media-6b.pdf.
[12] *Id*. at 4–5.
[13] *Id*. at 2–3.
[14] *Id*. at 5.

of legal clarity is fundamentally unfair. Some modicum of ambiguity is unavoidable in any legal system. But the rule of law requires that people be able to conform their actions to the requirements of the law. Anything short of that begins to look like tyranny.

The legal uncertainty created by the abuse of consumer protection law can also have a chilling effect on innovation and investment. When businesses are unsure of their legal rights—when they fear they might be held liable for actions they reasonably believed were legal—they become more hesitant to invest in new products, technologies, or ventures. Economic prosperity, which contributes to human flourishing, depends on a regulatory environment that fosters confidence and predictability.

Finally, relying too heavily on consumer protection laws to address broader political or societal issues can cause other departments of the government to atrophy. In the United States, for example, Congress has increasingly left complex national problems unresolved, in part because they assume administrative agencies like the FTC will step in to fill the gaps. The hard work of crafting effective, targeted laws is deferred or neglected. Over time, this undermines the balance of powers essential to a well-functioning democracy.

Thank you all for your attention today. I realize that each of our organizations has a unique mix of statutory authorities. You might have more authority than us in some areas and less in others. But my pitch to all of you is that our organizations are stronger and we better serve the public when we stay in our lanes.

I hope you enjoy the rest of the conference and your visit to the FTC.