IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE ENDOCRINE SOCIETY,

*Plaintiff*,

v.

Civil Action No. 1:26-CV-00512 (JEB)

FEDERAL TRADE COMMISSION et al.,

*Defendants*.

**DEFENDANTS' OPPOSITION
TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................................1

BACKGROUND ...............................................................................................................3

    A.    Statutory And Regulatory Framework.................................................. 3

    B.    Recent Developments In Pediatric Gender Dysphoria Treatment........................ 6

    C.    The Commission's Investigation Of PGDT............................................. 9

LEGAL STANDARD.........................................................................................................13

ARGUMENT ...................................................................................................................14

I.    ENDOCRINE SOCIETY IS NOT LIKELY TO PREVAIL ON THE MERITS..............14

    A.    This Court Lacks Authority To Hear Endocrine Society's Pre-Enforcement Challenge .................................................................... 14

        1.    Congress Channeled Endocrine Society's Claims Into the FTC Act's Exclusive Judicial-Review Scheme ...................................................15

        2.    Endocrine Society Has No Cause of Action ............................................20

    B.    Endocrine Society's First Amendment Retaliation Claim Is Meritless.................................................................................. 21

        1.    Endocrine Society Cannot Show Its Speech Caused the CID ...................22

        2.    The CID Has Not Chilled Endocrine Society's Speech............................35

        3.    A Retaliatory-Investigation Claim Is Not Cognizable..............................36

        4.    Endocrine Society's Reliance On Unrelated District Court Cases Is Misplaced..........................................................................37

    C.    Endocrine Society Is Not Likely to Prevail On Its Other Constitutional Claims.............................................................. 38

        1.    The CID Is Not A Viewpoint-Discriminatory Prior Restraint..................38

        2.    The CID Does Not Burden Endocrine Society's Associational Rights ...................................................................................39

        3.    The CID Does Not Violate The Fourth Amendment................................41

II.      THE EQUITIES SUPPORT DENIAL OF THE PRELIMINARY INJUNCTION ..........43

III.     AT A MINIMUM, THE COURT SHOULD REQUIRE A BOND AND STAY
         ANY INJUNCTION ...............................................................................................................44

CONCLUSION.............................................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

### <u>Cases</u>

*AAP v. HHS*,
— F. Supp. 3d —, 2026 WL 80796 (D.D.C. Jan. 11, 2026) ............................................. 29, 37

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*,
840 F. Supp. 2d 327 (D.D.C. 2012) .................................................................................. 43

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......................................................................................................... 21

*Alexander v. United States*,
509 U.S. 544 (1993) .......................................................................................................... 39

*Allen v. Napolitano*,
774 F. Supp. 2d 186 (D.D.C. 2011) .................................................................................. 29

*Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*,
367 F.3d 932 (D.C. Cir. 2004) .......................................................................................... 17

*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) .......................................................................................... 17

*Am. Meat Inst. v. USDA*,
968 F. Supp. 2d 38 (D.D.C. 2013) .................................................................................... 44

*Am. Med. Ass'n v. FTC*,
638 F.2d 443 (2d Cir. 1980 ............................................................................................... 31

*Am. Motors Corp. v. FTC*,
601 F.2d 1329 (6th Cir. 1979) ........................................................................................... 15

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .......................................................................................................... 40

*Anheuser-Busch, Inc. v. FTC*,
359 F.2d 487 (8th Cir. 1966) ............................................................................................. 15

*Archer v. Chisholm*,
870 F.3d 603 (7th Cir. 2017) ............................................................................................. 36

*Aref v. Lynch*,
    833 F.3d 242 (D.C. Cir. 2016) ........................................................................ 21, 35

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ............................................................................................ 20

*Ass'n of Nat'l Advertisers, Inc. v. FTC*,
    627 F.2d 1151 (D.C. Cir. 1979) ..................................................................... 24, 26

*Atl. Richfield Co. v. FTC*,
    546 F.2d 646 (5th Cir. 1977).............................................................................. 15

*Axon Enter., Inc. v. FTC*,
    598 U.S. 175 (2023) ............................................................................... 17, 18, 19

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) .............................................................................................. 39

*Belle Fourche Pipeline Co. v. United States*,
    751 F.2d 332 (10th Cir. 1984)............................................................................ 15

*Blue Ribbon Quality Meats, Inc. v. FTC*,
    560 F.2d 874 (8th Cir. 1977)................................................................... 5, 15, 31

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) ............................................................................................ 40

*Breaux v. City of Garland*,
    205 F.3d 150 (5th Cir. 2000).............................................................................. 36

*California Dental Ass'n v. FTC*,
    526 U.S. 756 (1999) ...................................................................................... 31, 34

*Camreta v. Greene*,
    563 U.S. 692 (2011) ............................................................................................ 19

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ........................................................................... 43

*Citizens for Resp. & Ethics in Wash. v. FEC*,
    971 F.3d 340 (D.C. Cir. 2020) ........................................................................... 19

*City of Rancho Palos Verdes v. Abrams*,
    544 U.S. 113 (2005) ............................................................................................ 20

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005) .......................................................................................... 28

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) ......................................................................................................... 20

*DeVillier v. Texas*,
601 U.S. 285 (2024) ....................................................................................................... 20

*DoorDash, Inc. v. City of New York*,
754 F. Supp. 3d 556 (S.D.N.Y. 2024) ............................................................................. 41

*FEC v. Lance*,
635 F.2d 1132 (5th Cir. 1981) .......................................................................................... 5

*Fed. Law Enf't Officers Ass'n v. Ahuja*,
62 F.4th 551 (D.C. Cir. 2023) ........................................................................................ 16

*Fed. Mar. Comm'n v. Port of Seattle*,
521 F.2d 431 (9th Cir. 1975) .......................................................................................... 30

*First Resort, Inc. v. Herrera*,
860 F.3d 1263 (9th Cir. 2017) ........................................................................................ 32

*FTC v. Boehringer Ingelheim Pharms., Inc.*,
778 F.3d 142 (D.C. Cir. 2015) .......................................................................................... 4

*FTC v. Cement Inst.*,
333 U.S. 683 (1948) ................................................................................................. 25, 26

*FTC v. Church & Dwight Co.*,
665 F.3d 1312 (D.C. Cir. 2011) ........................................................................................ 4

*FTC v. Cinderella Career & Finishing Sch., Inc.*,
404 F.2d 1308 (D.C. Cir. 1968) ................................................................................. 26, 35

*FTC v. Claire Furnace Co.*,
274 U.S. 160 (1927) ................................................... 2, 5, 14, 16, 19, 20, 21, 41, 43

*FTC v. Ernstthal*,
607 F.2d 488 (D.C. Cir. 1979) .................................................................................. 30, 31

*FTC v. Facebook, Inc.*,
581 F. Supp. 3d 34 (D.D.C. 2022) ........................................................................ 26, 27, 34

*FTC v. Invention Submission Corp.*,
965 F.2d 1086 (D.C. Cir. 1992) ............................................................................ 3, 4, 42

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) .............................................................................. 4, 5, 30

*FTC v. Match Grp., Inc.*,
2023 WL 3181351 (D.D.C. May 1, 2023) ................................................................... 4

*FTC v. Nat'l Comm'n on Egg Nutrition*,
517 F.2d 485 (7th Cir. 1975)................................................................................... 31

*FTC v. Nat'l Urological Grp., Inc.*,
645 F. Supp. 2d 1167 (N.D. Ga. 2008) ..................................................................... 9

*FTC v. Owens-Corning Fiberglas Corp.*,
626 F.2d 966 (D.C. Cir. 1980) .................................................................................. 4

*FTC v. Standard Oil of Cal.*,
449 U.S. 232 (1980) ................................................................................................ 43

*FTC v. Texaco, Inc.*,
555 F.2d 862 (D.C. Cir. 1977) .............................................................................. 5, 42

*Gen. Fin. Corp. v. FTC*,
700 F.2d 366 (7th Cir. 1983)............................................................... 2, 5, 15, 16, 41

*Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc.*,
906 F. Supp. 2d 9 (D. Mass. 2012) ......................................................................... 33

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) ................................................................................................ 22

*Google LLC v. United States*,
2025 WL 778150 (D.D.C. Feb. 25, 2025)................................................................. 41

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*,
859 F. Supp. 1521 (S.D.N.Y. 1994)......................................................................... 33

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*,
879 F.3d 101 (4th Cir. 2018)................................................................................... 32

*Green v. U.S. Dep't of Just.*,
54 F.4th 738 (D.C. Cir. 2022) ................................................................................. 14

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999) ................................................................................................ 20

*Hamilton v. Geithner*,
   666 F.3d 1344 (D.C. Cir. 2012) .............................................................................. 28

*Harris v. Wackenhut Servs., Inc.*,
   648 F. Supp. 2d 53 (D.D.C. 2009) ......................................................................... 27

*Hartman v. Moore*,
   547 U.S. 250 (2006) ..................................................................................... 22, 35, 36

*In re Architect of Capitol Emp. Disp.*,
   2024 WL 3359515 (D.D.C. July 10, 2024) ............................................................ 27

*In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*,
   2023 WL 8112947 (Nov. 17, 2023) ....................................................................... 32

*In re Feature Films for Families, Inc.*,
   150 F.T.C. 866 (Sept. 23, 2010) ............................................................................ 32

*In re Grand Jury Procs.*,
   220 F.3d 568 (7th Cir. 2000) ............................................................................ 39, 41

*In re Grand Jury Subpoena, Judith Miller*,
   438 F.3d 1141 (D.C. Cir. 2006) .............................................................................. 40

*In re Mar. 19, 2014 Civ. Investigative Demand Issued to Police Protective Fund, Inc.*,
   157 F.T.C. 1913 (May 22, 2014) ............................................................................ 31

*In re NBTY, Inc.*,
   151 F.T.C. 201 (2011) .............................................................................................. 9

*In re POM Wonderful LLC*,
   155 F.T.C. 1 (2013) .................................................................................................. 9

*J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*,
   39 F.4th 489 (8th Cir. 2022) ................................................................................... 36

*John Doe Co. v. CFPB*,
   849 F.3d 1129 (D.C. Cir. 2017) .............................................................................. 17

*L.W. ex rel. Williams v. Skrmetti*,
   84 F.4th 460 (6th Cir. 2023) ................................................................................ 6, 36

*LabMD, Inc. v. FTC,*
    776 F.3d 1275 (11th Cir. 2015) ................................................................... 17, 18

*Lakkis v. Lahovski,*
    994 F. Supp. 2d 624 (M.D. Pa. 2014) ................................................................ 29

*Maryland v. King,*
    567 U.S. 1301 (2012) ......................................................................................... 43

*Media Matters for Am. v. Bailey,*
    2024 WL 3924573 (D.D.C. Aug. 23, 2024) ....................................................... 22

*Media Matters for Am. v. FTC,*
    805 F. Supp. 3d 105 (D.D.C. 2025) ....................................................... 19, 36, 38

*Media Matters for Am. v. FTC,*
    2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ............................................... 26, 38

*Media Matters for Am. v. Paxton,*
    138 F.4th 563 (D.C. Cir. 2025) ............................................................. 18, 36, 40

*Minter v. District of Columbia,*
    809 F.3d 66 (D.C. Cir. 2015) ............................................................................. 30

*Moore v. Garnand,*
    83 F.4th 743 (9th Cir. 2023) .............................................................................. 36

*Nat'l Ass'n of Immigr. Judges v. Owen,*
    139 F.4th 293 (4th Cir. 2025) ............................................................................ 18

*Nieves v. Bartlett,*
    587 U.S. 391 (2019) ........................................................................................... 22

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................................... 44

*Nuclear Info. & Res. Serv. v. NRC,*
    509 F.3d 562 (D.C. Cir. 2007) ...................................................................... 25, 26

*Okla. Press Publ'g. Co. v. Walling,*
    327 U.S. 186 (1946) ........................................................................................... 42

*Patten v. District of Columbia,*
    9 F.4th 921 (D.C. Cir. 2021) ............................................................................. 17

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ................................................................................. 38, 39

*Rehberg v. Paulk*,
  611 F.3d 828 (11th Cir. 2010) .......................................................................... 36

*Reisman v. Caplin*,
  375 U.S. 440 (1964) ................................................................................. 14, 21

*Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*,
  593 F.2d 1030 (D.C. Cir. 1978) ........................................................................ 41

*Rosenberger v. Rectors & Visitors of the Univ. of Va.*,
  515 U.S. 819 (1995) ......................................................................................... 39

*Seila Law LLC v. CFPB*,
  591 U.S. 197 (2020) ........................................................................................... 5

*Singh v. Berger*,
  56 F.4th 88 (D.C. Cir. 2022) ............................................................................ 14

*Sivella v. Twp. of Lyndhurst*,
  2021 WL 3356934 (3d Cir. Aug. 3, 2021) ........................................................ 36

*Starbucks Corp. v. McKinney*,
  602 U.S. 339 (2024) ................................................................................. 13, 14

*Thompson v. Hall*,
  426 F. App'x 855 (11th Cir. 2011) .................................................................... 36

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 (1994) .............................................................. 15, 16, 17, 18, 19

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ......................................................................................... 43

*United States v. Fokker Servs. B.V.*,
  818 F.3d 733 (D.C. Cir. 2016) ......................................................................... 22

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) ................................................................... 3, 5, 24, 40

*United States v. Rundo*,
  108 F.4th 792 (9th Cir. 2024) ........................................................................... 30

*United States v. Skrmetti,*
  605 U.S. 495 (2025) ................................................................................ 8, 13, 36

*United States v. Strum, Ruger & Co.,*
  84 F.3d 1 (1st Cir. 1978) ................................................................................ 42

*United Steelworkers of Am. v. Marshall,*
  647 F.2d 1189 (D.C. Cir. 1980) ..................................................................... 26

*Waggel v. George Wash. Univ.,*
  957 F.3d 1364 (D.C. Cir. 2020) ..................................................................... 27

*Wash. Legal Found. v. Friedman,*
  13 F. Supp. 2d 51 (D.D.C. 1988) ................................................................... 33

*Wearly v. FTC,*
  616 F.2d 662 (3d Cir. 1980) ........................................................... 5, 15, 21, 42

*Weinberger v. Hynson, Westcott & Dunning, Inc.,*
  412 U.S. 609 (1973) ....................................................................................... 30

*White v. Lee,*
  227 F.3d 1214 (9th Cir. 2000) ........................................................................ 37

*Wis. Gas Co. v. FERC,*
  758 F.2d 669 (D.C. Cir. 1985) ....................................................................... 43

*Youssef v. Lynch,*
  144 F. Supp. 3d 70 (D.D.C. 2015) ................................................................. 27

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017) ....................................................................................... 20

*Zurcher v. Stanford Daily,*
  436 U.S. 547 (1978) ....................................................................................... 41

## Statutes

15 U.S.C. § 44 ............................................................................................... 31, 34

15 U.S.C. § 45 ................................................................................................. 3, 16

15 U.S.C. § 57b-1 ........................................... 1, 3, 4, 5, 13, 16, 17, 23, 32

x

## Rules

D.C. Cir. R. 36(e)(2) ........................................................................................... 19

## Regulations

16 C.F.R. § 2.1 ..................................................................................................... 3

16 C.F.R. § 2.10 .............................................................................................. 4, 13

16 C.F.R. § 2.4 ................................................................................................ 3, 16

16 C.F.R. § 2.7 ........................................................................................... 4, 16, 41

Exec. Order No. 14168,
    90 Fed. Reg. 8615 (Jan. 20, 2025) ................................................................ 28

Exec. Order No. 14187,
    90 Fed. Reg. 8771 (Jan. 28, 2025) ................................................................ 28

## Other Authorities

Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for
    Minors*, N.Y. Times (Feb. 4, 2026),
    https://perma.cc/B2EW-G54H ......................................................................... 7

Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics,
    Doctor Says*, N.Y. Times (Oct. 23, 2024),
    https://perma.cc/V4KH-4HTT ......................................................................... 8

Chloe Cole, *I'm a Detransitioner*, N.Y. Post (Mar. 11, 2025),
    https://perma.cc/3HV7-GN68 ......................................................................... 8

FTC, Press Release, *FTC Releases Agenda for Workshop on Unfair or Deceptive Trade
    Practices in "Gender-Affirming Care" for Minors* (June 25, 2025),
    https://perma.cc/BB4C-J6TE ........................................................................... 9

Ge Bai, *Who Paid for Gender-Affirming Care?*, Forbes (Nov. 1, 2024),
    https://perma.cc/7NYQ-29PD ........................................................................ 12

H. Cass, *Independent Review of Gender Identity Services for Children and Young People*
    (Apr. 2024),
    https://perma.cc/RDN3-WBYR ..................................................................... 6, 7

Jennifer Block, *How Did Planned Parenthood Become One of the Country's Largest Suppliers of Testosterone?*, The Free Press (Aug. 7, 2024), https://perma.cc/TB9T-27YA ............................................................................ 8

Kareen M. Matouk & Melina Wald, *Gender-affirming Care Saves Lives*, Colum. Univ. Dep't of Psychiatry (Mar. 30, 2022), https://perma.cc/6K7N-8PY6.......................................................................... 6

Kate Stringer, *The Benefits of Gender-affirming Care*, Wash. Sch. of Pub. Health (Mar. 31, 2023), https://perma.cc/FRP8-UMT7.......................................................................... 6

*Leaked Discussions Reveal Uncertainty About Transgender Care*, The Economist (Mar. 5, 2024), https://perma.cc/78ZN-7TGV ......................................................................... 9

*New Estimates Show 300,000 Youth Ages 13-17 Identify as Transgender in the US*, UCLA Sch. of L. Williams Inst. (June 10, 2022), https://perma.cc/KBZ9-7G86 ......................................................................... 6

*NHS Stops Prescribing Cross-sex Hormones to Children*, Daily Mail (Mar. 8, 2026), https://perma.cc/Y4JS-AW6P ......................................................................... 7

*Position Statement on Gender Surgery for Children and Adolescents*, Am. Soc'y of Plastic Surgeons (Feb. 3, 2026), https://perma.cc/849S-ZJQ2.......................................................................... 7

*Position Statement on Transgender Health*, Endocrine Society (December 2020), https://perma.cc/8369-8GZW..................................................................... 12

Robin Respaut & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022), https://perma.cc/QFS9-SYN8 ......................................................................... 6

*The Future of the COPPA Rule: An FTC Workshop – Session 1* (Oct. 7, 2019), https://perma.cc/ZS2Z-4SBN.......................................................................... 9

U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria*, (Nov. 19, 2025), https://perma.cc/59ZF-L3B5 ........................................................... 6, 7, 8, 23

*WPATH's Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S5, S18 (2022), https://perma.cc/52JK-PD6D ......................................................................... 8

**INTRODUCTION**

Congress has charged the Federal Trade Commission with protecting the public from unfair and deceptive trade practices, including from false or unsubstantiated claims involving medical services and treatments.  To carry out that mandate, the FTC has long relied on its broad authority to issue administrative subpoenas, commonly known as Civil Investigative Demands (CIDs), which permit the FTC to seek production from *any* person or entity that *may* have information about violations of the laws and regulations the agency administers.  15 U.S.C. § 57b-1.  Critically, these subpoenas are not self-executing, meaning that a subpoena recipient faces no legal penalty unless the agency pursues (and prevails in) a separate enforcement action in federal court.

Amid growing concern about deceptive representations surrounding Pediatric Gender Dysphoria Treatment (PGDT), a concept that encompasses a variety of medical interventions—many of which are invasive and may cause permanent harmful consequences—used to treat children and teenagers diagnosed with gender dysphoria, the FTC convened a workshop and carefully reviewed thousands of public comments on the issue.  After those initial steps uncovered significant and troubling evidence of misrepresentations and deceptive trade practices, the FTC decided to proceed with the routine investigative step of issuing CIDs to Endocrine Society and other organizations to gather more information.  That decision reflects a straightforward, common-sense application of federal law and established agency practice.  And Endocrine Society does not dispute the allegations of physical injury made by doctors and patients at the workshop that informed the FTC's decision.

Endocrine Society now challenges this CID in a pre-enforcement posture.  At their core, Endocrine Society's arguments boil down to the remarkable contention that the First and Fourth Amendments somehow bar the federal government from investigating *any* potential wrongdoing relating to PGDT.  That theory, which sharply departs from the text of the FTC Act and binding precedent, fails for multiple independent reasons.

To start, Endocrine Society is not likely to prevail on the merits.  Most fundamentally, this Court lacks jurisdiction to hear Endocrine Society's pre-enforcement challenge.  A nearly century-

long line of precedent has repeatedly recognized that a federal court may resolve disputes about an administrative subpoena only in an agency enforcement action. *E.g.*, *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927); *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983). That settled principle applies with equal force here.

Nor does Endocrine Society's claim of First Amendment retaliation withstand scrutiny. That claim ignores the presumption of regularity that attaches to government action, as well as the undisputed evidence of the CID's proper purpose. Under Endocrine Society's theory, any investigation that aligns with an agency's policy priority is *per se* retaliatory, even when supported by substantial and compelling evidence of wrongdoing. A retaliation claim also requires showing that the challenged action—an administrative subpoena carrying no legal penalty for noncompliance—would deter a similarly situated party from speaking. That contention is particularly implausible here, given the organization's considerable financial resources and institutional capacity.

Endocrine Society's fallback arguments fare no better. Endocrine Society attempts to argue that the CID operates as a viewpoint-discriminatory prior restraint. But viewpoint discrimination arises when the government suppresses speech, which has not happened here. Similarly, FTC's efforts to protect the public from unsubstantiated medical claims are viewpoint-neutral. And a CID does not impose a prior restraint because it does not prohibit speech.

The remaining constitutional claims—that the CID infringes Endocrine Society's associational, journalistic, and Fourth Amendment rights—are likewise unpersuasive. Not only are those claims premature, but Endocrine Society has also failed to identify any documents implicating those rights—and it would be impossible to do so before an enforcement action. Nor has Endocrine Society offered a valid ground to invoke the Fourth Amendment, which applies to compelled disclosure.

Beyond likelihood of success on the merits, Endocrine Society has not satisfied the other requirements for a preliminary injunction. Endocrine Society has not shown irreparable harm because its asserted constitutional injuries lack merit. For the same reason, the equities, which

merge with the public interest, strongly favor the government. It is a familiar principle that the government likely suffers irreparable harm from injunctions that exceed a district court's authority. An injunction would also harm the public, which benefits from enforcement of the FTC Act. This Court should accordingly deny the preliminary injunction.

## BACKGROUND

### A.  Statutory And Regulatory Framework

Section 5 of the FTC Act prohibits "persons, partnerships, or corporations" from engaging in "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Congress "empowered and directed" the Commission "to prevent" these unfair or deceptive acts or practices, *id.* § 45(a)(2), and thus authorized the agency "to investigate … any person, partnership, or corporation engaged in or whose business affects commerce," *id.* § 46(a). *See* 16 C.F.R. § 2.1 (describing how investigations are initiated); *id.* § 2.4 (the Commission "encourages the just and speedy resolution of investigations," and "will … employ compulsory process when in the public interest"). To fulfill this "continuing duty," the Commission "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 639, 642–43 (1950).

To aid the agency in conducting its investigations, the FTC Act authorizes the Commission to issue CIDs to "any person" who may have "any information" relevant to potential violations of the laws enforced by the Commission. 15 U.S.C. § 57b-1. The issuance of a CID is not a final agency action. *See, e.g.*, *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992). Instead, it is simply one step in an ongoing investigation, which initiates a process of discussion and negotiation. This process is "cooperative[]": the Commission expects CID recipients "to engage in meaningful discussions with staff to prevent confusion or misunderstandings regarding the nature and scope of the information and material being sought." 16 C.F.R. § 2.4.

That cooperative process involves negotiations between a CID recipient and FTC staff "to discuss compliance and to address and attempt to resolve all issues," including legal objections to a CID.  *Id.* § 2.7(k).  The FTC's regulations authorize FTC staff to modify a CID's terms following those meet-and-confer negotiations.  *Id.* § 2.7(*l*).  CID recipients are required to participate in the meet-and-confer process before filing a petition to quash the CID.  *Id.* § 2.7(k).

The petition-to-quash process offers the Commission an opportunity to address any remaining objections to a CID.  *Id.* § 2.10; *see* 15 U.S.C. § 57b-1(f)(1).  The process builds on the meet-and-confer negotiations.  16 C.F.R. § 2.7(k) (the Commission generally "will consider only issues raised during the meet and confer process."); *id.* § 2.10(a)(2) (requiring a "statement representing that counsel for the petitioner has conferred with Commission staff ... in good faith to resolve by agreement the issues raised by the petition").  FTC staff may reply to the petition, and the Commission generally has 40 days to rule on a petition; the CID compliance deadline is suspended during the pendency of a petition to quash.  *Id.* § 2.10(a)(4), (b), (c); *see* 15 U.S.C. § 57b-1(f)(2).  Taken together, these administrative procedures allow the parties to identify and address disputes before judicial review of any remaining objections in an enforcement action.

If that administrative process fails to resolve any disputes between the CID recipient and FTC staff, the Commission may file a petition for enforcement in a federal district court.  15 U.S.C. § 57b-1(e); *see Invention Submission Corp.*, 965 F.2d at 1088–91.  The court hearing a CID enforcement action (and any subsequent appellate court) may address and resolve a wide range of issues, ranging from routine discovery disputes, *see, e.g.*, *FTC v. Match Grp., Inc.*, 2023 WL 3181351 (D.D.C. May 1, 2023), to claims of trade secrets and attorney-client privilege or work-product protection, *see, e.g.*, *FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142 (D.C. Cir. 2015); *FTC v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966 (D.C. Cir. 1980), to issues of statutory construction, *see, e.g.*, *FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001), and assertions that the scope of the investigation prompting the CID was not properly authorized by a Commission resolution, *see FTC v. Church & Dwight Co.*, 665 F.3d 1312 (D.C. Cir. 2011).  Similarly, a district court may adjudicate constitutional challenges and objections to an agency

4

CID in an enforcement action.  *E.g.*, *Seila Law LLC v. CFPB*, 591 U.S. 197, 208–09 (2020); *FEC v. Lance*, 635 F.2d 1132, 1140–42 (5th Cir. 1981) (en banc).

Critically, a CID is not self-executing, and a recipient incurs no penalty or other legal detriment for failing to comply with a CID before a court orders enforcement.  *Gen. Fin. Corp.*, 700 F.2d at 368; *see, e.g.*, *Claire Furnace*, 274 U.S. at 174 (explaining "the defendants cannot suffer" until the government brings an enforcement action); *Wearly v. FTC*, 616 F.2d 662, 665 (3d Cir. 1980) ("[A] subpoena from the FTC is not self-enforcing.").

The scope of the Commission's authority to investigate and to issue CIDs "reaches further than [its] regulatory power."  *Blue Ribbon Quality Meats, Inc. v. FTC*, 560 F.2d 874, 876 (8th Cir. 1977).  If the Commission "has reason to believe" that the recipient "may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce," the FTC Act gives the Commission broad authority to seek information from "any person" through a CID.  15 U.S.C. § 57b-1(c).  Thus, the Commission may seek information from entities that are not suspected of any wrongdoing or even subject to the laws at issue.  More generally, this circuit has consistently held that administrative agencies have "wide latitude in asserting their power to investigate by subpoena" and that "an individual may not normally resist an administrative subpoena on the ground that an agency lacks regulatory jurisdiction if the subpoena is issued at the investigational stage."  *Ken Roberts Co.*, 276 F.3d at 586.

Nor must the Commission be certain that a CID recipient possesses relevant information. The FTC Act demands only a "reason to believe" that the recipient "may have" relevant information.  15 U.S.C. § 57b-1(c).  That permissive standard reflects the FTC's broad investigative power.  The Supreme Court has stressed the Commission's "power to get information from those who best can give it," analogizing the FTC's authority to that of a grand jury in a criminal investigation.  *Morton Salt*, 338 U.S. at 642.  And the D.C. Circuit has recognized "the important governmental interest in the expeditious investigation of possible unlawful activity." *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (en banc).

### B.  Recent Developments In Pediatric Gender Dysphoria Treatment

New diagnoses of gender dysphoria in children are on the rise in the United States.  Robin Respaut & Chad Terhune, *Putting Numbers on the Rise in Children Seeking Gender Care*, Reuters (Oct. 6, 2022), https://perma.cc/QFS9-SYN8.  About 42,000 children across this country received that diagnosis in 2021 alone—"nearly triple the number" reported only four years prior.  *Id.*  Other estimates indicate that, as of 2022, at least 300,000 adolescents in the United States between 13 to 17 years old identify as transgender.  *New Estimates Show 300,000 Youth Ages 13-17 Identify as Transgender in the US*, UCLA Sch. of L. Williams Inst. (June 10, 2022), https://perma.cc/KBZ9-7G86.

At the same time, medical treatments for gender dysphoria have rapidly expanded.  *E.g.*, U.S. Dep't of Health & Hum. Servs., *Treatment for Pediatric Gender Dysphoria*, at 9 (Nov. 19, 2025), https://perma.cc/59ZF-L3B5 (HHS Report).  One category of medical treatments—Pediatric Gender Dysphoria Treatment (PGDT)—treats gender dysphoric children with medical interventions that at least some consider "experimental."  *L.W. ex rel. Williams v. Skrmetti*, 84 F.4th 460, 488 (6th Cir. 2023).  PGDT "includ[es] but [is] not limited to pubertal suppression, hormone therapy, and surgery (*e.g.*, subcutaneous mastectomy, vaginoplasty, metoidioplasty, and phalloplasty)."  Dkt.9-25 at 9.  Certain proponents of PGDT insist that pubertal suppression, hormone therapy, and surgical procedures (like mastectomies) lead to improved mental health outcomes, such as lowering suicidality, depression, and anxiety.  *See, e.g.*, Kareen M. Matouk & Melina Wald, *Gender-affirming Care Saves Lives*, Colum. Univ. Dep't of Psychiatry (Mar. 30, 2022), https://perma.cc/6K7N-8PY6; Kate Stringer, *The Benefits of Gender-affirming Care*, Wash. Sch. of Pub. Health (Mar. 31, 2023), https://perma.cc/FRP8-UMT7.

Proliferation of PGDT procedures raises significant concerns.  For starters, recent reports have indicated weak scientific evidence and lack of substantiation for PGDT.  The Cass Report, a now-famous international government-commissioned review of PGDT, concluded that "[t]his is an area of remarkably weak evidence."  H. Cass, *Independent Review of Gender Identity Services*

*for Children and Young People*, at 13 (Apr. 2024), https://perma.cc/RDN3-WBYR.  Similarly, a peer-reviewed report from the Department of Health and Human Services found that PGDT's "purported benefits are based on poor quality evidence."  HHS Report at 23.  On the heels of these and other reports, the American Society of Plastic Surgeons issued a position statement in February 2026, declaring:

> [T]he overall evidence base for gender-related endocrine and surgical interventions is low certainty, and in light of recent publications reporting very low/low certainty of evidence regarding mental health outcomes, along with emerging concerns about potential long-term harms and the irreversible nature of surgical interventions in a developmentally vulnerable population, ASPS concludes there is insufficient evidence demonstrating a favorable risk-benefit ratio for the pathway of gender-related endocrine and surgical interventions in children and adolescents. ASPS recommends that surgeons delay gender-related breast/chest, genital, and facial surgery until a patient is at least 19 years old.

*Position Statement on Gender Surgery for Children and Adolescents*, Am. Soc'y of Plastic Surgeons, at 3 (Feb. 3, 2026), https://perma.cc/849S-ZJQ2.  The American Medical Association soon followed suit, stating that, "[i]n the absence of clear evidence, the AMA agrees with ASPS that surgical interventions in minors should be generally deferred to adulthood."  Andrew Jacobs, *Doctors' Group Endorses Restrictions on Gender-Related Surgery for Minors*, N.Y. Times (Feb. 4, 2026), https://perma.cc/B2EW-G54H.  Likewise, the United Kingdom's National Health Service announced on March 8, 2026, that it "will stop prescribing powerful cross-sex hormones to [new PGDT patients] under the age of 18," based on the potentially permanent consequences and the lingering questions about the long-term effects of PGDT, such as "breast cancer, heart disease, stroke and impaired sexual function," as well as potential "long term effects … on teenage brain development."  *NHS Stops Prescribing Cross-sex Hormones to Children*, Daily Mail (Mar. 8, 2026), https://perma.cc/Y4JS-AW6P.  At least six other countries have recently followed suit, and several others are conducting reviews of their positions on PGDT.  *See* HHS Report at 9, 63–65.

7

Certain statements by PGDT proponents tend to confirm this view. For example, WPATH—an organization that also received a CID in this investigation—continues to depict PGDT as "medically necessary" in its most recent standards of care. *WPATH's Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S5, S18 (2022), https://perma.cc/52JK-PD6D. But its internal emails appear to suggest that it made this decision not based on any objective scientific criteria, but for the purpose of securing insurance coverage and avoiding regulation of PGDT. *Boe v. Marshall*, No. 2:22-cv-0184 (M.D. Ala. Oct. 9, 2025), Dkt. 700-10 at 32–34, 42–43. And a prominent PGDT provider even admitted that she withheld data from a multimillion-dollar federally funded study because the data showed "[p]uberty blockers [as a treatment for gender dysphoria] did not lead to mental health improvements." Azeen Ghorayshi, *U.S. Study on Puberty Blockers Goes Unpublished Because of Politics, Doctor Says*, N.Y. Times (Oct. 23, 2024), https://perma.cc/V4KH-4HTT. And during oral argument in *United States v. Skrmetti*, counsel representing a PGDT provider and adolescent PGDT patients conceded that PGDT has not been shown to prevent suicide. Tr. of Oral Arg. 89:3–17, *United States v. Skrmetti*, 605 U.S. 495 (2025).

Patients, providers, and others have increasingly come forward with evidence that PGDT may harm teenagers. One young woman, for example, filed a medical malpractice suit, alleging that taking testosterone she received after only a "thirty-minute consult" caused "constant vocal pain, joint pain, and frustrating and sometimes painful sexual dysfunction." Jennifer Block, *How Did Planned Parenthood Become One of the Country's Largest Suppliers of Testosterone?*, The Free Press (Aug. 7, 2024), https://perma.cc/TB9T-27YA. Whistleblowers formerly working to provide and support PGDT have similarly asserted that institutions providing PGDT ignored or suppressed concerns that PGDT harmed minors in their care. *E.g.*, HHS Report at 202–09 (collecting whistleblower accounts).

Patients and their families have also alleged false statements and material omissions were communicated to them about PGDT's safety and efficacy. *E.g.*, Chloe Cole, *I'm a Detransitioner*, N.Y. Post (Mar. 11, 2025), https://perma.cc/3HV7-GN68. These allegations have raised serious

8

questions whether PGDT patients could give informed consent to the treatments.  Indeed, even some proponents of PGDT have suggested that children are *incapable* of understanding the often grave and "irreversible" consequences of PGDT, making it "impossibl[e]" to "gain[] their informed consent." *Leaked Discussions Reveal Uncertainty About Transgender Care*, The Economist (Mar. 5, 2024), https://perma.cc/78ZN-7TGV.

### C.  The Commission's Investigation Of PGDT

Against that backdrop, the FTC began to investigate whether "false or unsubstantiated representations" have been made and "unfair practices" have been committed "in connection with the marketing and advertising of [PGDT]."  Dkt.9-25 at 2.  That investigation has followed the FTC's standard and long-established practices.  Much like in prior investigations into healthcare sector entities, the FTC began by evaluating representations made to consumers about PGDT's purported benefits and the substantiation for those representations.  *See e.g.*, *In re POM Wonderful LLC*, 155 F.T.C. 1, 2 (2013) (addressing claims that products could treat, prevent, or reduce the risk of heart disease and prostate cancer); *In re NBTY, Inc.*, 151 F.T.C. 201, 203–06 (2011) (similar for dietary supplements promoting children's eye and brain development); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1190 (N.D. Ga. 2008) (similar for products purporting to cause weight loss and sexual enhancement).

Consistent with its usual approach, *see, e.g.*, *The Future of the COPPA Rule: An FTC Workshop – Session 1* (Oct. 7, 2019), https://perma.cc/ZS2Z-4SBN, the Commission then held a public, live-streamed workshop on July 9, 2025.  The purpose of the workshop was to "help the FTC to understand whether consumers are being or have been exposed to false or unsupported claims about 'gender-affirming care' and to gauge the harms consumers may be experiencing." FTC, Press Release, *FTC Releases Agenda for Workshop on Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors* (June 25, 2025), https://perma.cc/BB4C-J6TE.  During the workshop, Chairman Andrew Ferguson explained that the FTC is "not charged with passing moral judgment on anyone's ideology, lifestyle, or medical choices."  Dkt.9-22 at 5. Instead, "the

FTC is the federal government's guardian against false and deceptive health claims," and it has a "statutory mandate" "to protect vulnerable people from deceptive claims about health and cures." *Id.* at 5–6; *see also, e.g.*, FTC, Health Products Compliance Guidance at 1 (Dec. 2022), https://perma.cc/58E9-9WPU. Accordingly, the Commission must "ensure that those who make claims about gender-affirming care are held to the same standard we apply to every other person engaged in commerce." Dkt.9-22 at 6.

To that end, the workshop hosted medical and other professionals, as well as former patients and their families, who—the Commission believed—could provide helpful information, given their extensive personal experience with or expertise on PGDT. The information provided by the workshop's participants reinforced three main concerns raised in public reporting.

*First*, participants contended that PGDT is not evidence-based and lacks substantiation. For instance, an experienced endocrinologist noted that "[p]roper long-term studies [of PGDT] haven't been done" and that "[m]ultiple systematic reviews of evidence have found poor quality of evidence of benefit." *Id.* at 36. Another participant explained that Endocrine Society's Clinical Practice Guideline on gender dysphoria has "drawn criticism from some of the world's leading experts in evidence-based medicine" because it "makes strong recommendations in favor of puberty blockers and cross-sex hormones," "[d]espite acknowledging the poor quality of evidence" supporting those treatments. *Id.* at 22–23.

*Second*, participants suggested that PGDT was associated with serious, permanent, and irreversible harms to patients. One former patient stated that taking cross-sex hormones caused worsened mental health, vocal cord damage, liver damage, and urinary incontinence, while a mastectomy resulted in persistent "[e]xtreme slicing sensations." *Id.* at 12–13. One mother described her daughter's experience with PGDT, which ended with her daughter committing suicide while undergoing the treatment. *Id.* at 10–12. Medical doctors discussed severe potential consequences of testosterone prescribed by PGDT providers, including mental health issues like "aggression, anger," "dissociative identity disorder," "self-destructive behavior," and "suicidal ideation"—"similar as to what can be found in anabolic steroid abuse." *Id.* at 33. Doctors also

observed that cross-sex hormones and puberty blockers can "disrupt[] … normal brain development" or "normal bone development," as well as result in an "early menopause-like state," "sexual dysfunction," "infertility," "hypertension," and "potential risks for the reproductive tract of ovarian, breast, [and] uterine cancer." *Id.*; *see id.* at 43–44.

*Third*, workshop participants recounted alleged misrepresentations or significant omissions they personally experienced related to PGDT.  Some parents, for example, claimed that PGDT providers implied their children would commit suicide if not administered PGDT.  *E.g.*, *id.* at 9, 55.  As Commissioner Mark Meador summarized at the end of the workshop, the Commission "repeatedly heard from parents and individuals gravely impacted by [PGDT] gone wrong, who suffered the harms of misrepresentations about the effects of these medical interventions." *Id.* at 85.

The Commission then issued a Request for Information on PGDT—another common step in FTC investigations—"to better understand how consumers may have been exposed to false or unsupported claims about [PGDT], especially as it relates to minors, and to gauge the harms consumers may be experiencing." Dkt.9-24 at 2.  In response, the Commission received over 8,000 comments—many critical and some supportive of PGDT.  The comments often referred to medical organizations, including Endocrine Society, and their public guidelines or standards of care.  Consumers commented that they believed PGDT to be a "life-saving [and] evidence based" treatment that "reduces depression, anxiety, and suicide risk in trans youth," due to the "support" of PGDT by Endocrine Society and its Clinical Practice Guideline.  *Comment from Bonin, Ashlee* (Aug. 1, 2025), https://perma.cc/8297-3A58; *Comment from Anonymous* (Sept. 25, 2025), https://perma.cc/W7MX-S22K (noting that "[t]he guidelines of … the Endocrine Society … follow evidence-based care for" children with gender dysphoria "for optimal best outcomes and prevention of suicide"); *Comment from Hellinga, Richard* (Jul. 30, 2025), https://perma.cc/3PXY-WKSA (advocating that PGDT is "safe, effective treatments for children," based on "support[] by major medical associations, including … the Endocrine Society" and its Clinical Practice Guideline).  By contrast, numerous comments expressed serious concern over the lack of evidence

11

supporting the Endocrine Society's Clinical Practice Guideline and PGDT.  One physician asserted that the Endocrine Society Clinical Practice Guideline was not credible because it "blatantly ignor[es] the latest evidence (namely the Cass Review) regarding the care of" children with gender dysphoria.  *Comment from Rivera, Kristine* (Aug. 12, 2025), https://perma.cc/H8JC-BM4Z.  And although "Endocrine Society claims that their guidelines are based on two systematic reviews they commissioned," the physician contended, Endocrine Society "fail[ed] to mention that [those systematic] reviews" are not about PGDT, and their underlying "data is from adults."  *Id.*

Over the ensuing months, FTC staff reviewed all 8,000-plus comments.  The Commission subsequently took another conventional investigatory step: it sought to identify organizations and individuals who may possess relevant information about potential deceptive representations or unfair practices related to PGDT.

Endocrine Society fit the bill for several reasons.  It is a large member organization, with nearly $30 million in annual revenue, *see Endocrine Society*, ProPublica, https://perma.cc/UCM5-AR6N (last visited Mar. 17, 2026), that is made up of "more than 18,000 members, including scientists, physicians, educators, and nurses, in 122 countries,"  Dkt.9-2 ¶ 5, some of whom may have a financial interest in PGDT, *e.g.*, Ge Bai, *Who Paid for Gender-Affirming Care?*, Forbes (Nov. 1, 2024), https://perma.cc/7NYQ-29PD.  Additionally, Endocrine Society has taken the public position that PGDT "is medically necessary and should be covered by insurance."  *E.g.*, *Position Statement on Transgender Health*, at 1, Endocrine Society (December 2020), https://perma.cc/8369-8GZW.  And it has promulgated the Clinical Practice Guideline, a widely cited set of guidelines on PGDT, which Endocrine Society has described as "the standard of care for supporting transgender individuals, … to be used by healthcare professionals."  *Id.*  Although Endocrine Society contends that its Clinical Practice Guideline is "based on medical evidence, author expertise, and rigorous scientific review," Dkt.9-2 ¶ 12, it contains numerous highly contested statements.  These statements include: use of puberty blockers "is fully reversible" (and "prolonged" use of puberty blockers is reversible for boys); children can undergo "full" puberty "after cessation of" puberty blockers; "sex hormone treatment and gender reassignment surgery"

12

"resolve[s]" children's gender dysphoria; and PGDT "has been shown to improve psychological functioning in several domains."  Dkt.9-6 at 12–15 (explaining that "psychological functioning steadily improve[s]" due to "sex hormone treatment and gender reassignment surgery").  Endocrine Society has promoted the Clinical Practice Guideline in courts, workshops, conferences, and training programs.  *E.g.*, Br. of Amici Curiae Am. Acad. of Pediatrics (Sept. 3, 2024), *United States v. Skrmetti*, 605 U.S. 495 (2025).  As Endocrine Society maintains, its "guidelines [are] … [a] resource to be used for patient care."  Dkt.9-2 ¶ 13.

On January 15, 2026, the Commission issued CIDs to Endocrine Society and two other medical organizations, both of which have filed separate lawsuits advancing similar claims.  *See Am. Acad. of Pediatrics (AAP) v. FTC*, No. 1:26-cv-0508 (D.D.C.); *WPATH v. FTC*, No. 1:26-cv-0532 (D.D.C.). The CID sought information on various issues relevant to the investigation, such as representations about PGDT by Endocrine Society and others, and included interrogatories to help the Commission determine whether Endocrine Society's activities fall within the scope of the FTC's enforcement jurisdiction.  *See* Dkt.9-25 at 2–12.

After Commission staff met and conferred with Endocrine Society about the CID, Endocrine Society filed a petition to quash.  *See* Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj., Dkt.9-1 (Mot.) at 16-17.  Endocrine Society's compliance period is stayed pending resolution of the petition.  15 U.S.C. § 57b-1(f)(2).  If the Commission denies the petition in whole or in part, it will "specify new terms for compliance, including a new return date."  16 C.F.R. § 2.10(b).  Under the Commission's rules, a decision on the petition is due by March 23, 2026.  *See id.* § 2.10(c).

Mere days after filing its petition—and before the Commission issued an order addressing it—Endocrine Society brought this lawsuit and moved for a preliminary injunction.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'"  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (citation omitted).  Thus, "a

plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id*. at 346 (citation omitted). "The balance of the equities and the public interest 'merge when, as here, the Government is the opposing party.'" *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022) (citation omitted).

**ARGUMENT**

Endocrine Society satisfies none of the requirements for a preliminary injunction. Most fundamentally, Endocrine Society has not demonstrated that it is likely to succeed on the merits. The Supreme Court has repeatedly recognized that a district court lacks jurisdiction to hear a dispute over an administrative subpoena until the agency seeks judicial enforcement, which the FTC has not done. Nor has Endocrine Society established a likely violation of the First or Fourth Amendments. Plus, the remaining equitable factors tip decisively in favor of the FTC. The Court should deny the preliminary injunction.

## I.    ENDOCRINE SOCIETY IS NOT LIKELY TO PREVAIL ON THE MERITS

Endocrine Society has not shown that it is likely to succeed on the merits—the most important factor in the preliminary-injunction analysis, *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 745 (D.C. Cir. 2022). Because the FTC Act requires a party to raise any challenges to CID in an enforcement action brought by the Commission, this Court lacks subject-matter jurisdiction over the dispute. And even apart from that, Endocrine Society is unlikely to succeed on the merits of its First and Fourth Amendment claims.

### A.    This Court Lacks Authority To Hear Endocrine Society's Pre-Enforcement Challenge

For nearly a century, the Supreme Court and lower courts have consistently held that parties should resolve disputes about administrative subpoenas in an enforcement action initiated by the agency. *See Claire Furnace Co.*, 274 U.S. at 174; *Reisman v. Caplin*, 375 U.S. 440, 443 (1964) (upholding dismissal of pre-enforcement challenge to IRS summons). Relying on *Claire Furnace*

14

and *Reisman*, courts of appeals have repeatedly rejected pre-enforcement challenges to FTC and other federal agency CIDs and subpoenas. *See Gen. Fin. Corp.*, 700 F.2d at 368 (explaining that a plaintiff "must wait till the government sues … since that is the method of judicial review of FTC investigations that Congress has prescribed"); *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334–35 (10th Cir. 1984); *Wearly*, 616 F.2d at 668; *Am. Motors Corp. v. FTC*, 601 F.2d 1329, 1335–37 (6th Cir. 1979); *Blue Ribbon Quality Meats*, 560 F.2d at 876–77; *Atl. Richfield Co. v. FTC*, 546 F.2d 646, 651 (5th Cir. 1977); *Anheuser-Busch, Inc. v. FTC*, 359 F.2d 487, 490–91 (8th Cir. 1966) (Blackmun, J.).

A consistent and straightforward principle runs through these cases. Recipients of agency CIDs or subpoenas may not seek equitable relief in a pre-enforcement posture because, even if their administrative challenge fails, they have an adequate remedy at law: challenging the CID or subpoena in an enforcement action. *E.g.*, *Atl. Richfield*, 546 F.2d at 649. And this principle serves important purposes for subpoena recipients and agencies alike. On the one hand, it protects CID and subpoena recipients from legal penalties until they have an opportunity to raise their objections in an enforcement proceeding in federal court. On the other, it ensures that agencies may conduct investigations consistent with congressional directives, allows the parties to narrow and resolve disputes prior to litigation, and prevents premature judicial intervention without the factual context that an enforcement action would provide.

A preliminary injunction here would depart from these familiar and well-established principles, which Endocrine Society's nearly forty-five page brief remarkably overlooks, for two main reasons. First, Congress has precluded pre-enforcement review of CIDs under the claim-channeling doctrine articulated in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). Second, Endocrine Society has failed to state a valid cause of action.

### 1. Congress Channeled Endocrine Society's Claims Into the FTC Act's Exclusive Judicial-Review Scheme

In *Thunder Basin*, the Supreme Court explained that Congress may establish a statutory scheme that channels judicial review to an exclusive jurisdictional mechanism, diverting district

15

courts of their ordinary federal-question jurisdiction. 510 U.S. at 218. A statute channels review when (i) a preclusive intent is "fairly discernible in the statutory scheme," and (ii) the claims at issue "are of the type Congress intended to be reviewed within" that scheme. *Id.* at 207, 212 (citation omitted). The presence of those factors indicates Congress's intent to channel certain challenges to agency actions "to a single review process," streamlining investigations and enforcement proceedings. *Id.* at 211. The FTC Act satisfies both *Thunder Basin* conditions.

**a.** To start, Congress's preclusive intent is "fairly discernable" in the FTC Act. *See id.* at 207 (citation omitted). The FTC Act and its implementing regulations create an interdependent scheme to protect CID recipients. That scheme allows recipients to: discuss and negotiate the CID with FTC staff to resolve or narrow disputes, 16 C.F.R. §§ 2.4, 2.7(k); petition the Commission to quash the CID, 15 U.S.C. § 57b-1(f); and obtain judicial review of the CID, including any objections, when the FTC seeks to enforce it, *id.* § 57b-1(h). Simply put, CIDs are not self-executing, and recipients face no penalties for noncompliance until the court rules in an enforcement action. *See Gen. Fin. Corp.*, 700 F.2d at 368–69. This process permits parties to narrow disputed issues without unnecessarily embroiling district courts in abstract disputes. The FTC's exercise of its "discretion" in deciding whether to seek enforcement—and if so, which specifications to pursue—crystalizes the issues in dispute, sparing the court "much unnecessary labor and discussion." *Claire Furnace*, 274 U.S. at 174.

The FTC Act's statutory structure, which includes several other provisions authorizing judicial review, reinforces Congress's choice to provide an exclusive review mechanism for CIDs. For example, the Commission's final cease-and-desist orders are subject to review only in the courts of appeals. *See* 15 U.S.C. § 45(b); *see also id.* § 45(*l*) (providing district court review for violations of the FTC's final orders); *id.* § 45(m) (providing district review for violations of certain FTC rules). The "comprehensive nature" of these review provisions reveals Congress's preclusive intent. *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 558 (D.C. Cir. 2023).

The fact that the FTC Act does not channel review of enforcement actions related to CIDs to a court of appeals, but to district court (with subsequent appellate review), further reflects

Congress's intent to preclude pre-enforcement review. Although Congress "typically chooses" to channel claims to the courts of appeals, *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023), it is free to choose other methods as well, and sometimes does so. For instance, *John Doe Co. v. CFPB*, 849 F.3d 1129 (D.C. Cir. 2017) (per curiam), a binding D.C. Circuit decision, applied *Thunder Basin* to a CID scheme materially identical to the one at issue here. *Id.* at 1134. And in any event, the case for claim channeling in this case "is even stronger than it was in *Thunder Basin*" precisely because the FTC Act "channels claims into the district court." *Patten v. District of Columbia*, 9 F.4th 921, 927–28 (D.C. Cir. 2021).

    **b.** Similarly, Endocrine Society's claims are squarely "of the type Congress intended to be reviewed within" the FTC Act's statutory structure. *See Thunder Basin*, 510 U.S. at 212 (citation omitted). *Thunder Basin* identified three factors to consider when evaluating whether a litigant's claims are of the type that Congress intended to be reviewed within the statutory structure: (1) whether precluding district court jurisdiction would "foreclose all meaningful judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review provisions"; and (3) whether the claim is "outside the agency's expertise." *Axon*, 598 U.S. at 186 (citation omitted). Here, the answer to all three questions is no. Unlike *Axon*'s "structural constitutional" challenge to an agency's "power generally," Endocrine Society challenges a "specific substantive decision" on which FTC has considerable expertise. *Id.* at 192-93.

    *First*, precluding this pre-enforcement challenge would not foreclose meaningful judicial review because Endocrine Society can raise—and a federal court can resolve—all objections in a CID enforcement action. *See* 15 U.S.C. § 57b-1(h). Indeed, as explained above, this traditional mechanism—endorsed by numerous courts, including the Supreme Court—has always governed challenges to administrative subpoenas and provides meaningful judicial review.

    *Thunder Basin* does not recognize an exception for First Amendment claims, and the D.C. Circuit and other courts have applied *Thunder Basin* in that context. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 755–56 (D.C. Cir. 2019); *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 936–37 (D.C. Cir. 2004); *see also LabMD, Inc. v. FTC*, 776 F.3d

1275, 1280 (11th Cir. 2015) ("[N]one of our cases suggest that First Amendment retaliation claims must be treated differently than other constitutional claims under *Thunder Basin* …."). Nor does *Thunder Basin* provide an exception for cases alleging ongoing harm. *See, e.g.*, *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 312 (4th Cir. 2025). To the contrary, channeling schemes *presume* that such harm will exist. As the Supreme Court observed in *Axon*, exclusive review mechanisms often "require parties to wait before appealing, even when doing so subjects them to 'significant burdens.'" 598 U.S. at 191–92 (citation omitted). *Thunder Basin* similarly accepted the possibility of harms from "delayed judicial review," 510 U.S. at 207, even when such harms are irreparable and "onerous," *id.* at 205, 218.

*Media Matters for Am. v. Paxton*, 138 F.4th 563 (D.C. Cir. 2025), does not disturb that conclusion. *Paxton* considered a CID issued by a *state* official and did not implicate any federal statutory scheme. The *Thunder Basin* framework—which addresses "challenges to federal agency action," *Axon*, 598 U.S. at 185—simply did not apply. Thus, the question presented in *Paxton* was simply whether "ongoing" harm satisfies the Article III standing and ripeness requirements. 138 F.4th at 579–80. That issue is analytically distinct from the *Thunder Basin*/*Axon* inquiry, which presupposes the existence of ongoing harm and excepts only structural claims of the kind that Endocrine Society has not asserted here. More broadly, Congress had good reason to channel issues about federal agency CIDs to enforcement proceedings while permitting Section 1983 suits to challenge state CIDs. That approach ensures that both state and federal subpoena recipients may present their constitutional claims in a federal forum before legal penalties accrue.

*Second*, there is nothing "collateral" about Endocrine Society's claims. A claim is "collateral" only when it involves a challenge to "the structure or very existence of an agency." *Axon*, 598 U.S. at 186, 189. *Axon* distinguished that kind of "fundamental, even existential" claim, *id.* at 180, from party-specific claims that an agency should not have taken a specific action, *id.* at 192—precisely the kind of claim Endocrine Society raises here. Unlike in *Axon*, Endocrine Society challenges something "particular about how [the FTC's] power was wielded" and objects to a "specific substantive decision"—namely, the issuance of the CID—rather than the

18

Commission's "power generally." *Id.* at 189, 193. Endocrine Society's challenge also implicates "procedural or evidentiary matters," *id.*, such as the breadth of the CID and the relevance of certain specifications to the investigation's goals. Mot. 23–27. Thus, Endocrine Society's claims directly "relate to the subject" of an action to enforce the CID, which courts routinely adjudicate in enforcement actions. *See Axon*, 598 U.S. at 193; p. 15, *supra*.

*Third*, questions about the scope and application of CIDs fall directly within the FTC's expertise, and the agency should decide whether to narrow its CID before commencing an enforcement action. Those types of questions raise "considerations of agency policy," in which the FTC has "competence and expertise." *Axon*, 598 U.S. at 194 (citations omitted). The FTC routinely issues CIDs and has considerable experience negotiating with CID recipients and resolving petitions to quash. And the Commission has authority to consider any objections, including constitutional arguments, in a petition to quash, when those objections are "intertwined with or embedded in" the FTC's areas of expertise. *Id.* at 195. Indeed, the Commission evaluates those constitutional arguments in determining whether to bring an enforcement action and—if so—on what grounds. *See Claire Furnace*, 274 U.S. at 174 (recognizing the significance of the "exercise [of] ... discretion" in "examining" FTC subpoenas).

At any rate, the expertise inquiry is not demanding. In *Thunder Basin*, the Supreme Court found this factor satisfied after noting that an agency had "addressed constitutional questions in previous enforcement proceedings" and that the "statutory and constitutional claims … [could] be meaningfully addressed" in a subsequent federal court proceeding. *Thunder Basin*, 510 U.S. at 215. The same two conditions exist here.

To be sure, another judge of this Court recently reached a different conclusion about these channeling arguments. *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105 (D.D.C. 2025). But that decision "is not binding." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (citation omitted). The same is true of the divided D.C. Circuit panel's unpublished order declining to stay that decision pending appeal. *See Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 351 (D.C. Cir. 2020); D.C. Cir. R. 36(e)(2). And, as the FTC has explained in its pending appeal of

19

that ruling, the district court's decision is mistaken in several respects, including because it is at odds with nearly a century of Supreme Court and appellate precedent. Appellants' Br. 19–36, *Media Matters for Am. v. FTC*, No. 25-5302 (D.C. Cir. Jan. 5, 2026).

### 2.    Endocrine Society Has No Cause of Action

Endocrine Society also fails to assert a valid cause of action. The organization does not allege that it has a cause of action under the Administrative Procedure Act and instead relies solely on an implied equitable cause of action, asserting that its claims arise under the First and Fourth Amendments. Dkt.1 ¶¶ 20, 116–19. But "[c]onstitutional rights do not typically come with a built-in cause of action." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). And the Supreme Court has warned federal courts to hesitate before implying constitutional or statutory causes of action. *E.g.*, *Ziglar v. Abbasi*, 582 U.S. 120, 134–35 (2017); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring).

That hostility to implied causes of action stems from the inherent limitations on the "traditional equitable powers" of federal courts. *Ziglar*, 582 U.S. at 133. Those powers are limited to relief that was "traditionally accorded by courts of equity," *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999), and pre-enforcement injunctions against agency CIDs and subpoenas were not available at equity, *e.g.*, *Claire Furnace*, 274 U.S. at 174.

Additionally, the equitable power to "enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). In *Exceptional Child Center*, the Supreme Court relied on the Medicaid Act's implicit preclusion of private enforcement in declining to employ federal courts' equitable powers. *Id.* at 327–29. Likewise here, the FTC Act provides no express cause of action, and Congress's choice of an administrative process, followed by an enforcement action, as the sole remedy for CID recipients impliedly restricts equitable collateral attacks. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005) ("The provision of an express, private means of redress in the statute itself … indicat[es] that Congress did not intend to leave open a more expansive remedy.");

20

*Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) (same). Unsurprisingly, the Supreme Court and lower courts have frequently grounded their dismissals of pre-enforcement CID challenges in the absence of equitable grounds and the availability of an adequate remedy at law. *See Reisman*, 375 U.S. at 443; *Claire Furnace*, 274 U.S. at 174; *Wearly*, 616 F.2d at 665.

\*       \*       \*

Although Endocrine Society (like other CID recipients) would prefer immediate review, Congress weighed the policy factors and channeled CID disputes to enforcement actions. And the regime Congress adopted considers the interests of CID recipients, including through the implementation of the petition-to-quash process. Endocrine Society is "under no compulsion" to "turn over the documents" and faces no "penalties" until the FTC pursues—and prevails in—an enforcement proceeding. *Wearly*, 616 F.2d at 667. By contrast, permitting pre-enforcement challenges would carry serious and disruptive consequences, potentially allowing any subpoena recipient to halt law enforcement investigations simply by raising speculative constitutional claims.

### B. Endocrine Society's First Amendment Retaliation Claim Is Meritless

Endocrine Society argues that the FTC likely "violated the First Amendment by retaliating against its constitutionally protected speech." Mot. 19. To prevail on that claim, Endocrine Society must show that: (1) it "engaged in conduct protected under the First Amendment"; (2) the FTC "took some retaliatory action sufficient to deter a person of ordinary firmness in [Endocrine Society's] position from speaking again"; and (3) there is "a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Although the Commission does not dispute that Endocrine Society engages in some protected First Amendment conduct, Endocrine Society cannot establish any causal link between its speech and the CID or any chilling effect from the CID. Nor has Endocrine Society demonstrated that chill arising from an allegedly retaliatory investigation is actionable, and none of its cited authority supports that proposition.

21

### 1.    Endocrine Society Cannot Show Its Speech Caused the CID

To show causation, Endocrine Society must demonstrate that, *at a minimum*, the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[1]  In making that but-for showing, Endocrine Society must overcome the "longstanding presumption of regularity" that attaches to government action. *Hartman v. Moore*, 547 U.S. 250, 263 (2006).  That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order" that "judicial intrusion … should be minimal." *Id.*  Excessive judicial interference "could 'chill law enforcement,' cause delay, and 'impair the performance of a core executive constitutional function.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (citations omitted).

Thus, to establish a likelihood of success on the merits of its retaliation claim, Endocrine Society must marshal enough evidence to displace the presumption of regularity and demonstrate that the Commission would not have issued the CID but for a retaliatory motive.  Because the Commission acted for nonretaliatory reasons and Endocrine Society's purported evidence of retaliation is unavailing, Endocrine Society's retaliation theory fails.

**a.**  The Commission issued the CID to Endocrine Society as part of a broad investigation into a high-priority issue squarely within the FTC's bailiwick: false or unsubstantiated medical claims about the safety and effectiveness of certain treatments for pediatric gender dysphoria.

Several compelling reasons justified the Commission's investigation.  To begin, as illustrated both by publicly available reporting and the Commission's own initial investigatory steps, which have included hosting a workshop and issuing a request for public comment, significant questions have arisen about the scientific basis for various claims about PGDT's safety

---

[1] Although the Court need not reach the issue, the requisite showing is more robust: Endocrine Society must demonstrate that there was no reasonable basis for the CID. *See Nieves*, 587 U.S. at 399–400 (requiring lack of probable cause for a retaliatory arrest); *Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *12–13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons).

and effectiveness.  *See* Background Section B, *supra*.  As former Commissioner Holyoak recognized, "there are serious questions about the risks and purported benefits" of PGDT.  Dkt.9-22 at 47.

There is also significant reason to believe that children and parents may have been victimized by false or unsubstantiated statements about PGDT.  Through its investigation, the FTC heard from patients and parents, who testified about a significant disconnect between what they were told and what they experienced.  *See* Background Section C, *supra*.  After reviewing these troubling comments, which reinforced concerns already highlighted in public reporting, the Commission decided to seek additional information.

It did so by issuing CIDs to three entities, including Endocrine Society, that are prominent in this field.  *See, e.g.*, HHS Report at 146 (explaining that the "most influential sources of clinical guidance" on PGDT in the United States are AAP, WPATH, and Endocrine Society).  The FTC had ample "reason to believe" that Endocrine Society "may have" information "relevant to ... unfair or deceptive acts or practices." 15 U.S.C. § 57b-1(c).  After all, Endocrine Society is a large membership organization, some of whose members may have a financial interest in PGDT.  Endocrine Society has developed a much-cited set of guidelines regarding PGDT, which is frequently "incorporat[ed]" by "practicing clinicians and state regulators."  States' Amicus Br. 9.  As described above, Endocrine Society has also discussed PGDT extensively in multiple contexts, and both the FTC's workshop and numerous public comments addressed its work in this area.  *See* pp. 9-13, *supra*.  At a minimum, Endocrine Society is highly likely to possess information about whether other entities have disseminated false or unsubstantiated claims regarding PGDT.

To be sure, the Commission has not yet determined whether Endocrine Society or anyone else has violated the FTC Act.  As Chairman Ferguson explained, the purpose of the investigation is to "understand what sorts of claims are being made about these treatments, what sort of science supports them, what the risks associated with those treatments are, and whether vulnerable populations may have been subject to deception in the administration of those treatments."  Dkt.9-22 at 6–7.  The Commission is asking "the same sorts of questions [it] would ask about any health

claim." *Id.* at 7.  And although the "FTC cannot make policy decisions limiting [PGDT] for minors," as then-Commissioner Holyoak put it, "what [it] can and should do is protect children from deceptive statements regarding such treatments." *Id.* at 48.

Entities like Endocrine Society may prefer that the FTC not investigate these topics or believe that an investigation is unnecessary.  But the FTC is authorized to investigate "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43.  Far from demonstrating causation, the undisputed evidence refutes it.

**b.**  Endocrine Society's attempt to adduce evidence of retaliation is equally misplaced.  The purported evidence generally falls into six categories, none of which—either independently or taken together—demonstrates retaliation.

***1. Ordinary Law Enforcement Activity.***  Endocrine Society begins by criticizing the FTC's reliance on its customary investigatory practices, especially its decision to hold a workshop and to issue a request for public comment.  *See* Mot. 29.  But the FTC has taken those same steps on numerous prior occasions.  *See* p. 9, *supra*.  And it is well-established that the Commission may "engage in dialogue with concerned citizens." *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1173 (D.C. Cir. 1979).

Although Endocrine Society contends that the FTC did not conduct the workshop discussion in a neutral manner, *see* Mot. 29, that perspective is far from unusual.  It is hardly surprising that the representatives of an industry whose practices the FTC seeks to examine would insist that they were subjected to excessive criticism.  In reality, however, the testimony introduced at the workshop, which, as Endocrine Society concedes, included opposition to gender-dysphoria treatments, as well as criticism of Endocrine Society and its clinical guidance, *see* Mot. 9, 29, only provides additional grounding for the FTC's investigation.  Notably, Endocrine Society does not assert that any of the information presented at the workshop was false or even misleading.  In any event, the request for public comment opened shortly after the workshop offered ample

24

opportunity for all interested parties to provide their views, and Endocrine Society declined to participate. *See* Dkt.9-24.

Endocrine Society also argues, based on an anonymous letter from some (purported) FTC employees, that the workshop was improper because the FTC lacked jurisdiction and the topic was too politically charged. *See* Mot. 29. But unnamed agency employees cannot veto FTC investigations. And on the merits, their concerns are unfounded. As Chairman Ferguson explained, "the FTC is the federal government's guardian against false and deceptive health claims," and the Commission has brought "dozens of enforcement actions" against "businesses and individuals who have made claims about their health products and services that were not backed by scientific evidence." Dkt.9-24 at 3; Dkt.9-22 at 6. That "many people feel passionately about this issue" says nothing about the propriety of FTC's investigation; "if a medical claim is false or misleading, it is the commission's sworn duty to protect American citizens from that claim no differently than it would for any other false or misleading claim." Dkt.9-22 at 6. As then-Commissioner Holyoak put it, the FTC has authority over "unfair or deceptive practices related to gender-affirming care," and it "should use" that authority to protect children, who may be particularly vulnerable to deceptive or misleading medical claims. *Id.* at 47.

***2. Statements by law enforcement officials about potential violations of law.*** Endocrine Society points to statements from Chairman Ferguson and Commissioner Meador, attempting to recast them as hostility toward Endocrine Society and its advocacy. *E.g.*, Mot. 29, 31. That attempt is without substance.

Endocrine Society's argument rests on the mistaken premise that it is somehow improper for Chairman Ferguson and Commissioner Meador to publicly discuss potential violations of the laws enforced by the Commission. Courts have long rebuffed efforts to treat similar comments as evidence of bias or pre-judgment. *E.g.*, *Nuclear Info. & Res. Serv. v. NRC*, 509 F.3d 562, 571 (D.C. Cir. 2007) ("[A] mere showing that an official has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute" is not a basis for disqualification. (citation omitted)); *FTC v. Cement Inst.*, 333 U.S. 683, 700 (1948) (similar).

That makes good sense.   "Given the roles that agency officials must play," it is commonplace for them to develop views on how the laws they enforce may apply and to identify conduct that may violate those laws.  *Nuclear Info. & Res. Serv.*, 509 F.3d at 571; *see United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980) ("When Congress creates an agency with an express mission ... the agency officials will almost inevitably form views on the best means of carrying out that mission.").   Indeed, agency officials need "to formulate policy" and to "engage in dialogue with concerned citizens." *Ass'n of Nat'l Advertisers*, 627 F.2d at 1173–74; *see also id.* at 1177 (Leventhal, J., concurring) (recognizing that "even judges are not disqualified … because they have previously" expressed a view "on legal issues").   And the FTC is fully "authorized … to alert the public to suspected violations of the law." *FTC v. Cinderella Career & Finishing Sch., Inc.*, 404 F.2d 1308, 1314 (D.C. Cir. 1968).   Endocrine Society's contention that agency officials may not "hold policy views on questions," by contrast, "would eviscerate the proper evolution of policymaking," barring action by any official "who has opinions on the correct course of his agency's future action." *Ass'n of Nat'l Advertisers*, 627 F.2d at 1174. It would also improperly "immunize" from enforcement activity any entity that law enforcement officials considered a potential lawbreaker.  *Cement Inst.*, 333 U.S. at 701–02.

Consistent with these authorities, this Court has already declined to adopt a materially identical theory to the one Endocrine Society advances here.  A few years ago, Facebook sought to disqualify then-Chairwoman Lina Khan from a proceeding against the company, alleging that she had "an 'axe to grind' against [Facebook] ... given the views articulated in her past work," which included her "views on Facebook's monopoly status." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 64 (D.D.C. 2022) (Boasberg, J.); *see also Media Matters for Am. v. FTC*, 2025 WL 2988966, at *15–17 (D.C. Cir. Oct. 23, 2025) (Walker, J., dissenting) (cataloguing Khan's statements about her investigation "targets").   The Court rejected that argument, reasoning that Khan's role as an FTC Commissioner was analogous to "that of a prosecutor," who is "necessarily permitted to be zealous in [her] enforcement of the law." *Facebook*, 581 F. Supp. 3d at 63–64 (citation omitted).   Although "Khan [had] undoubtedly expressed views about Facebook's

26

monopoly power," this Court found no "personal animosity against Facebook" "beyond [Khan's] own views about antitrust law." *Id.* at 64.

In short, Khan's "belief in the validity of the allegations" against Facebook was not any cause for concern. *Id.* And there is no reason to believe that Facebook could have changed the outcome simply by styling its argument as a constitutional retaliation claim rather than a disqualification request. The same logic applies here. Just as in *Facebook*, the selected comments on which Endocrine Society relies demonstrate—at most—that Chairman Ferguson and Commissioner Meador have expressed opinions about potential violations of the FTC Act. In fact, Endocrine Society requests far broader relief—an injunction barring any investigation instead of mere recusal—than the *Facebook* court declined to impose.

It is also notable that Endocrine Society nowhere mentions former Commissioner Holyoak. *See* Dkt.9-22 at 47–49. And combined with the absence of *any* allegations that she harbored improper motives, former Commissioner Holyoak's support for the investigation further confirms its legitimacy.

Endocrine Society next turns to statements by *non*-decisionmakers, including a couple FTC staffers and a *separate* agency, without alleging that any of them participated in issuing the CID. Mot. 9, 28–29. Remarks from "non-decisionmakers are not generally direct evidence of retaliation." *Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1374 (D.C. Cir. 2020); *accord Youssef v. Lynch*, 144 F. Supp. 3d 70, 101 (D.D.C. 2015). The only way such statements could even conceivably enter the analysis is if the non-decisionmaker was involved in the decisionmaking process. *E.g.*, *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 62 (D.D.C. 2009), *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) (concluding that "comments made by … non-decisionmakers[] are inadmissible" where "plaintiff [had] failed to proffer evidence … that the speakers had any influence, or even had any input, on the [relevant] decision"); *In re Architect of Capitol Emp. Disp.*, 2024 WL 3359515, at *3 (D.D.C. July 10, 2024) (disregarding comments by "non-decisionmakers"). Endocrine Society has not contended that any of these individuals had any involvement in the issuance of the CID.

At any rate, the FTC staffers' comments are innocuous on their face. For instance, one staffer quoted a statement from the HHS Secretary, which was based on the findings of a peer-reviewed report. Dkt.9-20 at 2. Another merely observed that it was appropriate to "*investigat[e]* whether children had their breasts and genitalia improperly removed." Dkt.9-21 at 2 (emphasis added). A third individual (who was not an FTC employee at the time and was not hired by the FTC until after the CID was issued) suggested that revealing the prevalence of "deceptive activity" to the public through enforcement activity, such as "seeking injunctions," could be a catalyst for potentially beneficial change. Dkt.9-22 at 82–83; *contra* Mot. 29. Even if these statements from non-decisionmakers were relevant, none of them suggests retaliation against Endocrine Society but condemnation of unfair and deceptive trade practices relating to PGDT. *See* Dkt.9-28 at 3 (FTC staffer stating that "[n]o sane person could endorse the *needless* mutilation of children" and that "[e]very American should be *troubled by the possibility* that parents and their children were misled about" PGDT (emphasis added)).

**3. Administration Priorities.** Endocrine Society argues that the current "Administration has repeatedly and vehemently attacked gender affirming care and all entities that provide and advocate for that care." Mot. 27. For support, Endocrine Society cites statements and actions by other agencies and "executive orders." Mot. 7, 28–29; Dkt.9-8. The President signed those Executive Orders more than a year ago, and neither of them mentions Endocrine Society or the FTC. *See* Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025); Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025). Endocrine Society identifies no legal authority for its implicit assumption that the Orders, or the actions of other government entities, can be attributed to the FTC for purposes of a retaliation claim. And because the Orders predate the challenged action by over a year, they "negate[] any inference [of] a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005); *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (explaining that even "a three-month period" may "be too lengthy" for temporal proximity).

More fundamentally, the Administration may express its views on what constitutes good medical practice. And an Administration's view that some of those practices may disserve the public interest while also potentially violating federal law does not transform an investigation of them into retaliation. Otherwise, an administration's criticism of Big Tech, pharmaceutical companies, or payday lenders would render those sectors immune from investigation. The inescapable implication of Endocrine Society's arguments is that the current Executive—in its entirety—is simply powerless to investigate any abusive or deceptive practices relating to PGDT, and ultimately to protect the public from such practices. That is not the law.

**4. Timing of the CID.** Endocrine Society claims that "'the timing' … under which this CID was issued further suggest[s]" retaliatory motive. Mot. 31 (citation omitted). Its theory appears to rest on the premise that the FTC issued the CID in response to a district court ruling four days earlier in a case concerning a different federal agency. Mot. 10, 31 (citing *AAP v. HHS*, — F. Supp. 3d —, 2026 WL 80796 (D.D.C. Jan. 11, 2026)).

That theory fails on both the law and the facts. *First*, Endocrine Society must show temporal proximity between *its protected conduct* and the CID. *E.g.*, *Allen v. Napolitano*, 774 F. Supp. 2d 186, 201 n.2 (D.D.C. 2011) (measuring timing from "the protected activity"). The *HHS* ruling does not concern *Endocrine Society's* protected conduct (Endocrine Society was not even party to the case), and Endocrine Society makes no effort to identify any protected activity that is temporally proximate to the CID's issuance. It is impossible to find a temporal connection to an unknown event. *See Lakkis v. Lahovski*, 994 F. Supp. 2d 624, 634 (M.D. Pa. 2014) (concluding that allegations "not anchored in time" cannot "enable a fact-finder to infer a causal link."). And Endocrine Society's principal statements on PGDT—for instance, its 2017 Guidelines and 2020 Position Statement, Mot. 5–6, 11—are too far removed to support any causal inference. *See, e.g.*, *Allen*, 774 F. Supp. 2d at 201 n.2 ("[A]lleged retaliatory acts must occur within three or four months of the protected activity to establish causation ….").

*Second*, any connection to the *HHS* ruling is self-evidently implausible. As Endocrine Society admits, the FTC began investigating this topic long before the *HHS* decision. The FTC's

29

workshop, for example, was held on July 9, 2025—more than five months before AAP even filed its lawsuit in the *HHS* case.  Even if the timing supported Endocrine Society's retaliation theory, "temporal proximity" alone does not suffice.  *Minter v. District of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015); *United States v. Rundo*, 108 F.4th 792, 805 (9th Cir. 2024) ("[T]iming" does not demonstrate "improper motive" because it "can merely be the sign of the government's change in enforcement priorities.").  A plaintiff must identify "positive evidence [of retaliation] beyond mere proximity," *Minter*, 809 F.3d at 71–72, which Endocrine Society has not done.

Nor does Endocrine Society's reliance on several subpoena decisions, Mot. 30, carry much interpretative weight.  Those decisions are not binding and are subject to ongoing challenges.  And the FTC has never suggested that it would use "compulsory process" to halt PGDT, Mot. 30, only that it would target false and deceptive practices, including unsubstantiated medical claims.  Endocrine Society's attempted analogy further exposes its sweeping and untenable view that the FTC cannot investigate any form of lawbreaking concerning PGDT.

**5. *Justification for the CID.***    Endocrine Society also invokes the supposed lack of "a plausible justification for its investigatory demands."  Mot. 42.  Endocrine Society advances two main jurisdictional arguments, both of which are misplaced.

*First*, Endocrine Society argues that it is a nonprofit entity beyond the FTC's enforcement jurisdiction.  Mot. 20–21, 25–26, 38, 42.  That argument is mistaken in several respects.

To start, Endocrine Society's self-identification is not dispositive.  The Supreme Court has recognized that an agency has the power to investigate whether an organization is subject to its regulatory jurisdiction.  *See, e.g.*, *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973) (agency's "jurisdiction to determine whether it has jurisdiction is as essential to its effective operation as is a court's like power"); *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 434 (9th Cir. 1975) (similar).  The FTC therefore "is not obliged to prove its jurisdiction" even "in a subpoena enforcement proceeding"—let alone in this pre-enforcement posture.  *FTC v. Ernstthal*, 607 F.2d 488, 490 (D.C. Cir. 1979); *accord Ken Roberts Co.*, 276 F.3d at 586.

Given that authority, the Commission is "not required to take at face value an organization's claim that it is a charitable organization and can require it to produce documents and other information to enable the Commission to make that determination for itself." *In re Mar. 19, 2014 Civ. Investigative Demand Issued to Police Protective Fund, Inc.*, 157 F.T.C. 1913, 1916 (May 22, 2014). To the contrary, the FTC regularly investigates self-described nonprofits, and several of the CID's specifications are tailored to assess whether Endocrine Society is a true nonprofit or whether it is carrying on business "for its own profit or that of its members." 15 U.S.C. § 44; *see* Dkt.1-1 at 6–8. The FTC has previously used the type of information sought by the CID to establish jurisdiction over professed nonprofits, including in the medical field. *E.g.*, *California Dental Ass'n v. FTC*, 526 U.S. 756, 759 (1999); *Am. Med. Ass'n v. FTC*, 638 F.2d 443, 448 (2d Cir. 1980), *aff'd*, 455 U.S. 676 (1982); *see also FTC v. Nat'l Comm'n on Egg Nutrition*, 517 F.2d 485, 487–88 (7th Cir. 1975). Until the Commission receives the requested information, it is premature for the Commission (let alone this Court) to reach any conclusion on the issue. *See Ernstthal*, 607 F.2d at 490 (reasoning that courts should await "the close of" agency proceedings to allow the agency to "make the initial determination of its own jurisdiction").

Even taken at face value, Endocrine Society's assertions that it has a nonprofit mission and does not "seek profit for itself or its members," Mot. 20, do not prove that Endocrine Society lies beyond the FTC's jurisdiction. An entity need not "devote itself entirely to its members' profits" to qualify as a corporation under the FTC Act. *California Dental*, 526 U.S. at 766; *Am. Med. Ass'n*, 638 F.2d at 448. Instead, a "proximate relation to lucre must appear"—a standard that encompasses numerous factors, such as whether the entity "engages in lobbying, litigation, marketing, and public relations for the benefits of its members' interests." *California Dental*, 526 U.S. at 766–67.

More to the point, the FTC Act does not limit the agency to requesting information from potential wrongdoers only. The Commission's authority to investigate is far broader than its enforcement authority. *See Blue Ribbon Quality Meats*, 560 F.2d at 875–76. Thus, even if Endocrine Society were immune from an enforcement action (a point the Commission does not

31

concede), it is emphatically *not* immune from CIDs.  The FTC may issue a CID to "any person," including a nonprofit, who "the Commission has reason to believe … may … have any information[] relevant to unfair or deceptive acts or practices."  15 U.S.C. § 57b-1(c)(1); *see id.* § 57b-1(a)(6) (defining "person" to include a "partnership, corporation, association, or other legal entity").  That is why the FTC issues CIDs to nonprofits, and those entities may need to respond even if they are not ultimately subject to the FTC's enforcement authority.  *E.g.*, *In re Feature Films for Families, Inc.*, 150 F.T.C. 866, 870 (Sept. 23, 2010) (explaining that FTC "can require production … from an entity … not subject to the Commission's enforcement authority if" that production "furthers the investigation of possibly illegal conduct by entities … subject to" FTC's jurisdiction); *In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*, 2023 WL 8112947, at *2 (Nov. 17, 2023) (same).  Here, the FTC is investigating whether "[Endocrine Society] *or any other Person*" has violated the FTC Act.  Dkt.1-1 at 2 (emphasis added).  As explained above, the FTC has ample reason to believe that Endocrine Society may have information about whether certain entities have violated the FTC Act by making unsubstantiated medical claims.  *See* Background Section C, *supra*.  If nothing else, as the author of the Guidelines and Position Statement—a widely discussed set of materials addressing PGDT—Endocrine Society likely has information about the scientific substantiation (if any) of PGDT.

*Second*, Endocrine Society argues that the CID targets "vast quantities of documents and information … focused on the Endocrine Society's noncommercial speech."  Mot. 24.  That argument suffers from similar flaws.  Most obviously, the FTC has authority to assess its jurisdiction.  Additionally, determining whether a statement is noncommercial is a fact-intensive, statement-by-statement inquiry that requires knowledge of the statement's precise wording, intended purpose, and audience.  *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (The "commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." (citation omitted)); *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d 101, 108–09 (4th Cir. 2018) (similar).  Courts have also found that scientific research, such as

medical textbook and journal reprints, amounts to commercial speech in some contexts. *E.g.*, *Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc.*, 906 F. Supp. 2d 9, 17 (D. Mass. 2012) (press release containing scientific research comparing drugs qualified as commercial speech); *Wash. Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 62–65 (D.D.C. 1988), *vacated in part on other grounds*, 202 F.3d 331 (D.C. Cir. 2000) (dissemination of medical textbook and journal articles to promote off-label uses of drugs qualified as commercial speech); *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1544 (S.D.N.Y. 1994) (same for survey of periodicals aimed at "core consumers of those products").

Even assuming that some of Endocrine Society's statements were non-commercial and did not violate the FTC Act, those statements could still be relevant to determining whether *other* violations of the FTC Act occurred. For example, a researcher's email discussing the risks of a product or the absence of studies showing its benefits would be relevant to a substantiation claim, though the email itself may not be commercial speech.

**6. Scope of the CID.** Last, Endocrine Society argues that "[t]he 'broad scope' of the" CID reveals a retaliatory motive. *E.g.*, Mot. 23 (citation omitted). But the CID is no broader than what the FTC typically issues during investigations. *See, e.g.*, *FTC v. Cigna Group*, No. 1:25-mc-0004, Dkt.1-2 (D.D.C. Jan. 15, 2025) (43 specifications); *FTC v. It Media, Inc.*, No. 2:16-cv-9483, Dkt.1-2 (C.D. Cal. Dec. 12, 2016). In fact, the CID sent to Endocrine Society has *fewer specifications* and seeks *less information* than CIDs sent to other nonprofits or in other investigations involving healthcare claims. *E.g.*, Mot. to Quash Civ. Investigative Demand, Ex. P, *Police Protective Fund*, 157 F.T.C. 1913, https://perma.cc/2L5J-PM87; Pet. to Enforce Civ. Investigative Demand, Ex. 3, *FTC v. Kushly, LLC*, No. 2:20-mc-0036 (D. Ariz. July 30, 2020) (22 interrogatories and 15 document requests, many with subparts), https://perma.cc/QQJ9-GFXT; Pet. for an Order Enforcing Civ. Investigative Demand, Ex. 2, *FTC v Redwood Sci. Techs.*, No. 2:17-cv-07921 (C.D. Cal. Oct. 13, 2017) (22 interrogatories and 16 document requests, many with subparts), https://perma.cc/5BSC-8ATQ; Pet. to Limit or Quash Civ. Investigative Demand, Ex. 1, *In re*

33

*Lexium Int'l, LLC*, 162 F.T.C. 1212 (2016) (42 interrogatories and 36 document requests, many with subparts), https://perma.cc/Q6PG-D4LA.

Likewise, the CID's specifications flow from the Commission's goal of investigating whether Endocrine Society or any other persons are making deceptive or unsubstantiated claims about the safety and efficacy of treatments for gender dysphoria in violation of the FTC Act.  The CID requests relevant information about the statements Endocrine Society has made in support of these treatments, "to whom" they were made, and the scientific backing for the statements.  Dkt.1-1 at 7.  Other specifications relating to any (i) financial incentive Endocrine Society may have for its statements, *see e.g.*, Dkt.1-1 at 7 (requesting information on any "financial relationships[] or partnerships relating to PGDT between" Endocrine Society and "pharmaceutical compan[ies]" or a "clinic, hospital system, or individual clinician"), and (ii) benefits Endocrine Society provides to its members, *id.* at 6–7 (such as "discounts," "financing," "legal advocacy," "lobbying," "education and training" programs, or "certification[s]"), bear directly on FTC's jurisdiction and whether Endocrine Society operates "for its own profit or that of its members."  15 U.S.C. § 44; *see California Dental*, 526 U.S. at 760 (ostensible nonprofit that "lobbies and litigates in its members' interests" "carries on business for the profit 'of its members'" under the FTC Act).

*    *    *

In sum, Endocrine Society's purported evidence does not support an inference of retaliation.  By contrast, the Commission has proffered undisputed evidence of a nonretaliatory purpose for issuing the CID: advancing its broad investigation into whether Endocrine Society or other entities have violated the FTC Act by making deceptive or unsubstantiated claims about the safety and efficacy of certain medical treatments for gender dysphoria.  At root, Endocrine Society's position is that the First Amendment bars the federal government from investigating any potential wrongdoing relating to PGDT.  This Court would not credit that argument from any other industry, *see, e.g.*, *Facebook*, 581 F. Supp. 3d at 64, and it should not do so here.

34

### 2.    The CID Has Not Chilled Endocrine Society's Speech

Endocrine Society has also failed to show that the CID is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking." *See Aref*, 833 F.3d at 258.    The organization has raised only a generic retaliatory investigation claim, and the Supreme Court has expressly questioned whether the "adverse consequences of a retaliatory investigation would *ever* justify recognizing such an investigation as a distinct constitutional violation," *Hartman*, 547 U.S. at 262 n.9 (emphasis added).    The scope of the CID reflects the ordinary bounds of FTC investigations, and Endocrine Society has not alleged any unusual injury from the CID.    Instead, it points to alleged harms common to all CID recipients—such as fears of "additional adverse government action," the prospect that "any communication or association with the Endocrine Society … could expose others to similarly retaliatory action," and the possibility "of an enforcement action under the FTC Act."    Mot. 12–13, 22.    Invoking routine and practical effects of an FTC investigation does not demonstrate a chilling effect. *See Cinderella Career & Finishing Sch., Inc.*, 404 F.2d at 1316 ("The practical effect of the Commission's initial press release, in this or any other complaint proceeding, is undoubtedly deleterious to the respondents' economic, business, and community status.... Unfortunate though this result may be, we are convinced that this damage does not constitute a transgression of the appellees' legal rights.").    And Endocrine Society's claim of chill is implausible, given the organization's size and substantial resources. *See* p. 12, *supra*.

Some of Endocrine Society's alleged harms are also entirely speculative and unconnected to the CID.    For example, Endocrine Society contends that "researchers and methodologists … c[an] no longer be associated with work on gender affirming care, out of fear for their personal safety, future funding, and of government retaliation."    Mot. 12-13.    That theory depends on a chain of assumptions—without evidentiary support—about how third parties might react to the CID.    And Endocrine Society's other harms involve mere financial costs—amounting to less than two percent of its annual revenue—associated with "document preservation, collection, and production."    Mot. 12; p. 12, *supra*.

35

### 3. A Retaliatory-Investigation Claim Is Not Cognizable

Because Endocrine Society's retaliation claim fails, this Court need not decide whether a retaliatory *investigation* claim, such as the one asserted here, is cognizable. If the Court does reach that question, it should hold that Endocrine Society will likely not prevail on it.

The Supreme Court expressly left open this question, and the D.C. Circuit has declined to answer it. *See Hartman*, 547 U.S. at 262 n.9; *Paxton*, 138 F.4th at 584–85. Although the *Media Matters* district court found support for a retaliatory investigation claim in *Paxton*, *Media Matters*, 805 F. Supp. 3d at 132–33, *Paxton* did not address the issue because the defendant there forfeited the argument. *Paxton*, 138 F.4th at 584. One federal court of appeals has assumed that a retaliatory investigation claim could arise in extraordinary circumstances, *see Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (explaining that, although no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment), and several other courts of appeals have suggested that courts should not recognize the claim at all, *see Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157–61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country."); *Sivella v. Twp. of Lyndhurst*, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2021). And the Eleventh Circuit has squarely held that the initiation of a retaliatory investigation "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *accord Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam).

At the very least, the open questions about the existence of retaliatory-investigation claims "suggest that the key premise of a preliminary injunction—a showing of a likelihood of success on the merits—is missing." *Skrmetti*, 83 F.4th at 471, *aff'd*, 605 U.S. 495 (2025). Even if this Court ultimately adopts the most sweeping position on the issue, it would have to conclude only that *conducting* an investigation in certain unusually abusive ways could give rise to a

36

constitutional claim—an allegation not present here.  *See White v. Lee*, 227 F.3d 1214, 1220, 1233 (9th Cir. 2000) (addressing a challenge to government conduct during an investigation, which included threatening and defamatory actions not alleged here).

### 4. Endocrine Society's Reliance On Unrelated District Court Cases Is Misplaced

Endocrine Society draws heavily on two recent district court decisions—neither of which endorses its position—to support its retaliation claim.

*First*, Endocrine Society points to a lawsuit brought by AAP against the Department of Health and Human Services.  That case considered whether HHS improperly terminated grants to AAP based on AAP's speech about childhood vaccines and particularly its decision to sue HHS for firing members of the Advisory Committee on Immunization Practices.  *HHS*, 2026 WL 80796, at *1, *16, *19.  *HHS* had nothing to do with PGDT, the FTC, or even Endocrine Society (which was not a party and did not otherwise participate in the litigation).  And the district court grounded its decision to grant an injunction on considerations absent here, such as the view that "almost perfect[]" alignment existed between the grant terminations and "significant events in [AAP's lawsuit regarding the firings]," as well as the fact that "HHS offer[ed] only a pretextual explanation for its adverse actions."  *Id.* at *16, *20.

Endocrine Society nevertheless suggests that the *HHS* case somehow taints the FTC's independent investigation into an entirely different subject.  *See* Mot. 31.  Specifically, Endocrine Society asserts that a peer-reviewed HHS report from November 2025 about treatments for pediatric gender dysphoria precipitated the Commission's investigation.  *See id.* at 8–9.  That reasoning is unsound.  For starters, there is no causal connection; the FTC was investigating these practices months before the HHS released its report, as the Commission's July 2025 workshop confirmed.  Similarly, it cannot be correct that a single ruling in an unrelated case precludes the FTC from relying on peer-reviewed materials referenced by the executive agency entrusted with protecting Americans' health and well-being.  And the motives of individuals not alleged to have

played any role in the decision to issue the CID (such as HHS officials) do not illuminate the motives of the FTC's decisionmakers here. *See* pp. 27–28, *supra*.

*Second*, Endocrine Society repeatedly points to *Media Matters*. *E.g.*, Mot. 18. Neither the district court's decision nor the stay panel's ruling in that case is binding, and the district court's decision is currently on appeal. *See* p. 20, *supra*. As the Commission has explained in its appellate briefing, the district court's analysis of the retaliation claim in that case rested on a series of errors. *See* Appellants' Br. 36–54, *Media Matters*, No. 25-5302 (D.C. Cir. Jan. 5, 2026).

In any event, the reasoning of *Media Matters* is inapt here. The retaliation ruling in *Media Matters* "turned on facts unique to Media Matters," and the "likelihood that" another CID recipient in the same investigation could prevail on a similar claim would "depend on entirely different facts." *See* Docket Order, *Disinformation Index, Inc. v. FTC*, No. 1:25-cv-4137 (D.D.C. Dec. 16, 2025) (Sooknanan, J.). The stay panel majority also described *Media Matters* as involving "unique factual circumstances" and expressed skepticism that other CID recipients in the same investigation "could plausibly … seek similar relief." *Media Matters*, 2025 WL 2988966, at *11. The fact-bound holding of *Media Matters* is especially irrelevant to Endocrine Society, a CID recipient in a wholly different investigation.

If anything, *Media Matters* further reveals the weakness of Endocrine Society's case. The district court there relied primarily on the fact that Media Matters had previously prevailed in litigation asserting that state officials issued subpoenas to retaliate for a specific 2023 article. *Media Matters*, 805 F. Supp. 3d at 113–15. Endocrine Society alleges nothing comparable here.

### C. Endocrine Society Is Not Likely to Prevail On Its Other Constitutional Claims

Endocrine Society raises a panoply of fallback constitutional challenges. All fail.

#### 1. The CID Is Not A Viewpoint-Discriminatory Prior Restraint

Endocrine Society is unlikely to prevail on its viewpoint-discrimination claim. *See* Mot. 32–34. The First Amendment generally prohibits the "government from proscribing speech … or even expressive conduct … because of disapproval of the ideas expressed." *R.A.V. v. City of St.*

*Paul*, 505 U.S. 377, 382 (1992).  Viewpoint discrimination occurs when the government regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger v. Rectors & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).  But viewpoint discrimination requires an actual restriction of or regulation on speech.  *See id.* at 828–29.  The CID does neither; it merely requests information relevant to the Commission's investigation.  And nothing in the CID prevents Endocrine Society from continuing to express its views on PGDT. Instead, the CID simply pursues the Commission's viewpoint-neutral duty of protecting the public from false or deceptive medical claims.

Nor does the CID operate as a "prior restraint."  Mot. 32.  A prior restraint "describe[s] administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted).  The CID does not "forbid[]" any speech.  *See id.* (emphasis and citation omitted).

Endocrine Society's reading of *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), is similarly unpersuasive.  *See* Mot. 33.  That case involved an informal censorship campaign, in which state officials pressured distributors to restrict the circulation of disfavored books through threats of legal penalties.  *See id.* at 59–61.  The CID does nothing of the sort—it does not proscribe speech, pressure third parties to suppress it, or threaten any penalty for noncompliance.  Ordinary investigative process aimed at gathering information bears no resemblance to the censorship condemned in *Bantam Books*.

### 2.  The CID Does Not Burden Endocrine Society's Associational Rights

Endocrine Society also contends that the CID burdens its First Amendment "rights to association, press, and petition."  Mot. 35.  Nothing in the record supports that strained thesis.

To start, this claim is premature.  Endocrine Society has not identified any disputed materials on a "document-by-document basis" that implicate these privileges, *see In re Grand Jury Procs.*, 220 F.3d 568, 571 (7th Cir. 2000), and it would be impossible to do so before the CID-

39

enforcement stage.  In any event, Endocrine Society's principal authority for its associational-privilege argument, *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), undermines its position.  *See* Mot. 35.  There, the Supreme Court faulted the State of California for enforcing a sweeping disclosure regime that required "tens of thousands of charities" to submit their confidential donor lists, even though "less intrusive alternatives"—"such as a *subpoena* or audit letter" issued to particular entity—were available.  *Bonta*, 594 U.S. at 613–14 (emphasis added).  But this case involves the very tools identified in *Bonta* as permissible alternatives.  The FTC did not impose a generally applicable disclosure requirement on an entire class of organizations; it issued administrative subpoenas to a specific entity that it had reason to believe possessed information about potential FTC Act violations.

Endocrine Society's journalistic-privilege argument, *see* Mot. 36, fares no better.  Parties typically invoke the journalistic privilege to resist disclosure of confidential sources or information.  *See Branzburg v. Hayes*, 408 U.S. 665, 669–71 (1972).  But the Supreme Court has never recognized a privilege granting publishers a "special immunity from the application of general laws."  *Id.* at 683 (citation omitted).  Although the First Amendment protects information-gathering activity "from official harassment," *Paxton*, 138 F.4th at 580 (citation omitted), the D.C. Circuit has held that any journalistic privilege does not apply to grand-jury proceedings, *see In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145–49 (D.C. Cir. 2006), and an FTC investigation is "analogous to the Grand Jury," *Morton Salt*, 338 U.S. at 642.  And the CID, which simply requests information and imposes no penalties for noncompliance, does not prevent Endocrine Society from "advanc[ing] its research and publishing endeavors."  *Contra* Mot. 37.

The CID likewise does not infringe Endocrine Society's "right to petition the government."  *Id.* at 37.  Contrary to Endocrine Society's contention, the CID does not prohibit "commenting on proposed legislation," lobbying, or "[p]articipating in litigation."  *Id.* (citation omitted).  Endocrine Society remains free to engage in all those activities.  Endocrine Society's independent decision to "pause[] engagement in coalitions" and to "adjust[] the content of its [litigation] submissions," *id.* at 38, does not transform the CID into a restriction on petitioning.  At bottom, Endocrine Society

seeks a "right to lobby *in secret*"—a right the First Amendment does not recognize. *DoorDash, Inc. v. City of New York*, 754 F. Supp. 3d 556, 577 (S.D.N.Y. 2024).

### 3.    The CID Does Not Violate The Fourth Amendment

Nor can much be made of Endocrine Society's argument that the CID is impermissibly overbroad under the Fourth Amendment. *See* Mot. 39–40. That claim is premature, *see* pp. 31-32, *supra*, and rests on the mistaken premise of "*compelled disclosure*," Mot. 35 (emphasis added) (citation omitted). But no compelled disclosure can occur unless the Commission pursues—and prevails in—an enforcement action. *Gen. Fin. Corp.*, 700 F.2d at 368. Currently, the CID is not fixed or final, *see* 16 C.F.R. § 2.7(*l*), and it remains unclear whether the Commission will attempt to enforce it at all. *See Claire Furnace*, 274 U.S. at 174 (recognizing the "discretion" in "designating the inquiries to enforce"). Indeed, FTC staff has already agreed to narrow the applicable time period for several requests in the CID. Dkt.9-26 at 5. Additionally, Endocrine Society has not identified *any* specific document or even category of documents that it disputes, *see In re Grand Jury Procs.*, 220 F.3d at 571, and has refused to utilize the privilege-log procedure described in the CID.

Unsurprisingly, none of the cases on which Endocrine Society relies arose in a pre-enforcement posture. *See* Mot. 39–40. For instance, *Zurcher v. Stanford Daily*, 436 U.S. 547 (1978), addressed an appeal of a summary-judgment order and held that the search (and seizure) of "negatives, film, and pictures" at a newspaper office did not violate the First or Fourth Amendments. *Id.* at 551, 567–68; *see Google LLC v. United States*, 2025 WL 778150, at *8 (D.D.C. Feb. 25, 2025) (*Zurcher* "held that warrants impinging on First Amendment interests raise no special concerns" under the Fourth Amendment). And the D.C. Circuit has agreed that "the existence of First Amendment 'interests' does not give rise to any substantive or procedural protections above and beyond those afforded by the Fourth Amendment." *Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1056 (D.C. Cir. 1978) (citing *Zurcher*, 436 U.S. at 565). Even if Endocrine Society could invoke the Fourth Amendment before the FTC

seeks to compel disclosure, administrative subpoenas satisfy the Fourth Amendment when "the investigation is authorized by Congress, is for a purpose Congress can order, and the documents sought are relevant to the inquiry." *Okla. Press Publ'g. Co. v. Walling*, 327 U.S. 186, 208–09 (1946); *see United States v. Strum, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir. 1978) (noting the "modest," "minimal standards of *Oklahoma Press*" for administrative subpoenas). Section 20 of the FTC Act provides the necessary authorization and lawful purpose, and the information sought in the CID is relevant to the Commission's investigation into potential deceptive or unfair practices related to the marketing or advertising of PGDT. *See FTC v. Invention Submission Corp.*, 965 F. 2d 1086, 1090 (D.C. Cir. 1992) (describing the "standard for judging relevancy in an investigatory proceeding" as "more relaxed than in an adjudicatory one").

That leaves Endocrine Society's garden-variety overbreadth claim. *See* Mot. 39–40. To prevail, Endocrine Society must establish more than "[b]roadness" or a "burden"; it must show that the CID is "*unduly* burdensome or *unreasonably* broad." *Texaco*, 555 F.2d at 881–82 (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186 (1946)). Endocrine Society has not met that standard, failing even to allege (let alone show) that complying with the CID would "unduly disrupt or seriously hinder normal [business] operations." *Id.* at 882. Endocrine Society is "under no compulsion" to "turn over the documents" and faces no "penalties" for not doing so. *Wearly*, 616 F.2d at 667. At oral argument, the *Media Matters* district court expressed skepticism about a similar claim, concluding that it would be "odd" "to apply privilege in the abstract at this stage" and that the plaintiff could raise any privilege argument "in a more concrete way" in an enforcement action, where it would be clear if the FTC is "going to take issue with [the] assertions of privilege." Tr. of Mot. Hr'g 14–15, Dkt.43, *Media Matters for Am. v. FTC*, No. 1:25-cv-1959 (D.D.C. Aug. 13, 2025); *see id.* at 17 (Judge Sooknanan explaining that she did not "see any pre-enforcement Fourth Amendment cases where a plaintiff sought to enjoin a CID or a subpoena as overbroad").

## II.     THE EQUITIES SUPPORT DENIAL OF THE PRELIMINARY INJUNCTION

Because Endocrine Society is unlikely to succeed on the merits, it does not satisfy the most important factor supporting a preliminary injunction. The remaining factors point the same way.

"[T]he Government is likely to suffer irreparable harm from the District Courts' entry of injunctions that likely exceed the [courts'] authority." *Trump v. CASA, Inc.*, 606 U.S. 831, 860 (2025); *see Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). An injunction would also disserve the public, which benefits from the robust enforcement of the FTC Act. *See FTC v. Standard Oil of Cal.*, 449 U.S. 232, 242 (1980). The public interest carries particular weight in an investigation like this one, which addresses allegations that deceptive or unsubstantiated medical claims have harmed parents and children. Enjoining the FTC's ability to investigate inflicts grievous harm on the public and the agency—a harm compounded by the likelihood that an injunction would invite a barrage of copycat pre-enforcement challenges.

By contrast, the only potentially irreparable harm identified by Endocrine Society consists of meritless constitutional injuries, which fall far short of the D.C. Circuit's "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). And the Supreme Court has long held that the ordinary burdens associated with responding to an administrative subpoena do not alone constitute irreparable harm. *Claire Furnace*, 274 U.S. at 174; *see Standard Oil*, 449 U.S. at 244.

Nor do Endocrine Society's purported reputational injuries, *see* Mot. 40–41, show irreparable harm. "The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and thus recoverable. *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012). The D.C. Circuit has explained that an alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Thus, when a harm is "based

43

on independent market variables such as how [a company's] customers and/or retailer consumers might react," that harm does not flow directly from the challenged action. *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014).  Even if compliance with the CID will "cost hundreds of thousands of dollars" and impose operational burdens, Mot. 40, those are the ordinary incidents of responding to lawful process.  To the extent Endocrine Society claims additional harm from "stalled" work on gender dysphoria treatment and limited "ability to collaborate with scientists and researchers," *Id.* at 41, that harm stems from Endocrine Society's own choices or speculation about the actions of third parties.  In all events, the alleged injuries are monetary—the paradigmatic example of *reparable* harm.

## III.   AT A MINIMUM, THE COURT SHOULD REQUIRE A BOND AND STAY ANY INJUNCTION

At most, Endocrine Society could obtain a preliminary injunction against the enforcement of this particular CID.   *See* Order, *Media Matters for Am. v. FTC*, No. 1:25-cv-1959 (Aug. 15, 2025), Dkt.35.  If the Court decides to grant an injunction (it should not), it should require a bond under Rule 65(c) commensurate with the scope of relief granted.  Because Defendants have satisfied the requirements for a stay, *see Nken v. Holder*, 556 U.S. 418, 434 (2009), they respectfully request that the Court stay any injunction pending appeal, or, at a minimum, enter a seven-day administrative stay to allow Defendants to consider seeking relief from the Court of Appeals.

### CONCLUSION

For the foregoing reasons, the Court should deny the motion for preliminary injunction.

Dated: March 17, 2026

Respectfully submitted,

<table>
<tr><td>

OF COUNSEL:

LUCAS CROSLOW
*General Counsel*
ALEX POTAPOV
*Deputy General Counsel*
ETHAN D. BECK
*Counsel to the General Counsel*

CHRISTOPHER MUFARRIGE
*Director*, Bureau of Consumer Protection
KATHERINE WHITE
*Deputy Director*, Bureau of Consumer Protection

Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2110
ebeck@ftc.gov

</td><td>

BRETT A. SHUMATE
*Assistant Attorney General, Civil Division*

JOHN BAILEY
*Counsel to the Assistant Attorney General*

*/s/ Daniel F. Mummolo*
DANIEL F. MUMMOLO
*Counsel to the Assistant Attorney General*

United States Department of Justice
Civil Division
950 Pennsylvania Ave. NW
Washington, DC 20005
Phone: (202) 514-6054
Email: daniel.f.mummolo@usdoj.gov

</td></tr>
</table>

*Attorneys for Defendants*

45