**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

THE ENDOCRINE SOCIETY,

                *Plaintiff,*

                v.

FEDERAL TRADE COMMISSION, *et al.*,

                *Defendants*.

Case No. 1:26-cv-00512-JEB

**REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

I.      THIS COURT HAS AUTHORITY TO HEAR THIS SUIT. .......................................... 3

     A.      The Court has jurisdiction over the Endocrine Society's constitutional claims. ................................................................................................................ 3

     B.      The Endocrine Society has a valid cause of action. .............................................. 7

II.      THE ENDOCRINE SOCIETY IS LIKELY TO SUCCEED ON ITS FIRST AND FOURTH AMENDMENT CLAIMS. ................................................................................. 8

     A.      The Endocrine Society is likely to establish retaliation in violation of the First Amendment. ........................................................................................... 8

         1.      The FTC's investigation would deter a person of ordinary firmness from speaking again. ...................................................................... 9

         2.      The Endocrine Society has established causation. ................................... 10

             a.      The CID is retaliatory on its face. ................................................ 10

             b.      The FTC announced its intent to retaliate against the Endocrine Society. ......................................................... 15

             c.      The FTC's investigation fits into a pattern of retaliatory action. ......................................................................................... 18

         3.      Retaliatory investigations are not insulated from First Amendment scrutiny. ..................................................................................... 19

     B.      The Endocrine Society is likely to prevail on its other First Amendment claims. ....................................................................................... 20

         1.      The FTC's investigation violates the Constitution's prohibition on viewpoint-discriminatory prior restraints. ............................................. 20

         2.      The FTC's investigation burdens the Endocrine Society's association, press, and petition rights. ....................................................... 21

     C.      The Endocrine Society is likely to prevail on its Fourth Amendment claim. ....... 23

III.      THE FTC'S RETALIATORY INVESTIGATION CAUSES IRREPARABLE HARM AND DISSERVES THE PUBLIC INTEREST. ................................................... 24

IV.      NEITHER A STAY NOR A SIGNIFICANT BOND IS WARRANTED. ..................... 25

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Oversight v. Hegseth*,
788 F. Supp. 3d 14 (D.D.C. 2025) ..................................................................................25

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ........................................................................................................22

*Arch Coal, Inc. v. Acosta*,
888 F.3d 493 (D.C. Cir. 2018) ..........................................................................................4

*Archer v. Chisolm*,
870 F.3d 603 (7th Cir. 2017) ..........................................................................................19

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) ....................................................................................... 8-9

*Armstrong v. Exceptional Child Ctr.*,
575 U.S. 320 (2015) ..........................................................................................................3

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ........................................................................................................11

*Axon Enter., Inc. v. FTC*,
598 U.S. 175 (2023) .................................................................................................. 4, 6-7

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ..................................................................................................... 20-21

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ........................................................................................................20

*Bell v. Hood*,
327 U.S. 678 (1946) ..........................................................................................................7

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ........................................................................................................11

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........................................................................................24

*Chiaverini v. City of Napoleon*,
602 U.S. 556 (2024) ........................................................................................................19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Cusumano v. Microsoft Corp.*,
  162 F.3d 708 (1st Cir. 1998)...................................................................................22

*DoorDash, Inc. v. City of New York*,
  754 F. Supp. 3d 556 (S.D.N.Y. 2024)......................................................................23

*Elion v. Jackson*,
  544 F. Supp. 2d 1 (D.D.C. 2008)............................................................................14

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)............................................................................................ 6-7

*FTC v. Claire Furnace Co.*,
  274 U.S. 160 (1927)...............................................................................................3

*FTC v. Facebook, Inc.*,
  581 F. Supp. 3d 34 (D.D.C. 2022).........................................................................17

*Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc.*,
  906 F. Supp. 2d 9 (D. Mass. 2012)........................................................................13

*Gordon & Breach Science Publishers S.A. v. American Institute of Physics*,
  859 F. Supp. 1521 (S.D.N.Y. 1994)........................................................................13

*In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*,
  __ F. Supp. 3d __, 2026 WL 710202 (D.D.C. Mar. 13, 2026) ...................................... *passim*

*Hartley v. Wilfert*,
  918 F. Supp. 2d 45 (D.D.C. 2013)............................................................................9

*Hartman v. Moore*,
  547 U.S. 250 (2006)..............................................................................................10

*Jenner & Block LLP v. U.S. Dep't of Just.*,
  784 F. Supp. 3d 76 (D.D.C. 2025)............................................................................9

*John Doe Co. v. CFPB*,
  849 F.3d 1129 (D.C. Cir. 2017)................................................................................5

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020)................................................................................25

*Linder v. United States*,
  268 U.S. 5 (1925)..................................................................................................14

iii

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Media Matters for Am. v. Bailey*,
   2024 WL 3924573 (D.D.C. Aug. 23, 2024) ..........................................................................10

\**Media Matters for Am. v. FTC*,
   2025 WL 2988966 (D.C. Cir. Oct. 23, 2025) ................................................................. *passim*

\**Media Matters for Am. v. FTC*,
   805 F. Supp. 3d 105 (D.D.C. 2025).............................................................................12, 24

\**Media Matters for Am. v. Paxton*,
   138 F.4th 563 (D.C. Cir. 2025)..................................................................................... *passim*

*Media Matters for Am. v. Paxton*,
   732 F. Supp. 3d 1 (D.D.C. 2024) ......................................................................................9

*Moore v. Garnand*,
   83 F.4th 743 (9th Cir. 2023) ...........................................................................................19

*Nken v. Holder*,
   556 U.S. 418 (2009)........................................................................................................25

*Patten v. District of Columbia*,
   9 F.4th 921 (D.C. Cir. 2021)..............................................................................................5

*Rehberg v. Paulk*,
   611 F.3d 828 (11th Cir. 2010) ........................................................................................19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819 (1995)..................................................................................................21, 23

*See v. City of Seattle*,
   387 U.S. 541 (1967)........................................................................................................24

*In re Subpoena No. 25-1431-014*,
   2025 WL 3252648 (E.D. Pa. Nov. 21, 2025) .................................................................14

*Tao v. Freeh*,
   27 F.3d 635 (D.C. Cir. 1994)............................................................................................9

\**Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994)................................................................................................. *passim*

*Torrey v. Infectious Diseases Soc'y of Am.*,
   86 F.4th 701 (5th Cir. 2023) ...........................................................................................11

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) .................................................................................7

*United States v. Brown,*
  125 F.4th 1186 (D.C. Cir. 2025) ............................................................................10

*United States v. Ring,*
  706 F.3d 460 (D.C. Cir. 2013) ...............................................................................23

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Couns., Inc.,*
  425 U.S. 748 (1976) ..................................................................................................2

*Washington Legal Foundation v. Friedman,*
  13 F. Supp. 2d 51 (D.D.C. 1998) ...........................................................................13

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President,*
  784 F. Supp. 3d 127 (D.D.C. 2025) ........................................................................23

*Ziglar v. Abbasi,*
  582 U.S. 120 (2017) ..................................................................................................8

**Statutes and Rules**

15 U.S.C.
  § 57b-1(e).................................................................................................................5
  § 57b-1(h).................................................................................................................5

28 U.S.C. § 1331 .........................................................................................................3

42 U.S.C. § 1983 ................................................................................................... 19-20

Federal Rule of Civil Procedure 65(c) ........................................................................25

**Other Authorities**

*In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.,*
  2023 WL 8112947 (F.T.C. Nov. 17, 2023) ........................................................15, 20

*Coll. Football Ass'n,*
  117 F.T.C. 971 (1994)..............................................................................................12

*Feature Films for Families, Inc.,*
  150 F.T.C. 866 (2010)..............................................................................................15

**INTRODUCTION**

A few weeks ago, this Court quashed criminal subpoenas issued against the Federal Reserve Board, finding that "the asserted justifications for these subpoenas are mere pretexts" to investigate an individual who has not "committed any crime other than displeasing the President." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, __ F. Supp. 3d __, 2026 WL 710202, at *1, 7 (D.D.C. Mar. 13, 2026). The Court's decision adds to a growing body of precedent rejecting the federal government's attempts to use its investigatory powers to retaliate against disfavored individuals and causes. *See* ECF No. 9-1 (Mem.) at 17-18. And the Federal Trade Commission (FTC) is no stranger to these cases: the D.C. Circuit recently held that the FTC likely retaliated in issuing compulsory process against a media entity that criticized the President's allies. *Media Matters for Am. v. FTC*, 2025 WL 2988966, at *6 (D.C. Cir. Oct. 23, 2025).

This case is the latest chapter in this unfortunate saga, and the Court should close the book on the FTC's campaign to retaliate against the Endocrine Society for its medical views. For the reasons explained in the Endocrine Society's opening brief, the Civil Investigative Demand (CID) issued against the Endocrine Society violates the First and Fourth Amendments. It demands vast reams of sensitive information about the Endocrine Society's medical guidance and advocacy on matters relating to gender affirming care. A constellation of objective factors reveals that the CID was motivated by the FTC's and the Administration's dislike for the Endocrine Society's speech about gender affirming care. And if not enjoined, the CID will continue to chill the Endocrine Society's ability to speak, to associate, and to petition about these vital issues.

Far from rebutting these points, the FTC's opposition confirms the Commission's retaliatory intent. The FTC cannot bring itself to address—or even to quote—statements by its leaders calling for retaliation against entities with perspectives on gender affirming care that the

1

Administration dislikes. And "[a]gainst such extensive and persuasive evidence of improper motive, the [FTC] counters with only a tenuous assertion of a legitimate purpose." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *7. Nothing in the FTC's opposition provides any evidence—or even inference—that the Endocrine Society has engaged in advertising or commercial speech within the FTC's jurisdiction or has information relevant to a legitimate investigation against any other actor. Instead, the FTC claims the bare authority to investigate any medically "contested statements" in a "Clinical Practice Guideline." ECF No. 30 (Opp.) at 12. Those statements are beyond the government's power to censor or punish: "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Couns., Inc.*, 425 U.S. 748, 770 (1976).

The FTC's remaining arguments are inconsistent with settled law and undisputed facts. The FTC leads with a jurisdictional argument the D.C. Circuit roundly rejected just months ago in *Media Matters*. It insists that challenges to retaliatory investigations are not cognizable, even though the D.C. Circuit recognized one in that same case. It denies that the Endocrine Society is harmed by the CID but fails to address the Endocrine Society's sworn evidence that the CID meaningfully impairs the Society's ability to address vital medical debates on gender affirming care. And it ignores key authorities establishing that its investigation burdens the Endocrine Society's First Amendment rights to speak, associate, conduct journalism, and petition. In short, the FTC fails to undercut the Endocrine Society's entitlement to—and urgent need for— preliminary relief.

## ARGUMENT

### I.    THIS COURT HAS AUTHORITY TO HEAR THIS SUIT.

This Court has jurisdiction to hear the Endocrine Society's claim under 28 U.S.C. § 1331, which entrusts district courts with "original jurisdiction of all civil actions arising under the Constitution."  And the Endocrine Society's cause of action "to enjoin unconstitutional actions by . . . federal officers . . . reflects a long history of judicial review of illegal executive action, tracing back to England."  *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 327 (2015).  The FTC's contrary arguments ignore the settled rulings of the Supreme Court and D.C. Circuit.

### A.    The Court has jurisdiction over the Endocrine Society's constitutional claims.

The FTC argues that *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), bars this Court from exercising jurisdiction over the Endocrine Society's challenge.  Opp. 15-20.  As the FTC belatedly admits, the D.C. Circuit has recently rejected that precise argument about precisely this statutory scheme.  Opp. 19.  In *Media Matters*, the D.C. Circuit held that "[t]he Commission has not made a strong showing that it is likely to succeed on the merits of its jurisdictional argument." 2025 WL 2988966, at *3.  Not even the dissent in that case endorsed the FTC's position.  *See id.* at *11-19 (Walker, J., dissenting).  The FTC provides no reasoned basis to break with the D.C. Circuit's thorough analysis of the very same question before this Court.

As the D.C. Circuit explained, First Amendment retaliation claims represent an exception to the "general rule" that pre-enforcement challenges to FTC investigations and CIDs cannot be heard by a district court.  *Media Matters*, 2025 WL 2988966, at *3.  The theory behind that general rule is that "until the Commission acts, the demand recipients cannot suffer."  *Id.* (alterations adopted) (quoting *FTC v. Claire Furnace Co.*, 274 U.S. 160, 174 (1927)).  In the First Amendment retaliation context, that rule breaks down because compulsory-process recipients can (and do) suffer "present, concrete, and objective harms" that "will persist without the Commission also

3

taking enforcement action." *Id.* (quoting *Media Matters for Am. v. Paxton*, 138 F.4th 563, 579 (D.C. Cir. 2025)). As the government itself put the point, "[t]hat injury does not depend on how the enforcement proceeding ends; regardless of the outcome, the recipient must spend time and resources litigating it." Br. for United States at 18, 23, *First Choice Women's Res. Ctrs., Inc. v. Platkin*, No. 24-781 (U.S. Aug. 28, 2025). The Endocrine Society has amply documented such harms in this case, *see* Mem. 12-14, and the FTC "does not . . . dispute the existence of those particular harms or their material impact on [the Endocrine Society's] ability" to speak on matters of public concern, *Media Matters*, 2025 WL 2988966, at *4.

The FTC's argument about the two "*Thunder Basin* conditions" is similarly deficient. Opp. 16. Under the *Thunder Basin* framework, courts examine whether "Congress intended that a litigant proceed exclusively through a statutory scheme of administrative and judicial review," as determined by whether "(i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory scheme." *Arch Coal, Inc. v. Acosta*, 888 F.3d 493, 498 (D.C. Cir. 2018) (alteration in original). Neither factor supports the FTC's argument that this Court lacks jurisdiction to hear the Endocrine Society's suit.

***No fairly discernible intent to preclude review.*** On the first factor, "foreclosing timely judicial consideration" is not "likely contemplated by the statutory review scheme Congress designed." *Media Matters*, 2025 WL 2988966, at *5. Congress "typically chooses" to channel initial review through administrative agencies where "[t]he agency effectively fills in for the district court, with the court of appeals providing judicial review." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 184-85 (2023); *see Thunder Basin*, 510 U.S. at 207. But here, the Endocrine Society "does not seek to circumvent an administrative proceeding followed by judicial review in a court

4

of appeals." *Media Matters*, 2025 WL 2988966, at *5. Indeed, this scheme does not provide CID recipients with the opportunity to seek judicial review of FTC decisions on CIDs. Only the FTC can permit review by initiating an enforcement action in district court. 15 U.S.C. § 57b-1(e), (h).

That statutory structure takes this case outside of *Thunder Basin* and cases like it. Those cases require would-be plaintiffs to wait for an agency to act and then seek judicial review of that action. But here, the FTC *has* acted: The FTC has denied the Endocrine Society's petition to quash, meaning that the Endocrine Society has "exhausted what little Commission procedure was available by engaging with agency officials, who then rejected its requests." *Id.*; *see* Ex. 27.[1] So now, "there is no dispute that the next step for review of [the Endocrine Society's] constitutional claims is in district court." *Media Matters*, 2025 WL 298896, at *5; *see* 15 U.S.C. § 57b-1(e). The only question is whether the Endocrine Society can invoke this Court's jurisdiction now or must instead wait for the FTC to do so if, and whenever, it wants.

The FTC cites no *Thunder Basin* case from any court precluding review under a statutory scheme that gives the government the choice to seek judicial review. It claims that *John Doe Co. v. CFPB*, 849 F.3d 1129 (D.C. Cir. 2017), supports its argument, but that is simply wrong. In that case, there was "[an] enforcement action pending in the United States District Court for the Central District of California," so the D.C. Circuit held that the claims must be raised in that court rather than in a different one. *Id.* at 1134; *see* Opp. 17. And the scheme in *Patten v. District of Columbia*, 9 F.4th 921 (D.C. Cir. 2021), allowed the private party—rather than the government—to seek "judicial review through the Administrative Procedure Act." *Id.* at 927; *see* Opp. 17.

---

[1] "Ex." refers to the exhibits attached to the Declaration of Raymond P. Tolentino (ECF No. 9-3) and the Supplemental Declaration of Raymond P. Tolentino, concurrently filed herewith.

***Not claims of the type Congress intended to be precluded.***  The FTC's *Thunder Basin* argument is even weaker on the second prong.  The Supreme Cout has "identified three considerations" to determine whether "particular claims" are "of the type Congress intended to be reviewed within [a] statutory structure." *Axon*, 598 U.S. at 186.  Those considerations ask whether: "(1) precluding district court jurisdiction would foreclose all meaningful judicial review of the claim, (2) the claim is wholly collateral to the statute's review provisions, and (3) the claim is outside the agency's expertise." *Media Matters*, 2025 WL 2988966, at *5; *see Axon*, 598 U.S. at 186.  All three considerations cut sharply against the FTC.

*First*, waiting for the FTC to initiate enforcement proceedings in district court would provide the Endocrine Society with no "meaningful avenue for relief." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490-91 (2010).  As the D.C. Circuit explained, "[a]llowing the party that has issued a demand that is causing concrete and ongoing First Amendment injury to dictate when, if ever, judicial review can commence could deprive parties of all meaningful . . . review" of their retaliation claims. *Media Matters*, 2025 WL 298896, at *5.  Having completed its internal process, the FTC could sit on its CID forever, leaving the Endocrine Society with no avenue for review of the "'here-and-now' First Amendment harms" caused by the FTC's investigation. *Id.*

The FTC has no answer to the Circuit's analysis in *Media Matters*.  It stubbornly insists that the "Endocrine Society can raise—and a federal court can resolve—all objections in a CID enforcement action." Opp. 17.  But the FTC ignores the possibility that the enforcement "step . . . might never happen." *Media Matters*, 2025 WL 298896, at *5.  And while it cites various cases applying *Thunder Basin* to First Amendment claims, none of them involved the allegedly retaliatory use of compulsory process, which inflicts unique, ongoing injury by requiring a CID

6

recipient to "alter[] its behavior to avoid creating evidence or materials that it would be forced to turn over if the [demand] were enforced." *Paxton*, 138 F.4th at 581.

*Second*, the Endocrine Society's claims are "wholly collateral" to the FTC's administrative process. *Axon*, 598 U.S. at 186. The "collateralism factor favors" the Endocrine Society because it is "challenging the [FTC's] power to proceed at all." *Id.* at 192. After all, if the FTC's investigation is retaliatory, then the FTC lacks authority to proceed with the investigation. The FTC misunderstands this point, claiming that the Endocrine Society challenges mere "procedural or evidentiary matters" relating to the CID. Opp. 19. It does not: There is no way for the FTC to cure its retaliatory intent post hoc, regardless of procedure or evidence.

*Third*, the Endocrine Society's "constitutional claims" fall "outside the Commission's competence and expertise." *Free Enter. Fund*, 561 U.S. at 491. The Endocrine Society's First Amendment arguments do not depend on any legal issues that fall within the FTC's wheelhouse. And even if they did, the FTC has already denied the petition to quash. Ex. 27. Thus, the FTC's argument that it deserves a further opportunity to "decide whether to narrow its CID before commencing an enforcement action" has been overtaken by events. Opp. 19. In these circumstances, "there is no agency-expertise benefit to waiting." *Media Matters*, 2025 WL 2988966, at *5.

## B. The Endocrine Society has a valid cause of action.

The FTC's cause-of-action argument lacks any support. For centuries, federal courts have "issue[d] injunctions to protect rights safeguarded by the Constitution." *Bell v. Hood*, 327 U.S. 678, 684 (1946). The D.C. Circuit has thus recognized "a direct cause of action under the First Amendment" to bring a "claim of unconstitutional retaliation." *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006); *see id.* at 190 n.22 ("[T]he court's power to enjoin unconstitutional acts by the government is inherent in the Constitution itself." (alteration adopted)).

The FTC offers the Court no basis to defy those precedents. It invokes *Ziglar v. Abbasi*, 582 U.S. 120 (2017), but that case concerns "an implied damages remedy" and recognized that the plaintiffs "may seek injunctive relief." *Id.* at 131, 144; *see* Opp. 20. And its attempt to repackage its *Thunder Basin* argument fails for the reasons already explained.

## II.  THE ENDOCRINE SOCIETY IS LIKELY TO SUCCEED ON ITS FIRST AND FOURTH AMENDMENT CLAIMS.

The FTC's arguments fare no better on the merits. The Endocrine Society is likely to prevail on its claims that the FTC: (1) unconstitutionally retaliated in violation of the First Amendment; (2) violated the First Amendment's prohibition on viewpoint-discriminatory prior restraints; (3) burdened the Endocrine Society's First Amendment rights to associate, practice journalism, and petition; and (4) violated the Fourth Amendment. The Court need agree with only one of those theories to rule that the Endocrine Society is likely to succeed on the merits.

### A.  The Endocrine Society is likely to establish retaliation in violation of the First Amendment.

The Endocrine Society is likely to establish unconstitutional retaliation because: (1) the Society engages in protected speech on matters of public concern; (2) the FTC's intrusive investigation would deter a reasonable person from engaging in that speech; and (3) the FTC's investigation was caused by—indeed, seeks to punish—the Endocrine Society's speech. Mem. 19-32; *see Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). The FTC concedes that the "Endocrine Society engages in some protected First Amendment conduct"—though, as explained below, it badly misunderstands just how much of the Endocrine Society's work is beyond the government's power to abridge. Opp. 21.

The FTC's arguments on the remaining two prongs fail on the facts and the law. It asserts that the Endocrine Society is not chilled by its investigation, while ignoring the Endocrine Society's evidence that it is experiencing here-and-now harms. The FTC's effort to defeat

8

causation is similarly without support.  Unable to distance itself from the Endocrine Society's showing of retaliation, the FTC leans into that retaliation by insisting that it has unfettered authority to police the Endocrine Society's noncommercial medical views.

> **1.      The FTC's investigation would deter a person of ordinary firmness from speaking again.**

The Endocrine Society has shown that the FTC's investigation crosses the low bar of being "sufficient to deter a person of ordinary firmness in [P]laintiff's position from speaking again." *Aref*, 833 F.3d at 258; *see Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 95 n.7 (D.D.C. 2025) (citing *Tao v. Freeh*, 27 F.3d 635, 639 (D.C. Cir. 1994)).  It is well-established that retaliatory investigations are "sufficient to deter protected speech."  *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 28 (D.D.C. 2024) (collecting cases).  And the Endocrine Society has submitted detailed allegations in a sworn declaration that the CID is already chilling its speech. Mem. 22-23; *see Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (stating that a plaintiff's "actual response" to retaliation provides "some evidence" of its "tendency . . . to chill").  That declaration explains, for example, that "[s]everal individuals who previously have worked on [gender affirming care] have informed the Society that they can no longer do so."  ECF No. 9-2 (Becker Decl.) ¶ 32.  And the declaration states that the Society has "stopped responding to most media request on gender affirming care" and that its "peer-reviewed journals do not invite papers or opinions on the topic, as they otherwise would."  *Id.* ¶ 29.

The FTC has nothing to say about the Endocrine Society's evidence.  The FTC makes vague references to the Endocrine Society's "size and substantial resources" and its "annual revenue."  Opp. 35-36.  But those considerations are irrelevant to whether the FTC's investigation is objectively sufficient to chill speech and to whether it has already chilled the Endocrine Society's speech.  Next, the FTC insists that the Endocrine Society's allegations that its speech

has already been chilled "depend[] on a chain of assumptions—without evidentiary support—about how third parties might react to the CID." Opp. 35. That claim ignores the Endocrine Society's allegations and uncontested proof that the FTC's investigation is already chilling speech.

### 2.    The Endocrine Society has established causation.

The Endocrine Society has also established that the CID would not have been issued "but for" its protected speech. Mem. 23-32; *see Hartman v. Moore*, 547 U.S. 250, 256 (2006).[2] The FTC fails to identify any fact whatsoever suggesting that the Endocrine Society has engaged in or knows about any actionable wrongdoing. Instead, the FTC's opposition doubles down on the agency's retaliatory intent by claiming authority to regulate medical viewpoints the agency dislikes. Finally, the FTC can neither wave away its own leaders' statements of retaliatory intent nor hide from the remarkable pattern of retaliatory investigations against the Endocrine Society and organizations like it.

### a.    The CID is retaliatory on its face.

The best evidence that the FTC's investigation was caused by the Endocrine Society's protected speech is that the CID expressly targets—and asks for a wealth of information about—the Endocrine Society's protected speech. Ex. 22 at 6-8. In particular, the CID targets the Endocrine Society's 2017 Guidelines and Position Statement, both of which present the Endocrine Society's views on medical matters of public concern. And it demands extensive information about the Endocrine Society's communications with scientists, advocates, and policymakers regarding gender affirming care. *See* Mem. 10-12.

---

[2] Because an argument in a "cursory footnote" is "forfeited," the Endocrine Society does not address the FTC's half-hearted claim that a standard other than but-for causation applies. *United States v. Brown*, 125 F.4th 1186, 1207 (D.C. Cir. 2025); *see* Opp. 22 n.1. In any event, the FTC "cites no case in which a court has applied *Nieves* in the civil context," and this Court should decline to be the first. *Media Matters for Am. v. Bailey*, 2024 WL 3924573, at *12 (D.D.C. Aug. 23, 2024).

The FTC's defense of its sweeping CID exacerbates rather than alleviates First Amendment concerns. The FTC urges that it may investigate questions concerning "false or unsubstantiated medical claims about the safety and effectiveness of certain treatments for pediatric gender dysphoria." Opp. 22. And it states that the Endocrine Society "likely has information about the scientific substantiation" for gender affirming care, further complaining that the Endocrine Society's "Clinical Practice Guideline . . . contains numerous highly contested statements." Opp. 12, 22, 32. The FTC's petition-to-quash ruling is similarly overt, explaining that the Commission is investigating the "Endocrine Society's statements, opinions, and positions" about gender affirming care. Ex. 27 at 6. Those assertions run headfirst into a wall of case law explaining that the First Amendment categorically protects "medical opinion[s]—even . . . hotly debated one[s]— in . . . peer-reviewed journal[s]." *Torrey v. Infectious Diseases Soc'y of Am.*, 86 F.4th 701, 704-05 (5th Cir. 2023); *see* Mem. 21, 25 (collecting additional cases). And the FTC's claim that it may investigate whether the Endocrine Society's "positions have provided the basis for other persons to make false or unsubstantiated representations or engage in unfair practices," Ex. 27 at 6, is inconsistent with the settled First Amendment rule that "the mere tendency of speech to encourage unlawful acts is not a sufficient reason" to abridge that speech, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 236 (2002); *see Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969). By claiming authority to investigate the Endocrine Society's medical views, the FTC necessarily admits that it targets the Endocrine Society for a purpose forbidden by the First Amendment.

Nor is there any basis in the FTC's opposition to question that the Endocrine Society's speech is beyond the agency's constitutional power to scrutinize. "[T]he more evidence there is that the purpose [of a CID] is improper, the more is needed to show that a proper purpose nonetheless dominated." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL

11

710202, at *7.  Yet the FTC has given "no credible reason to think that [it] is investigating suspicious facts as opposed to targeting a disfavored" organization.  *Id.* at *10.  Strikingly absent from its brief is any suggestion that the FTC has any evidence that the Endocrine Society did anything to violate the FTC Act; falls within the jurisdiction of the FTC; or has any connection to any other legitimate target of investigation.

Start with the fact that the FTC provides no basis to suspect that the Endocrine Society's speech has any commercial character, let alone a requisite connection to "marketing or advertising."  Opp. 2.  The FTC's opposition makes no concrete references to a single piece of "marketing" or "advertising" of any sort, let alone any reference to how the Endocrine Society's protected speech might relate to them.  Instead, the FTC relies on a series of generic, unsupported assertions to attempt to shield its investigation with a veneer of legitimacy.  For example, the FTC asserts without evidence that some of the Endocrine Society's members "may have a financial interest in PGDT."  Opp. 23.  The FTC even suggests that the Endocrine Society might not be a true charitable nonprofit and therefore might be subject to its enforcement jurisdiction.  Opp. 31.

"[T]he record is utterly devoid of evidence to support" any of that speculation.  *See Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 137 (D.D.C. 2025) (quoting *Paxton*, 138 F.4th at 585).  The Endocrine Society lacks any of the characteristics that have brought other nonprofit medical organizations the FTC refers to—none of them 501(c)(3) organizations like the Endocrine Society—within the FTC's jurisdiction.  Opp. 31; *see* Mem. 25-26.  As its publicly available financial documents show, the Endocrine Society's activities and its expenditures are closely tied to its "recognized public purposes."  *Coll. Football Ass'n*, 117 F.T.C. 971, 993 (1994); *see* Becker Decl. ¶ 9.  And the FTC has provided no evidence that it has reason to suspect that the Endocrine Society's nonprofit status is tainted by hidden commercial motive or activity.  It also does not

salvage the FTC's retaliatory investigation that some of the CID's specifications ask for information that could be relevant to determining its jurisdiction.  Opp. 34.  The Endocrine Society attempted to provide financial information to the FTC that would have allowed it to confirm its lack of jurisdiction, but the FTC rejected that proposal.  Ex. 23 at 7-9.

The FTC fares no better invoking unrelated cases to suggest—again, without evidence—that the Endocrine Society's speech might be "commercial."  Opp. 32-33.  All three cases the FTC cites concern the "secondary dissemination" of scientific material by commercial actors who attempted to use the materials to sell their products by giving them a "pecuniary gloss."  *See, e.g.*, *Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc.*, 906 F. Supp. 2d 9, 15 (D. Mass. 2012).  The FTC's citation to *Washington Legal Foundation v. Friedman*, 13 F. Supp. 2d 51 (D.D.C. 1998), is especially inapt given the court's statement that "[i]t is beyond dispute that when considered outside of the context of manufacturer promotion of their drug products . . . peer-reviewed medical journal articles . . . merit the highest degree of constitutional protection."  *Id.* at 62.  And the FTC's reliance on *Gordon & Breach Science Publishers S.A. v. American Institute of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994), is similarly flawed.  That case involved claims against a publisher of scientific journals that had "publish[ed] a comparative survey of scientific journals which . . . rate[d] its own publications as superior" to its competitors.  *Id*. at 1523.  The Court dismissed several claims, concluding they fell "too close to core First Amendment values to be considered 'commercial advertising or promotion' under the Lanham Act."  *Id.* at 1544.  The claims that survived involved "activities explicitly promotional in nature": Distribution of materials "favoring [the] defendants' products to an audience that represents the core consumers of those products."  *Id.*  The FTC has nothing similar here.

Finally, the FTC says nothing to connect the CID against the Endocrine Society to any

13

other legitimate investigation.   The FTC's opposition complains about the medical advice of unnamed "providers."  Opp. 11.  But the FTC has no authority to "direct[ly] control . . . medical practice," which has long been acknowledged to be "beyond the power of the federal government." *See Linder v. United States*, 268 U.S. 5, 18 (1925).  Instead, States have had the "traditional and longstanding authority to oversee the regulation of the practice of medicine."  ECF No. 23 (States Amicus Br.) at 2; *see also In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at \*28 (E.D. Pa. Nov. 21, 2025) ("Congress never authorized a roving mandate to regulate and alter state-licensed medical care.").  And more to the point, the FTC says nothing to connect any providers' alleged behavior to the Endocrine Society or its protected speech.

The FTC's overt misunderstanding of its authority, coupled with the lack of evidence to support its jurisdiction, also takes this case far outside the "presumption of regularity that attaches to government action."  Opp. 22.  In light of the FTC's own statements, both in the CID and in this Court, the Endocrine Society also does not rely on "mere speculation or conjecture"—instead, this is the "rare case" where "the evidence of improper purpose is overwhelming."  *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at \*7.   And regardless, the presumption of regularity is at its nadir when the same government actor under the same leadership is alleged to be engaging in the same illegal action in the same manner that this Court and the D.C. Circuit have already proscribed.  *See Elion v. Jackson*, 544 F. Supp. 2d 1, 8 (D.D.C. 2008) (stating that "past . . . retaliatory behavior" can be relevant to retaliation claim).

Contrary to the FTC's sky-is-falling rhetoric, a ruling for the Endocrine Society will not stymie legitimate investigations into false advertising.  *See* Opp. 29.  Ordinarily, a government investigator will be able to show that it is "investigating suspicious facts as opposed to targeting a disfavored" entity.  *In re Grand Jury Subpoenas No. [Redacted] & [Redacted]*, 2026 WL 710202,

14

at *10.  Indeed, the FTC plainly did so in the cases it cites involving nonprofits, charging that one nonprofit spent "90% of [its] fundraising revenue" to "fundraising and employee compensation" and that the other likely made misrepresentations "to consumers regarding [its] status as a nonprofit organization." *In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*, 2023 WL 8112947, at *1 (F.T.C. Nov. 17, 2023); *Feature Films for Families, Inc.*, 150 F.T.C. 866, 870 (2010); *see* Opp. 32.  It is the total absence of actionable facts regarding the Endocrine Society—coupled with the FTC's constitutionally infirm claims of authority to police the "Endocrine Society's statements, opinions, and positions" on medical questions, Ex. 27 at 6—that takes this case outside of the ordinary.

### b.      The FTC announced its intent to retaliate against the Endocrine Society.

In light of the CID's openly retaliatory purpose, confirmed by the FTC's opposition and order denying the Endocrine Society's petition to quash, the Court need not consider the extensive corroborating evidence of retaliation.  But if it does, the Endocrine Society has put forward overwhelming evidence of the Administration's and the FTC's stated intention to retaliate against it for its protected speech concerning gender affirming care.  Mem. 27-30.  The FTC attempts to brush off the many statements expressing hostility to the Endocrine Society's speech and an intent to retaliate against it.  It often declines to quote the relevant statements in full, instead attempting to paraphrase them in a manner that changes their meaning.  *See, e.g.*, Opp. 28.

But this Court should take Chairman Ferguson, the FTC, and the Administration at their word rather than indulge the FTC's post hoc revisions.  Chairman Ferguson said that the FTC's goal is to "[f]ight back against the trans agenda" and "proponents of gender-affirming care."  Ex. 15 at 1; Ex. 19 at 2.  And other FTC officials have characterized medical opinions about gender affirming care as "lie[s]" by "partisan morons" that should expose nonprofit organizations to

15

liability for "malpractice." Exs. 17-18. These are overt statements of retaliatory intent, much as the FTC prefers to ignore them now.

The FTC also fails to meaningfully address the specific statements at its workshop that directly advocate for retaliation against protected speech against entities outside the FTC's jurisdiction. At that workshop, an individual who has now been hired by the FTC to spearhead this investigation (and from whom the Endocrine Society has since received correspondence) suggested that the FTC should use "investigations" against "medical associations" that "published . . . de facto endorsements of [gender affirming care]" to cause those "associations" to "start losing members," "revenue streams," and "traction on Capitol Hill." Ex. 19 at 80-82. The speaker recognized that the FTC could not directly "go in and force" those organizations to change their views, and so urged the FTC to use its investigatory power to do indirectly what it could not do directly. *Id.* at 82. The problem with those statements is not only that the workshop was not "conduct[ed] . . . in a neutral manner." Opp. 24. It is also that the speaker openly urged retaliation at that workshop and, in response, the FTC hired her to lead that campaign.

Finally, the FTC fails to grapple with the President's overt instruction to take aim at the Endocrine Society and its peer organizations. *See* Mem. 27-28. The FTC argues that there is "no legal authority" suggesting that the President's "Orders . . . can be attributed to the FTC for purposes of a retaliation claim." Opp. 28. But this Court considered and rejected that argument just two weeks ago, explaining that "the motives of the President" are relevant to whether his subordinates' "investigation was launched for an improper purpose." *In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *9. After all, the FTC Chairman "was appointed by the President and can be fired by him." *Id.* (Indeed, the FTC and the President have jointly urged the Supreme Court to expand the President's powers and allow him to remove any

FTC commissioner at will.)  No surprise, therefore, that Chairman Ferguson has promised to use the FTC to "[a]dvance the President's agenda."  Ex. 15 at 1.  Nor does it "negate[] any inference [of] a causal connection" that several months passed between the Executive Orders the Endocrine Society cites and the issuance of the CIDs.  Opp. 28 (alteration in original).  As in *Media Matters*, the FTC's investigation is part of a "pattern" of the Administration's actions against gender affirming care and "gender ideology" that has "spanned virtually every day" since President Trump took office.  2025 WL 2988966, at *6; *see* Mem. 6-10, 17-18.  During those months, for example, the FTC held the workshop at which individuals advocated for retaliating against nonprofits for their support of gender affirming care.  *See* Ex. 19 at 80-82.

Rather than reckon with the substance of these statements, the FTC resorts to attacking straw men.  The Endocrine Society's arguments do not imply that "criticism of Big Tech, pharmaceutical companies, or payday lenders would render those sectors immune from investigation."  Opp. 29.  Nor does it call into question the FTC's authority to investigate false medical advertising.  *See* Opp. 9.  Instead, the Endocrine Society argues that official statements advocating for retaliation against protected speech by those entities might support a claim of First Amendment retaliation.  To the Endocrine Society's knowledge, no FTC decisionmaker has ever made such openly retaliatory and hostile statements against those entities and their work—further refuting the FTC's business-as-usual narrative.  For that same reason, the FTC's reliance on this Court's decision in *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022), is deeply misguided.  Opp. 26.  That case had nothing to do with the First Amendment—it concerned then-Chair Khan's alleged obligation to recuse from voting to authorize litigation based on her previous writings taking a position on a related legal issue.  *Id.* at 61-62.  Unlike here, there were no allegations that Chair Khan had urged retaliation for any protected speech.

17

        **c.**        **The FTC's investigation fits into a pattern of retaliatory action.**

As the Endocrine Society has shown, both the Administration and the FTC have translated these retaliatory statements into retaliatory actions—often through punitive investigations—targeting protected speech, gender affirming care, or both. Mem. 30-32; *see also* ECF No. 21-2 (LAMBDA Amicus Br.) at 6-14 (describing in detail the Administration's attempts to "punish and restrain" those who "depart[] from the Administration's viewpoint[s]" on gender affirming care). Numerous courts have concluded that similar investigations, subpoenas, and CIDs were retaliatory or otherwise contrary to law. *See* Mem. 30-31 (collecting cases). This Court should do the same.

On this point, the FTC barely responds to the Endocrine Society's actual arguments. For example, the FTC posits that the Endocrine Society's reference to actions by a "*separate* agency" are irrelevant because individuals at those agencies did not "participate[] in issuing the CID." Opp. 27. And the FTC posits that it dooms the Endocrine Society's claim that it does not make allegations of retaliatory motive specific to Commissioner Holyoak. *Id.* But the Endocrine Society never claimed there was any such overlapping authority, and it need not allege that Commissioner Holyoak harbored any separate retaliatory intent. Rather, the Endocrine Society argues that there is a "pattern of litigation and information demands" of which the CID is a part—similar to the pattern of action the D.C. Circuit found persuasive in denying the FTC's stay motion in *Media Matters*. 2025 WL 2988966, at *6. It goes without saying that the D.C. Circuit did not suggest that officials in state government in Missouri or Texas participated in issuing the CID at issue there. *See id.* at *6-7. But the Court nonetheless viewed the pattern of retaliatory action as relevant to the likelihood that the CID was in retaliation to Media Matters' protected speech. *Id.*

This Court should follow the Circuit's approach in *Media Matters*. Rather than substantively engage with that decision, the best the FTC can do is to note that *Media Matters* is not "binding." Opp. 38. True, but the decision represents the considered views of a D.C. Circuit

18

panel majority—who will also hear the *Media Matters* appeal on the merits—on the issues before this Court. And while the FTC emphasizes that *Media Matters* (like all cases) involves "unique factual circumstances," it says little to distinguish this case, which involves the same government entity, under the same leadership, retaliating in the same manner, from *Media Matters*. *Id.* The Court need not ignore the D.C. Circuit's decision just because the Endocrine Society is "a CID recipient in a wholly different investigation." *Id.* If anything, the FTC's eagerness to deploy the same retaliatory playbook against many entities is a reason to grant relief, not deny it.

### 3. Retaliatory investigations are not insulated from First Amendment scrutiny.

Finally, the Court should reject the FTC's deeply confused argument that a "retaliatory-investigation claim is not cognizable." Opp. 36. None of the D.C. Circuit judges in *Media Matters* found that proposition persuasive. And there is a wealth of authority in this Circuit stating that parties are entitled to injunctions against retaliatory investigations. *See Paxton*, 138 F.4th at 580 ("[B]ad faith use of investigative techniques can abridge journalists' First Amendment rights.").

The FTC's out-of-circuit authorities do not help it either. Those cases arise under 42 U.S.C. § 1983, where "common-law tort principles . . . . determine the precise contours of a constitutional claim" for money damages. *Chiaverini v. City of Napoleon*, 602 U.S. 556, 561 (2024); *see* Opp. 36 (collecting Section 1983 cases). And many of them focus on criminal investigations that were both "based on probable cause" and did not involve any compulsory process to the defendant. *See, e.g.*, *Archer v. Chisolm*, 870 F.3d 603, 620 (7th Cir. 2017); *see also Rehberg v. Paulk*, 611 F.3d 828, 850 n.24 (11th Cir. 2010) ("No § 1983 liability can attach merely because the government initiated a criminal investigation."). Indeed, one of the FTC's cited cases acknowledges that an investigation would violate the First Amendment if the government "questioned plaintiffs under threat of subpoena" and "directed them to produce documents." *Moore v. Garnand*, 83 F.4th 743,

19

752 (9th Cir. 2023). The FTC thus has no case suggesting that a *civil* investigative *demand* is beyond the First Amendment's reach, particularly when a plaintiff does not seek damages under Section 1983 but rather requests injunctive relief.

**B.      The Endocrine Society is likely to prevail on its other First Amendment claims.**

The FTC barely engages with the Endocrine Society's remaining First Amendment claims. Its arguments why the Endocrine Society's rights have not been burdened fail to address the relevant authority. And the FTC does not claim that its investigation satisfies any level of scrutiny.

**1.      The FTC's investigation violates the Constitution's prohibition on viewpoint-discriminatory prior restraints.**

The FTC's retaliatory investigation is also an unconstitutional attempt to wield state power to silence future speech. Mem. 32-34; *see Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). The FTC's arguments in response do not withstand analysis.

To start, the FTC is wrong to assert that "viewpoint discrimination requires an actual restriction of or regulation on speech" that is absent here. Opp. 39. The law is settled that the First Amendment comes into play whenever the government "set[s] [out] to achieve the suppression of [ideas]," including through "an informal censorship campaign." *Bantam Books*, 372 U.S. at 58, 67. And the FTC's investigation is succeeding in "compromising the ability to engage in robust scientific exchange" and develop "future clinical practice guidelines" concerning gender affirming care. ECF No. 27 (Medical Orgs. Amicus Br.) at 10, 12. The FTC's only argument for why its investigation and CID are not the same sort of "informal censorship campaign" is its conclusory assertion that they do "not proscribe speech, pressure third parties to suppress it, or threaten any penalty for noncompliance." Opp. 39. But the FTC's investigation includes "coordination with law enforcement," "authority to refer matters for prosecution," and "thinly veiled threats to institute criminal proceedings"—exactly the factors that the Court found persuasive in *Bantam*

*Books*.  *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189 (2024) (quoting 372 U.S. at 68).

Indeed, the FTC itself characterizes this as a "law-enforcement investigation" conducted by "law

enforcement officials."  Opp. 22, 24-25.

Stripped of that faulty premise, the FTC's arguments collapse.  The FTC halfheartedly

denies that it is "regulat[ing] speech based on" the Endocrine Society's "specific motivating

ideology," "opinion," or "perspective."  Opp. 39 (quoting *Rosenberger v. Rector & Visitors of

Univ. of Va.*, 515 U.S. 819, 829 (1995)).  But the FTC elsewhere admits that it is specifically

investigating entities that hold a specific perspective on gender affirming care.  *See* Opp. 12-13;

*see also* Ex. 27 at 6 (conceding that investigation focuses on the "Endocrine Society's statements,

opinions, and positions" about gender affirming care). That is what it means to "target[] . . .

particular views taken by speakers on a subject."  *Rosenberger*, 515 U.S. at 829.

Nor does the FTC endeavor to satisfy any level of First Amendment scrutiny.  It does not

suggest that it has a compelling interest or that investigating nonprofits for their speech on matters

of public concern is tailored to that interest.  It thus does not shoulder its First Amendment burden.

> **2.      The FTC's investigation burdens the Endocrine Society's association, press, and petition rights.**

As explained in the Endocrine Society's opening brief, the FTC's investigation is subject

to heightened scrutiny because it burdens the Society's rights to associate, conduct journalism, and

petition the government.  Mem. 35-38.  The FTC's contrary arguments lack merit.

***Association*.**   The FTC is wrong that the Endocrine Society's association claim is

"premature."  Opp. 39.  There are no "privileges" the Endocrine Society is invoking for which it

is required to "identif[y] . . . disputed materials on a 'document-by-document basis.'"  *Id*. Rather,

the Endocrine Society argues that "even absent enforcement," the CID is inflicting "present,

concrete, and objective harms" to its First Amendment rights.  Mem. 34-35 (quoting *Media*

21

*Matters*, 2025 WL 2988966, at *3).  The D.C. Circuit has made clear that such "harms" are legally cognizable even if the Endocrine Society is never required to produce documents.  *Paxton*, 138 F.4th at 579; *see id.* at 588 (Henderson, J., concurring in the judgment) (describing an analogous associational injury as "not contingent or attenuated").  The FTC does not acknowledge or respond to that binding precedent.

Equally off-base is the FTC's argument that *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021), "undermines" the Endocrine Society's position because that case discussed "subpoenas" as a permissible alternative.  Opp. 40.  The cherry-picked statement the FTC quotes had nothing to do with whether associational rights were burdened, but rather addressed tailoring. 594 U.S. at 611-15.  And the Court accepted the same argument the Endocrine Society makes here: that there was a "dramatic mismatch . . . between the interest that the [government] seeks to promote and the disclosure" requirement that it imposed "in service of that end."  *Id*. at 612.  It did not hold that every subpoena would bear a "substantial relation" to a "sufficiently important governmental interest."  *Id.* at 611.

***Press.***  The FTC's arguments concerning the Endocrine Society's claims based on press freedoms are equally misguided.  The FTC does not dispute that the Endocrine Society is entitled to the same protections as other organizations engaged in journalism.  *See Cusumano v. Microsoft Corp.*, 162 F.3d 708, 714 (1st Cir. 1998).  And the D.C. Circuit recently held—in a case regarding compulsory process issued to a journalistic organization—that "official harassment of the press places a special burden on information-gathering."  *Paxton*, 138 F.4th at 580 (alterations and internal quotation marks omitted).  The FTC acknowledges this precedent but fails to explain why it should not apply here.  Opp. 40.  And once again, the FTC's arguments regarding a "privilege" are inapposite.  *Id*.  Just like *Paxton*, this case is about an investigation and CID that burden First

22

Amendment rights, not any privilege invoked against disclosure of particular materials.

*Petition.*  Finally, the FTC also fails to rebut the Endocrine Society's Petition Clause claim. It is the law of this Circuit that laws burdening the ability to "provid[e] information" to legislators "implicate . . . petition rights." *United States v. Ring*, 706 F.3d 460, 468 (D.C. Cir. 2013).  The Endocrine Society has submitted evidence that the FTC's investigation has burdened that ability. Becker Decl. ¶¶ 26, 30, 31, 36.  In addition, a court in this District recently held that the Administration's actions that "undermin[ed]" an organization's "ability to pursue litigation" burdened its right to petition. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F. Supp. 3d 127, 156 (D.D.C. 2025).  The Endocrine Society has submitted evidence that the FTC's investigation has burdened that activity as well.  Becker Decl. ¶¶ 26, 30, 36.

The FTC's reliance on an out-of-circuit district court case, *DoorDash, Inc. v. City of New York*, does not help it.  754 F. Supp. 3d 556 (S.D.N.Y. 2024).  *DoorDash* concerned the assertion of privilege against a non-party subpoena issued as part of civil litigation, not a claim that a government investigation was—even absent enforcement—broadly burdening First Amendment petitioning rights.  *Id.* at 576-77.  And the case turned on the view that the plaintiffs had no "First Amendment right to lobby *in secret*." *Id.* at 577.  That holding has nothing to do with this case, where the FTC is chilling the Endocrine Society's ability to petition the government—publicly or privately—because it does not like the Society's views.  *See Rosenberger*, 515 U.S. at 828-29.

### C.     The Endocrine Society is likely to prevail on its Fourth Amendment claim.

Finally, the Endocrine Society has established that it is likely to succeed on the merits of its Fourth Amendment claim.  *See* Mem. 39-40.  Curiously, the FTC begins this section of its brief with an argument that the CID "is not fixed or final," even though the FTC has now denied the petition to quash.  Opp. 41.  The FTC next faults the Endocrine Society for failing to identify "categor[ies] of documents that it disputes." *Id*.  That is also wrong: The Endocrine Society's

23

opening brief notes the objectionable nature of many of the CID's specifications, and the resulting documents that it should not have to produce, *see, e.g.*, Mem. 40. Thus, the only question is whether the CID is "unreasonably burdensome." *See v. City of Seattle*, 387 U.S. 541, 544 (1967). Because it takes aim at a broad swath of First Amendment-protected conduct, *see supra* at 21-23, it fails the "scrupulous exactitude" that the Fourth Amendment demands in this context, Mem. 39.

## III. THE FTC'S RETALIATORY INVESTIGATION CAUSES IRREPARABLE HARM AND DISSERVES THE PUBLIC INTEREST.

The FTC barely develops an independent argument on the equitable factors. The Endocrine Society previously explained (Mem. 40) that it is irreparably harmed by the loss of its First Amendment freedoms. The FTC does not deny that those constitutional harms meet the D.C. Circuit's "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Instead, it insists that the Endocrine Society's constitutional claim is "meritless" and that any injunction would "exceed the courts' authority." Opp. 43 (alteration adopted and citation omitted). The Court should reject that argument for the reasons already explained. *Cf. Media Matters*, 805 F. Supp. 3d at 138 ("[The FTC] do[es] not respond to the argument that the First Amendment injury itself is irreparable, thereby conceding it.").

The FTC also fails to address the extensive real-world harms that the investigation is already causing. The FTC does not contest that the Endocrine Society's work on gender affirming care has slowed; that its ability to work with scientists and researchers has been impaired; that its members and employees have ceased or slowed communicating about gender affirming care; and that advocacy and education efforts relevant to gender affirming care have stalled. Mem. 40-41. Instead, the FTC insists that those harms are "economic" and "recoverable"—and that, even if they are not, they "stem[] from Endocrine Society's own choices." Opp. 43-44. Neither claim is correct: The Endocrine Society did not face these harms before the current rash of retaliatory

investigations, and the impairment of research—including its inability to update its guidelines—cannot be quantified in monetary terms.

The FTC's public-interest analysis suffers from similar problems. Again, its arguments are premised on the notion that "[e]njoining the FTC's ability to investigate inflicts grievous harm on the public and the agency." Opp. 43. But "enforcement of an unconstitutional" policy "is always contrary to the public interest." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). Nor does the FTC's concern about "a barrage of copycat pre-enforcement challenges," Opp. 43, move the needle: If the FTC's other investigations are unconstitutionally retaliatory, the public interest would favor halting those investigations as well.

## IV.    NEITHER A STAY NOR A SIGNIFICANT BOND IS WARRANTED.

Finally, the FTC is wrong to insist that it is entitled to either a stay pending appeal or a significant bond under Federal Rule of Civil Procedure 65(c). The FTC has not "satisfied the requirements for a stay" pending appeal because it has not shown that it is likely to succeed on the merits or that the equities favor its position. Opp. 44; *see Nken v. Holder*, 556 U.S. 418, 434 (2009). And given that the FTC "do[es] not even attempt to claim that [it] will be forced to absorb any costs as a result of an injunction," the Court should at most "order Plaintiff to post a bond of $1.00." *Am. Oversight v. Hegseth*, 788 F. Supp. 3d 14, 32 (D.D.C. 2025) (Boasberg, C.J.).

## CONCLUSION

For the foregoing reasons, the Endocrine Society requests that the Court grant injunctive relief that (1) prohibits Defendants from implementing or enforcing the Civil Investigative Demand served by the Federal Trade Commission to the Endocrine Society dated January 15, 2026; and (2) prohibits Defendants from issuing any further demands on or further investigating the Endocrine Society in violation of its First or Fourth Amendment rights, including in connection with its Guidelines, Position Statement, or noncommercial speech regarding gender affirming care.

25

Dated:  March 27, 2026

Respectfully submitted,

*/s/ Raymond P. Tolentino*
Raymond P. Tolentino (D.C. Bar No. 1028781)
Heather Sawyer (D.C. Bar No. 497688)
(*Pro Hac Vice*)
Joshua Revesz (D.C. Bar No. 1616617)
Dev P. Ranjan (D.C. Bar No. 90019329)
(*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC  20004-2400
Telephone: (202) 842-7800
Facsimile: (202) 842-7899
rtolentino@cooley.com
hsawyer@cooley.com
jrevesz@cooley.com
dranjan@cooley.com

*Counsel for Plaintiff the Endocrine Society*

26