# EXHIBIT 27

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**     **Andrew N. Ferguson, Chairman**
                       **Mark R. Meador**

|  |  |
|---|---|
| **In the Matter of** | ) |
| | ) |
| | )   **File No. P264800** |
| **CIVIL INVESTIGATIVE DEMAND TO** | )   **PUBLIC** |
| **ENDOCRINE SOCIETY** | ) |
| **DATED JANUARY 15, 2026** | ) |
| | ) |
| | ) |

**ORDER DENYING PETITION TO QUASH**
**CIVIL INVESTIGATIVE DEMAND**

**By FERGUSON, Chairman:**

Endocrine Society petitions the Commission to quash in its entirety a Civil Investigative Demand (CID) issued on January 15, 2026, in connection with the Commission's investigation into whether Endocrine Society or any other person has made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment (PGDT)—medical interventions for minors with gender dysphoria, including but not limited to pubertal suppression, hormone therapy, and surgery.

Endocrine Society requests that the Commission quash the CID because the CID (1) exceeds the Commission's authority; (2) violates the First and Fourth Amendments; and (3) is overly broad and unduly burdensome. *Petition*, at 2-3. For the reasons set forth below, we deny Endocrine Society's petition.

## I.    BACKGROUND

Endocrine Society, a 501(c)(3) nonprofit organization, describes itself as "the largest and most active organization in the world devoted to the study of hormones and clinical practice in endocrinology." *Id.* at 1. According to Endocrine Society, its mission is "to advance excellence in endocrinology by promoting scientific discovery, medical practice, and human health," and it pursues that mission by publishing peer-reviewed journals, hosting forums, and supporting its over 18,000 members at all stages of their professional development. *Id.* Endocrine Society notes that it publishes dozens of clinical practice guidelines for treatment of endocrine disorders, scientific statements, and position statements concerning endocrinology, including a guideline titled *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, last published in 2017 (2017 ES Guidelines), and a position statement published in 2020 titled *Transgender Health* (2020 Position Statement). *Id.* at 1-2.

On January 15, 2026, under the authority of two Commission resolutions authorizing the use of compulsory process, the Commission issued a CID to Endocrine Society pursuant to Section 20 of the FTC Act, 15 U.S.C. § 57b-1. *Petition* Ex. 1. The Endocrine Society CID was issued as part of the Commission's investigation into whether Endocrine Society or any other person has made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of PGDT to consumers in violation of Sections 5 and 12 of the FTC Act, and whether FTC action to obtain monetary relief would be in the public interest. *Id.*

The CID to Endocrine Society seeks information pertaining to the following: Endocrine Society's membership requirements, composition, benefits, and services; Endocrine Society's education, training, or certification programs; Endocrine Society's PGDT-related workshops, townhalls, and conferences; each type of PGDT advertised, marketed, promoted, addressed, or referred to by Endocrine Society in documents disseminated by Endocrine Society; the dissemination of and substantiation for any Covered Statement, a term defined in the CID to mean six specific representations; the development and issuance of the 2017 ES Guidelines and 2020 Position Statement, including related communications with Professional Medical Organizations or other organizations, institutions, or individuals; Endocrine Society's financial relationships or partnerships relating to PGDT with any (a) pharmaceutical company, (b) medical device manufacturer, or (c) clinic, hospital system, or individual clinician; all investigations and lawsuits involving Covered Statements or PGDT, including where Endocrine Society is amicus; any studies involving PGDT that Endocrine Society sponsored, conducted, or contributed to; PGDT-related information Endocrine Society provided to any legislature or regulator; Endocrine Society's financial statements; and Endocrine Society's records retention policy, among other subjects. *Id.* at 5-7. The relevant time period for Endocrine Society's responses is from January 1, 2021, to the date of full and complete compliance with the CID, but certain specifications apply regardless of time period. *Id.* at 5.

The CID attached two resolutions: (1) the Resolution Directing Use of Compulsory Process in a Non-Public Investigation of Dietary Supplements, Foods, Drugs, Devices, or Any Other Product or Service Intended to Provide a Health Benefit or to Affect the Structure or Function of the Body, issued by the Commission on August 9, 2019; and (2) the Resolution Directing Use of Compulsory Process Regarding Acts or Practices Affecting Children, issued by the Commission on September 2, 2021. *Id.* at 15-16.

Endocrine Society had two meet-and-confer sessions with Commission staff, on January 30 and February 5, 2026. *See Petition* Ex. 3, at 1-8 (Statement of Counsel Pursuant to 16 C.F.R. § 2.10(a)(2)). During those meet-and-confers, Endocrine Society purports to have raised objections to the CID based on the Commission's statutory authority, the CID's breadth and vagueness, burden, and the First and Fourth Amendments. *Id.* But Endocrine Society does not appear to have offered any proposals to modify the CID's specifications in a manner that would address its concerns while providing the Commission the information it needs. *See generally id.* The return date of the CID was March 16, 2026. *See Petition* Ex. 1, at 3. Commission staff proposed a production schedule that would have extended the CID's return date for certain

specifications, conditional on Endocrine Society agreeing to accept service, forgo any petition to quash, and continue engaging with Commission staff in good faith. *Petition* Ex. 6, at 4-5.

Endocrine Society and Commission staff continued to discuss via email on February 6 and 9, 2026. *See generally id*. Endocrine Society timely filed the instant petition on February 10, 2026.

## II.    ANALYSIS

### A.  The CID Is Not *Ultra Vires*.

Endocrine Society first argues that the Commission lacks enforcement jurisdiction over it, because Endocrine Society is not a "corporation" under Section 4 of the FTC Act. *Petition*, at 3-6. Endocrine Society next argues that the CID is not reasonably relevant to any legitimate investigation under Section 5 or 12. *Id.* at 6-10.

### 1.  Non-Profit Status

Endocrine Society argues that it meets the test articulated in *In re College Football Ass'n*, 1117 F.T.C. 971, 998 (1994), for determining whether a nonprofit entity is a corporation within the Commission's jurisdiction. *Petition*, at 3-6. Specifically, Endocrine Society asserts that it is a "true" charitable, nonprofit organization, because it is organized as a 501(c)(3) nonprofit, has had tax-exempt status since it was first incorporated in 1918, and devotes its activities and funding to its charitable public purposes. *Id.*

Endocrine Society's argument confuses the Commission's enforcement authority with its broader investigatory authority.[1] The plain language of the FTC Act makes clear that the Commission has the authority to issue this CID as part of its investigation. Section 20 authorizes the Commission to serve a CID on any "person." 15 U.S.C. § 57b-1(c)(1).[2] "Person" for purposes of Section 20 is defined as "any natural person, partnership, corporation, association, or *other legal entity*, including any person acting under color or authority of State law." *Id.* § 57b-1(a)(6) (emphasis added). Prior Commission decisions have recognized that Section 20 authorizes the Commission to obtain information from any "legal entity," irrespective of whether the entity falls within the definition of "corporation" in Section 4 of the FTC Act. *See In re Aug. 11, 2022 Civ. Investigative Demand Issued to Childhood Leukemia Found., Inc.*, No. 222-3073,

---

[1] As discussed more fully below, identifying whether the Commission has such enforcement authority is a proper purpose of a CID. Until and unless Endocrine Society complies with the CID and produces information and documents sufficient to show the Commission that it lacks enforcement authority over Endocrine Society, the Commission cannot concede that it lacks enforcement authority over Endocrine Society.

[2] Section 20(c)(1) provides: "Whenever the Commission has reason to believe that any person may be in possession, custody, or control of any documentary material or tangible things, or may have any information, relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of section 45(a)(1) of this title), or to antitrust violations, the Commission may, before the institution of any proceedings under this subchapter, issue in writing, and cause to be served upon such person, a civil investigative demand requiring such person to produce such documentary material for inspection and copying or reproduction, to submit such tangible things, to file written reports or answers to questions, to give oral testimony concerning documentary material or other information, or to furnish any combination of such material, answers, or testimony." 15 U.S.C. § 57b-1(c)(1).

3

2023 WL 8112947, at \*2 (Nov. 17, 2023) ("[T]he plain language of Section 20 permits the Commission to serve a CID on any legal entity, regardless of whether it is a 'corporation' within the meaning of Section 4[.]"); *In re Mar. 19, 2014 Civ. Investigative Demand Issued to Police Protective Fund, Inc.*, 157 F.T.C. 1913, 1915-18 (May 22, 2014); *In re Feature Films for Families, Inc.*, 150 F.T.C. 866, 870 (Sep. 23, 2010) (Commission "can require production of material from an entity that is not subject to the Commission's enforcement authority if that material furthers the investigation of possibly illegal conduct by entities that are subject to the agency's jurisdiction, such as for-profit telefunders making calls on [the CID recipient's] behalf"). Given that it is a "501(c)(3) nonprofit," *Petition*, at 1, Endocrine Society cannot credibly argue that it is not a "legal entity." Therefore, regardless of whether the Commission may enforce Section 5 of the FTC Act against Endocrine Society, Endocrine Society is a "legal entity" that falls within the definition of "person" under Section 20 of the FTC Act and therefore is subject to the Commission's investigatory jurisdiction and may properly be issued a CID.

Endocrine Society's citations to *College Football Ass'n*, 117 F.T.C. 971, *American Medical Ass'n*, 94 F.T.C. 701 (1979), and *FTC v. Grand Canyon Education, Inc.*, 745 F. Supp. 3d 803 (D. Ariz. 2024), are thus beside the point. Those cases all involved the analytically separate question of whether the Commission could take *enforcement* action against the entities, not whether the Commission could obtain information from them via CIDs.

The law is clear that an agency has the power to investigate to determine whether an organization is subject to its regulatory jurisdiction. *See, e.g.*, *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973) (agency's "jurisdiction to determine whether it has jurisdiction is as essential to its effective operation as is a court's like power"); *Fed. Mar. Comm'n v. Port of Seattle*, 521 F.2d 431, 434 (9th Cir. 1975) ("[E]ach independent regulatory administrative agency has the power to obtain the facts requisite to determining whether it has jurisdiction over the matter sought to be investigated."). As discussed in prior Commission decisions, the Commission "possesses the authority to investigate whether its jurisdiction extends to" the CID recipient. *Feature Films for Families*, 150 F.T.C. at 871; *see also Childhood Leukemia Found., Inc.*, 2023 WL 8112947, at \*4; *Police Protective Fund, Inc.*, 157 F.T.C. 1913 at 1919-20.

Endocrine Society has attached copies of its certificates of incorporation and certificates of amendment to support its assertions that it meets all the requirements of a "true" nonprofit. *Petition*, at 5, Exs. 4-5. But, as we explained in *Police Protective Fund*, "the Commission is not required to take at face value an organization's claim that it is a charitable organization, and can require it to produce documents and other information to enable the Commission to make that determination itself." 157 F.T.C. at 1916; *see also Childhood Leukemia Found.*, 2023 WL 8112947, at \*5 ("[T]he Commission is not required simply to accept CLF's representation that it is a nonprofit based on CLF's selective presentation of evidence. It needs the information requested in the CID to determine whether CLF is truly operated as a nonprofit such that it is not a 'corporation' within the meaning of Section 4.").

Here, as in *Police Protective Fund*, the Commission will conduct a careful examination to determine whether Endocrine Society is in fact carrying on business "for its own profit or that of its members." 157 F.T.C. at 1915 (citing 15 U.S.C. § 44). For example, interrogatories 1-3 ask

4

about Endocrine Society's membership requirements, composition, benefits, and services; interrogatory 4 and document request 7 ask about Endocrine Society's education, training, or certification programs; interrogatory 9 and document request 10 seek information about financial relationships or partnerships between Endocrine Society and any (a) pharmaceutical company, (b) medical device manufacturer, or (c) clinic, hospital system, or individual clinician; and document request 11 seeks Endocrine Society's financial statements. *Petition* Ex. 1, at 5-7. Information and documents responsive to these specifications will enable the Commission to conduct a fact-intensive inquiry into how Endocrine Society actually operates, including examination of "the primary purpose of the organization, the extent to which funds or other benefits may have been conferred on related for-profit companies or individuals, and the extent to which the organization may have been used by individuals or for-profit entities as a device to seek monetary gain." *Police Protective Fund*, 157 F.T.C. at 1917-18. For purposes of this inquiry, "'[t]he extent to which an entity confers benefits on private interests is relevant even if those benefits are not in the form of 'profits' as that term is traditionally understood." *Id.* at 1918.[3]

### 2.    Reasonable Relevance of the CID

Endocrine Society argues that the CID is not reasonably relevant to any legitimate investigation of a violation of Sections 5 or 12. *Petition*, at 6. Endocrine Society asserts that, because it does not "market" or "advertise" any treatment, none of its statements could fall within the scope of Sections 5 or 12. *Id.* at 7. Endocrine Society points out that it publishes dozens of clinical practice guidelines available for free on its website, that similar guidelines are published by hundreds of other medical organizations, and that clinicians routinely use these guidelines in discussing treatment options with patients. *Id.* at 7-8. Endocrine Society asserts that the Commission's enforcement and investigative powers do not allow it to regulate medical opinion or practice. *Id.* at 8-9. Endocrine Society also raises two different constitutional concerns namely, that holding entities liable for scientific or medical opinions published in a non-commercial context would raise significant First Amendment concerns, and that the CID burdens Endocrine Society's First and Fourth Amendment rights because it seeks to compel Endocrine Society into "disproving" its own opinion. *Id.* at 8, 10. Finally, Endocrine Society asserts that the CID exceeds the Commission's authority because the Commission's putative justification is pretextual. *Id.* at 10.

To quash Commission compulsory process on the basis of relevance, a petitioner must show that "the information sought is [not] 'reasonably relevant' to the agency's inquiry." *FTC v. Anderson*, 631 F.2d 741, 745 (D.C. Cir. 1979) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950)). This is a high bar: "The standard for judging relevancy in an investigatory proceeding is more relaxed than in an adjudicatory one." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1090 (D.C. Cir. 1992) *see also In re Civ. Investigative Demand to Intuit Inc.*, 170 F.T.C. 486, 489 (Aug. 17, 2020) ("The standard for the relevance of administrative compulsory

---

[3] *See also FTC v. Gill*, 183 F. Supp. 2d 1171, 1184-85 (C.D. Cal. 2001) (company was "not a legitimate nonprofit organization" where evidence showed individual defendant lived in corporate office, paid personal expenses from corporate account, and otherwise commingled assets); *In re Ohio Christian Coll.*, 80 F.T.C. 815, 848 (1972) ("Profit, for the purpose of Section 4 of the Federal Trade Commission Act, is not limited to dividends, gains or direct reward."); *cf. Liu v. SEC*, 591 U.S. 71, 84 (2020) (expenses such as "extraordinary salaries" may amount to "dividends of profit under another name").

process is … broader and more relaxed than would be in an adjudicatory discovery demand." (cleaned up)). The evaluation of reasonableness "need not be limited to information necessary to prove a specific charge; [the Commission] can demand, instead, any documents or information 'relevant to the investigation—the boundary of which may be defined quite generally' by the Commission." *Intuit*, 170 F.T.C. at 489 (quoting *Invention Submission Corp.*, 965 F.2d at 1090). The D.C. Circuit, addressing FTC subpoenas, has explained that "the test is satisfied if the documents sought are 'not plainly irrelevant' to the investigative purpose." *FTC v. Carter*, 636 F.2d 781, 788 (D.C. Cir. 1980) (citation omitted). "The [Commission's] own appraisal of relevancy must be accepted so long as it is not 'obviously wrong.'" *FTC v. Bisaro*, 757 F. Supp. 2d 1, 6 (D.D.C. 2010) (quoting *Invention Submission Corp.*, 965 F.2d at 1089; citing *FTC v. Texaco, Inc.*, 555 F.2d 862, 874 (D.C. Cir. 1977)).

Applying these standards here, we conclude that Endocrine Society's relevance challenge is meritless. At this stage of the matter, the Commission is not required to accept Endocrine Society's assertions, *Petition*, at 7, that it "does not 'market' or 'advertise' any treatments." *See Morton Salt Co.*, 338 U.S. at 642-43 (noting that the Commission "has a power of inquisition .... [that] is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated or even just because it wants assurance that it is not"). In addition, as the CID's "Subject of Investigation" field makes clear, the Commission is investigating both Endocrine Society *and* other persons. In other words, the Commission's investigation is not limited to Endocrine Society's own marketing or advertising. The Commission's investigation encompasses broader concerns such as whether Endocrine Society's statements, opinions, and positions have provided the basis for other persons to make false or unsubstantiated representations or engage in unfair practices related to the marketing or advertising of PGDT. Cases like *Waltham Watch Co. v. FTC*, 318 F.2d 28, 32 (7th Cir. 1963), recognize the availability of means and instrumentalities liability for violations of Sections 5 and 12.[4] Information responsive to the CID is plainly relevant to these concerns.

Endocrine Society asserts that "the Commission is not authorized to regulate medical opinion or practice in the United States, through either its enforcement or its investigative power." *Petition*, at 8. But that is not what the Commission has done with this inquiry. Rather, the Commission properly issued the CID to assess whether law violations have occurred, including whether Endocrine Society or any other persons are making deceptive claims about the safety and efficacy of PGDT; the Commission needs the information sought by the CID to make this assessment. Investigating potentially deceptive claims about the safety or efficacy of products or services intended to provide a health benefit or to affect the structure or function of

---

[4] For further discussion on means and instrumentalities liability, see Dissenting Statement of Comm'r Andrew N. Ferguson, Joined by Comm'r Melissa Holyoak, *In the Matter of Rytr*, Matter No. 2323052, at 3-9 (Sep. 25, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/ferguson-rytr-statement.pdf.

6

the body is well within the Commission's remit,[5] and the Commission has pursued such investigations for decades.[6]

Endocrine Society also argues that the CID is not reasonably relevant to any viable FTC Act investigation because the First Amendment protects scientific or medical opinions published in a non-commercial context. *Petition*, at 8. The law is clear, however, that misleading commercial speech is "not protected by the First Amendment." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002); *see also Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 638 (1985) (holding that it is "well settled" that "the Federal Government [is] free to prevent the dissemination of commercial speech that is false, deceptive, or misleading"); *FTC v. Trudeau*, 662 F.3d 947, 953 (7th Cir. 2011) ("[M]isleading commercial speech gets no constitutional protection."). In any event, Endocrine Society's concerns about liability are premature. The Commission is merely conducting an investigation, one purpose of which is to determine whether Endocrine Society or others may have engaged in conduct that lacks protection under the First Amendment. *See Police Protective Fund*, 157 F.T.C. at 1920; *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190-91 (2024) ("When the government threatens no sanction—criminal or otherwise—we very much doubt that the government's criticism or effort to embarrass the intermediary threatens anyone's First Amendment rights." (cleaned up)). As such, the Commission is entitled to collect information from Endocrine Society that would allow it to ascertain whether Endocrine Society's speech is commercial and thus subject to the prohibitions against deception set forth in the FTC Act.

We also reject Endocrine Society's assertion that the Commission's justification for issuing the CID is "pretextual." *Petition*, at 10. Recent reports have indicated weak scientific evidence and lack of substantiation for PGDT.[7] Patients, providers, and others have increasingly

---

[5] *See, e.g.*, *FTC Policy Statement on Deception* (Oct. 14, 1983), *appended to Cliffdale Associates, Inc.*, 103 F.T.C. 110, 174 (1984), https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf; *FTC Policy Statement on Advertising Substantiation* (Nov. 23, 1984), *appended to Thompson Medical Co.*, 104 F.T.C. 648, 839 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987), https://www.ftc.gov/legal-library/browse/ftc-policy-statement-regarding-advertising-substantiation.

[6] *See* FTC, *Health Products Compliance Guidance* (Dec. 2022) ("Since 1998, the FTC has settled or adjudicated more than 200 cases involving false or misleading advertising claims about the benefits or safety of dietary supplements or other health-related products, including foods, over-the-counter (OTC) drugs, homeopathic products, health equipment, diagnostic tests, and health-related apps."), https://www.ftc.gov/business-guidance/resources/health-products-compliance-guidance; *see, e.g.*, *POM Wonderful LLC v. FTC*, 777 F.3d 478, 495-97 (D.C. Cir. 2015) (affirming Commission's competent and reliable scientific evidence standard for disease-related claims about food products); *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000) (affirming Commission's finding that advertisements of back pain remedies were deceptive because they contained an unsubstantiated implied claim of superior efficacy); *Bristol-Myers Co. v. FTC*, 738 F.2d 554, 557-58 (2d Cir. 1984) (affirming Commission's finding that advertisements about the efficacy of analgesics were deceptive); *FTC v. Roca Labs*, 345 F. Supp. 3d 1375, 1381-82, 1387 (M.D. Fla. 2018) (requiring competent and reliable scientific evidence to support health-related claims, including claims of weight loss efficacy); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 293-94, 300 (D. Mass. 2008) (finding that because defendants made "non-establishment health-related efficacy claims, the defendants must be able to point to 'competent and reliable scientific evidence' as substantiation).

[7] For example, the Cass Report, a now-famous international government-commissioned review of PGDT, concluded that "[t]his is an area of remarkably weak evidence." H. Cass, *Independent Review of Gender Identity Services for Children and Young People*, at 13 (Apr. 2024), https://perma.cc/RDN3-WBYR.

come forward with evidence that PGDT may harm teenagers.[8] Patients and their families have also alleged false statements and material omissions were communicated to them about PGDT's safety and efficacy.[9] Against that backdrop, the FTC began evaluating representations made to consumers about PGDT's purported benefits and the substantiation for those representations. On July 9, 2025, the FTC held a workshop focusing on unfair or deceptive trade practices in "gender-affirming care" for minors.[10] Chairman Ferguson's remarks at the workshop made clear that he had *not* made up his mind regarding the legality of any conduct by proponents of PGDT. *See* Andrew N. Ferguson, Chairman, FTC, *Welcome Keynote at the Dangers of "Gender-Affirming Care" for Minors* 1 (July 9, 2025), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-The-Dangers-of-Gender-Affirming-Care-for-Minors-Transcript.pdf ("It is about healing the wounds that proponents of gender-affirming care *may* have inflicted on our nation's children and parents" (emphasis added)); *id.* ("[O]ne of the reasons we are here today is [to] examine *whether* some of the practices in gender-affirming care are deceptive and require greater scrutiny by the FTC" (emphasis added)). As he explained, "We are not here to pass judgment on anyone. We are here to ensure that those who make claims about gender-affirming care are held to the same standard we apply to everyone else who engages in commerce." *Id.* at 5. Commissioner Meador expressed similar sentiments. *Id.* at 74 ("In my view, treating people with respect and dignity means being honest with them, including about the effects of medical interventions, about the evidentiary basis, about the anticipated outcomes, and this is especially important when we're talking about decisions involving children. That's what today's workshop is about."). Neither Chairman Ferguson nor Commissioner Meador mentioned Endocrine Society. *See generally id.*

Following the workshop, the FTC issued a Request for Public Comment "to better understand how consumers may have been exposed to false or unsupported claims about 'gender-affirming care' (GAC), especially as it relates to minors, and to gauge the harms consumers may be experiencing."[11] By the September 26, 2025, comment deadline, the agency received close to 8,000 responsive comments.[12] Numerous commenters referenced Endocrine Society or the 2017 ES Guidelines.[13] After considering the perspectives provided at the

---

[8] One young woman, for example, filed a medical malpractice suit, alleging that taking testosterone she received after only a "thirty-minute consult" caused "constant vocal pain, joint pain, and frustrating and sometimes painful sexual dysfunction." Jennifer Block, *How Did Planned Parenthood Become One of the Country's Largest Suppliers of Testosterone?*, The Free Press (Aug. 7, 2024), https://perma.cc/TB9T-27YA.

[9] *E.g.*, Chloe Cole, *I'm a Detransitioner*, N.Y. Post (Mar. 11, 2025), https://perma.cc/3HV7-GN68.

[10] *See* FTC, *FTC Announces Workshop on Exploring Unfair or Deceptive Trade Practices in "Gender-Affirming Care" for Minors* (June 9, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/06/ftc-announces-workshop-exploring-unfair-or-deceptive-trade-practices-gender-affirming-care-minors.

[11] Press Release, FTC, *FTC Requests Public Comment Regarding "Gender-Affirming Care" for Minors* (July 28, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/07/ftc-requests-public-comment-regarding-gender-affirming-care-minors.

[12] *See Request for Public Comment Regarding "Gender-Affirming Care" for Minors*, regulations.gov, https://www.regulations.gov/docket/FTC-2025-0264.

[13] For example, consumers commented that they believed PGDT to be a "life-saving [and] evidence based" treatment that "reduces depression, anxiety, and suicide risk in trans youth," due to the "support" of PGDT by Endocrine Society and its Clinical Practice Guideline. *Comment from Bonin, Ashlee* (Aug. 1, 2025), https://perma.cc/8297-3A58; *Comment from Anonymous* (Sep. 25, 2025), https://perma.cc/W7MX-S22K (noting that "[t]he guidelines of … the Endocrine Society … follow evidence-based care for" children with gender dysphoria "for optimal best outcomes and prevention of suicide"); *Comment from Hellinga, Richard* (Jul. 30, 2025), https://perma.cc/3PXYWKSA (advocating that PGDT is "safe, effective treatments for children," based on "support[] by major medical associations, including … the Endocrine Society" and its Clinical Practice Guideline).

workshop and in the public comments, the Commission issued the CID to investigate potential deceptive or unfair practices related to the marketing or advertising of PGDT.

**B.  The CID Is Not Overbroad or Unduly Burdensome.**

Endocrine Society argues that the CID is unduly burdensome, given the CID's broad definitions, the CID's "nearly limitless" specifications, and Endocrine Society's limited resources and staff. *Petition*, at 10-13.

We are unpersuaded by Endocrine Society's arguments about the CID's broad definitions. *Petition*, at 11. "The party objecting to discovery as vague or ambiguous has the burden to show such vagueness or ambiguity." *Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 655 (D. Kan. 2006). In doing so, a party "should exercise reason and common sense to attribute ordinary definitions to terms and phrases," *id.* (quotation omitted), while avoiding "[h]yper-technical, quibbling, or evasive objections," *Avalos v. Carpenter*, No. 15-cv-00369, 2017 WL 387243, at *1 (E.D. Cal. Jan. 27, 2017). Similar definitions of "Communication," "Document," "Organization," "You, and "Your" can be found in other Commission CIDs.[14] The definition of "Covered Statement" lists six specific representations, and Endocrine Society does not explain why it cannot interpret the various terms within the six enumerated representations—such as "safe," "proven effective," "supported by evidence-based science," and "few side effects"—using common sense and the ordinary usage of those words. Endocrine Society has not met its burden of showing why use of these common definitions and terms renders the CID overbroad or unduly burdensome.

We also reject Endocrine Society's contention that "the CID makes nearly limitless requests." *Petition*, at 11. As discussed below in Section II.C.2.a, Endocrine Society appears to be misreading certain specifications. Moreover, the CID sent to Endocrine Society actually has fewer specifications and seeks less information than other CIDs sent to nonprofits or purported nonprofits[15] or in other investigations involving healthcare claims.[16]

---

By contrast, numerous comments expressed serious concern over the lack of evidence supporting the Endocrine Society's Clinical Practice Guideline and PGDT. One physician asserted that the Endocrine Society Clinical Practice Guideline was not credible because it "blatantly ignor[es] the latest evidence (namely the Cass Review) regarding the care of" children with gender dysphoria. *Comment from Rivera, Kristine* (Aug. 12, 2025), https://perma.cc/H8JC-BM4Z. And although "Endocrine Society claims that their guidelines are based on two systematic reviews they commissioned," the physician contended, Endocrine Society "fail[ed] to mention that [those systematic] reviews" are not about PGDT, and their underlying "data is from adults." *Id.*

[14] *See, e.g.,* Pet. to Quash or Limit Civil Investigative Demand Ex. 1, *In re Civ. Investigative Demand to MGM Resorts Int'l*, No. 2423028 (Feb. 20, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/2423028mgmpetquashpublic.pdf; Pet. to Quash or Limit Civil Investigative Demand to Matthew Thayer Ex. A, *In re IM Mastery Academy*, No. 2123090, 2023 WL 4014246 (F.T.C. June 5, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2123090ptqthayer.pdf.

[15] *See, e.g.*, Pet. to Quash Civil Investigative Demand Ex. B, *Childhood Leukemia Found.*, 2023 WL 8112947, https://www.ftc.gov/system/files/ftc_gov/pdf/2223073-PTQ.pdf (28 interrogatories and 55 document requests, many with subparts); Mot. to Quash Civil Investigative Demand Ex. P, *Police Protective Fund*, 157 F.T.C. 1913, https://www.ftc.gov/system/files/documents/petitions-quash/police-protective-fund-inc./140422policeprotfundquash.pdf (76 interrogatories and 53 document requests, many with subparts).

[16] Pet. to Enforce Civil Investigative Demand Ex. 3, *FTC v. Kushly, LLC*, No. 2:20-mc-00036 (D. Ariz. July 30, 2020), https://www.ftc.gov/system/files/documents/cases/01_petitionexhibitsproposed_order.pdf (22 interrogatories and 15 documents requests, many with subparts); Pet. for an Order Enforcing Civil Investigative Demand Ex.2, *FTC*

Endocrine Society also fails to provide adequate support for its claim of undue burden. As Endocrine Society acknowledges, *Petition*, at 13, agency process is not unduly burdensome unless compliance "threatens to unduly disrupt or seriously hinder" the normal operations of the recipient's business. *Texaco*, 555 F.2d at 882. The test is "not easily met" because "[s]ome burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest." *Id.*; *see also FTC v. Shaffner*, 626 F.2d 32, 38 (7th Cir. 1980) ("[A]ny subpoena places a burden on the person to whom it is directed. Time must be taken from normal activities and resources must be committed to gathering the information necessary to comply. Nevertheless, the presumption is that compliance should be enforced to further the agency's legitimate inquiry into matters of public interest.").

A CID recipient bears the burden of showing how a CID interferes with its ability to operate its business. *See FDIC v. Garner*, 126 F.3d 1138, 1146 (9th Cir. 1997) (rejecting claim of undue burden where recipient failed "to enunciate how these subpoenas constitute a 'fishing expedition'"); *see also FTC v. Standard Am., Inc.*, 306 F.2d 231, 235 (3d Cir. 1962) (finding no undue burden where subpoena recipients "did not adduce a single shred of evidence" to support their claim that compliance would result in "the virtual destruction of a successful business").

Endocrine Society submitted an affidavit from Mila Becker, Endocrine Society's Chief Policy Officer, to support its claims of undue burden. For example, the affidavit states that compliance would require "significant time" from "at least 30 ... of the organization's approximately 80 employees"; that Endocrine Society "might need to seek potentially responsive documents" from individuals like "member experts in transgender medicine who have participated in the Endocrine Society's work"; that "costs could be well over $500,000 plus weeks of IT and other relevant staff time"; and that Endocrine Society's Finance and IT Departments are already considering the budget impact of compliance. *Petition* Ex. 2, at 5-7. We are not persuaded by these claims. As discussed below in Section II.C.2.a, Endocrine Society appears to be misreading certain specifications by assuming that the CID requires Endocrine Society to "disprove" its own views or taking an overly broad reading of document request 8. Moreover, Endocrine Society appears to be overlooking the fact that the CID only requires production of documents and information in "Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity." *Petition* Ex. 1, at 10. Contrary to Endocrine Society's assumptions, *Petition* Ex. 2 at 6-7, the CID does *not* require production of documents or information from Endocrine Society's "rank-and-file members" unless the documents or information are in Endocrine Society's possession or under its actual or constructive custody or control. Finally, Commission staff has already responded to Endocrine Society's burden

---

*v. Redwood Sci. Techs.*, No. 2:17-cv-07921 (C.D. Cal. Oct. 13, 2017), https://www.ftc.gov/system/files/documents/cases/redwood_2017-10-30_enforcement_petition.pdf (22 interrogatories and 16 document requests, many with subparts); Pet. to Limit or Quash Civil Investigative Demand Ex. 1, *In re Cellmark Biopharma LLC*, 162 F.T.C. 1212 (2016), https://www.ftc.gov/system/files/documents/petitions-quash/lexium-international-llc/160613petitiontoquash-lexium.pdf (42 interrogatories and 36 document requests, many with subparts).

PUBLIC

arguments by agreeing to limit several of the "regardless of time period" specifications (interrogatories 8 and 13 and document requests 1-3) so that they only apply from January 1, 2014, to the present. *See Petition* Ex. 6, at 4. As Commission staff explained, they selected the January 1, 2014, date because it precedes the 2017 Endocrine Society Guidelines—central to the CID—by approximately three years. *Id.* The specifications requiring information "regardless of time period" that staff refused to limit were, as staff explained to Endocrine Society, naturally limited by the CID's request for information related to the 2017 ES Guidelines or the 2020 Position Statement. *Id.* at 5. These time limits (as modified) seek the production of reasonably relevant information that the Commission needs to conduct its investigation.

## C. The CID Does Not Violate Endocrine Society's First or Fourth Amendment Rights.

Endocrine Society argues that the CID retaliates against and chills protected speech. *Petition*, at 13-14. Endocrine Society also argues that the CID implicates Endocrine Society's rights to speech, association, and petition. *Id.* at 14-15. Finally, Endocrine Society claims that the CID violates the qualified privilege that applies to journalists. *Id.* at 15.

### 1. Retaliation

As an initial matter, to the extent that Endocrine Society is alleging the Commission is engaging in a retaliatory investigation in violation of the First Amendment, it appears unlikely that such a claim is even cognizable. The Supreme Court and the U.S. Court of Appeals for the District of Columbia Circuit have declined to resolve the question. *See Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 584-85 (D.C. Cir. 2025). Several courts of appeals have suggested that such claims should not be recognized. *See Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017); *Breaux v. City of Garland*, 205 F.3d 150, 157-61 (5th Cir. 2000); *see also J.T.H. v. Mo. Dep't of Soc. Servs. Child.'s Div.*, 39 F.4th 489, 493 (8th Cir. 2022) ("[W]e have never recognized a retaliatory-investigation claim of this kind. Nor have other courts around the country...."); *Sivella v. Township of Lyndhurst*, No. 20-2342, 2021 WL 3356934, at *3 (3d Cir. Aug. 3, 2021). And the U.S. Court of Appeals for the Eleventh Circuit has squarely held that "a retaliatory investigation" "does not implicate a federal constitutional right." *Rehberg v. Paulk*, 611 F.3d 828, 850 & n.24 (11th Cir. 2010), *aff'd*, 566 U.S. 356 (2012); *Thompson v. Hall*, 426 F. App'x 855, 858 (11th Cir. 2011) (per curiam) (same).

Even if a retaliatory investigation claim were theoretically cognizable—which only one federal court of appeals appears to have assumed—it could arise only in extraordinary circumstances. *See Moore v. Garnand*, 83 F.4th 743, 752 (9th Cir. 2023) (recognizing that while no case had "held that a retaliatory investigation by itself was unconstitutional," it was possible that the entire "scope and manner" of a given investigation could violate the First Amendment (cleaned up)). Such extraordinary circumstances might include "campaigns of harassment and humiliation," *Coszalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003), threats of arrest, *Lacey v. Maricopa County*, 693 F.3d 896, 909-10, 917 (9th Cir. 2012), or "other means of coercion, persuasion, and intimidation" such as a substantial fine, *White v. Lee*, 227 F.3d 1214, 1228 & n.8 (9th Cir. 2000) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)). None of which are present in the Commission's investigation. Endocrine Society faces no threat of fines or arrest. CIDs are not self-executing, and Endocrine Society will incur no penalty or other

11

legal detriment for failing to comply unless the Commission first files a petition for enforcement in a federal court and the court, after considering Endocrine Society's arguments, rules for the Commission and orders Endocrine Society to respond. *See, e.g.*, *Gen. Fin. Corp. v. FTC*, 700 F.2d 366, 368 (7th Cir. 1983); 15 U.S.C. § 57b-1(e) (CID enforcement provision). Endocrine Society's statement of counsel acknowledges that, far from harassing or coercing Endocrine Society, Commission staff has met and conferred twice to address Endocrine Society's concerns and has modified certain specifications in response to those concerns. *See Petition* Ex. 3, at 1, 4, 9. And, as discussed in more detail below, none of Endocrine Society's asserted harms are sufficient to show a chilling effect, much less rise to the level of extraordinary circumstances.

Even assuming that a retaliatory investigation claim is cognizable, Endocrine Society did not provide adequate evidence to support its claim. To prevail on a retaliation claim, a party must show (1) that it engaged in conduct protected under the First Amendment, (2) that there is "a causal link between the exercise of the constitutional right and the adverse action taken against [the organization]"—*i.e.*, a retaliatory action, and (3) that the Commission's "retaliatory action [was] sufficient to deter a person of ordinary firmness in [the organization's] position from speaking again"—*i.e.*, a chilling effect. *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (cleaned up). For purposes of this Order, the Commission assumes without deciding that Endocrine Society engages in some protected First Amendment activities. Endocrine Society's petition nevertheless fails to establish the other two prongs: it has not shown a causal link between the CID and its First Amendment protected activities, and it has not shown that the CID has caused a sufficient chilling effect.

### a. Retaliatory Action

Endocrine Society fails to demonstrate a causal link between its speech and the CID. *Aref*, 833 F.3d at 258. To show causation, Endocrine Society must demonstrate at a minimum that the CID "would not have been [issued] absent the retaliatory motive." *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019).[17] In making that but-for showing, Endocrine Society must overcome the "longstanding presumption of regularity" that attaches to government action. *Hartman*, 547 U.S. at 263. That presumption is at its apex in the context of law-enforcement investigations, an area of "executive discretion of such high order." *Id.* For that reason, to meet this prong, Endocrine Society must put forward sufficient evidence to displace the presumption of regularity and demonstrate that the but-for cause of the CID was Endocrine Society's protected activity. Endocrine Society claims that both "the Commission and the Administration more broadly have stated their intention to retaliate against proponents of gender affirming care" and also points to "the lack of a legitimate basis for the Commission's purported investigation," *Petition*, at 14, but these fall well short of establishing that the Commission issued the CID as retaliation.

---

[17] In fact, the requisite showing is more robust: Endocrine Society actually must demonstrate that there was no reasonable basis for the CID. For example, in the similar context of retaliatory arrests, the Supreme Court has held that plaintiffs must show that the government lacked probable cause. *Nieves*, 587 U.S. at 399-400. The same logic applies here too. *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring); *cf. Media Matters for Am. v. Bailey*, No. 24-cv-147, 2024 WL 3924573, at *12-13 (D.D.C. Aug. 23, 2024) (considering the issue and ultimately declining to impose an objective basis standard, at least in part for case-specific reasons). As discussed in the accompanying text, however, Endocrine Society has not satisfied even the basic but-for standard.

Likewise, Endocrine Society's citation to Executive Order 14190 fails to establish that the executive order was a but-for cause of the CID. The executive order does not so much as mention the FTC, much less direct or encourage the FTC to investigate Endocrine Society or proponents of PGDT more generally. In addition, the executive order was issued on January 29, 2025—almost a full year before the January 15, 2026, CID to Endocrine Society. A "lengthy time lapse … negates any inference" of a causal connection. *Constantine*, 411 F.3d 474, 501 (4th Cir. 2005) (cleaned up); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012) (temporal proximity can support causation "only where the two events are very close in time" and even "a three-month period" may "be too lengthy") (cleaned up).

Endocrine Society also cites a memo uploaded to Punchbowl News, *Petition*, at 14 n.12, which says that Chairman Ferguson would "[i]nvestigate" those who have "deceptively pushed" PGDT "while failing to disclose strong evidence that such interventions are not helpful and carry enormous risks." The memo is insufficient as evidence of a causal link. The memo does not mention Endocrine Society, and far from suggesting retaliation, the memo reflects a legitimate concern about potential violations of the FTC Act that may have harmed consumers. Expressing views on the types of deceptive conduct that the Commission should investigate is not evidence of retaliatory intent. *See United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980) ("When Congress creates an agency with an express mission . . . the agency officials will almost inevitably form views on the best means of carrying out that mission."); *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1179 (D.C. Cir. 1980) ("Agency decisionmakers are appointed precisely to implement statutory programs, and so inevitably have some policy preconceptions."); *see also Media Matters of Am. v. FTC*, No. 25-5302, 2025 WL 2988966, at *14 (D.C. Cir. Oct. 23, 2025) (Walker, J., dissenting) ("Ferguson's sequence of conduct—saying what he would do in office, and then doing it—is what we expect of public servants tasked with enforcing the law, especially in a republic where elections and appointments by elected Presidents matter.").

As discussed above in Section II.A.2, the Commission's investigation is for a lawful purpose, and the CID is reasonably related to that purpose. Endocrine Society's Petition fails to cite any evidence indicating that the Commission issued the CID in retaliation for its speech. As such, Endocrine Society has failed to establish its retaliatory investigation claim, to the extent that such a claim even exists.

### b. Chilling Effect

Additionally, Endocrine Society has failed to show that the CID caused a chilling effect. Endocrine Society's petition does not articulate what chilling effects Endocrine Society has purportedly suffered, including only a declaration from Mila N. Becker, Endocrine Society's Chief Policy Officer, in which she asserts that: Endocrine Society's staff and members "are communicating less, and less freely, because of the CID"; that affected departments and teams "are pausing some activities or reducing current activities out of concern that if required to comply with the CID they will be unable to perform other duties and responsibilities of their jobs"; that individuals who previously worked on issues related to the endocrine treatment of gender dysphoria are now unwilling to do; that Endocrine Society's media relations and Government and Public Affairs Department is less willing to engage with external stakeholders;

that, if Endocrine Society is forced to comply with the CID, members will decrease their volunteering and participating, and new members will be deterred from joining; and that whenever Endocrine Society is thinking of participating in the policy, legislative, or regulatory process, it "must consider whether this will result in adverse attention from the government." *Petition* Ex. 2 at 7-10. None of these asserted harms, however, are sufficient to show evidence of a chilling effect.

Though Ms. Becker's declaration asserts that Endocrine Society's staff and members fear that complying with the CID will leave them "unable to perform other duties and responsibilities, of their jobs," *Petition* Ex. 2 at 8, this is insufficient to establish a chilling effect. Such alleged harm is common to all CID recipients, because the costs of responding to the CID are standard for any entity served with a CID. *See Texaco, Inc.*, 555 F.2d at 882 ("Some burden on subpoenaed parties is to be expected and is necessary in furtherance of the agency's legitimate inquiry and the public interest."); *cf. FTC v. Standard Oil*, 449 U.S. 232, 244 (1980) ("The expense and annoyance of litigation is part of the social burden of living under government." (cleaned up)). As previously noted, the CID's specifications are typical for CIDs seeking to determine whether an organization has made health and safety claims in advertising and whether those claims are substantiated. *See supra* note 16. *All* CIDs require their recipients to incur costs and divert internal resources to respond. If these consequences amount to a chilling effect, then virtually every CID the Commission issues would impermissibly chill speech.

With that being said, Ms. Becker's declaration also fails to provide adequate details about why Endocrine Society's staff and members thought it necessary to reduce their written communications, hesitate before responding to reporter inquiries, or pause certain activities. *Petition* Ex. 2, at 8-9. Particularly for the claims relating to Endocrine Society's dealings with reporters and engagement in coalitions, it is unclear how Endocrine Society's actions were attributable to the issuance of the CID. Subjective responses are not dispositive in determining whether the CID is likely to "deter a person of ordinary firmness." *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) ("While the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity, it is not dispositive."); *cf. Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002) (finding that a person of ordinary firmness would have been deterred where defendants stopped plaintiff's vehicle with their guns drawn, detained plaintiff for an extended period, seized plaintiff's property and did not return it, and charged plaintiff with a criminal misdemeanor); *see id.* (discussing other cases where courts found "various concrete intimidating tactics would have deterred ordinary persons," such as a county board's decision to withhold legal notice advertising, release of confidential information regarding a rape investigation, and denial of a land use permit). Here, in contrast, Endocrine Society has only alleged routine and practical effects of an FTC investigation, which are not sufficient to demonstrate a chilling effect. *See FTC v. Cinderella Career & Finishing Sch., Inc.*, 404 F.2d 1308, 1316 (D.C. Cir. 1968) ("The practical effect of the Commission's initial press release, in this or any other complaint proceeding, is undoubtedly deleterious to the respondents' economic, business, and community status.... Unfortunate though this result may be, we are convinced that this damage does not constitute a transgression of the appellees' legal rights."). Similarly, the fact that some individuals have chosen to stop working on issues related to the endocrine treatment of gender dysphoria due to fear of "government threats of investigation and legal action" is also not

14

PUBLIC

sufficient evidence that a "person of ordinary firmness" would be deterred by the CID. Moreover, as noted above, the CID is not self-enforcing. *See Gen. Fin. Corp.*, 700 F.2d at 368 ("[T]here are no sanctions for failing to comply with a subpoena of this type unless and until a district court enters an order under section 20(e) of the Act, 15 U.S.C. § 57b-1(e), directing compliance.").

Overall, Endocrine Society's Petition also fails to establish that the Commission's issuance of the CID has had a sufficient chilling effect on its speech. For that reason, too, Endocrine Society has failed to establish its retaliatory investigation claim, to the extent that such a claim exists.

## 2.  Rights to Speech, Association, and Petition

Endocrine Society states that the CID "implicates the Endocrine Society's rights to speech, association, and petition." *Petition*, at 14-15. But Endocrine Society's discussion is so abbreviated that it is difficult to ascertain what arguments Endocrine Society is making. The Commission reminds Endocrine Society that Section 2.10(a) requires petitioners to "set forth all assertions of protected status or other factual and legal objections to the Commission compulsory process, including *all appropriate arguments*, affidavits, and other supporting documentation." 16 C.F.R. § 2.10(a) (emphasis added). Despite Endocrine Society's failure to offer "any support, explanation or reasoned argument," *In re Postal Careers Inst., Inc.*, 125 F.T.C. 1317, 1319 (1998), we explain why Endocrine Society's invocation of these rights is not a basis to quash the CID.

### a.  Compelled Speech

To the extent that Endocrine Society is raising a compelled speech claim, Endocrine Society appears to be misreading the CID's specifications. Contrary to Endocrine Society's assertions, *Petition*, at 10, 14, the CID does not require Endocrine Society to "disprove" its own views. In fact, interrogatory 12 merely seeks its "views regarding whether the Covered Statements are substantiated, and the reasoning therefor." *Id.* Ex. , at 6. This is an open-ended invitation for Endocrine Society to provide its perspective on whether or not the Covered Statements are substantiated. It does not "compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995). Nor does the CID require Endocrine Society to "either speak as the State demands or face sanctions for expressing [Endocrine Society's] own beliefs." *303 Creative LLC v. Elenis*, 600 U.S. 570, 589 (2023).

Similarly, Endocrine Society's assertion that the CID requires disclosure of attendance sheets for sessions concerning GAC for minors, *Petition*, at 14, appears to be based on a misreading of document request 8. In its entirety, document request 8 reads as follows:

> With respect to any workshop, townhall or other formal or informal session, or conference You hosted or organized related in any way to PGDTs: (a) all recordings and transcripts; (b) all Documents distributed to attendees or

PUBLIC

participants; and (c) Documents required to be signed by any attendee, participant, or speaker.

*Petition* Ex. 1, at 7. On its face, this document request does not require production of attendance lists. If Endocrine Society has attendance lists that are responsive to document request 8(b) because the attendance list was "distributed to attendees or participants," or that are responsive to document request 8(c) because Endocrine Society "required" attendees to sign in, then Endocrine Society should have raised this concern during the meet-and-confer process so that Commission staff could work constructively with Endocrine Society on a mutually agreeable solution.

### b.    Right to Free Association

To the extent Endocrine Society brought a claim regarding the right to free association, it is premature. The only case it cites on this issue involved a situation where the entity was being threatened with penalties for noncompliance. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 603 (2021) (state attorney general sent deficiency letters, then threatened to suspend the entities' registrations and fine their directors and officers). Here, by contrast, the Commission has not sought enforcement of the CID. The Commission has not yet decided whether it will do so at all, and if so, as to which specifications (or even portions of specifications). *See Gen. Fin. Corp.*, 700 F.2d at 368 ("Compliance with the subpoenas could be a hardship but it is one the plaintiffs can prevent by defending successfully against the Commission's [process] enforcement action").

Relatedly, Endocrine Society's argument is too underdeveloped for the Commission to evaluate at this juncture. It is not clear from Endocrine Society's Petition which specifications Endocrine Society believes would implicate the right to free association. *See Petition*, at 11-12, 14-15. To the extent that Endocrine Society's freedom of association claim hinges on document request 8, Endocrine Society appears to be misreading that specification, as discussed above in Section II.C.2.a. In addition, Endocrine Society fails to identify whose associational rights would be chilled, what (if any) responsive material it has for each specification, and why disclosure of the responsive material would result in harassment, membership withdrawal, discouragement of new members, or other consequences which objectively suggest an impact on, or chilling of, associational rights. For example, the 2017 ES Guidelines lists ten authors. Without details about whether the responsive material (if any) relates to the publicly known authors or instead to Endocrine Society volunteers or members who wish to be anonymous, the Commission cannot evaluate the associational interests at stake.

In addition, without more details about what material Endocrine Society claims is protected by the First Amendment, the Commission cannot apply the appropriate balancing test. In a recent case involving compelled disclosure of associational information, three Justices took the view that the applicable standard is "exacting scrutiny." *Bonta*, 594 U.S. at 607 (plurality opinion as to Part II-B-1).[18] Under that standard, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest," and the

---

[18] More specifically, Chief Justice Roberts and Justices Kavanaugh and Barrett applied exacting scrutiny, Justice Thomas would have applied strict scrutiny, and Justices Alito and Gorsuch saw no need to decide between the two standards. 594 U.S. at 619-20 (Thomas, J., concurring in part and concurring in the judgment); 594 U.S. at 622-23 (Alito, J., concurring in part and concurring in the judgment).

disclosure requirement must be "narrowly tailored to the interest it promotes." *Id.* (cleaned up). The Commission's important government interests furthered by this CID include investigating potential deceptive claims about PGDT, protecting children and families from deception, and investigating whether the Commission has enforcement authority over Endocrine Society. Yet without more information about what responsive material Endocrine Society has, the Commission cannot assess whether these important government interests are sufficient to overcome any claimed chilling effect, whether there are other means by which the Commission could obtain the information it needs for its investigation, and whether the claimed injury to Endocrine Society's associational rights could be cured by narrowing the specifications, redacting certain information, putting in place use or disclosure restrictions, or taking other measures. *Cf. Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 950 F.2d 1456, 1458 (9th Cir. 1991) (concluding that the DOL could obtain union meeting minutes that recorded "discussions of a highly sensitive and political character" because the DOL had a compelling interest, but upholding various restrictions on the DOL's use and disclosure of the meeting minutes).

Endocrine Society is free to assert this claim in the concrete factual context of an enforcement proceeding, if one ever occurs. For the moment, however, its claim is both premature and insufficiently concrete.

### c.  Right to Petition

Endocrine Society seemingly attempts to argue that document request 7, which seeks "[a]ll testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs," burdens its right to petition. *Petition*, at 14-15.

Document request 7 seeks "[a]ll testimony, advocacy, or other information provided to any legislature or regulator related to PGDTs." *Id.* Ex. 1, at 7. To the extent that Endocrine Society contends that disclosure of this information would chill its right to petition legislatures or regulators, that contention is without merit. Although Endocrine Society has a First Amendment right to lobby government officials, it has "no First Amendment right to lobby *in secret*." *DoorDash, Inc. v. City of New York*, 754 F. Supp. 3d 556, 577 (S.D.N.Y. 2024); *see also Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, No. A-15-CV-134-RP, 2016 WL 5922315, at *7 (W.D. Tex. Oct. 11, 2016) (rejecting the contention "that there is a First Amendment right not only to lobby the government, but to do so secretly").

### d.  Qualified Privilege for Journalists

Endocrine Society mentions the "qualified privilege against compelled disclosure" that applies to journalists without actually arguing that it is an organization that engages in journalistic activities or identifying what information would be covered by the privilege it invokes. *Petition*, at 15.[19] We are unpersuaded that such a privilege, assuming it exists, shields

---

[19] Although Endocrine Society raised First Amendment concerns generally during the meet and confer process, it did not mention the qualified privilege for journalists during those discussions. *See generally Petition* Ex. 3. This provides another basis on which to reject Endocrine Society's arguments regarding the journalist's privilege. *See* 16 C.F.R. § 2.7(k) ("[A]bsent extraordinary circumstances, [the Commission] will consider only issues raised during the meet and confer process."). Nevertheless, we address Endocrine Society's argument on the merits.

17

Endocrine Society from responding for two reasons: the public interest in effective law enforcement outweighs any qualified First Amendment privilege in withholding information that Endocrine Society may hold, and Endocrine Society has not met its burden of showing that the information sought by the CID falls within that privilege.

Some courts have held that the First Amendment "provides journalists with a qualified privilege against compelled disclosure of information obtained through their news gathering activities." *Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 118 (D.D.C. 2002); *see also Zerilli v. Smith*, 656 F.2d 705, 712-14 (D.C. Cir. 1981). In those courts that have recognized the privilege, the reporter invoking the privilege bears the burden of demonstrating its applicability. *See Hutira*, 211 F. Supp. 2d at 119 nn.4-5. "[T]he critical question for deciding whether a person may invoke the journalist's privilege is whether she is gathering news for dissemination to the public." *Shoen v. Shoen*, 5 F.3d 1289, 1293 (9th Cir. 1993). In other words, assuming the existence of the privilege,[20] the person seeking to invoke the privilege "must demonstrate, through competent evidence, the intent to use material—sought, gathered or received—to disseminate information to the public and that such intent existed at the inception of the newsgathering process." *Von Bulow v. Von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987).

### i.    The Public Interest

The Supreme Court has held that only in limited circumstances will the First Amendment bar the government from gathering information during a law enforcement investigation. In *Branzburg v. Hayes*, 408 U.S. 665 (1972), the Court considered whether the First Amendment protected journalists from revealing confidential information and sources in response to a grand jury subpoena. The Court ruled in favor of the government, noting that it could "perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial." *Id.* at 690-91; *see also Zerilli*, 656 F.2d at 711 ("The Court justified this decision by pointing to the traditional importance of grand juries and the strong public interest in effective criminal investigation.").

The Commission exercises investigative law enforcement powers akin to those of a criminal grand jury. Indeed, the Supreme Court has noted that the Commission "has a power of inquisition . . . . [that] is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated." *Morton Salt*, 338 U.S. at 642-43; *see also In re Grand Jury Proceedings*, 486 F.2d 85, 90 (3d Cir. 1973) ("Grand jury subpoenas then, when they are brought before the federal courts for enforcement, for all practical purposes are exactly analogous to subpoenas issued by a federal administrative agency on the authority of a statute, without any prior judicial control.").

---

[20] *See In re Request from U.K. Pursuant to Treaty Between Gov't of United States & Gov't of U.K. on Mutual Assistance in Criminal Matters in re Dolours Price*, 685 F.3d 1, 17 n.23 (1st Cir. 2012) ("[T]here is a circuit split on whether under *Branzburg* [*v. Hayes*, 408 U.S. 665 (1972)] there can ever be a reporter's privilege of constitutional or common law dimensions."); *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1145-49 (D.C. Cir. 2006) (rejecting existence of constitutional reporter's privilege in grand jury proceedings); *cf. Chen v. FBI*, 153 F.4th 1289, 1295 (D.C. Cir. 2025) (declining to recognize a federal common law newsgathering privilege).

As such, when the Commission acts in its law enforcement capacity, as it does here, the public interest in the ability to thoroughly gather evidence outweighs any qualified First Amendment privilege.

### ii.     Endocrine Society's Burden

Endocrine Society also fails to meet its burden to show that the material sought by the CID qualifies for the journalist's privilege as recognized by some courts. Endocrine Society makes no attempt to show "intent to use material—sought, gathered or received—to disseminate information to the public and that such intent existed at the inception of the newsgathering process," much less "competent evidence" of such intent. *Von Bulow*, 811 F.2d at 144. In addition, to assert a "claim of protected status" in response to the CID, Endocrine Society needed to "include a detailed log of the items withheld . . . of sufficient detail to enable the Commission staff to assess the validity of the claim for each document . . . . The failure to provide information sufficient to support a claim of protected status may result in a denial of the claim." 16 C.F.R. § 2.11(a)(1). Endocrine Society submitted no such privilege log here, nor did it otherwise identify any purportedly privileged documents. Its privilege claim can be denied on that basis alone.

Accordingly, assuming the First Amendment journalist's privilege exists, we reject its application to this CID.

## III.    CONCLUSION

For the foregoing reasons, Endocrine Society's petition to quash is denied.

**IT IS HEREBY ORDERED THAT** Endocrine Society's Petition to Quash the January 15, 2026, Civil Investigative Demand be, and hereby is, **DENIED**.

**IT IS FURTHER ORDERED THAT** Endocrine Society shall comply in full with the Commission's Civil Investigative Demand no later than 60 days after the Court's decision on Endocrine Society's Motion for Preliminary Injunction in *Endocrine Society v. FTC*, No. 1:26-cv-512 (D.D.C. filed Feb. 17, 2026), or at such other date, time, and location as the Commission staff may determine.

By the Commission.

April J. Tabor
Secretary

SEAL:
ISSUED:  March 23, 2026

19