UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

    ENDOCRINE SOCIETY,
                                          Civil Case
                      Plaintiff(s),       No. 26-00512 JEB
              v.
                                          Washington, D.C.
    FEDERAL TRADE COMMISSION, et al.,
                                          April 7, 2026
                      Defendant(s).

    ------------------------------------------------------------

                    PRELIMINARY INJUNCTION HEARING
                BEFORE THE HONORABLE JAMES E. BOASBERG
                  UNITED STATES DISTRICT CHIEF JUDGE

    APPEARANCES:

    FOR THE PLAINTIFF(S):   Raymond P. Tolentino, Esquire
                            Joshua Revesz, Esquire
                            Dev Ranjan, Esquire
                            Heather Chase Sawyer, Esquire
                            Cooley, LLP
                            1299 Pennsylvania Avenue Northwest
                            Suite 700
                            Washington, D.C. 20004




    FOR THE DEFENDANT(S):   Daniel F. Mummolo, Esquire
                            John Bailey, Esquire
                            United States Department of Justice
                            950 Pennsylvania Avenue Northwest
                            Washington, D.C. 20530




    REPORTED BY:            Tammy Nestor, RMR, CRR
                            Official Court Reporter
                            333 Constitution Avenue Northwest
                            Washington, D.C. 20001
                            tammy_nestor@dcd.uscourts.gov

The following proceedings began at 10:32 a.m.:

THE COURT:  Good morning, everyone.

THE COURTROOM DEPUTY:  Good morning, Your Honor.

Your Honor, just for note, the public line is on and connected.  We are here for Civil Case 26-cv-512, Endocrine Society versus the Federal Trade Commission, et al.

Beginning with counsel for plaintiffs, please approach the lectern and identify yourself for the record.

MR. TOLENTINO:  Good morning, Your Honor.  Raymond Tolentino for the Endocrine Society.

THE COURT:  Good morning.  Do you want to introduce your colleagues.

MR. TOLENTINO:  Sure.  Apologies, Your Honor.  I am here at counsel table with my colleagues Heather Sawyer, Joshua Revesz, and Dev Ranjan, all on behalf of the plaintiff.

THE COURT:  Thank you.  Nice to see you all.

MR. MUMMOLO:  Good morning, Your Honor.  Daniel Mummolo on behalf of the defendants.  I'm here with my colleague John Bailey.

THE COURT:  Welcome to both of you.

MR. MUMMOLO:  Thank you.

THE COURT:  All right.  We are here today for a motion for preliminary injunction brought by the Endocrine Society.  So, Mr. Tolentino, I will hear from you.

MR. TOLENTINO:  Good morning, Chief Judge Boasberg, and may it please the Court.

This is not a normal case.  The Federal Trade Commission has weaponized its investigatory power to punish, intimidate, and silence a century-old charitable scientific organization for expressing a medical opinion the government disagrees with.

The record contains ample, unrebutted evidence that the government is taking this retaliatory action against the Endocrine Society because of its First Amendment protected views on gender-affirming care.  The FTC has loudly proclaimed its intent to attack organizations like the Endocrine Society.  The CID on its face reflects this intent targeting the Endocrine Society's core First Amendment activity related to gender-affirming care --

(There was an interruption by the court reporter.)

MR. TOLENTINO:  Absolutely.

-- including what the Endocrine Society has said, whom it associates with, and how it interacts with its government including in amicus briefs.  The FTC --

THE COURT:  All right.  So, Mr. Tolentino, it seems the central claim here, as you just said, is First Amendment retaliation.  And it seems a critical component of that is whether there's a legitimate basis to send the CIDs to the Society.

And so it seems to me that much of that hinges on whether the CIDs are likely to uncover unfair or deceptive acts or practices.  In other words, isn't the critical question here whether the Society engaged in commercial speech or not?

MR. TOLENTINO:  That's correct, Your Honor.  That's one of the key factors.  And as Your Honor articulated in the Powell decision, the way that you evaluate the retaliatory motive is you look at the evidence of retaliation and then you look to whether there's some non-forbidden reason for the FTC to engage in this.

And one of the considerations, as Your Honor identified, is whether there's even any sort of commercial activity here.  The record is bereft of any evidence that the Endocrine Society is engaging in any of the type of commercial activity that lies at the heart of the FTC's regulatory authority.

THE COURT:  All right.  So let's explore that a little bit more.  So it's clear that the Society is a 501(c)(3) devoted to the study of hormones and clinical practice, and it's primarily an academic organization with members who are scientists, doctors, and teachers and so forth.  But so what do you think would be necessary for the government to show that there's some commercial purpose, that there's some commercial speech?  Clearly it's a

nonprofit.  That can't be enough.  But how about if its leaders are engaged in commercial activities related to this practice?

For example, if you had a doctor on the board who performed this kind of procedure, an ability to do more of the procedures would yield more income, for example. Wouldn't that be a commercial purpose, a permitted commercial purpose?

MR. TOLENTINO:  I think the way that you would look at this, Your Honor, is whether or not the particular activity that is the target of the FTC's regulation and CID is actually tethered to some commercial nexus.  In that circumstance, it would depend on whether or not the doctor's function on the board is connected to what the FTC is looking at.

In this particular circumstance, the CID --

THE COURT:  Hold on.  Let's say that the -- I'm wondering whether we are blurring the line here, and maybe not, but if there's a doctor and his purpose on the board is -- just say he's a regular board member, that he just approves and helps set policy for the organization, but he performs these procedures or he has -- or he owns a clinic that does these procedures, that he has some commercial interest in it, wouldn't that be then commercial -- wouldn't that be some commercial purpose then behind the

organization?

MR. TOLENTINO:  I think that there would be a bit of a commercial nexus there.  Now, the articulated purpose of the FTC's CID has nothing to do with that, Your Honor.  It hasn't said you have a board member that engages in gender-affirming care such that we are asking for information to determine whether or not there's a commercial nexus here that gives us an anchor.

The CID is fairly explicit, Your Honor.  It says we want your speech on a topic that is hotly debated.  So I grant you, Your Honor, that would be a little bit of a closer case, but there are two things that are relevant.

The first is that the government has not pointed to any such evidence suggesting there is a commercial nexus, number one.

And number two, the CID on its face doesn't ask for such information.  It asks for the protected speech of the Endocrine Society.

THE COURT:  But as to the first -- again, this is not an enforcement action yet.  It's just a CID.  If they have some suspicions that there is some commercial activity, they don't need proof of that at this point, you would agree, so why can't they explore the issue with CIDs?

MR. TOLENTINO:  If I could just back up to sort of articulate the framework here, I think the easiest way to

start is with Your Honor's Powell decision.  First you look to retaliatory evidence.  If there is a lot of retaliatory evidence, which there is here based on the face the CID, the statements of Chairman Ferguson, the workshop regarding gender-affirming care, I think all of that needs to be sort of step one.  And then step two, under Your Honor's Powell's decision, is you can't have a tenuous assertion of a legitimate purpose.

That sort of sliding scale mechanism, I think, is quite important as you evaluate this case because the mountain of retaliatory evidence means that you have to have more of a legitimate showing here.  And the reality is there's just no showing here at all.

THE COURT:  All right.  So let me give you a hypothetical here.  So let's say you have an organization whose aim is to promote marijuana consumption, that it's -- which is made up of academics or just enthusiasts who have no -- there's no commercial purpose whatsoever, and the FTC makes a bunch of statements which say we are really against drug addiction, we think there's too much marijuana use, we think it's leading to health problems, to addiction, to lost work hours, and this organization's out there saying everybody should be using marijuana on a daily basis.

As long as the organization has no commercial purpose, you would agree they could not send a CID in that

instance?

MR. TOLENTINO:  I think it would depend on the nature of the CID.  If the CID was targeting its protected speech, so asking it what amicus briefs have you filed, how have you engaged with Congress, and then there was this sort of pattern of retaliatory activity, so, you know, we are going after the people who talk about marijuana, we don't like marijuana, marijuana is bad, in that circumstance, I think you would have something a little bit closer to what we are talking about here.

What sets up the guardrails, Your Honor, to sort of preempt the notion that we are just trying to dismantle the FTC's authority, I think the guardrails are set forth in Media Matters, which is the FTC does have authority.  It has authority to regulate deceptive practices.

What you have to ask here is is there a retaliatory motive, is there evidence of that.  The answer to that is yes.  And then you look to is there justification.  In that circumstance, I think it's a little bit closer to the line. Here, the --

THE COURT:  Okay.  Let me move you a little bit further.  Let's say the organization is made up of dispensary owners and their purpose without a doubt is to sell more marijuana because they have a direct commercial purpose.  Now let's say the FTC, it's chairman, its board

members are saying if we get into office, we need to crack down on marijuana use, we need to -- for all the reasons I just said, and they make a lot of statements that say marijuana is harming us and this organization is promoting it because its leadership is profiting from that.

So there's a strong -- it's a retaliatory motive, but are you saying they couldn't, in that circumstance, they couldn't send CIDs?

MR. TOLENTINO:  I think that's a different type of organization.  So all of the cases that the FTC cites to are a little bit more akin to Your Honor's hypothetical, which is there is, in fact, a profit motive that is animating what the organization is doing.  Recall, the Endocrine Society is a 110-year-old charitable organization.  We are talking about medical guidelines here that it then issues and then physicians then use.

There is no evidence in the record that the reasons it issues this medical guideline is so that people can make money off of gender-affirming care.  The idea is and, in fact, the guidelines make very clear this doesn't set up exact standard of care that every single doctor has to or must follow.  They say that you have to do this on an individualized basis.  So I think it's important to keep in mind the nature of the organization.

Your Honor's hypothetical, I think, is a little

closer to the line because it's a little bit more -- in the words of the case law, it has some approximation to lucre or to money making. And I just think that's just not evident in the record here.

THE COURT: Okay. So let me ask. So, again, that's sort of trying to draw the line here. It goes back to what I'm talking about originally, which is is this more of an academic organization, or is it more of a commercial organization. In other words, is it more like our marijuana enthusiasts, or is it more like our dispensary owners. But in looking at the record, the Society does have a corporate liaison board which it pitches as a partnership between the Society and senior executives in industry. And there are a number of big pharmaceutical names that are a part of the board. So does that render its purpose more commercial?

MR. TOLENTINO: I think you have to look not just at the purpose of the organization -- and to be clear, I'm not conceding that it has a commercial purpose within the remit of the FTCA. What I think you have to look at is what is the FTC actually looking at with its CID.

There's no dispute that it has the authority to look into false advertisement with respect to commercial activity. But in this case, you have to look at the object of the CID. And it's not just the activity of individuals on the board or the Endocrine Society engaging in commerce.

Quite the contrary, it said in its denial of the petition to quash what we are looking to regulate here, what we are investigating is actually the statements, opinions, and positions of the Endocrine Society.

So, Your Honor, as with every nonprofit where there are relationships with private commercial entities, that doesn't necessarily mean that every nonprofit, particularly ones that take First Amendment stances, are, therefore, fair game for the FTC to regulate particularly in as punitive a manner as it has done so here.

THE COURT:  Now, there is no doubt that the CIDs are wide-ranging, exceedingly so.  But just switching gears a little bit on the scope, so let's say that I thought that there was some ability to probe commercial interests in the manner we have hypothesized but that the CIDs here are much too broad and target -- are much more related to speech.  Do I have any role here?  In other words, on a motion to quash, is it all or nothing?

Do I have to say -- I mean, it seems like you are saying I have to quash everything.  But if there were something in there that was legitimate, some topics that were legitimate, isn't the better course for me to stay the case, for example, and for you to negotiate with the FTC, which is what they sort of say?  That's what they say the process should be anyway.

MR. TOLENTINO:  Let me respond to your question first, and then I will give some context.  The first is nothing prohibits you from narrowing the subpoena.  And we certainly would welcome that because the subpoena is overbroad for all of the reasons that we articulated.  We think the CID --

THE COURT:  Can I ask, what is my authority on a CID to narrow that prior to enforcement action?

MR. TOLENTINO:  Well, we think it's intertwined with the First Amendment retaliation and --

(There was an interruption by the court reporter.)

MR. TOLENTINO:  -- the Fourth Amendment and the First Amendment together sort of give you the authority under the Ex parte Young to limit the scope of the CID.

Now, just backing up a little bit, I think you're right that our lead position is that the entirety of the CID should be quashed.  And partly that's because of the retaliatory motive that sort of seeps through the CID top to bottom.  So we think Your Honor would have quite a difficult time parsing out what things are, you know, in violation of the First Amendment and what aren't.  If something is retaliatory, it's retaliatory.

And if I could just make one other point, which is we tried to give them the information that suggested that we aren't a target of their -- we aren't falling within their

jurisdiction.  We said, listen, we have information and we are happy to give it to you, can you extend the motion to quash deadlines so that we can negotiate back and forth, to Your Honor's point about is there any -- shouldn't you be negotiating with the government.

And just to show you how the FTC's investigation is so irregular, they basically said, no, you have to waive every constitutional objection before we give you any kind of extension.  Also, you have to accelerate your production deadlines.

So, Your Honor, we totally agree that the normal course of this would have been to sort of go back and forth with the government and narrow the CID.  We tried to do that, and in response, all they said was, no, produce immediately and faster on all of these things.  And we think that's yet another piece of evidence of retaliatory motive and, if anything, suggests the government isn't entitled to the presumption of regularity when it conducts itself in that manner.

THE COURT:  All right.  So you reference my Powell case.  And in that case, you know, I am looking at, as you pointed out, a sliding scale between improper purpose and proper purpose.  And so is your argument here that there's no proper purpose or that -- or rather, that the improper purpose dwarfs the proper purpose, therefore making it the

but-for reason for the issuance of the CIDs?

MR. TOLENTINO:  We think we can win on both theories, Your Honor, so we both think that there is no proper purpose animating the CID.  If Your Honor is inclined to disagree and thinks that there is some improper purpose, we would submit that it's only --

THE COURT:  I think you meant some proper purpose.

MR. TOLENTINO:  Yeah, some proper purpose.  It would only be a tenuous assertion of a legitimate purpose which Your Honor said is not enough in the face of a mountain of retaliatory evidence.

So we think it's closer to the former where the government has not come forward with any justification, period, even though we have repeatedly asked them to.  Their briefs, again, they try to sort of come up with a generalized theory of wrongdoing.  It isn't even any wrongdoing that the Endocrine Society engages in much less one with any commercial nexus within the FTCA Act.

So under Your Honor's Powell framework sort of, scales are such that there's a lot of retaliation, no purpose, or at the very most, some semblance of purpose about maybe we have jurisdiction over this organization and maybe its speech is relevant to some down-the-line violation of the FTCA Act.

THE COURT:  Okay.  So let me move on again.  We are

sort of talking about in my marijuana hypothetical an antipathy toward drug use, but that's not the same as an antipathy toward drug users.  And the question here is, does it matter that the antipathy may be toward trans people as opposed to treatment?  Should that factor in here at all?

MR. TOLENTINO:  If I could just challenge the premise, Your Honor, I think there's loads of evidence in the record that suggests that it isn't just animus towards trans people, although we do think that evidence exists in the record, but that the government is actually targeting trans, quote, ideology which includes individuals who sort of support the idea of gender-affirming care or its use in medical scenarios.

So we don't think -- you know, to the extent that distinction makes any difference at all, we don't think it makes a difference because the ideology that the government has articulated is, itself, the target of its CID, what is it saying.  And the CID makes that clear, that one step towards the care of trans individuals is the guidelines and the position statement that the Endocrine Society engages in to facilitate the doctors providing that treatment.

So we actually do think that the animus is directed towards the Endocrine Society and organizations like it.  And in fact, the best evidence of that is that they issued CIDs against other organizations that can engage in similar

positions, which you will hear from later, Your Honor.

THE COURT:  And when we talk about retaliatory motive or animus, should I be looking just at the FTC or should I be looking across the administration?

MR. TOLENTINO:  Your Honor --

THE COURT:  Go ahead.

MR. TOLENTINO:  We think you should look across the administration.  That's the approach that you took in Powell when you looked at the President's statements.  It's also the approach that the D.C. Circuit took in Media Matters when it looked to administration-wide statements.  So there certainly is precedent for you to look beyond the FTC.

We think the FTC, itself, has sort of spoken for itself through its chairman and the workshop and then hiring the panelist who said, you know what we should do, we should use investigations to punish these organizations, they hired this person, and then the person showed up in our case.  So we certainly think there's enough evidence on the FTC side.

But what the President has made clear and what this administration has made clear is that this is a whole of government approach to retaliation.  And so it's certainly relevant to determining whether or not this is of a piece with a retaliatory pattern in expressing hostility towards our protected speech.

THE COURT:  Okay.  Thank you very much,

Mr. Tolentino.

MR. TOLENTINO:  Thank you, Your Honor.

THE COURT:  I will give you a few minutes to rebut.

Okay.  Mr. Mummolo, whenever you are ready to proceed.

MR. MUMMOLO:  Thank you, Chief Judge Boasberg.  May it please the Court, Daniel Mummolo on behalf of the defendants.

Congress has long authorized the Federal Trade Commission to investigate unfair, deceptive trade practices including false or unsubstantiated medical claims. Consistent with that authority, the FTC across multiple administrations has frequently relied on administrative subpoenas to carry out that mandate.

Confronted with significant evidence of potentially unsubstantiated claims about gender dysphoria treatments that may cause permanent and harmful consequences for children, the Commission decided to issue a CID to Endocrine Society, an organization that has published a widely-cited set of guidelines on pediatric gender dysphoria treatment and has contended that it is at times medically necessary.

The Commission's decision reflects a straightforward, common-sense application of the FTC Act, and the Court should deny the preliminary injunction for multiple independent reasons.

THE COURT:  Okay.  Let's start where I started with Mr. Tolentino, which is, so you would agree that if an entity's speech does not fall within the FTC's ambit of enforcement, that you've got no basis to issue CIDs toward it, correct?

MR. MUMMOLO:  Respectfully, Your Honor, I think this is an important clarification that needs to be made.  I think there is some conflation going on here with the FTC's ultimate enforcement jurisdiction to enforce the FTC Act and its statutory authority to issue a CID.  And I --

THE COURT:  Right.  I agree with you to the extent the distinction is that if the entity that you are subpoenaing has information that can lead to acts within the FTC's ambit, I agree you can do that.  So that's the distinction you are making.

But what here is the information you intend to obtain that can lead to an enforcement proceeding?

MR. MUMMOLO:  Well, again, Your Honor, a couple of things I would mention.  If we just look at the face of the CID that was issued, the FTC is seeking and asking whether the organization or any other person has made any false or unsubstantiated representations in connection with the marketing and advertising of pediatric gender dysphoria treatment.

So I know we are drawing this distinction about how

the ultimate enforcement authority is going to require some sort of commercial nexus or commercial speech.  The Commission is by no means conceding that that doesn't exist on this record.  The record is admittedly underdeveloped.

But again, I think that for the purposes of this proceeding and the purposes of this CID, all we can look at is whether the -- we can look at the face of the statute in 57(b)(1), which is a very broad standard that Congress entrusted the Commission with to protect the public from potentially unfair and deceptive trade practices.

And again, if I may, I just want to -- because I think that we are losing sight a little bit of that, that whenever the Commission has reason to believe that any person may be in possession of potential violations of the FTC Act, that is a valid basis --

THE COURT:  Sure.  I got it.  And I understand that, but so what is the evidence?

MR. MUMMOLO:  Well, again, I would say all of the -- even on this underdeveloped record, I think we can look at statements that were made at the 2025 workshop, a participant explaining that some of the world's leading experts in evidence-based medicine have criticized Endocrine Society's clinical practice guidelines, patients and parents describing serious and irreversible effects from --

(There was an interruption by the court reporter.)

MR. MUMMOLO:  Yes, apologies.

-- patients and parents describing serious and irreversible effects.

THE COURT:  Okay.  But hold on.  Let's go back to my marijuana hypothetical.

MR. MUMMOLO:  Sure.

THE COURT:  And say you have a bunch of marijuana enthusiasts, none of whom makes any money from it, they just enjoy using marijuana, and they say, people -- everyone should smoke marijuana multiple times a day, and you have a workshop, and there are plenty of doctors who say this is a bad idea.  Can you send CIDs to this organization if there's no evidence whatsoever that there is any -- it engages in any commercial practice or commercial speech?

MR. MUMMOLO:  Again, not to resist the hypothetical, but I think that if the Commission had no reason to believe that that particular organization had any information about potential violations of the FTC Act, then yes, I would say that that is correct.  However, on this record, I think it's completely the opposite.  And there was --

THE COURT:  Okay.  So what you have quoted to me so far are workshop participants saying that the treatment is harmful, but that's the same as that marijuana use is harmful.  What I want to hear from you is evidence that there's a commercial -- there are commercial activities or

practices within the Society.

MR. MUMMOLO:  Well, again, I think that even on this underdeveloped record, I think that it was more than just the treatments being harmful.  I think, you know, and we cite this in our briefing, you know, there were statements at that workshop about potentially -- about potential deception and potential misleading statements about the efficacy of these treatments.

THE COURT:  But again, why is that different from the marijuana people saying that you should be using marijuana multiple times a day, that that may well be -- and that it promotes health?  It may well be completely false, but don't you need some -- I'm still waiting for sort of the link to the commercial activity.

MR. MUMMOLO:  So again, Your Honor, I think for the purposes of the commercial activity, I think that, like I said, you know, some of the world-leading -- some of the world's leading experts in evidence-based medicine have criticized this guide -- these clinical practice guidelines. There were serious questions about the risks and purported benefits.

The Endocrine Society has taken the position that this treatment is medically necessary.  There were thousands of public comments that were submitted during the request for information phase.  And those comments expressed, and

these are cited in our opposition brief at pages 11 and 12, serious concern over the lack of evidence supporting these clinical practice guidelines.  And I think that is clearly -- clearly meets the threshold of a reasonable basis to seek more information.

And again, I don't want to jump too far away from this, but let's even assume that we dial in to the ultimate enforcement jurisdiction of the Commission.  It seems that my friend on the other side's position here is that if someone just self-proclaims that they are a not-for-profit, they are somehow immune from the FTC's ultimate enforcement jurisdiction.  And to be clear, I --

THE COURT:  Okay.  But, I mean, are you doubting -- I guess it's from the Becker declaration.  But are you saying that what Becker says is false?  In other words, when she says that membership -- that all that is required for membership is dues, and the organization's board of directors is entirely made up of M.D. or Ph.D. holders employed at academic universities save for one who works at Biogen that doesn't sell medical products, you know, are we saying that we don't believe her?

MR. MUMMOLO:  Your Honor, what I am saying is that on this record, that there is more than a reasonable basis to request information.  And as the Supreme Court has recognized in Weinberger and as we cite in our briefing in

FTC v. Ken Roberts, the Commission is allowed to pursue investigative steps to determine its ultimate enforcement jurisdiction.

THE COURT: But isn't it, according to Mr. Tolentino, which seems like a reasonable point, if that's your aim, aren't these wildly overbroad CIDs? In other words, doesn't that undercut your justification if the CIDs seem to be asking for a whole lot of material that has no relation to that?

MR. MUMMOLO: Again, respectfully, I would disagree. I think that this particular CID is seeking, from what I recall, 15 -- there's 15 interrogatories and 12 requests for production. And again, in our briefing we cite how that fits comfortably within the parameters of other investigations. This is by no means some sort of anomalous investigation in the context of other CIDs.

And if I may, I just want to go back. You mentioned something about the workshop. And forgive me for not stating it earlier. But you know, there were, and this is at docket 922 at pages 9, 55, and 85, descriptions about parents and patients being misled about these types of treatments.

That is clearly within the domain of the Federal Trade Commission to pursue and at a minimum to ask questions. And that is really -- again, I think that we are

really dialing into this idea of whether there will be ultimate enforcement jurisdiction.  At this stage all that's needed is a reasonable belief that they may have information.

THE COURT:  So again, back to my marijuana enthusiasts.  Someone comes and says I was misled by them, I thought it was good to take marijuana multiple times a day, and now I have developed an addiction, I have been deceived by them.  You could then go after -- you could then submit CIDs to them?

MR. MUMMOLO:  I think that there would potentially be a reasonable basis to at least ask more questions.

THE COURT:  But if you have no evidence whatsoever, then this group isn't anything but a bunch of enthusiasts who like marijuana?

MR. MUMMOLO:  Again, accepting the premise of that hypothetical, and that is the sole basis of the record, you know, I think that would be a tougher call.  But that's not the case that we have before us.  We have, even on this underdeveloped record, the statements that I cited.

And again, you know, I think that, and Your Honor alluded to this in your questions to my friend on the other side, that, you know, the commercial nexus, it's not as simple as just looking at a balance sheet or an income statement and seeing if the number at the end of that is

positive.

In California Dental Association and the American Medical Association case we cited from the Second Circuit, and the California Dental Association case is from the Supreme Court, you know, the inquiry into whether a nonprofit is subject to the ultimate enforcement jurisdiction of the FTC, it's not as simple as just looking at, you know, receipts and expenses. It's whether the organization advances the material interests of its member. That's a very broad inquiry. And it can --

THE COURT: So assuming there is some proper purpose as you have just described it, the Society has given me a whole bunch of retaliatory quotes from your -- from the FTC and across the administration, so shouldn't I be taking those into consideration?

MR. MUMMOLO: I'm glad you brought this up, Your Honor. So I think we should look at the quotes and look at exactly what was said, you know. And I'm just going to read a couple here because I think they are pretty illustrative of the nexus to the FTC's purpose of protecting the public from unfair, deceptive trade practices.

There were statements by some staffers and agency officials that the agency should investigate the doctors, therapists, hospitals, and others who deceptively pushed gender confusion, puberty blockers, et cetera. So there's a

nexus of deception there.

Another staffer who was -- I will read another one. That one is at Exhibit 15 at page 1, just to have it there.

And then another one said, every American should be troubled by the possibility that parents and children were misled about these types of treatments. That's at docket 928 at page 3.

So I just want to put that out there, that all of those of statements, you know, were not exhibiting any sort of retaliatory motive as much as they were, you know, pursuing the congressional mandate.

THE COURT: You have cherrypicked some of them that say that, but there are others including by your chair that don't talk about that, correct, that talk about anti-trans treatment as -- I mean anti-trans ideology, that it had nothing to do with deceptiveness or false trade practices, right?

MR. MUMMOLO: Two things on that, Your Honor. Respectfully, the first quote I actually read was from the chairman. So I do think that we can look at those statements for what they are, and it's very clear that there's always been a connection and a tethering to the actual text of the FTC Act.

Secondly, I just want to dial back for a moment. A couple of things about statements of decision-makers and

non-decision-makers.  So all of these statements, I believe, that are being cited as evidence of retaliatory motive, there's no allegation that these people even participated in the issuance of the CID in question.  We cite the Waggel case for the proposition that the statements of non-decision-makers are not relevant to the retaliation inquiry.

THE COURT:  Right.  The chair's certainly a decision-maker, you would agree?

MR. MUMMOLO:  Again, there's no allegation here that he participated in this issuance of the CID.

THE COURT:  Wait a minute.  So you are saying if the head of an organization -- if the head of a government agency speaks in very negative terms, but his signature isn't on the CID, that I can't consider that?

MR. MUMMOLO:  Again, I think that -- well, a couple of things I would say to that.  So even accepting the premise, which I'm not, but for the sake of this hypothetical, even accepting --

THE COURT:  Let me just see if you really want to take that position.

So, for example, in the Powell case, I was wrong to ever cite President Trump's statements because his name wasn't on the subpoena that was issued to the board, right?

MR. MUMMOLO:  Well, again, you know, I think that

this is not the Powell case for several reasons.  You know, just looking at the factual predicate for this CID, I think this is not the Powell case and to draw an analogy to that Powell case is improper in this type of case.

But doctrinally, I would just like to make another point about the statements of agency officials.  Courts have consistently recognized, whether it's Nuclear Information and Resource Center, FTC v. Cement Institute, and the Supreme Court even in the viewpoint discrimination context, that the statements of agency officials -- that the fact that an agency official has an opinion or a viewpoint about the policy that they are charged with enforcing does by no means establish a retaliatory motive.  The Supreme Court in --

THE COURT:  That sort of sounds like you are saying, look, the chair, he's just not really involved in this, he may have his own opinions.  But didn't he set up the workshop, determine the agenda of the Commission, and is fully involved in this CID?  You are really trying to say don't worry about him, he's got nothing to do with this?

MR. MUMMOLO:  Your Honor, respectfully, I think we should look at the chair's statements, the chair's statements that are in the record.  And the only statements I have seen in the record are statements about pursuing the agency's mission to protect the public from unfair,

deceptive trade practices.  I have not seen any allegations that the chair has been involved in the particular -- in the issuance of this particular CID.

And again, to be very clear, I want to make this point again just because I think it's so important, to the extent an agency official, an agency director, agency leadership, to the extent that they carry an underlying philosophy about a particular policy goal does by no means render any subsequent investigation into a sector retaliatory.

If I may, just to pose a hypothetical about this, you know, we are talking about the context of pediatric gender dysphoria treatment.  But we can easily imagine a world in which a different FTC chair potentially is making statements about concerns about firearm manufacturers or payday lenders.  And it would be a remarkable proposition, which I think is the proposition that my friend's argument boils down to, that the fact that an agency official has expressed an underlying philosophy or a policy view on those things would confer some sort of general, broad immunity from that sector, not even from enforcement, but from just the mere investigation and seeking of information.

THE COURT:  So the question then, as it was in Powell, as it appears to be here, is, so how do we balance and what is the improper purpose, which would be pure

retaliation, and is that the but-for cause or is there a proper purpose? And that's what I'm trying to get at both in questions to Mr. Tolentino and to you about trying to tease out that proper purpose and the balance between them.

So I don't want to keep asking the same question, so let me just move on to the other question I asked Mr. Tolentino about.

What options do you think I have here if I believe that some part of the CID is appropriate but that it's overbroad? Do you agree with him that I can narrow it, or do you think I either have to quash it entirely or let it proceed entirely to negotiations between the two sides?

MR. MUMMOLO: So, Your Honor, what I would say to that question is that, you know, for all of the reasons explained in our briefing, we do not think that this is the relevant forum to adjudicate a dispute about the scope of the CID.

For nearly a century, the Supreme Court has considered these types of burdens in analogous context, whether it's Claire Furnace, whether it's Reisman, which actually involved allegations of constitutional injury, the proper forum, as the Supreme Court has recognized, the proper forum for this is to allow the administrative process to unfold. And the FTC, to the extent the Commission decides to pursue an enforcement action, that's the proper

forum to decide any sort of limitation or anything like that on the CID.

THE COURT:  Okay.  So I appreciate that, but I am going to ask you to be -- to narrowly answer my question.  I appreciate that point.  But so is the answer no, that I either must quash it or let it proceed, that I have no power to narrow?

MR. MUMMOLO:  My answer respectfully would be that you have to let this proceed within the typical agency administrative process that has been outlined for nearly a century by the Supreme Court.  So yes, I think in that situation, how it would unfold is there has been no enforcement proceeding that has been initiated by the Commission.  In order to initiate that actual proceeding, the Commission needs to take a vote.  And during that vote, there could be --

THE COURT:  Do you believe I have the power to narrow it?

MR. MUMMOLO:  Well, respectfully, Your Honor --

THE COURT:  And I trust that everything you are telling me is respectful, so you need not caveat it with that adverb.

MR. MUMMOLO:  For the same reason that I don't think that there is jurisdiction here to even entertain the underlying proceeding because it should be channeled into

the review scheme that Congress very clearly articulated, my answer to that would be no.

THE COURT:  Okay.  Thank you very much.

MR. MUMMOLO:  Thank you, Chief Judge Boasberg.

THE COURT:  Mr. Tolentino, I will give you a few minutes to rebut.

Why don't you start -- I mean, I don't know if you have anything to add to your response earlier on the question I just asked Mr. Mummolo about my authority to narrow it as opposed to all or nothing.

MR. TOLENTINO:  Well, Your Honor, we do think you have the authority to narrow it both under the Fourth and First Amendment.  It would be sort of the classic overbreadth analysis to articulate the areas that you believe are constitutionally overbroad.

I will say that I think the evidence is pretty acute that the entire thing is tainted by retaliatory motives.  So if the other side is saying you can't do half or a quarter, I think the answer to that question is that's because the entire thing is retaliatory on its face.

THE COURT:  All right.  Let's move on.  The central thrust of your colleague's argument was, look, the CID is focused on unfair and deceptive practices, which is the heartland of the FTC's jurisdiction.  So why isn't that correct?

MR. TOLENTINO:  Your Honor, I don't think that's a correct characterization of the CID, itself.  The CID targets the positions -- the First Amendment protective activity of the Endocrine Society.

Your Honor gave counsel for the government an opportunity to provide a basis for their investigation or anything that the Endocrine Society has done that, A, has a commercial nexus and, B, is deceptive or false that doesn't implicate First Amendment rights.

The only answer that my friend on the other side gave you was essentially an end run around the general principle that the federal government has no business regulating medical practice, which is exactly their theory of the case, which is gender-affirming care is incorrect and it's not deceptive because it's some statement, it's deceptive because it's wrong.

So that would, I think, set a very dangerous precedent, Your Honor, of suggesting that they can just investigate any kind of medical association because they believe that the target medical opinion is incorrect.  That's classic First Amendment protected activity.  The government doesn't get to decide medical orthodoxy.  And it hasn't provided you any reason to believe that the Endocrine Society hasn't even engaged in something within its remit.

But I do want to back up because the relevant

question here, Your Honor, is not necessarily whether it has jurisdiction in the broader sense. I think the relevant question here is why the FTC is investigating us. And on that question, the record is clear, it has a retaliatory motive.

So Your Honor doesn't have to sort of accept the notion that you have to find something ultra vires here in order to rule for us. I want to make that very clear. The reason that's relevant, the reason the jurisdictional question is relevant, is that it is very strong evidence that the proper motive here is not -- is sort of pretext, as Your Honor sort of reasoned in the Powell case.

And so I think when you are undertaking this analysis, you know, I don't think you should get stuck on, oh, does it have the sort of ancillary jurisdiction to investigate, because what you can do is you can look very quickly at cases that the FTC, itself, cites to like the Leukemia Foundation case.

In that particular case, there was very clear evidence that the nonprofit wasn't acting as a nonprofit. It was enriching itself. So I would commend Your Honor to sort of read that case and sort of look at it as a juxtaposition and a contrast to what's going on here, which is that there's zero evidence on their side to suggest that we are doing anything within the FTC's mandate.

And so to return to the First Amendment question, you look at whether or not the motive is retaliatory.  And it is here.  And I think that resolves a lot of Your Honor's hypotheticals.

In those circumstances, it may be true that the FTC has some jurisdiction to investigate, but it better come up with receipts if it is suggesting that it's investigating and notwithstanding a retaliatory motive.

The government -- again, you gave the government an opportunity to give you any fact suggesting that the Endocrine Society has done anything wrong or in violation of the FTCA Act or has information about wrongdoing.  And the counsel for the government said nothing to allay your concerns that what's going on here is just pure retaliation against the Endocrine Society for holding views that the government simply doesn't like.

THE COURT:  All right.  Thank you very much, Mr. Tolentino.

MR. TOLENTINO:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Mummolo.

Let's take a five-minute recess for our noble court reporter, and then we will hear the other matter.

(The hearing concluded at 11:19 a.m.)

- - -

C E R T I F I C A T E


I hereby certify that the foregoing is an accurate

transcription of the proceedings in the above-entitled

matter.



4/8/26                          s/ Tammy Nestor
                                Tammy Nestor, RMR, CRR
                                Official Court Reporter
                                333 Constitution Avenue NW
                                Washington, D.C. 20001
                                tammy_nestor@dcd.uscourts.gov