UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ENDOCRINE SOCIETY,

    Plaintiff,

    v.

FEDERAL TRADE COMMISSION, *et al.*,

    Defendants.

Civil Action No. 26-512 (JEB)

**MEMORANDUM OPINION**

How can we know when an agency's use of its investigative tools shifts from legitimate to retaliatory? The Federal Trade Commission here has demanded documents from Plaintiff Endocrine Society in connection with its investigation into the non-profit's potential unfair-marketing practices. In its work, the Society affirms the view that individuals can experience gender incongruence between their biological sex and their gender identity and that gender-affirming care can treat that incongruence. Members of the Executive Branch, including the President, have expressed vehement disagreement with, criticism of, and vitriol toward that message. Agencies including the FTC have taken up the President's call to go after proponents of gender-affirming care by rescinding grants and opening investigations.

The Society has brought this action to enjoin enforcement of the Civil Investigative Demand served on it by the FTC and now seeks a preliminary injunction. The Court believes that Plaintiff has established a likelihood that the CID was issued in retaliation for its First Amendment activity and that the FTC's purported reason for its investigation bears little

1

relationship to the extensive demand it issued.  As the other preliminary-injunction factors also favor Plaintiff, the Court will grant the Motion and preliminarily enjoin the implementation or enforcement of the CID.

## I.    Background

### A.    Factual Background

The Endocrine Society is a 501(c)(3) nonprofit organization "dedicated to accelerating scientific breakthroughs and improving patient health and well being" in the field of endocrinology — the science of hormones.  See Endocrine Society, Our History, https://perma.cc/ZW22-WNEY; see also ECF No. 1 (Compl.), ¶ 2.  Founded in 1916, the Society serves as a hub for scientists and medical professionals who study and treat various endocrine disorders.  See Compl., ¶¶ 2, 25.  It hosts conferences and educational sessions, publishes peer-reviewed journals, and "provides information to legislatures and regulators" relevant to policies and positions affecting endocrinology.  Id., ¶¶ 26–28.  The Society boasts over 18,000 members internationally and a staff of around 70 employees, whose work is supplemented by volunteers. Id., ¶ 2.

Substantively, the Society educates physicians about, publishes research on, and takes policy positions regarding "hormone-related conditions" like "diabetes, obesity, and hormone-related cancers."  Id.  The Society publishes free clinical practice guidelines on those conditions to support medical professionals, scientists, researchers, and students in the endocrinology field. See generally Endocrine Society, Clinical Practice Guidelines, https://perma.cc/B4GL-VTHG (Guidelines available for adrenal conditions, reproductive issues, osteoporosis, obesity, pediatric concerns).  The Guidelines do not recommend particular treatments or products; rather, they

offer guidance developed by panels of researchers and professionals and are the culmination of a multiyear drafting and editing process. See Compl., ¶¶ 34–36.

One premise of the Society's work is acceptance of the scientific and medical proposition that some individuals feel incongruence between their gender identity and their designated gender, which is based on their primary and secondary sex characteristics observed at birth. See ECF No. 9-6 (Guidelines) at 3875. Such incongruence can lead to gender dysphoria, a hormone-related condition included in the Diagnostic and Statistical Manual of Mental Disorders. See Am. Psychiatric Ass'n, DSM-5-TR 511–13 (5th ed. 2025). That condition captures the "distress and unease" individuals experience when their gender identity and designated gender are mismatched. See Guidelines at 3875. The Society accepts that gender dysphoria exists, that some individuals have the condition, and that physicians and other medical providers can treat it. Since 2009 it has published Guidelines related to the treatment of gender dysphoria — often called gender-affirming care — that rely on this premise. See Compl., ¶ 37. The Society has also explicitly stated that "[t]here is a durable biological underpinning to gender identity," which leads to some individuals being transgender or gender diverse and some being cisgender — i.e., when their gender identity and designated gender match. See Endocrine Society, Transgender Health Position Statement (2020), https://perma.cc/8PMD-2U9P.

The Trump Administration disagrees. The President has made no secret of his disdain for the concept of gender dysphoria. During his campaign for a second term, he promised to immediately "sign an executive order instructing every federal agency to cease the promotion of sex or gender transition at any age." ECF No. 9-11 (NPR Article) at 1. What followed was a flurry of executive orders during the first few weeks of his second term. See, e.g., ECF Nos. 9-8 (Schooling Exec. Order) (issued Jan. 29, 2025); 9-9 (Minor Exec. Order) (issued Jan. 28, 2025);

3

9-10 (Gender Ideology Exec. Order) (issued Jan. 20, 2025).  The orders declared that "[i]t is the policy of the United States to recognizes two sexes," which in turn are "not changeable" and represent "an individual's immutable biological classification."  Gender Ideology Exec. Order at 8615.  The view that individuals can maintain a gender identity that is different from the gender associated with their sex — a view the Endocrine Society has implicitly and explicitly adopted — was deemed harmful "gender ideology" by the Trump Administration.  Id. at 8615–16.  President Trump described the recognition of gender/sex incongruity as "wrong" and "unhealthy," id. at 8615, the use of certain gender-affirming-care treatments for minors as "radical" and "tragic" "mutilation," Minor Exec. Order at 8771, and named gender ideology as one of several "radical, anti-American," "subversive, harmful, and false ideologies" plaguing the country.  See Schooling Exec. Order at 8853.

The trio of executive orders did not merely lambast the view that gender dysphoria is a medical condition and the proponents of treating it.  They exhorted federal agencies to put a stop to any acknowledgment of gender dysphoria or that some individuals are transgender.  See, e.g., Gender Ideology Exec. Order at 8615 (directing agencies to use "language and policies that recognize women are biologically female, and men are biologically male"); id. at 8616 ("Agencies shall remove all statements . . . that promote . . . gender ideology" and "take all necessary steps . . . to end the Federal funding of gender ideology.").  The orders directed agencies to adopt specific policy positions, such as housing transgender women in male prisons or detention centers, id., or excluding gender-affirming care for minors from federal health-insurance coverage.  See Minor Exec. Order at 8772.  They also levied a general charge to agencies to interpret statutes and regulations to reinforce the binary nature of sex, "assess grant conditions" to avoid "promot[ing] gender ideology," and rescind previously issued executive

4

orders acknowledging the existence of transgender individuals.  See Gender Ideology Exec. Order at 8616–17.

Some agencies heeded the call.  Former Attorney General Pam Bondi pledged to bring gender-affirming care "to an end" and to "investigate and hold accountable" medical providers and pharmaceutical companies that have purportedly "mis[led] the public" about gender-affirming care.  See Memorandum from the Att'y Gen. to Select Component Heads, Preventing the Mutilation of American Children 4, 6 (Apr. 22, 2025), https://perma.cc/54NN-ARKU.  The Department of Justice accordingly issued subpoenas to hospitals, telehealth providers, and other providers of gender-affirming care.  A slew of courts has characterized those subpoenas as a "smokescreen" for the Government's "true objective of pressuring" providers into ceasing their gender-affirming-care practices.  In re Dep't of Just. Admin. Subpoena No. 25-1431-030, 2026 WL 33398, at *7 (D. Colo. Jan. 5, 2026); see also QueerDoc, PLLC v. U.S. Dep't of Just., 807 F. Supp. 3d 1295, 1304 (W.D. Wash. 2025) (quashing subpoena on telehealth-gender-affirming-care provider); In re Subpoena Duces Tecum No. 25-1431-016, 2025 WL 3562151, at *17 (W.D. Wash. Sept. 3, 2025) (similar).  The Department of Health and Human Services, for its part, terminated grants supporting health initiatives for transgender individuals.  See The White House, Report to the President on Protecting Children from Surgical and Chemical Mutilation Executive Summary (Apr. 28, 2025), https://perma.cc/Z7NY-6V9P.  Other agencies issued memoranda and letters reiterating the Administration's position against gender-affirming care for minors or excluded coverage for such care from federal health-insurance plans.  Id.

The Endocrine Society was not free from the roving aim of executive-branch action. HHS released a report in 2025 calling the Society's Guidelines (along with guidance from the World Professional Association for Transgender Health (WPATH) and the American Academy

5

of Pediatrics) "very low quality" and "lacking in developmental rigour." ECF No. 9-15 (HHS Report) at 146–47 (quotation marks and alterations omitted). HHS later sent the Society a letter requesting that medical organizations "immediately . . . revise medical guidelines . . . that advise medical professionals to provide" what it called "sex-rejecting procedures" on minors. See ECF No. 9-17 (HHS Letter) at ECF p. 3. The Department threatened to "use all authority under the law" to "aggressively pursue any medical organization" that participates in providing or favorably recommending gender-affirming care for minors. Id.

Enter the Federal Trade Commission. The record reflects acrimonious statements of Commission staff and leadership toward proponents of gender-dysphoria treatment that echo the Trump Administration's characterizations. A position paper pitching then-Commissioner Andrew Ferguson's nomination pledged that he would "[f]ight back against the trans agenda" as Chair of the FTC. See ECF No. 9-18 (Ferguson Statement) at 1. Social-media statements by senior FTC staff evince the same sort of disdain for practitioners and supporters of gender-affirming care. One called the journalists framing the Administration's actions as attacks on transgender rights "partisan morons." ECF No. 9-21 (Joe Simonson Post). Another amplified the claim that medical associations had "peddled the lie" that gender-affirming care could be beneficial for minors, levying accusations of "malpractice" and a "betray[al of] their oath" against the entities. See ECF No. 9-20 (Jon Schweppe Post).

The Endocrine Society saw the tenor of these informal statements by Commission staff reflected in the FTC's later formal actions. See Compl., ¶¶ 59–60. In the summer of 2025, the FTC held a workshop entitled "The Dangers of 'Gender-Affirming Care' for Minors." ECF No. 9-22 (FTC Workshop Tr.) at 1. In line with its title, the tone of the workshop was decidedly disapproving of such care. Some participants raised concerns about the caliber of medical

6

evidence used to inform gender-affirming care. See, e.g., id. at 19 (calling evidence "low quality"); id. at 25 (concern that "bias undermines the entire process"); see generally id. at 33–35 (several critiques of evidence quality). The Society attracted commentary related to its research and published Guidelines. Id. at 70 (calling Guidelines claim that "puberty blockers [are] fully reversible" "untrue"); id. at 21 (claiming "poor quality of evidence" in Society's work).

Other discussants veered into debate over the medical concept of gender dysphoria, denouncing the very existence of "being transgender" as an "untrue claim[]" worthy of rejection. Id. at 30; see also id. at 14 (supporting "false belief" that an individual's gender identity can align with their "opposite sex" constitutes "fraud"); id. at 61 (expressing need to "affirm[] biological truth" and prevail in "battle of good versus evil"). The Society was not spared from sweeping critiques of the "radical left-wing ideologies" that "ha[ve] taken over" the "institution of medicine." Id. at 23; see also id. at 33 (describing Society as "otherwise legitimate medical organization" that "do[es] great work except in gender stuff"); id. at 44 (medical researchers and physicians undertake "deceptive practice[s] by claiming that . . . women are actually men").

Notably, one workshop participant recommended "conducting thorough investigations" of medical associations because such investigations would cause groups to "start losing members" and "lose . . . revenue streams." Id. at 81–82. The FTC later hired that participant as an employee. See Compl., ¶ 60. When the Commission sought public comments about "organization[s] that recommend[] gender-affirming care" shortly thereafter, the Society saw that move as the start of that very strategy: investigating a non-violative organization solely to cause a loss of public support. Id. (alterations in original); see also ECF No. 9-1 (Pl. Mot.) at 29.

B.    Procedural History

According to Plaintiff, the FTC stepped up its campaign to winnow the resources of gender-affirming-care proponents when it issued Civil Investigative Demands — akin to administrative subpoenas — to the Society, WPATH, and the American Academy of Pediatrics — the three nonprofit organizations previously deemed "the most influential sources of clinical guidance" for gender-affirming care for minors.  See Compl., ¶ 69 (quotation marks omitted); HHS Report at 146; see also ECF No. 9-25 (CID).  The Society's CID's stated aim is to "determine whether [the Society] or any other Person . . . ha[s] made, or assisted others in making, false or unsubstantiated representations or engaged in unfair practices in connection with the marketing and advertising of Pediatric Gender Dysphoria Treatment."  CID at ECF p. 2. To that end, it requires the Society to turn over a wide range of materials, including: 1) any documents "relating to substantiation" for the proposition that pediatric-gender-dysphoria treatment is safe and effective; 2) all "[c]ommunications . . . regarding the development and publication" of the Guidelines; 3) any materials or information the Society uses in its educational and advocacy work; and 4) the Society's financial statements and records of payments between it and other medical companies or hospitals.  Id. at ECF p. 8.  The CID requires a five-year lookback for some requests but seeks all documents on certain topics, including the Society's 2017 Guidelines and its 2020 Position Statement on Transgender Health, "[r]egardless of time period."  Id. at ECF pp. 6, 8.

The Society viewed the CID as part of a "retaliatory investigation[]" to "cut off both access to and speech about gender affirming care."  Compl., ¶ 61.  The strategy worked: the Society asserts that the CID immediately affected its ability to continue its academic and charitable activities.  It heard from volunteers and academic partners that they could no longer

support the Society's publishing or educational events, for fear that they would face job repercussions for associating with a targeted organization or that they would experience further government retaliation for their involvement. See ECF No. 9-2 (Mila Becker Declaration), ¶¶ 32–33. Members and staff raised concerns about collateral consequences or additional retaliation when the Society informed them that a litigation hold required them to preserve documents to fulfill the FTC's investigative requirements; some withdrew from the Society's work altogether. Id., ¶ 33. The Society has had to delay publication of the next iteration of its Guidelines because of the lost volunteer and professional support. Id., ¶ 24.

Seeking to curtail these effects, the Society reached out to the Commission to try to narrow the scope of the CID. See Compl., ¶ 78. Discussions were fruitless, see generally id., ¶¶ 79–82, and the Society moved to quash the CID under 15 U.S.C. § 57b-1(f)(1) and its implementing regulations. See generally Mot. to Quash, In re Civil Investigative Demand to the Endocrine Society Dated January 15, 2026, FTC File No. P264800 (Feb. 10, 2026), https://perma.cc/QXS2- 8FLC. Those provisions authorize the Commission itself to review motions to quash CIDs it has issued. See 16 C.F.R. § 2.10(c). The FTC ultimately denied the Society's motion. See ECF No. 32-2 (FTC Denial) (issued March 23, 2026).

Prior to receiving the Commission's denial, the Society filed suit in this Court against the FTC, as did the other two nonprofit recipients of similar CIDs. See Compl. (filed Feb. 17, 2026); see also Am. Acad. of Pediatrics v. FTC, No. 26-508 (D.D.C. Feb. 17, 2026) (before Judge Cooper); World Pro. Ass'n for Transgender Health v. FTC, No. 26-532 (D.D.C. Feb. 18, 2026) (before this Court). It cited the ongoing harm to the Society's work and its members and sought judicial relief in the form of a preliminary injunction blocking the CID and further investigation by the FTC related to the Society's Guidelines and published statements on gender-affirming

9

care.  See Pl. Mot. at 17, 43.  The FTC has opposed the Society's Motion, see ECF No. 30 (Gov.

Opp.), and the Court held a hearing on April 7, 2026.  See Minute Entry of April 7, 2026.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter

v. NRDC, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish [1]

that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

injunction is in the public interest."  Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011)

(alterations in original) (quoting Winter, 555 U.S. at 20).  "[I]f the government is the opposing

party," the latter two factors "merge."  Glob. Health Council v. Trump, 153 F.4th 1, 12 (D.C.

Cir. 2025).

"The moving party bears the burden of persuasion and must demonstrate, 'by a clear

showing,' that the requested relief is warranted."  Hosp. Staffing Sols., LLC v. Reyes, 736 F.

Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454

F.3d 290, 297 (D.C. Cir. 2006)).  A court "may deny a motion for preliminary injunction,

without further inquiry, upon finding that a plaintiff is unable to show either irreparable injury or

a likelihood of success on the merits," making those two factors "particularly crucial."  Luokung

Tech. Corp. v. Dep't of Def., 538 F. Supp. 3d 174, 182 (D.D.C. 2021) (emphasis in original)

(quotation marks omitted).

## III.    Analysis

The Court looks at each of the preliminary-injunction factors separately, spending the

lion's share of its time on the likelihood of success on the merits.  As the Court finds that

Plaintiff's First Amendment retaliation claim warrants preliminary relief, it need not consider its other claims.

A.     Likelihood of Success on Merits

The Government cites two threshold barriers that it believes impede the Society's chances of success on the merits of its claim — *viz.*, jurisdiction and a lack of a valid cause of action.  After dispensing with those, the Court examines the claim itself.

1.     *Jurisdiction*

The Government first contends that Congress, through the FTC Act, has "divest[ed] district courts of their ordinary federal-question jurisdiction" over any pre-enforcement challenges to CIDs.  See Gov. Opp. at 15–16.  Congress may indeed choose to consign the initial review of challenges to agency action to the agency itself.  When it establishes a "special statutory review scheme," that scheme "may preclude district courts from exercising jurisdiction over challenges" that they would otherwise hear under 28 U.S.C. § 1331.  Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023).  There is also no doubt that Congress, by way of enabling legislation, has divested district courts of jurisdiction over certain claims and has instead channeled those claims to an agency-review process, often followed by judicial review in a federal appellate court.  See id. (noting in such structure that "[t]he agency effectively fills in for the district court, with the court of appeals providing judicial review").

The existence of a statutory scheme that governs some claims, however, does not automatically preclude district courts from exercising jurisdiction over all challenges a plaintiff brings to agency action.  Axon, 598 U.S. at 185.  Courts typically consider the factors laid out in Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994), which ask whether: 1) "precluding district court jurisdiction [would] 'foreclose all meaningful judicial review' of the claim"; 2) the

claim is "'wholly collateral to the statute's review provisions'"; and 3) the claim is "outside the agency's expertise." Axon, 598 at 186 (quoting Thunder Basin, 510 U.S. at 212–13) (alterations omitted). "When the answer to all three questions is yes, [courts] presume that Congress does not intend to limit jurisdiction." Id. (quotation marks omitted).

The Court does not write on a blank slate here. The FTC raised this same jurisdictional argument before the D.C. Circuit in Media Matters, where it sought a stay of another district court's injunction that blocked a separate retaliatory CID. See 2025 WL 2988966, at *3 (Oct. 23, 2025). There — as here — the FTC argued that, because Media Matters's claim concerned a CID, it was subject to exclusive review by the Commission unless and until the FTC brought an enforcement action in federal district court under 15 U.S.C. § 57b-1(e). Id. (recounting Commission argument); Gov. Opp. at 16–17 (raising same argument). The FTC Act does permit CID recipients to move to quash or modify the CID before the Commission. See 15 U.S.C. § 57b-1(f)(1).

In rejecting the FTC's position, the Circuit noted in Media Matters that the FTC Act is an uneasy fit for prior statutes that courts have interpreted to preclude district-court jurisdiction in favor of initial agency review. Unlike the typical Thunder Basin case, where preliminary review is consigned to the agency, with judicial review by an appellate court, "there is no dispute that the next step for review of [Plaintiff's] constitutional claims is in district court." 2025 WL 298896, at *5. The FTC Act also provides minimal pre-enforcement process before the Commission, in contrast to the multilevel agency review guaranteed to the mining companies in Thunder Basin itself. Compare 15 U.S.C. § 57b-1 (CID provision of FTC Act), with Thunder Basin, 510 U.S. at 207–08; see also Media Matters, 2025 WL 2988966, at *5 (noting that "Media Matters exhausted what little Commission procedure was available" before filing suit).

12

The Circuit also reasoned that the <u>Thunder Basin</u> framework was inapposite to a First Amendment retaliation claim when a party has already incurred harm from the mere issuance of the CID.  Such claims allege "present, concrete, and objective harms . . . resulting from retaliatory government actions" in violation of the First Amendment, meaning that the case is "not simply about a pre-enforcement challenge to a non-self-executing CID."  <u>Media Matters for Am. v. Paxton</u>, 138 F.4th 563, 579 (D.C. Cir. 2025).  Where the agency has inflicted "existing and continuing First Amendment harms," resulting claims are distinct from those addressing harms from pre-enforcement challenges that "did not involve a First Amendment claim or any already-accruing harm."  <u>Media Matters</u>, 2025 WL 2988966, at *3.  The Circuit thus declined the FTC's stay request, holding that "when a [plaintiff] challenges a 'sweeping' demand on First Amendment grounds and demonstrates actual and ongoing harm to its constitutional rights," the case does not fall into the standard pre-enforcement channeling regime.  <u>Id.</u> (quoting <u>Paxton</u>, 138 F.4th at 569).

In renewing its arguments in this case, the Commission entreats that the Circuit's decision is not binding on this Court because it was not a judgment on the merits but only a denial of a stay.  <u>See</u> Gov. Opp. at 19.  That case does, however, reflect the appellate court's reasoning on a dispositive legal question; indeed, if the Circuit had concluded that the district court lacked jurisdiction over Media Matters's claim, it would have presumably granted the FTC's stay request.  <u>Media Matters</u>, 2025 WL 2988966, at *3 ("The likelihood of success carries great weight in any stay analysis . . . .").

As in <u>Media Matters</u>, precision in identifying the claim Plaintiff brings — which the agency seeks to channel — is critical.  Rather than presenting a classic challenge to the limits of the Commission's authority or the CID's substantive requirements, Plaintiff raises constitutional

concerns about the very act of issuing the CID and presents evidence "that it is suffering" in wake of those constitutional violations. Cf. id. (holding that such claims can be challenged in district court). The Society alleges that the FTC is retaliating against it for engaging in protected speech about the medical treatment and care of transgender individuals in violation of the First Amendment. See Compl., ¶¶ 33–37, 59–60, 70–77, 92–96. The method of retaliation is the issuance of a highly intrusive and resource-intensive CID, whose existence is curtailing the Society's work by frightening its academic and professional partners. Id., ¶¶ 84–90.

As Media Matters did, the Society has demonstrated such ongoing harm. It has alleged, and submitted declarations to show, that the CID prompted the Society's academic partners to withdraw from ongoing work and decline leadership positions within the Society. See Becker Decl., ¶¶ 33–34. The very scientists and researchers who draft, edit, and review the Society's publications are, according to Plaintiff, unwilling to undertake that work for fear that their "personal safety" and "future funding" would be at risk or they would face "government retaliation." Becker Decl., ¶ 24. As a consequence, the Society has limited or postponed ongoing work. Id., ¶¶ 30, 36. Viewed in this light, the Court agrees with the D.C. Circuit that "Thunder Basin is unlikely to foreclose [its] jurisdiction here." Media Matters, 2025 WL 2988966, at *5.

Even to the extent that the Thunder Basin factors apply, the Society's claim sails through the "three considerations" relevant to assessing whether Congress has intended to remove district courts' jurisdiction over a particular claim. Axon, 598 U.S. at 186. Take the first: whether consigning a claim to agency review would "foreclose all meaningful judicial review" of that claim. Id. (quotation marks omitted). The FTC contends that the Society can challenge the CID only once the Commission brings an action in federal district court to enforce its terms. But the

14

Commission is in sole control of the decision to initiate an enforcement action. See 15 U.S.C. § 57b-1(e). Indeed, in Plaintiff's telling, the FTC has no incentive to initiate an enforcement action because it has achieved the very outcome it wanted — less objectionable speech by the Society — simply by issuing the CID. The Court thus does not accept the Commission's argument that the Society faces no "penalty or other legal detriment" for failure to comply "before a court orders enforcement." Gov. Opp. at 5. The CID and the accompanying threat of future enforcement sit as a Sword of Damocles suspended over Plaintiff's head. To mix weaponry metaphors, the Society alleges that the FTC is using its investigative demands as a cudgel, "inflict[ing] concrete and ongoing injuries that suppress speech," regardless of any later enforcement action. Media Matters, 2025 WL 2988966, at *4 (quotation marks omitted).

As the Supreme Court recently pointed out, "where a plaintiff suffers ongoing injuries from the [CID] itself," it "does not follow" that "review upon enforcement" provides sufficient remedy. First Choice Women's Res. Ctrs., Inc. v. Davenport, 608 U.S. ___, 2026 WL 1153029, at *10 (2026). The Court thinks it unlikely that Congress would grant an agency license to run roughshod over a party's First Amendment rights "while simultaneously closing the courthouse doors to relief as long as the agency chooses not to take additional enforcement steps." Media Matters, 2025 WL 2988966, at *4.

The Society's claim, moreover, is "wholly collateral" to the existence of the FTC's investigatory power or authority to issue a CID. Axon, 598 U.S. at 186 (quotation marks omitted). The prototypical collateral claim challenges an agency's very existence or its "power to proceed at all." Id. at 192; see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 490 (2010) (challenge that agency structure violates Appointments Clause of Constitution is collateral to "any Commission orders or rules"). So, too, here: the Society brings

15

a retaliation claim that is antecedent to and independent of the CID's content, legal authorization, or scope. That claim turns on the Commission's motive in taking any investigative action against the Society — including issuing the CID — not on whether, say, it was procedurally proper and sought discoverable material about topics within the FTC's jurisdiction. The CID is merely the tool giving effect to the FTC's alleged retaliation against the Society. Plaintiff does not seek a narrowing of the CID for want of relevance or lack of clarity of its terms. It "protest[s] the 'here-and-now' injury of subjection to an unconstitutional[] process." Axon, 598 U.S. at 192. This is precisely the sort of injury that the Supreme Court has held "can be remedied by a court without regard to the eventual outcome of agency proceedings." Id. at 210 (Gorsuch, J., concurring in the judgment) (quotation marks omitted).

Finally, the FTC has no "expertise" in adjudicating First Amendment retaliation claims that parties bring against the Commission itself. Id. at 186 (majority opinion) (quotation marks omitted). The Supreme Court has held that Congress can reserve initial review of even constitutional claims to an agency that "routinely adjudicates" such claims when they are intertwined with the agency's area of expertise. Elgin v. Dep't of the Treasury, 567 U.S. 1, 12 (2012). The Society's retaliation claim, however, concerns the FTC's purported abuse of its own authority in order to suppress Plaintiff's speech. Such self-policing is far outside the Commission's expert field of consumer protection and the regulation of anti-competitive behavior. What is more, the Commission "was already afforded an opportunity" to pass on the constitutional question when it considered the Society's motion to quash the CID. Media Matters, 2025 WL 2988966, at *5; see also FTC Denial (issued approximately one month after Endocrine Society moved for injunctive relief). There is thus "no agency-expertise benefit to

waiting" to proceed with judicial review until the agency itself decides when (if ever) it is ready. Media Matters, 2025 WL 2988966, at *5.

Faced with a proposed statutory interpretation that would force Plaintiff to "suffer[] present, concrete, and objective harms" from agency action while that same agency controls access to judicial review, the Court can discern no congressional intent to leave parties stranded in the manner the FTC suggests.  Id. at *3 (quotation marks omitted).  To hold that this Court's jurisdiction is displaced here would "present the serious constitutional question that would arise if an agency statute were construed to preclude all judicial review of a constitutional claim." Elgin, 567 at 9 (quotation marks omitted).  The Court thus holds that Plaintiff is likely to succeed in demonstrating that this Court has jurisdiction over its claim.

### 2.    *Cause of Action*

Another basis for rejecting Plaintiff's Motion, the Government argues, is the Society's lack of a cause of action.  A viable cause of action is indeed necessary for a plaintiff "to invoke the power of the court to redress the violations of law that [it] claims the FTC has committed." Trudeau v. FTC, 456 F.3d 178, 188 (D.C. Cir. 2006).  Although the Society brings "claims aris[ing] under the First and Fourth Amendments," the Government asserts that because the Constitution provides no express cause of action, the Society may not sue to enjoin the FTC from violating its constitutional rights.  See Gov. Opp. at 20.

The incongruity of the Government's position bears repeating.  The FTC contends that — notwithstanding Plaintiff's allegation that the Government is unconstitutionally chilling its expression in retaliation for prior protected speech — the Society has no right, and this Court has no authority, to require it to stop.  Id.  But we "presume that justiciable constitutional rights are to be enforced through the courts." Davis v. Passman, 442 U.S. 228, 242 (1979); cf. Free Enter.

Fund, 561 U.S. at 491 n.2 (alluding to "right to [injunctive] relief as a general matter" against unconstitutional government action). The most obvious enforcement method is a court order requiring the Government to cease its unconstitutional actions. Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers . . . reflects a long history of judicial review of illegal executive action."). That same intuition underlies the D.C. Circuit's holding that "[t]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself." Hubbard v. U.S. Env't Prot. Agency, Adm'r, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986). The D.C. Circuit has already reasoned, albeit in *dicta*, that a "direct cause of action under the First Amendment" is available to plaintiffs alleging "unconstitutional retaliation." Trudeau, 456 F.3d at 190.

None of the cases the FTC cites undermines the conclusion that a plaintiff subject to unconstitutional action by executive officers may sue to enjoin those actions. First, it invokes the Supreme Court's increasing hesitancy to recognized implied private actions for damages to remedy alleged constitutional violations by federal officers. See, e.g., Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70 (2001) (recognizing limited availability of damages remedy). Such implied damages actions, called Bivens actions after their eponymous case, see 403 U.S. 388 (1971), are undeniably "disfavored" outside of the narrow contexts in which the Supreme Court has already recognized monetary remedies. Ziglar v. Abbasi, 582 U.S. 120, 135 (2017) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). No analogous caution, however, attends claims for injunctive relief from constitutional violations. Nor should it: Bivens actions address constitutional violations by individual federal officers and provide damages to deter those officers where no "alternative methods of relief" are available. Id. at 145; see also id. at 140.

18

Claims seeking injunctive relief, by contrast, fall within the heartland of traditional equitable relief that the Constitution empowers plaintiffs to seek and courts to provide — a point emphasized by many of the cases the FTC relies upon.  Ziglar, 582 U.S. at 144 (detainees who could not bring Bivens action for damages could "seek injunctive relief"); Malesko, 534 U.S. at 74 ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."); cf. DeVillier v. Texas, 601 U.S. 285, 292 (2024) (discussing difference between causes of action for injunctive relief and damages, without deciding whether constitutional provision created cause of action).

Next, the FTC appears to assert that Congress, via the FTC Act, foreclosed all avenues of relief for CID recipients other than "an administrative process, followed by an enforcement action."  Gov. Opp. at 20.  Yet that Act does not establish anything close to the "detailed remedial scheme" that courts require to find that Congress has cut off equitable relief for even statutory rights — let alone ones guaranteed by the Constitution.  Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 74 (1996).  Other cases that the FTC cites concern Congress's selection of statutory remedies for statutory rights.  City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 122–23 (2005) (asking whether Congress withdrew statutorily enacted cause of action in § 1983 via later legislation); Alexander v. Sandoval, 532 U.S. 275, 289 (2001).

The Commission also contends that the Society's First Amendment retaliation claim is "not cognizable" because it is a retaliatory-investigation claim.  See Gov. Opp. at 36.  It cites Hartman v. Moore, 547 U.S. 250 (2006), in support of its argument.  See Gov. Opp. at 36.  There the Court mused that the "adverse consequences" (such as the "expense") of a retaliatory investigation might not ever "justify recognizing such an investigation as a distinct constitutional violation."  Hartman, 547 U.S. at 262 n.9.  That aside does not call into question the case's

broader affirmation that "the law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." Id. at 256. Where, as here, that "action" is a government investigation that inflicts a standalone injury by chilling protected speech, it falls under the prohibited umbrella and is actionable. Cf. First Choice, 2026 WL 1153029, at *8 (injury "arise[s] when a defendant burdens a plaintiff's constitutional rights"). The Society is thus likely to succeed on the cause-of-action requirement.

### 3. *First Amendment Retaliation*

With those preliminary questions resolved, the Court next assesses whether the Society is likely to demonstrate that the FTC's CID violates its constitutional rights. Plaintiff must thus show that 1) it "engaged in conduct protected under the First Amendment"; 2) the Government's alleged retaliatory action was "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again"; and 3) there exists "a causal link between" the protected speech and the retaliatory action. Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016).

### a. Protected Speech

The FTC does not dispute that the Society satisfies the first element of a First Amendment retaliation claim. It frequently engages in protected speech covered by the First Amendment: it provides educational sessions for professionals working in endocrinology and related fields, hosts conferences, and participates in legislative advocacy for certain health-policy changes. See Becker Decl., ¶¶ 7–8. Relevant here, it publishes the medical Guidelines that were the focus of the FTC's July workshop and the at-issue CID. Id., ¶¶ 12–17. The FTC concedes that Plaintiff "engages in some protected First Amendment conduct," so the Society will undoubtedly prevail on the first prong. See Gov. Opp. at 21.

b.    Chill

On the second prong, the Society must show that the Government's conduct (here, issuing a CID) "would likely deter a person of ordinary firmness from continuing to engage in protected activity." Hartley v. Wilfert, 918 F. Supp. 2d 45, 53 (D.D.C. 2013) (quotation marks omitted). "[A] plaintiff's actual response to a defendant's conduct is not dispositive" of the conduct's deterrent effect, but it may "provide some evidence of the tendency of that conduct to chill First Amendment activity." Pinson v. U.S. Dep't of Just., 246 F. Supp. 3d 211, 224 (D.D.C. 2017) (quotation marks and alterations omitted).

The Society contends that it is experiencing deleterious effects on its speech and work as a result of ongoing government scrutiny, culminating in the issuance of the CID. The chilling effects are found, for example, in the hesitancy of the Society's staff or academic and professional members to continue communicating, for fear of further government retaliation or collateral consequences of being associated with an organization under investigation. One of the Society's senior staff members attests that "staff and members are communicating less, and less freely, because of the CID." Becker Decl., ¶ 28. Plaintiff has limited its publishing, posting, and educational events concerning transgender health. Id., ¶ 29. It has also "significantly reduced [its] communications with government officials and limited [its] efforts to influence government policy" regarding transgender health. Id., ¶ 30. Most concretely, the Society has experienced a withdrawal of member participation in its work because of fear of government scrutiny triggered by the CID. Id., ¶ 33. These impacts have already delayed the Society's planned update of its Guidelines for gender-dysphoria treatment — the very Guidelines targeted by the CID. Id., ¶ 24. Those limitations on the Society's speech far exceed the relatively modest requirement that an

21

action "deter a person of ordinary firmness" from speaking again.  Hartley, 918 F. Supp. 2d at 53.

The FTC disclaims any chilling effect as the "routine and practical effects of an FTC investigation" and a set of "speculative" assumptions about third parties' behavior.  See Gov. Opp. at 35.  It is true that in the regular course of an agency's investigations, "the possibility of incidental loss . . . is sometimes unavoidable," even if the investigative target is later cleared of any wrongdoing.  Am. Sumatra Tobacco Corp. v. SEC, 110 F.2d 117, 121 (D.C. Cir. 1940).  Those losses can include a "substantial tarnishing of the name, reputation, and status" of an entity "throughout the related business community as well as in the minds of some portion of the general public."  FTC v. Cinderella Career & Finishing Schs., Inc., 404 F.2d 1308, 1313 (D.C. Cir. 1968).  Such harm, while "[u]nfortunate," is a necessary cost of agency action that does not on its own "constitute a transgression of [the investigated entity's] legal rights."  Id. at 1316.

What the Society describes, however, is not merely the routine reputational damage that might attend an ongoing investigation.  Id.  Rather than lost standing in its industry or across a customer base, its Complaint and declarations attest that its very business — protected speech — has already been stifled.  Work on the Guidelines that the Society has undertaken since 2009 has been delayed.  See Becker Decl., ¶ 24.  The engine driving the Society's work — internal and external communications — operates more slowly or not at all due to the CID.  Id., ¶¶ 28–34.  These harms are in line with the limits on communication and professional activities that the D.C. Circuit has held satisfy the "ordinary firmness" test.  Paxton, 138 F.4th at 581.

Nor does the Court credit the Commission's implication that the Society and its members are assuming a risk of future harm that does not exist.  Plaintiff's declarant identifies the main motivations for members' ceasing their collaboration with the organization's work: fear of

heightened scrutiny by the Government, fear for personal safety following public backlash from the Government's targeting of the Society, risk to employment and funding opportunities, and fear for immigration status.  See Becker Decl., ¶ 32.  All are realistic collateral consequences of the CID that "[o]bjectively reasonable people" would not "lightly disregard."  First Choice, 2026 WL 1153029, at *9.  The Society is thus likely to prevail on the second element of its claim.

c.    Causal Link

Plaintiff's most difficult task is demonstrating the causal link between its disfavored speech and the Commission's decision to issue a CID.  To succeed here, the Society must show that "the adverse action against [it] would not have been taken absent the retaliatory motive."  Nieves v. Bartlett, 587 U.S. 391, 399 (2019).  The "retaliatory motive" must be "a but-for cause" of the injury.  Id. at 398–99.  "Circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent," in part because the latter "is usually difficult, if not impossible, to obtain."  Media Matters, 2025 WL 2988966, at *8 (quotation marks and citation omitted).

The parties lightly dispute the causation standard that the Society must meet.  The FTC briefly argues that the Society "must demonstrate that there was no reasonable basis for the CID."  Gov. Opp. at 22 n.1.  Its conclusion rests on the Supreme Court's holdings that plaintiffs bringing retaliatory-prosecution or retaliatory-arrest claims under the First Amendment must demonstrate that no probable cause existed for the underlying prosecutorial action.  E.g., Hartman, 547 U.S. at 265–66 ("absence of probable cause . . . must be pleaded and proven" in retaliatory-prosecution claim); Nieves, 587 U.S. at 404 (applying rule to retaliatory-arrest claims).  That rule captures two features of retaliatory actions that manifest in criminal prosecution cases: 1) the "distinct body of highly valuable circumstantial evidence available" to show probable cause that can shed light on retaliatory causation; and 2) the "complex

23

connection" between the defendant's retaliatory animus (which is mediated by an absolutely immune prosecutor) and the plaintiff's injury, requiring a more robust causal link. Hartman, 547 U.S. at 260–62. Neither feature is present here. The statutory standard that the FTC need only have "reason to believe" an entity has relevant information, see 15 U.S.C. § 57b-1(c)(1), offers no font of relevant evidence. Cf. Hartman, 547 U.S. at 265 (proving absence of probable cause "will usually be cost free"). Nor does this case present an attenuated connection between a plaintiff and a non-prosecuting retaliatory defendant: the FTC itself is both the prosecutor and the purported retaliator. The Court must thus ensure that the Society is not "punished for exercising a protected statutory or constitutional right," a requirement captured by but-for causation. United States v. Goodwin, 457 U.S. 368, 372 (1982); see also United States v. Meyer, 810 F.2d 1242, 1245 (D.C. Cir. 1987) (impermissible for "prosecutor [to] act[] in order to punish [party] for standing on his legal rights").

The Society contends that it is likely to succeed in showing that retaliatory animus caused the FTC to issue its CID. The breadth and vigor of Government action levied against proponents of the view that there can be an incongruence between an individual's sex and gender identity provides relevant circumstantial evidence here. The "expression of hostility to the protected speech" can "support a finding that protected speech caused the agency's response." Media Matters, 2025 WL 2988966, at *8. The Trump Administration has labeled the idea that individuals can be transgender as "gender ideology," Gender Ideology Exec. Order at 8615, and warned the public to be vigilant against the "anti-American, subversive, harmful, and false" concept of gender incongruence. See Schooling Exec. Order at 8853. It has called on agencies to reflect its preferred viewpoint in their regulations, statements, and funding decisions. See generally Gender Ideology Exec. Order at 8616–17. To that end, HHS released a report

24

criticizing the Society and requesting that it alter its guidance to remove support for pediatric-gender-affirming care.  See HHS Report at 146–47; HHS Letter at ECF p. 3.

The Attorney General soon followed suit and kicked off a legion of investigations into proponents of transgender medical care.  Preventing the Mutilation of American Children at 3–4, https://perma.cc/54NN-ARKU.  Courts across the country have quashed civil subpoenas issued in furtherance of these investigations as a "pretextual" cover for the purpose of "downsiz[ing] or eliminat[ing] all gender-affirming care."  QueerDoc, 807 F. Supp. 3d at 1303 (quotation marks omitted).  "No reported federal decision has ruled in the government's favor" regarding subpoenas "sent to providers of gender-related care."  In re Administrative Subpoena No. 25-1431-030, 2026 WL 33398, at *3 (quotation marks and alterations omitted); but see In Re: Administrative Subpoena 25-1431-032, No. 26-mc-6, ECF No. 2 (Order) (N.D. Tex. Apr. 30, 2026) (ordering hospital to comply with subpoena).

What is more, the highest echelons of the FTC have affirmed the Administration's view. Chair Ferguson used his eagerness to "[f]ight back against the trans agenda" as a talking point for his nomination.  See Ferguson Statement at 1.  Adopting the Administration's semantic disdain for advocates for transgender health, the Chair then banned FTC employees from American Bar Association events in part because of the ABA's "leftist amicus advocacy" on "transgender ideology."  ECF No. 9-19 (Ferguson Letter) at 2.  It is true that Ferguson's direct comments at the FTC's gender-affirming-care workshop largely concerned substantiation of scientific claims about gender-affirming care for minors, rather than pure animus toward its existence.  See generally FTC Workshop Tr. at 2–6 (describing FTC's goal "to ensure that those who make claims about gender-affirming care are held to the same standard we apply to everyone else who engages in commerce").  But many participants also voiced heated rejections

25

of the basic notion of gender-affirming care or the idea that individuals can be transgender.  See, e.g., id. at 38 (gender dysphoria is "science fiction" and "the foundational fraud"); id. at 61 (participant working toward "affirming biological truth").  They also targeted the Endocrine Society and other medical associations, accusing them of lying and making "false" representations.  Id. at 41.

The Government's "expression of hostility" regarding "the protected speech . . . can support a finding that protected speech caused the agency's response."  Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs., 816 F. Supp. 3d 27, 54 (D.D.C. 2026).  Here, the evidence is more attenuated because the FTC hosted the forum for such disapproval rather than explicitly endorsing it.  The Society, however, was a target of this workshop in part because it espouses a position contrary to the Administration's stated "policy" that there are only "two sexes" that are "not changeable."  Gender Ideology Exec. Order at 8615.  A CID targeting the Society's work on transgender-health issues thus reasonably appears to be one more step in a multiagency campaign to stamp out dissenters.

While this demonstrates that the Society has brought forth robust circumstantial evidence that retaliation motivated the FTC's actions, that is not enough to prevail under a but-for-cause standard.  The FTC could show that a legitimate purpose nevertheless prompted it to issue the CID.  Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).  Indeed, the Commission protests that it issued the CID in service of a legitimate investigation and that such basis, not retaliatory intent, motivated its action.  It claims to be investigating "a high-priority issue squarely within the FTC's bailiwick: false or unsubstantiated medical claims about the safety and effectiveness of certain treatments for pediatric gender dysphoria."  Gov. Opp. at 22; see also CID at ECF p. 6.  The Society, it theorizes, may hold information regarding what

26

"entities" may be spreading false information on gender-dysphoria treatment for minors by dint of its position as an "influential source[] of clinical guidance." Gov. Opp. at 23 (quotation marks omitted). The FTC also characterizes its workshop, statements by FTC officials, and other actions by the Administration as well within the ambit of an executive branch seeking to enforce the law. See generally id. at 24–29. Those statements represent Commission officials' views on potential legal violations, it says, and are akin to permissible statements that reflect an official's "own views about [substantive] law" without evincing "personal animosity." Id. at 27 (quoting FTC v. Facebook, Inc., 581 F. Supp. 3d 34, 64 (D.D.C. 2022)).

The Court has some sympathy for the FTC's argument. The entire point of Congress's grant of investigative authority to the agency is to give it the necessary tools to obtain records and testimony to uncover violations. FTC v. Ken Roberts Co., 276 F.3d 583, 587 (D.C. Cir. 2001). The low statutory threshold that requires the Commission to have "reason to believe" an entity possesses such information reflects its broad power. See 15 U.S.C. § 57b-1(c)(1); Ken Roberts Co., 276 F.3d at 587 ("On its own terms, the FTC Act gives the FTC ample authority to investigate . . . .").

At the same time, it is "clearly true" that an agency undertaking a civil investigation may not "conduct an unlimited fishing expedition." United States v. Time Warner, Inc., 1997 WL 118413, at *4 (D.D.C. Jan. 22, 1997). Nor may agencies use their investigative tools to suppress speech with which they disagree. Hartman, 547 U.S. at 256. The Court takes the Commission's explanation at face value, in keeping with the "longstanding presumption of regularity accorded to prosecutorial decisionmaking." Id. at 263. But even in the Commission's own telling, the Court strains to discern a plausible connection between the CID and the suspected violations that concern the FTC. The Commission is "charged with protecting consumers from false or

27

misleading advertising of products being sold, not from being exposed to novel or unproven medical ideas contained in health-related publications." FTC v. Agora Fin., LLC, 447 F. Supp. 3d 350, 366 (D. Md. 2020).  The Society's clinical guidance, education, and policy advocacy clearly fall on the "ideas" rather than "products" side of the line.  It is thus unclear who the Commission hypothesizes is violating the FTC Act.  Medical providers?  Pharmaceutical companies?  If so, why are the Society and other nonprofit organizations that sell no products and engage in no advertising the current investigative targets?  If the Society is not the one supposedly making commercial representations, why does the FTC seek records of, for example, "[a]ll materials used in any education, training, or certification program" the Society offers?  See CID at ECF p. 8.

The FTC offers no answers to these questions.  It asserts that the Society itself could be engaging in commercial activity, despite its nonprofit status, and, in any event, it may have "information about whether other entities have disseminated false or unsubstantiated claims." Gov. Opp. at 23.  Fair enough — in theory.  But the sum total of the FTC's reasoning for the Society's own commercial involvement is the unsupported assertion that some of its members "may have a financial interest" in pediatric-gender-dysphoria treatment.  Id.  When nonprofit entities exhibit signs of capture by a particular industry or are rife with conflicts of interest that steer them from a noncommercial posture, the FTC can exercise enforcement authority over them.  See, e.g., Cal. Dental Ass'n v. FTC, 526 U.S. 756, 767 (1999) (appropriate where professional association "provides advantageous insurance and preferential financing arrangements for its members" and "confer[s]" economic benefits that "enhanc[e] its members' profit") (quotation marks omitted).  The Commission offers no evidence, however, that any such conflict is at play here and has declined to give the Court any theory upon which it expects to

28

uncover concrete evidence of a third-party violator. See ECF No. 33 (Hearing Tr.) at 21:2–8 (leaning on "treatments being harmful" and "potential deception and potential misleading statements" with no accompanying evidence of commercial activity). That leaves the evidence of a non-retaliatory motive sorely wanting.

The scope of the CID further undercuts the FTC's argument that it seeks evidence of potentially misleading commercial speech. The CID seeks all communications surrounding the Society's work on the 2017 Guidelines and 2020 Position Statement, including "all [c]ommunications with Professional Medical Organizations," "[a]ll testimony, advocacy, or other information provided to any legislature or regulator related to" gender-affirming care for minors, and all documents the Society has ever "disseminated" stating that such care is "safe" or "effective." CID at ECF pp. 8–9. It seeks the names and qualifications of anyone who developed claims of gender-affirming care's safety and effectiveness for minors, which could cover thousands of the Society's members and all of its staff. Id. at ECF p. 7. Put simply, the CID seeks substantive content that itself would be protected by the First Amendment and the identity of the individuals who created the content. That raises concerns that its true aim is to suppress the Society's speech regarding gender-affirming care. Cf. Media Matters, 2025 WL 2988966, at *7 ("effort to probe into editorial decisionmaking" and publication communications can point to "pretext"). The Court at the hearing in fact inquired about its ability to strike some of the more concerning provisions rather than enjoining the entire CID. The Commission, however, declined to engage with that possibility, telling the Court that essentially it was all or nothing. See Hearing Tr. at 30:08–32:02.

Nor does the FTC's secondary justification — i.e., that the Society may have information relevant to the substantiation element of an unfair-marketing claim — overcome the retaliatory

29

evidence.  True, "determining whether [an] advertiser's claim is false, misleading, or unsubstantiated" is a crucial step in demonstrating a violation.  POM Wonderful, LLC v. FTC, 777 F.3d 478, 490–91 (D.C. Cir. 2015) (describing substantiation requirements for different claims).  It is not clear, however, why a CID is needed for that function, given that the Society shows its work.  The Guidelines at the center of the CID come with a complete bibliography of studies the authors relied upon.  See Guidelines at 3896–3903.  The authors' names and institutional affiliations are public.  Id. at 3869.  Federal agencies — or anyone else — should feel free to criticize the quality of those studies or deploy their own in rebuttal.  See, e.g., HHS Report at 146–50 (doing precisely that).  Yet the FTC has offered no reason to believe that the studies themselves are fabricated or that the Society's internal records would reveal otherwise untoward influence.  Seeking reams of academic evidence solely on the basis of exploring whether certain health claims are substantiated cannot sustain a CID that seeks extensive internal and external communications spanning research, educational, and advocacy fora.  Cf. POM Wonderful, 777 F.3d at 493–94 (evaluating substantiation by publicly available studies in order to regulate advertisers).  To so hold would blow open the careful distinction between commercial speech — the subject of FTC regulation — and academic or medical speech — historically, the province of state regulation.  See generally ECF No. 23 (States' Amicus Br.) at 2 (derailing Society's ability to issue Guidelines risks "usurping states' traditional and longstanding authority to oversee the regulation of the practice of medicine").

This Court follows the D.C. Circuit's lead in Media Matters, which involved another allegedly retaliatory CID, albeit in a different procedural posture.  See 2025 WL 2988966, at *6–8.  The Circuit there credited a "pattern of litigation and information demands" targeted at a disfavored speaker over the course of some months.  Id. at *6.  It also considered the CID's

"broad scope" to be "relevant evidence" that the Commission's purpose was pretextual.  Id. at *7.  The Court finds the same systemic targeting of proponents of medical treatment for gender incongruence at work here.  The Society is the latest casualty in some Executive Branch agencies' bid to investigate hospitals, medical providers, and charitable organizations that support transgender health.  The CID's focus on academic and medical speech, combined with the FTC's paucity of logic or evidence pointing to a genuine investigation, confirms the conclusion that the CID was likely issued for a retaliatory purpose.  While the Society still faces the heavy burden of making that showing on the merits, Media Matters, 2025 WL 2988966, at *9, on this preliminary record it is likely to succeed in its First Amendment retaliation claim against the FTC.

> B.      Irreparable Harm

With one substantial tick in the Society's column, the Court need not belabor the other preliminary-injunction factors.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Mahmoud v. Taylor, 606 U.S. 522, 569 (2025) (quotation marks and alterations omitted).  When a party makes it "apparent" that its "constitutional rights are violated," it easily clears the irreparable-harm requirement to warrant preliminary relief.  Mills v. District of Columbia, 571 F.3d 1304, 1312 (D.C. Cir. 2009). The Society has shown that the Government's CID "ha[s] already violated and continue[s] to violate" its First Amendment rights by prompting "self-censorship and the chilling of First Amendment expression."  Turner v. U.S. Agency for Glob. Media, 502 F. Supp. 3d 333, 385 (D.D.C. 2020) (finding irreparable injury satisfied).

The FTC protests that the supposed irreparable harms are merely "purported reputational injuries" or hypothetical effects that "stem[] from Endocrine Society's own choices or

speculation about the actions of third parties" that are not caused by the CID and can be remedied by money damages. See Gov. Opp. at 43–44. The record reveals a different story. The Society's affiants attest that "[s]everal individuals who previously have worked" on the development of its Guidelines have withdrawn from the process, citing fear of "scrutiny from the administration." Becker Decl., ¶ 32. Work on the Guidelines has stalled and the next update has been delayed. Id., ¶ 24. Other members relayed threats of job loss and anxiety about job security that prevented their continued work with the Society after receiving the litigation hold imposed by the CID. Id., ¶ 33. Because the CID encompasses internal staff communications, the Society reasonably expects that its "staff and members will avoid communicating with each other on current Endocrine Society projects," and volunteers will decline to work on Society operations or join the group for fear that their statements will be relayed to the FTC. Id., ¶ 34. These are not amorphous future harms. The Society is losing membership, work capacity, and the ability for its staff to maintain free, frank conversations because of the pall the CID cast over it. Removing the CID would alleviate that pall. Keeping it in place would inflict further injury to the Society's speech that "cannot be fully compensated by later damages." Susman Godfrey LLP v. Exec. Off. of President, 789 F. Supp. 3d 15, 56 (D.D.C. 2025) (quotation marks omitted).

      C.     Balance of Equities

"It is well settled that the balance of equities and public interest factors merge if the government is the opposing party." Paxton, 138 F.4th at 585 (citing Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)). There is no contest. The Society's interest in obtaining an injunction mirrors that of every person subject to government power: vindicating the right to be free of retaliation for its protected speech. As for the public interest, "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional

32

government action." Id. (quotation marks omitted).  The Government indeed has an undeniable interest in enforcing the law, id., but this decision does not interfere with its power to investigate other entities that could be employing unfair marketing practices in the way that it fears.  If some striking new evidence comes to light, moreover, that makes the connection between the Society's academic work and genuine violations within the FTC's purview less hypothetical and attenuated, the Commission may return and seek a lifting of this Court's preliminary injunction.  The Court will also limit its injunction to implementation and enforcement of the CID, as further relief from other investigative steps is not appropriate at this early stage.  See Pl. Mot. at 43 (seeking broader relief)  The harm to the FTC from a stay of a discrete piece of its investigation — the CID against the Endocrine Society — pales in comparison to the benefit the Society will receive once the chilling weight of the CID is lifted.  The final factors thus swing strongly toward preliminary relief.

      D.      Final Issues

The FTC seeks a bond in the event that Plaintiff prevails here.  See Gov. Opp. at 44.  Federal Rule of Civil Procedure 65(c) requires that a movant for a preliminary injunction "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  In line with this Court's "broad discretion . . . to determine the appropriate amount of an injunction bond" and the lack of "material monetary injury" shown by the FTC, the Court will require that Plaintiff post a $1.00 bond.  Cf. J.G.G. v. Trump, 786 F. Supp. 3d 37, 82 (D.D.C. 2025).  Because the Endocrine Society will bear the lion's share of any costs resulting from the ultimate enforcement of the CID, the Court finds this nominal amount appropriate here.

Finally, the Court will deny the Government's request to stay its preliminary injunction pending appeal.  See Gov. Opp. at 44.  The parties jointly agreed to stay the CID's operation until after this Court's decision on Plaintiff's Motion.  See ECF No. 12 (Stipulation), ¶ 3.  The Court's decision here therefore requires no immediate action from either party: as it does not alter the status quo, no stay pending appeal is warranted.

## IV.   Conclusion

The Society has prevailed in showing that the factors governing preliminary relief all point in its favor.  The Court will thus grant its Motion for the most part and preliminarily enjoin enforcement of the CID.  It will deny the Society's Motion to the extent it seeks further relief.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 7, 2026

34